1

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    .  Case No. 1:10-CR-00256
                             .  (RMC)
              Plaintiff,      .
                             .  Washington, D.C.
   v.                        .  February 14, 2011
                             .
MICHELLE NICHOLE RIOS,       .
                             .
MANUEL ANTONIO SARAVIA, AND  .
                             .
NOE MARCHADO-ERAZO,          .
                             .
              Defendants.     .
. . . . . . . . . . . . . . . .

                      DETENTION HEARING
                BEFORE THE HONORABLE ALAN KAY
             SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      Office of the U.S. Attorney
                        By:  SETH ADAM MEINERO, AUSA
                             WILLIAM O'MALLEY, AUSA
                        450 Main Street
                        New Haven, CT 06510

For Defendant Rios:     Brennwald & Robertson, LLP
                        By:  STEPHEN F. BRENNWALD, ESQ.
                        922 Pennsylvania Avenue, SE
                        Washington, DC 20003-2140

For Defendant Saravia:  Law Offices
                        By:  JOSEPH CONTE, ESQ.
                        400 Seventh Street, NW, Ste 400
                        Washington, DC 20004

For Defendant Erazo:    Law Offices
                        By:  KIRA ANNE WEST, ESQ.
                        1325 G Street, N.W., Ste. 500
                        Washington, DC 20005

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.
_____
                  BOWLES REPORTING SERVICE
                       P.O. BOX 607
        GALES FERRY, CONNECTICUT 06335 - (860) 464-1083

(Proceedings commenced at 2:44 p.m.)

THE COURT:  Criminal Case Number 2010-256, The United States of America v. Michelle Nichole Rios, Defendant Number 5, Manuel Antonio Saravia, Defendant Number 7, Noe Marchado-Erazo, Defendant Number 8 and Jose Martinez-Amaya, Defendant Number 9.

Seth Adam Meinero and William O'Malley representing the Government.

Stephen Brennwald representing Defendant Rios, Joseph Conte representing Defendant Saravia, Kira Ann West representing Defendant Marchado-Erazo, and Joseph Virgilio representing Defendant Martinez-Amaya.

Interpreter Teresa Salazar is the interpreter.

All four defendants are present in the courtroom.

This is set on the calendar for a detention hearing.

THE COURT:  Mr. O'Malley?

MR. O'MALLEY:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. O'MALLEY:  Your Honor, I have disclosed or displayed to counsel for Mr. Martinez-Amaya, that's Mr. Virgilio, and counsel for Mr. Marchado-Erazo, that's Ms. West, a copy of the detentions -- detainers,

which were filed at the D.C. jail with regard to both of their clients, and I forwarded those to the Court, to as such, ask that the Court hold them preventative, pending their trial.

I would note for the Court that with regard to Mr. Saravia, Mr. Saravia, while he has legal status here in the United States, he's also subject to detainer because his membership in MS-13 -- and he is a member of MS-13 by his admission, and by -- we have numerous people who'll testify -- his membership in MS-13 makes him deportable, and as such, Your Honor, were he to be released, the detainer, which has already been filed with D.C. jail -- I didn't bring it because I wasn't aware of this when we filed the detainers with respect to all of these Defendants, the detainer would be lodged -- is lodged and would be acted on, and he would be going to ICE custody for deportation.

So in addition to the grounds that we had previously posed for Mr. -- I'm sorry, Your Honor, Mr. Saravia, that one exists, as well.

THE COURT:  All right.  So we have Mr. Saravia, we have Mr. Marchado-Erazo, and Mr. Martinez-Amaya, all have lodged detainers –

MR. O'MALLEY:  That's correct.

THE COURT:  -- at D.C. jail.

4

So let me ask counsel, do you still want to go forward with the detention hearing?

MR. CONTE: Yes, Your Honor. I'm -- I'm unfamiliar with, at this point, whether the Government can lodge a detainer just on the allegation that my client's a member of a street gang. He's here legally. As far as I'm concerned, I thought –

THE COURT: But if an ICE detainer has been lodged, Mr. Conte, what do you want this Court to do?

MR. CONTE: I don't have a detainer. I haven't seen it. We only have --

MR. O'MALLEY: I have 10 days to produce that, but I will go forward with this hearing, Your Honor.

THE COURT: All right.

MR. O'MALLEY: He's eminently detainable --

THE COURT: Well, whether he's eminently or not –

MR. O'MALLEY: – (unintelligible).

(Pause.)

THE COURT: Let me interrupt you, Mr. O'Malley –

MR. O'MALLEY: Certainly.

THE COURT: -- before you go forward at the moment.

Mr. Marchado-Erazo, would you stand, sir?

I understand, Mr. Marchado-Erazo, that you, when you were last before the Court last Thursday, I guess, a -- an assistant federal public defender represented you at that hearing but was unable -- could not continue the representation of you.

Do you have any money to hire a lawyer?

THE DEFENDANT 8:  No.

THE COURT:  No assets in this country, such as cash or bank accounts?

THE DEFENDANT 8:  No.

THE COURT:  All right.

The Court's going to find you're eligible for appointment of counsel.

I'm going to appoint Ms. Kira West to represent you in this case.

So you're now formally appointed, Ms. West.

MS. WEST:  Thank you, Your Honor.

THE COURT:  In light of the detainer that's extent, are you going to challenge the detention of your client?

MS. WEST:  No, Your Honor.

May I approach the podium, please?

THE COURT:  Surely.

Mr. O'Malley?

6

Oh, yes.  Go ahead.

MS. WEST:  Yes, Your Honor, Kira West for Mr. Marchado-Erazo.

Before Court today, Mr. O'Malley was kind enough to give me a copy of the Notice of Detainer that's been lodged, and based on Mr. O'Malley's representation, we would waive our right to a detention hearing at this time, but we did want the Court to know that we would retain our right to a speedy trial.

THE COURT:  All right.  Well, good.

Well, the Court notes that there will be no objection to the Government's request for detention in the case of Mr. Marchado-Erazo, and, of course, that's without prejudice, as well know, Ms. West –

MS. WEST:  Yes, Your Honor.

THE COURT:  -- to be revisited any time by the trial judge.

Mr. O'Malley – Thank you, Ms. West.

MS. WEST:  Thank you.

THE COURT:  All the individual -- these Defendants who are not citizens, are they not. of the U.S.?

MR. O'MALLEY:  They are not citizens.

THE COURT:  Yeah, have they been –

MR. O'MALLEY:  Well, except for Ms. Rios,

Your Honor.  She is a citizen.

THE COURT:  Ms. Rios is a citizen.

MR. O'MALLEY:  Yes.

THE COURT:  With respect to the other three individuals, have they been notified of their right to have the consulate?

MR. O'MALLEY:  I don't know that they have, Your Honor.

THE COURT:  That's required; is it not?

MR. O'MALLEY:  I do know that Mr. Marchado-Erazo was advised of his right –

THE COURT:  I see.

MR. O'MALLEY:  -- to counsel.

THE COURT:  I see.  Mr. Conte, was –

MR. CONTE:  No, he was not.

THE COURT:  He was not.  All right, and Mr. Virgilio?

MR. VIRGILIO:  No, Your Honor.

THE COURT:  I see.

Well, I think that's a prerequisite –

MR. O'MALLEY:  Yes, Your Honor.

THE COURT:  -- is it not?

MR. O'MALLEY:  With regard -- Court's indulgence?

With regard to Mr. Martinez-Amaya and Mr.

Saravia, Your Honor, as non-citizens to the United States who are under arrest and detained, they're entitled to have the United States notify their country's counsel or representatives here in the United States.

They should know that a counsel or official from their country may be able to help them obtain legal counsel and may contact their family, both here and in the -- in their native country and the counsel may visit them in detention, among other things.

If they want us to notify their country's counsel or officials, they can request this notification now or at any time in the future. After their counsel or officials are notified, they may call or visit them and, of course, we would inquire of the Defendants through the Court, if they wish us to make counsel or notice.

THE COURT: All right. All right.

So, Counsel, to the extent that any of your clients who are eligible to have visitation by representatives of their consulate, advise Mr. O'Malley after you've had an opportunity to talk to your respective clients.

Mr. Virgilio, I understand that a detainer has been lodged with respect to your client?

MR. VIRGILIO: Yes, Your Honor, and at this time, the D.C. detention based on that detainer, and I have spoken with Mr. Martinez about the counselor notification at this time, and he doesn't wish the Government to notify the counselor –

THE COURT: All right.

MR. VIRGILIO: -- counsel that are here, and he will reserve the right to do so in the future.

THE COURT: All right.

Thank you, Mr. Virgilio.

Well, in light of the position taken by Mr. Martinez-Amaya, the Court is going to grant the Government's request for detention, obviously without prejudice with respect to both Mr. Martinez-Amaya and also on behalf of Mr. Marchado-Erazo.

So you may proceed, Mr. O'Malley, with respect to Mr. Conte's client.

MR. O'MALLEY: Thanks, Your Honor.

Your Honor, with respect to both Mr. Saravia and Ms. Rios, the Government relies, in great part, on the allegations in the Indictment; that is, the introduction to the Indictment, which was found by the ladies and gentlemen of the Grand Jury as to probable cause that is the nature of the street gang that's actually an international gang known as MS-13, Your

Honor, and -- and just to summarize here for the record, MS-13 is a gang of -- an El Salvadorian -- or a Salvadorian gang which originated in Los Angeles and eventually went back to El Salvador when the original leaders of the gang were deported to El Salvador.  It is located all through out the United States, particularly in large metropolitan areas.  It is largely -- it's membership is largely made up of Salvadorian immigrants and persons of Salvadorian heritage.

In addition, however, Your Honor, there are known members from other Central American countries, particularly Guatemala and Honduras.

The gang is a violent gang.  You know, it has a code that requires members to be jumped in, and that's the final stage of initiation into the gang. Jumping in requires that the member be beaten by multiple members -- or the proposed member be beaten by multiple members of the gang while yet another member of the gang counts to 13, the 13 being a number of great significance to MS-13.

MS-13 -- MS stands for Mara Salvatrucha, Your Honor, and they have a violent and rigid code which is set out in the -- in the Indictment, Your Honor.  Among the things that the gang adheres to is that gang

members are expected to kill what are known as cavallos, C-A-V-A-L-L-O-S.  Cavallos are non-members -- members of other street gangs, and they are encouraged to kill them on sight.  Indeed, many elements of the gang, which are known as clicks, in order to get your membership, which is the last -- which is -- there are two -- there are stages before that.

One becomes a paisa (phonetic), and in becoming a paisa, one is associated with the gang, stays with the gang and engages in various criminal activities, and in some of the clicks, they are required to commit a murder before they can become members of the gang.

Members of the gang are held to a rigid -- to a rigid code.  They pay rent and dues.  They do extortion of non-gang members.  Gang members who violates the rules of the gang, particularly the rule that requires gang members not to cooperate with law enforcement, are subject to a green light.

Indeed, in this particular case, Your Honor, there are the gang -- the MS here in the Washington, D.C. area, there are two instances, one of which is already charged in this Indictment.  There are two instances where gang members were killed based upon a green light.  In both of those instances, Your Honor,

it's important to note that the gang members were noticed of their -- of the green light on these two people by individuals in El Salvador.

As I indicated to the Court earlier, many of the leaders of the gang -- in fact, most of the leaders of the gang known among the gang as the, "Big Homies," are deported to El Salvador.  Many are, indeed, in prison in El Salvador and are using site or telephones that monitor meetings, they give instructions to the click leaders, sometimes known as the, "Word," or the, "Jefe," and there's a second Word or a second leader, and they, indeed, attend the meetings through the speaker phone feature on cellular telephones at the meeting and they are on their cellular telephone in El Salvador.

In both cases -- now, one is the murder of an individual known as -- his nickname is Zombie.  Zombie was an individual who had been -- had not been coming to meetings.  Now, this subject had been to a calatone (phonetic).  That's a beating for discipline purposes. He came to a meeting.  When he appeared at the meeting, he had on him, a knife, and it is -- I was going to say verboten, but that would be the wrong -- the wrong colloquialism, Your Honor.  It is forbidden to bring weapons to a click meeting.  There was counsel with an

13

individual in El Salvador, and it was indicated that that individual said that if he had come to a meeting in El Salvador, armed, he would've been beaten -- he would've been murdered right at that point.  A green light was then issued -- then issued.

That's authority to kill someone, for Zombie, and Mr. Saravia, among others participated in that homicide.  We can prove that Mr. Saravia participated in that homicide because he admitted it to two gang members.  We can prove that Mr. Saravia participated in that homicide by the use of a cellular and -- cell tower and GPS technology on the telephones that Mr. Saravia and the two other people who participated in the murder with him at the time of the murder.

In addition to that, Your Honor, there are -- there is Title 3.  This case has been the subject of Title 3 monitoring of two telephone -- two cellular telephones which were possessed by click leaders not -- none of which -- none of whom are at this table, but among the people that were intercepted were people on -- at this table.

In addition, Your Honor, there was -- it's alleged in the Indictment but it is not charged yet – That murder by the way, the Zombie murder, occurred in Maryland, Your Honor.

In addition, Your Honor, there's a second murder which occurred in the District of Columbia. That, too, was a green light in discipline, again authorized by a leader in El Salvador, and a number of people in the gang assaulted that individual and stabbed him multiple times and he died in the District of Columbia, December of 2008.

That, too, will be indicted.  There will be superseding indictments in this case.

With respect to Mr. Saravia, Your Honor, I summarized or I made a list of the charges in the Indictment -- the overt acts in the Indictment which are charged directly to him.

On December 9th, 2009, Mr. Saravia and another -- and another individual who's indicted but not before the Court, he's -- he was deported before he could be indicted, shot an -- shot an individual.  That was the murder that I summarized for the Court.  That was on December the 9th of 2009.

On March 6th, Mr. Saravia, Mr. Noe Marchado and others attended -- discussed the proper method of jumping or initiating in a new member.  That was a source recording.  Your Honor, we have a recording of that meeting.

On March 31st, 2010, in the District of

Columbia, Mr. Saravia, Mr. Noe Marchado-Erazo killed, on or about that -- That actually probably occurred on March the 28th, Your Honor, the individual known as Zombie.

I'm sorry, the December 9th one was not Zombie. It was another individual, and that was we had -- the December 9th, one, we overheard conversations among the gang members on the tell -- on the T-3, implicating that it was -- or the Title 3, indicating that it was a murder in furtherance of the conspiracy.

On April 18th, 2010, Mr. Saravia advised a member -- advised an MS-13 leader in El Salvador that he had killed cavallos; that is, rival gang members.

On April 23rd, he attended a meeting and discussed extorting the courted gang member who had recently returned to the United States. We have both that gang member and the source to testify to that, Your Honor.

On May the 30th, Mr. Saravia and the Defendant, Ms. Rios, obtain a weapon. Each of them handled the weapon, and they went out into the city, searching for a cavallos to kill. I misspelled cavallos earlier, Your Honor. It's not an O in the last. It's an A.

On -- On or about October the 10th, Mr.

Saravia and others attended an MS-13 meeting and on -- again, on November the 6th, these meetings are corroborated by sources who attended the meeting, as well, as well as by records -- One of the meetings was held at a hotel, and we have records indicating that Mr. Saravia rented the room in the hotel.

I should also advise the Court that on December 31st, Mr. Saravia – and this will appear as 204 evidence at this -- 404 evidence at this point, but would eventually be in a superseding indictment -- indictment, were involved in the beating and robbery that was based upon their gang membership.

I think, also, Your Honor, as you may have noted a number of times during the course of -- that last one, Your Honor, if you're looking for it, that last one was not a -- an overt act in the Indictment, the beating and bring on December 31st.

I think the Court should note that on a number of occasions, I have mentioned that the information here is source information.  This is critical in view -- when one considers MS-13.  As I indicated to the Court, and as the Indictment charges, it is a essential tenant of the gang that any member of the gang who cooperates with law enforcement is subject to death, and -- and -- and, in fact, in this case, as

I said, there are two members of the gang who were killed because of their violation of the rules.

In addition, Ms. Rios, both on the telephone and on a Facebook account that is listed to her, and we obtained that account through a search -- through the use of a search warrant, has threatened a former gang member at -- for being a source and for cooperating with law enforcement.

Ms. Rios, herself, has been, on numerous occasions, subject to what the gang calls, "Investigations," based upon her -- upon the suspicion that she is a member of -- she is cooperating with law enforcement, and so she knows full well the potential for the murder -- for the potential punishment that can come to someone who cooperates with law enforcement.

With respect to Ms. Rios, Your Honor, as -- there -- there are a number of overt acts, Overt Act B, Overt Act H, Overt Act I, Overt Act K, those overt acts allege that Ms. Rios has sent money to El Salvador.

One of the principal -- or a heavy obligation of gang members in the dues is to forward that money to the gang leaders, the Big Homies, in El Salvador for their support.  Prison in El Salvador, as in many Central American countries, is operated on a different concept than prison here in the United States.  The --

The Government provides minimal services for prisoners. Some prisoners in some prisons are, indeed, expected to feed themselves and to provide for their own feeding. All they get is -- is detention.  So there is a need for money, both to support the prisoner in prison, as well as to support his family in El Salvador, and as a consequence, the -- and the obligation is on the various clicks.  Those are the sub-units of the gang -- the various clicks to forward money to El Salvador so this could be done.

In each instance where it's charged here, in B -- as I said, in B, in H, in I, we have Western Union records and we have proof both in El Salvador and in the United States that the individual to whom the money was forwarded is the life partner of the Big Homie who runs, in particular, the gang that Ms. Rios -- the part of the gang that Ms. Rios is a member of.  She's a member of the Northern Beat -- or MLS click of MS-13, and the Big Homie is in -- is in prison there, and the money was forwarded to his life partner.  She visits him regularly.  We have prison -- There are prison records available in El Salvador to approve that.

As I said, Your Honor, one of the particularly significant things with respect to Ms. Rios, is the threats that she was engaged in with

respect to an individual that she believes is or believed is a member of MS-13 -- or is a member of MS-13, but is cooperating with law enforcement.  That individual is located in North Carolina, and she threatened that individual and the individual's mother.  The individual's mother took the telephone call, and she did that again in her Facebook account in -- it's in Spanish, or I would have presented it to the Court if it were in English.  So she is, indeed, a dangerous risk.

Finally, Your Honor, the thing about this -- this particular gang and MS-13, or these Defendants as charged in MS-13, they are all charged in an offense -- with an offense which carries the potential for life in prison.  For those of them who actually committed the murders involved, it carries a potential for the death penalty, and that, of course, will be -- now that an Indictment is returned, that, of course, will be pursued before Judge Collier to whom this case is assigned, and the Government will go through the process at the Department of Justice to determine whether or not the Government will seek the death penalty with respect to any or all of the Defendants actually charged with the murders.

Your Honor, I think the evidence here is very

strong. In addition, it's Title 3. It's corroborated by numerous surveillances, by consensually monitored telephone calls, and there are many, many of those. It's corroborated by telephone calls of individuals who are incarcerated in prisons here in the District of -- in detention facilities here in the District of Columbia, in prisons in the State of Virginia. It's corroborated by the testimony of cooperating sources, and it involves a great deal of violation.

I should indicate to the Court that -- that a -- that one of the particular kinds of violence that this gang is involved in is -- was charged in the first Indictment in this case. This case -- The Indictment that the Court is now looking at is a Superseding Indictment, but the first Indictment in this case -- and this is -- basically, what it comes down is to is what we all know from television and any reading we've done about the Mafia is the old protection racket. The premises -- The basement apartment in the premises of 301 Taylor Street, Northwest was a Latin brothel, and members of MS-13 entered that Latin brothel. They were armed. They robbed the people in the brothel. One of the ladies who worked in the brothel was sexually assaulted. She was threatened both with a weapon and with sexual assault, even threatened with sexual --

21

with graver assault if she did not submit without the use of a condom, and it was, with all due respect, Your Honor, what I would call a locked case. The police came in while three members of the gang are still there, in the premises. Two such -- other members were subsequently indicted and charged, and one of these those members who was indicted and charged, in fact, was charged with telephone calls, threatening the witnesses.

This is how MS-13 operates. They -- They pick on people who have immigration problems themselves, and as a sequence of that -- those people's immigration problems, they go forward in the cynical view that these people won't report them to law enforcement, at least in part, because they're afraid of law enforcement because of their immigration problems, but they also know that they won't report them to law enforcement because they will subject to the wrath of MS-13, and it's not just MS-13, you know, in terms of -- in fact -- in terms of -- of MS-13 -- one click. The events that occurred at 301 Taylor Street in December of 2009, Your Honor, those events were perpetrated by members of what's known as the Sailor's Click.

The individual who made the threats was not

even a member of the Sailor's Click.  He was a member of yet another click of MS-13.

This is what the -- many of the complainants in this -- in this matter deal with.  They -- They not -- They're -- They deal with the fear of their immigration status and the fear of MS-13, and Ms. Rios, in particular, and Mr. Saravia, in particular -- Mr. Saravia has exacted MS-13's revenge.  Ms. Rios has threatened MS-13's revenge so that they maintain a threat.  No, they are a threat not only to flight, but also to the citizens who are the complainants, the people who are the cooperators.  I can -- I don't think it takes a lot of experience to understand that this Indictment is going to be studied carefully by members of MS-13 to try to figure out the who the sources are and to take action against those sources, and the only thing we can do at this juncture is to protect those people and to limit these people's access to those people, and as a consequence, Your Honor, we ask that the Court detain both Mr. Saravia and Ms. Rios.

THE COURT:  Mr. Conte?

MR. CONTE:  Thank you, Your Honor.  May it please the Court?

Your Honor, there are certain overt acts named in the Indictment of Mr. Saravia that he's been

charged with, and we note this, and the Court notes those.  Ninety percent of what Mr. O'Malley was up there saying was generalities about MS-13, and the Court has to remember that we only have probable cause at a Grand Jury that my client is a member of MS-13.

So when you take and separate what actually has been alleged in the Indictment, and some that occurred in the State of Maryland -- That's not before this Court -- and look at the charges and the overt acts only as to my client, and if you look at the fact that he's 31 years old.  He's never been, to my knowledge, arrested before.  The pretrial service agency report lists no prior convictions, list no prior arrests.

His mother is in the courtroom.  His sister is in the courtroom.  His cousin is in the courtroom. He has significant family ties.

He's in the United States -- He's in the United States legally.  He has a permanent residence card.

Under these circumstances, Your Honor, we believe that a halfway house or electronic monitoring will both ensure his attendance in court and protect the community.  It's unusual -- We have to look at the probable cause standard from the Indictment, and you

look at the fact that a 31 year-old gentleman that never had any previous contact with the criminal justice system, to our knowledge, and but yet he's charged with all these offenses, it -- In my experience, people this deeply involved in this type of an organization, have prior contacts with the criminal justice system.

According to pretrial service agency report, my client does not have those.

THE COURT: All right.

Thank you, Mr. Conte.

All right. Mr. Brennwald?

MR. BRENNWALD: Your Honor, like Mr. Conte said, when Mr. O'Malley talks about the events, he talks about generalities, nothing specific about what Ms. Rios did, just that she supposedly called somebody in North Carolina and threatened them. No specifics about what the threats were or about whom they were, that it was connected with MS-13.

Ms. Rios is having hard time sitting there, listening to this. She's telling me these are lies and can she talk. I tried to tell her that today is not the time to talk, but she, you know, completely denies all these charges and is asking to be released.

She's 21 years old. She has one child, as

it's listed in the pretrial report of two children, and we don't have the discovery, yet, for some reason. So it's hard for us to contradict generalities.

Obviously, if the Court holds her, we will come back to Court if we find that the evidence that the Government proffered today is not supported by the hard evidence; that's a wire tap or any other documents provided to the Court, but in any event, Ms. Rios is denying all these –

THE COURT:  It's her position she had no -- no involvement in any of the activities which she's been charged?  That's her position, isn't it?

MR. BRENNWALD:  Her position is either that she has no involvement in activities charged or that the activities that were listed were not what they appeared to be to the Government, and that the sending of the money, if there was any, was not part of a criminal act involving MS-13.

So she either denies, depending on the -- on that -- what's listed in the charge, denies committing it, or that there's any significance to whatever she's accused of doing.

As the Court heard from Mr. O'Malley himself, MS-13 members suspected that somehow, she was cooperating at different times, although that was not

true, and so she would know quite well about the threats that someone would make to you, and I would argue that that would make her less likely to actually carry out any threats knowing that she could have been subject to –

THE COURT: But she's asserting that she has no association with any of these events and these people that are involved?

MR. BRENNWALD: Absolutely. That's all I –

THE COURT: And yet -- And yet she was held to be under suspicion for cooperating with the Government, so there's something mutually inconsistent there, but all right.

MR. BRENNWALD: All right. Yes.

THE COURT: Anything else, Mr. Brennwald?

MR. VIRGILIO: I don't have any discovery, so I can't –

THE COURT: No, I understand the limitation.

MR. BRENNWALD: I wish I could say more specific -- something more specific, but I can't, and I would also note, Your Honor, just for the sake of the record, that there are two members of the El Salvador consulate here today.

THE COURT: All right.

Are they here for any -- any particular --

any of the particular –

MR. BRENNWALD:  I think they were advised by this event –

THE COURT:  I see.

So they're just here to make themselves available.  I see.  All right.

MR. O'MALLEY:  Two things, Your Honor.

THE COURT:  Yeah.

MR. O'MALLEY:  Mr. Wilson of Pretrial Services has confirmed that the detainer is lodged at D.C. jail –

THE COURT:  With respect to Mr. Conte's –

MR. O'MALLEY:  -- with respect to Mr. Conte's client, Mr. Saravia.

THE COURT:  I see.

MR. O'MALLEY:  Second, Mr. Conte is right that one of the events, the violent crimes that Mr. Saravia is engaged in as the murder of the individual who's moniker is Zombie, occurred in the State of Maryland, but everything else occurred in the District of Columbia.

Finally, with regard to the voracity of the charges against Ms. Rios, there's the reports of the complaining witnesses of the threatening telephone calls in North Carolina.  Those might be lies, but how

does one assume that those are lies when on Ms. Rios' Facebook, she herself has placed those threats on the Facebook.

So sounds like somebody isn't lying, and somebody else is, and I'll leave it to the Court to decide who is.

THE COURT:  Someone's being economical with the truth, I guess.

Mr. O'Malley, I don't know if you know anything about this but -- or whether or not it's a marshal's issue, is -- if there are people from -- a Consul officer -- office with respect to in any of the individuals here, whether or not –

MR. O'MALLEY:  We have taken steps with regard to any potential threats, Your Honor.

THE COURT:  Well, it's not so much threats. It's whether or not the individuals who are here, would have access to in any of the individuals if they were requested or is -- obviously, they're welcome to be here, but if they -- if the individuals involved have no desire to speak to them -- Counsel, has there been any desire by any of your –

UNIDENTIFIED FEMALE:  I think that she's come here to listen to them.

THE COURT:  I see.  All right.

MR. O'MALLEY:  I -- For the record, I believe that's one of the representatives of the country of El Salvador.

THE COURT:  Yes, I understand.  I understand.  All right.

MR. CONTE:  Your Honor, I'm certain my client is -- although he's living here legally, is a citizen of El Salvador, and he would request that the United States inform the El Salvadorian Government of his current situation.

THE COURT:  Well, I think they are now –

MR. CONTE:  I mean, if they're here -- they're here to see him today, I would ask the Court to make him available to any representatives.

THE COURT:  I see.  Well, I think that, of course, clearly has to go through the U.S. Marshal's office.

MR. O'MALLEY:  That occurs at D.C. jail, Your Honor, because whether -- we will -- with respect to Mr. Saravia, we will send a letter -- I think as a practical matter, notices are given or we will send a letter to the Consular office of the Republic of El Salvador, notifying them of Mr. Saravia's status and his desire to –

THE COURT:  And if he's held, that -- if he

would -- if they could visit him at the D.C. jail.

All right.  Thank you, Counselor.

With respect to Ms. Rios, and with respect to Mr. Saravia, the Court is going to find that -- well, initially, the Court is confronted with a determination by a group of people called a Grand Jury, and they found probable cause that the individuals in the Indictment may have committed a list of criminal acts which, certainly from the Court's vantage point, has a chilling affect in terms of the nature of those offenses.

The Court is going to find that there -- by a clear and convincing standard, that there are no conditions or combination of conditions that would warrant their release pending a trial in this case.

Now, the matter is before District Judge Collier.  Judge Collier will have an opportunity to revisit this issue as counsel become more conversant with the evidence that the Government has, and if, at some time during the course of the discovery process, Counsel believe that they have sufficient basis to revisit the issue of the bond status of their clients outside of the ones where there is a detainer to be lodged, that the matter can be brought before Judge Collier and, of course in this instance, it only

impacts Ms. Rios.

It seems to me that if there's an ICE detainer lodged against Ms. Rios, it would be a puric victory for me or Judge Collier to put him on some bond status when immediately, the ICE folks would then take custody of him, and he would come under their jurisdiction.

Whether or not, as Mr. Conte indicated, there may be some doubt as to whether or not his participation in the gang, if, in fact, there was a participation, that that would not precipitate deportation, that's something between, I guess between Mr. Saravia and the Immigration and Customs Enforcement people, but I'm going to find, at this juncture, that those individuals -- all three -- four individuals named in the Indictment and present in this Court, should be held without bond pending further proceedings.

Thank you, Counsel. Nothing further.

MR. CONTE: Your Honor?

THE COURT: Yes.

MR. CONTE: Court's indulgence?

Your Honor, I've tendered to Madame Clerk, a medical alert --

THE COURT: Very well. Thank you, Mr. --

Thank you, Mr. Conte.

That will be attached to the commitment order.

(Proceedings concluded at 3:23 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          May 24, 2011

STEPHEN C. BOWLES