# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OMAR AGUILAR | ) | CR-10-256 (02) (RMC) |
| WILFREDO MEJIA | ) | CR-10-256 (03) (RMC) |
| MANUEL SARAVIA | ) | CR-10-256 (07) (RMC) |
| NOE MACHADO-ERAZO | ) | CR 10-256 (08) (RMC) |
| JOSE MARTINEZ-AMAYA | ) | CR 10-256 (09) (RMC) |
| RUDIS CASTRO MARTINEZ | ) | CR 10-256 (10) (RMC) |
| MARIO LOPEZ-RAMIREZ | ) | CR 10-256 (11) (RMC) |
| JUAN MELGAR-HERNANDEZ | ) | CR 10-256 (18) (RMC) |
| HENRY DIAZ-ANTUNEZ | ) | CR 10-256 (19) (RMC) |

## GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' PRE-TRIAL MOTIONS

## Table of Contents

I. BACKGROUND..................................................................................................................1

II. MOTIONS TO ADOPT CO-DEFENDANTS' MOTIONS .............................................4

III. MOTIONS TO DISMISS ...................................................................................................5

    A. VENUE...........................................................................................................................5

    B. DUPLICITOUS INDICTMENT ...................................................................................6

IV. MOTIONS TO SEVER..................................................................................................... 11

    A. APPLICABLE LAW ....................................................................................................12

    B. DEFENDANTS' CLAIMS...........................................................................................15

        1. Same Series of Acts or Transactions Under Rule 8 ................................................15

        2. Alleged Disparity of Evidence Resulting in Alleged Spillover Prejudice............................17

        3. Other Non-Specific Prejudice .................................................................................20

            (a) Antagonistic Defenses.....................................................................................20

            (b) Prejudicial Evidence of Gang Affiliation ........................................................20

            (c) Non-testifying Defendants...............................................................................21

            (d) Bruton Issues ..................................................................................................22

V. DISCOVERY-RELATED MOTIONS..............................................................................22

    A. BILL OF PARTICULARS...........................................................................................22

        1. Indictment Provides Sufficient Notice....................................................................23

        2. The Information Sought has Already Been Provided or is Readily Discoverable .............26

    B. DISCLOSURE OF BRADY/GIGLIO/JENCKS MATERIALS ..................................28

    C. DISCLOSURE OF INFORMANTS ............................................................................31

    D. E-MAIL COMMUNICATIONS..................................................................................35

    E. DISCLOSURE OF 1006 SUMMARIES......................................................................36

    F. 404(b) EVIDENCE ......................................................................................................36

VI. MOTIONS TO SUPPRESS .............................................................................................38

    A. MOTIONS TO SUPPRESS STATEMENTS ..............................................................38

        1. Factual Background.................................................................................................38

        2. Probable Cause for Arrest ......................................................................................38

        3. Voluntariness of the Miranda Waiver and Statements ..........................................41

    **4. Individual Defendants**.........................................................................................**43**

       **(a) Mario Lopez-Ramirez**........................................................................**43**

       **(b) Noe Machado Erazo**..........................................................................**44**

       **(c) Jose Martinez-Amaya**.......................................................................**45**

       **(d) Manuel Saravia**.................................................................................**45**

  **B. MOTIONS TO SUPPRESS EVIDENCE**.................................................................**45**

    **1. Probable Cause for Issuance of Warrant**.................................................**46**

    **2. Good Faith Basis** ......................................................................................**48**

    **3. Execution of Search Warrant** ..................................................................**48**

    **4. Franks Issue**.............................................................................................**49**

  **C. MOTION TO SUPPRESS IDENTIFICATION**......................................................**50**

**VII EVIDENTIARY MOTIONS**.........................................................................................**51**

  **A. MOTION TO PRECLUDE ADMISSION OF CO-CONSPIRATOR EVIDENCE** .............**51**

  **B. MOTION TO EXCLUDE GANG EVIDENCE**.........................................................**51**

  **C. MOTION TO STRIKE ALIAS**..............................................................................**57**

**CONCLUSION** ..................................................................................................................**59**

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia, the Assistant Attorney General for the Criminal Division, United States Department of Justice, and undersigned counsel, submits this Omnibus Opposition to Defendants' Pre-Trial Motions. Excluding the motions requesting permission to adopt co-defendants' motions, there are more than thirty (30) substantive motions filed. Because of the similarity of legal issues in many of the motions, as well as the overlap of facts, the government submits that a single omnibus motion will be the most efficient manner to address the issues.[1]

## I. BACKGROUND

*La Mara Salvatrucha,* or MS-13, is a transnational criminal street gang that was formed in the Los Angeles area in approximately the mid-1980s by El Salvadoran immigrants fleeing the civil war who were seeking to protect themselves from other Los Angeles gangs. As its members were deported back to El Salvador and encountered guerilla fighters or veterans of the civil war, the gang grew into a more violent organization. They, in turn, began to migrate to the United States, making MS-13 even more violent in this country. Presently, MS-13 can be found in over thirty of the United States, in most of the Central American countries, and in some other countries in the world.

The gang is sub-divided into cliques which usually are named after a geographic feature of the area from which they arose, often a street, or the town. Thus, Normandies (NLS) is named for a street in Los Angeles from which it arose; Uniones is named for Union, New Jersey, the town in which it was founded. The cliques are usually led by a person selected by the clique members; that person is said to have "the word" and may be called La Palabra (Spanish for "The Word") or the shotcaller. Many cliques have a "second," and may even have a treasurer to

---

[1] A separate opposition addressing the wiretap will be filed under seal. The Court recently authorized an extension of time for responding to Aguilar's Motion to Dismiss (Speedy Trial Act)

collect and keep track of dues.  Clique meetings are often held every other week, but may be held weekly or monthly.  In recent years, cliques in the same metropolitan areas have banded together to form a "Program" to handle matters of mutual interest.  In the Washington metropolitan area, that coalition of cliques was called "La Hermandad," or "The Brotherhood."  Clique leaders seek advice and direction not only from other clique leaders, but also from international leaders in El Salvador, Honduras, and sometimes Guatemala.  Often these "Big Homies" are incarcerated; they communicate with the cliques through smuggled cell phones.  Some of the dues collected at clique meetings may be sent to these incarcerated leaders.

One of the primary rules of MS-13, as with many gangs, is that members may not cooperate with law enforcement.  If the gang discovers that a member is cooperating, the gang orders the execution of that member, which is called "greenlighting." Permission must be sought from Big Homies to greenlight a fellow MS-13 member.

The gang initiates new members into MS-13by a jump-in, a process which consists of three other members beating up the recruit while someone else, often one of the leaders, counts thirteen seconds.  Once a person joins the gang, he is expected to represent the gang by protecting its territory, attacking rival gang members, retaliating for disrespect to him or the gang, backing up his fellow gang members, attending meetings and paying dues, and obeying the rules of the gang.

MS-13 has been the subject of multiple investigations and prosecutions in the United States and in the Washington metropolitan area.  The United States Attorney's Office for the Eastern District of Virginia has prosecuted many MS-13 leaders and members under the VICAR statute (Violent Crimes in Aid of Racketeering, 18 U.S.C. §1959).  The District of Maryland prosecuted over forty MS-13 members using RICO, VICAR, and other related or complimentary

statutes.  The District of Columbia U.S. Attorney's Office has also prosecuted MS-13 members, primarily using the VICAR statute, but also under the D.C. Code.  The instant prosecution is the first use of the RICO statutes against MS-13 in the District of Columbia.

This investigation began in earnest in early 2009, when agents of Immigration and Customs Enforcement (hereinafter ICE) cultivated a source who was a gang member.  At that point, the Normandie clique was the focus of investigation. That source began recording phone calls and meetings with other gang members.  Moreover, from the end of 2009 and into approximately mid-March 2010, through a court-authorized wire tap, agents intercepted calls over three different lines associated with MS-13 members; some of these calls dealt with violent crimes.

On December 11, 2009, several MS-13 members forced their way into an apartment that was used as a brothel, or *putaria*, to rob the occupants.  In September 2011, a federal grand jury in the District of Columbia indicted those who were involved in the *putaria* robbery.   These defendants were members or associates of the Sailors clique.  With the development of other sources and other investigative techniques, agents soon uncovered evidence of MS-13 members' participation in the murder of  Louis Membrano-Zelaya on November 6, 2008, which involved both Normandie and Sailors members; the murder of Giovanni Sanchez on December 12, 2008 (which had been indicted in Superior Court); the murder of Luis Chavez-Ponce in Riverdale, Maryland on July 29, 2008; and the murder of Felipe Enriquez in Montgomery County, Maryland on or about March 31, 2010.  In February 2011, the federal grand jury returned an indictment charging twelve persons with MS-13 related crimes, including RICO conspiracy and VICAR crimes.  As additional information was gathered, the grand jury returned two superseding indictments, culminating in the current indictment.

The government will provide additional facts or background information related to specific motions as necessary to support the government's responses.

## II.  MOTIONS TO ADOPT CO-DEFENDANT'S MOTIONS

Virtually all the defendants have filed one or more motions to join the other defendants' motions.  In some instances, they have specified which motions to join; in others, there is simply a blanket request to join co-defendants' motions.  As represented at a recent status hearing, the government has no objection to each defendant adopting the others' motions, so long as the motion to be adopted is not one that would require the violation of a particular constitutional right, or one that requires the showing of facts personal to the particular defendant.  To the extent that a particular defendant seeks to adopt another defendant's motion to suppress a statement, evidence, or an out-of-court identification, the government objects.  To the extent a particular defendant seeks to adopt another defendant's motion to sever, without producing facts peculiar to that defendant, the government objects.

Defendants Machado-Erazo, Melgar-Hernandez, and Saravia seek a blanket adoption of all co-defendants' motions.  The government objects to this.  These defendants cannot adopt motions related to statements or searches, as those involve personal constitutional rights for which they have no standing.  *See generally Rakas v. Illinois*, 439 U.S. 128 (1978) (standing to assert a Fourth Amendment violation requires a legitimate expectation of privacy in the place or thing searched);  *Bellis v. United States*, 417 U.S. 85 (1974) (Fifth Amendment); *United States v. Sims*, 845 F.2d 1564 (11th Cir. 1988), (Sixth Amendment).

All defendants have moved to adopt the motion to exclude wiretap evidence.  However, defendants Aguilar, Rudy Martinez, and Henry Diaz-Antunez are not aggrieved parties as defined by statute and, therefore, do not have standing to move to suppress.  *See* 18 U.S.C. §

2510(11) (defining an "aggrieved party" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed.")

## III.  MOTIONS TO DISMISS

### A.  Venue

Most of the defendants have been charged with conspiracy to violate RICO for their participation in and management of MS-13, a RICO enterprise, in violation of 18 U.S.C. § 1962(d). Third Superseding Indictment, captioned "Indictment" (Doc. No. 101). The Indictment alleges that the enterprise operated in the Washington, DC metropolitan area, including the District of Columbia, Maryland, and Virginia since the 1990's. *See id.* at 1-6. Additionally, Count 1 lists 84 overt acts committed by the defendants in furtherance of the enterprise, some of which are alleged to have occurred in the District of Columbia, Maryland, and Virginia. *Id.* at 10-22.  Defendant Melgar-Hernandez now moves to dismiss Count 1 for lack of proper venue in the District of Columbia. *See* Def. Mot. to Dismiss for Improper Venue (Doc. No. 185). He is joined in this motion by Machado-Erazo (blanket motion to adopt), Machado-Erazo (specifically adopting), and Saravia (blanket motion to adopt).

Venue is proper in the District of Columbia with regard to the RICO conspiracy because multiple overt acts occurred in the District.  "[A]ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). In conspiracy cases, venue is proper in "any district in which some overt act in furtherance of the conspiracy was committed by any of the co-conspirators."  *Lam Kwong–Wah,* 924 F.2d 298, 301 (D.C. Cir. 1991) (quoting *United States v. Rosenberg*, 888 F.2d 1406, 1415 (D.C. Cir. 1989)); *see Hyde v. United States,* 225 U.S. 347, 363-64 (1912); *United States v. Martinez*, 764 F. Supp. 2d 166, 172-173 (D.D.C. 2011).

Some conspiracy statutes, including the RICO conspiracy provision, do not require proof of an overt act for conviction. *See* 18 U.S.C. § 1962(d); *Salinas v. United States*, 522 U.S. 52, 63 (1997). Nevertheless, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense." *Whitfield v. United States*, 543 U.S. 209, 218 (2005).

In this case, the defendants have been charged with conspiracy to participate in the affairs of a racketeering enterprise. Although proof of an overt act is not required to convict the defendants of the RICO conspiracy, the Indictment alleges 84 overt acts committed in furtherance of the conspiracy, some of which occurred in the District of Columbia. While the defendants argue that some of them never participated in any overt act in the District of Columbia, their argument fails to recognize the expansiveness of venue in conspiracy cases. As the Supreme Court reaffirmed in *Whitfield*, a conspiracy prosecution can be brought in *any* district where *any* of the co-conspirators committed *any* overt act. *Id.* Because the Indictment alleges overt acts in the District of Columbia, venue in the District of Columbia is proper for all the defendants, regardless of the fact that a particular defendant's criminal activity may have been confined to another location.

### B. Duplicitous Indictment

Melgar-Hernandez has filed Motion to Dismiss Duplicitous Indictment (Doc. No. 187) which defendants Aguilar, Machado-Erazo, Martinez, Martinez-Amaya, and Saravia have joined. Because the motion alleges that Count One, charging the RICO conspiracy, is defective, and defendant Aguilar is not charged in Count One, the motion should be denied as to him.

The other five defendants who have joined this motion have been charged with conspiracy to violate RICO for their management of and participation in MS-13, a RICO

6

enterprise, in violation of 18 U.S.C. § 1962(d). Within Count One, the Indictment alleges eighty-four overt acts that the Government will rely upon in establishing the RICO enterprise and the defendants' agreement to manage and participate in the enterprise. *Indictment* (Doc. 101)Additionally, the Indictment charges Aguilar and Martinez with various other substantive offenses. *See id.* at 22-39. The defendants now move to dismiss Count One as being impermissibly duplicitous because it charges multiple conspiracies in a single count. The defendant's motion has no legal basis and should be denied.

An indictment is impermissibly duplicitous if it joins two or more *separate* and *distinct* offenses in a single count. *United States v. Klat*, 156 F.3d 1258, 1266 (D.C. Cir. 1998) (emphasis added); *see* Fed. R. Crim. P. 8(a). As a result, separate conspiracies cannot be charged within a single conspiracy count. *Kotteakos v. United States*, 328 U.S. 750, 773-75 (1946). In determining whether a single count charges a single conspiracy or multiple conspiracies, the D.C. Circuit has instructed courts to consider (1) whether the alleged co-conspirators shared a common goal, (2) the degree of dependence for one another, and (3) the overlap of participants in the various operations of the conspiracy. *See United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009); *United States v. Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988). However, the most important factor is whether the defendants intended to further the same unlawful purpose. *See id.* at 1392 ("A single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective.").

The gravamen of a RICO conspiracy is a violation of a substantive RICO provision, *i.e.,* participation in the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d); *Salinas v. United States*, 522 U.S. 52, 62 (1997); *see e.g., United States v. Carrozza*, 4 F.3d 70, 79 (1st Cir. 1993) ("A RICO conspiracy is considered a single object conspiracy with

that object being a violation of RICO."). In defining racketeering acts under 18 U.S.C. §1961, the statute contemplates conspiracies as predicate acts for a substantive RICO violation.  See: *United States v. Fernandez,* 388 F.3d 1199, 1221-22 (9th Cir. 2004) (conspiracy to murder as RICO predicate), *United States v. Warneke*, 310 F. 3d 542, 546-47 (7th Cir. 2002) (conspiracies to commit various State offenses as RICO predicates); *United States v. Darden,* 70 F.3d 1507, 1524-25 (8th Cir. 1985) (conspiracy to distribute controlled substances as RICO predicate); *United States v. Pungitore,* 910 F.2d 1084, 1135 (3d Cir. 1990) (conspiracy to murder as RICO predicate).

The Supreme Court has addressed and readily rejected the type of argument advanced by the defendants.  In *Braverman v. United States*, 317 U.S. 49, 54 (1942), the Court held that "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects'."  (citations omitted).    The Court explained "[w]hether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes." *Id.* at 53.

In establishing the defendant's participation in a RICO conspiracy, the Government relies upon evidence of predicate acts of racketeering for the purposes of proving the existence of a RICO enterprise and the defendant's agreement to participate in such an enterprise. *Salinas*, 522 U.S. at 62-65; *United States v. Nguyen*, 255 F.3d 1335, 1341 (11th Cir. 2001) ("[T]o be guilty of a RICO conspiracy, a defendant must either agree to commit two predicate acts or agree to participate in the conduct of the enterprise with the knowledge . . . that other [co-conspirators] would commit at least two predicate acts in furtherance of the enterprise.")

However, the predicate acts are not themselves objects of the RICO conspiracy. *United States v. Corrado*, 227 F.3d 528, 541-42 (6th Cir. 2000); *United States v. Zemek*, 634 F.2d 1159, 1170 n. 15 (9th Cir. 1980) ("The essence of a RICO conspiracy is not an agreement to commit predicate crimes but an agreement to conduct or participate in the conduct of the affairs of an enterprise."). Indeed, the Government may properly rely on proof of several smaller, predicate conspiracies to establish the existence of a single overarching RICO enterprise and conspiracy. *United States v. Madhi*, 598 F.3d 883, 889-890 (D.C. Cir. 2010); *see also United States v. Pungitore*, 910 F.2d 1084, 1135 (3d Cir. 1990) ("[T]he RICO conspiracy and the predicate conspiracy are distinct offenses with entirely different objectives."); *United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir. 1984) *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997) ("A RICO conspiracy under § 1962(d) based on separate conspiracies as predicate offenses is not merely a 'conspiracy to conspire' as alleged by appellants, but is an overall conspiracy to violate a substantive provision of RICO.").

Because the predicate acts are not themselves objects of the RICO conspiracy, an indictment is not duplicitous simply because the Government relies upon numerous overt acts in demonstrating the existence of a RICO conspiracy. *United States v. Diecidue*, 603 F.2d 535, 546 (5th Cir. 1979) (holding that predicate conspiracies committed as part of RICO conspiracy are "merely descriptive of the single overall agreement and do not render the count duplicitous"); *see Madhi*, 598 F.3d 889-90. In *Madhi*, the defendant was arrested for operating a large-scale narcotics distribution enterprise and was charged with a nearly fifty-count indictment, which included a RICO conspiracy count and numerous other substantive offenses. *Id.* At 886.  The defendant argued that the RICO conspiracy count improperly subsumed three separate murder conspiracies, none of which were charged substantively. *Id.* At 887.  Nonetheless, the D.C.

9

Circuit found that count was proper because the murder conspiracies were "merely [used] as racketeering acts within the RICO count." *Id* at 889

In the instant case, the defendants have only been charged with one count of conspiracy – conspiracy to violate RICO. As the case law makes clear, a single conspiracy exists when all of the co-conspirators pursue the same unlawful purpose and a RICO conspiracy, by definition, has only a single unlawful purpose – violation of the substantive RICO provision. The indictment properly alleges that the co-conspirators agreed to violate § 1962(c) by participating in a single RICO enterprise, namely, MS-13.

The defendants argue that evidence of numerous overt acts committed by co-conspirators other than the defendant impermissibly expands the RICO conspiracy. However their reliance on *United States v. Anderson,* 9 F.3d 331, 347 (D.C. Cir. 1994), *rev'd in part en banc*, 59 F.3d 1323 (1995) and *United States v. Mathis*, 216 F.3d 18 (D.C. Cir. 2000) for this proposition is misplaced. Those cases, like all the cases but one cited by the defendant, did not involve a RICO conspiracy. The single case cited by the defendant addressing duplicity in a RICO conspiracy case rejected the defendants' argument, stating that the "[p]erformance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall agreement'" *United States v. Zemek,* 634 F.2d 1159, 1167 (9th Cir. 1980). In the instant case, the evidence will demonstrate that the various overt acts alleged in the Indictment (some of which are charged as substantive crimes) were in furtherance of the overall criminal agreement; indeed, the defendants and co-conspirators committed these acts as part of the rules of and their membership in MS-13. The government is entitled to elicit evidence showing agreements to commit individual racketeering acts, in order to establish the overarching RICO enterprise and agreement. *See Mahdi*, 598 F.3d at 889-90.

Both *Mathis* and *Anderson* involved traditional narcotics distribution conspiracies with a central "hub" distributing narcotics to various "spokes" and the question was whether the evidence established a single large "wheel" conspiracy or smaller, individual conspiracies between the suppliers and distributors.  *See Mathis*, 216 F.3d at 130–31; *Anderson*, 39 F.3d at 336  However, here the Government has not alleged a type of "wheel" structure and a RICO conspiracy case, such as this one, differs significantly from traditional conspiracies because of the very nature of the substantive RICO provisions which require proof of an enterprise and pattern of racketeering activity. In this case, the Government has alleged and intends to prove that each defendant agreed to participate in the *same enterprise* with the knowledge and understanding that they themselves or other co-conspirators would commit a substantive violation of § 1962(c). As such, there is no duplicity in Count One.

## IV.  MOTIONS TO SEVER

Several defendants have filed Motions to Sever in which they allege either improper joinder under Rule 8, or prejudice which should result in severance of defendants (docket #s 149 [Machado-Erazo], 153 [Saravia], 155 [Martinez-Amaya], 163 [Diaz-Flores], and 168 [Aguilar]). Each of the remaining defendants, except Rudy Martinez, has moved to join or adopt these motions.  Henry Diaz-Antunez, in his motion to join or adopt (docket #172) has alleged grounds for severance specific to his charges. Because the indictment on its face demonstrates proper joinder and a joint trial would not unfairly prejudice any defendant, this Court should deny the Motions to Sever.

All of the defendants who have filed or joined the Motions to Sever are charged with RICO conspiracy, VICAR offenses, or both, except Henry Diaz-Antunez, who is charged only under the D.C. Code with a murder (and the Indictment further alleges that that murder was in furtherance of the M-13 enterprise, as set forth in over act "j" of Count One).  The enterprise described in the RICO conspiracy and the VICAR offenses is MS-13.   For both the RICO conspiracy and the VICAR offenses, the government has alleged, and must prove, that MS-13 is

engaged in racketeering activity which includes acts involving murder, robbery, extortion, narcotics trafficking, obstruction of justice, and other offenses.

### A. Applicable Law

Joinder and severance are governed by the Federal Rules of Criminal Procedure. Rule 8(b), which addresses joinder,[2] and permits the government to charge in a single indictment

> 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

The crux of this rule recognizes that joinder is proper where the indictment alleges the same series of acts or transactions.

In *United States v. Wilson,* 26 F.3d 142, 153 n.4 (D.C. Cir.1994), the Court joined other Circuits in recognizing that Rule 8(b) provided "the sole standard for determining the permissibility of joinder of offenses." (*citations omitted*)  *See also, United States v. Carson,* 455 F.3d 336, 373 n.34 (D.C. Cir. 2006).   This Circuit previously set the bar high for severance based on misjoinder when it stated:  "this circuit's law makes it difficult to prevail on a claim that there has been a misjoinder under Rule 8(b)." *United States v. Nicely,* 922 F.2d 850, 853 (D.C. Cir 1991).

Joint trials are particularly appropriate in RICO and conspiracy trials, where the government relies upon the same evidence to prove charges against multiple defendants. *United States v. Richardson*, 167 F.3d 621, 624 (D.C. Cir. 1990) ("Joint trials are favored in RICO cases . . . 'The joinder presumption is especially strong where . . . the respective

---

[2]  Only defendants Martinez-Amaya and Diaz-Flo**res** have alleged improper joinder.  Martinez-Amaya specifically states his motion to sever is made under Rule 14, which addresses *prejudicial* joinder.  Nonetheless, he also cites Rule 8, but does not set forth argument as to improper joinder.

charges require presentation of much the same evidence, testimony of the same witnesses, and involve . . . defendants who are charged, *inter alia*, with participating in the same illegal acts.'") (quoting *United States v. Ford*, 870 F.2d 729, 731 (D.C. Cir. 1989)); *United States v. Carson*, 455 F.3d 336, 373 (D.C. Cir. 2006) (Stating that "[t]he indictment alleged that all of these counts were overt acts in furtherance of the narcotics conspiracy and predicate acts in furtherance of the RICO conspiracy," the court held that "[t]his provided the necessary link to satisfy Rule 8(b)."); *United States v. Irizarry,* 341 F.3d 273, 289-290 (3d Cir. 2003) ("Rule 8(b) provides substantial leeway to prosecutors who would join racketeering defendants in a single trial. The rule permits joinder of defendants charged with participating in the same racketeering enterprise or conspiracy, even when different defendants are charged with different acts, so long as indictments indicate all the acts charged against each joined defendant (even separately charged substantive counts) are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with a commonly charged RICO enterprise or conspiracy." (citations omitted)); *United States v. Spriggs,* 102 F.3d 1245, 1255 (D.C. Cir. 1996) (single money-laundering conspiracy); *United States v. Houle,* 237 F.3d 71, 75 (1st Cir. 2001) ("The fact that Houle was not charged as a RICO defendant is of no consequence . . . . If an indictment charges RICO violations, offenses committed as part of the pattern of racketeering activity are properly joined even if the defendant objecting is not named in the RICO count." (citations omitted)).

Notwithstanding that joinder may be proper initially, a defendant may find relief if he demonstrates prejudicial joinder under Fed. R. Crim. Pro. 14(a), which states:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court

> may order separate trials of counts, sever the defendants' trials, or provide any
> other relief that justice requires.

It is the defendant's burden to establish prejudice. *Carson*, 455 F.3d at 374. The test for prejudice is that of "a serious risk that a joint trial would compromise a specific trial right. . . ." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). However, even if a risk of prejudice is shown, severance is not required if other relief, such as a limiting instruction, would lessen that risk. *Id.* at 538-539.

The types of prejudice defendants often proffer are insufficient to warrant severance under Rule 14. For example, a defendant is not entitled to severance merely because he would have a better chance of acquittal if tried separately. *Id.* at 540; *United States v. Manner*, 887 F.2d 317, 324 (D.C. Cir. 1989). Even where defendants have mutually conflicting defenses, severance is still not required. As the Supreme Court stated in *Zafiro*, "[m]utually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to the district court's sound discretion." 506 U.S. at 538-39. The Court in *Zafiro* unanimously affirmed the lower court's denial of the defendant's motion for severance in a drug conspiracy case. *Id.* at 541. Although defendants often complain of disparate evidence resulting in spillover and prejudice, appellate courts have repeatedly held that clear cautionary instructions that allow the jury to compartmentalize the evidence are sufficient to avoid such effects. *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987) ("[J]uries are presumed to follow their instructions"). *See e.g., Carson*, 455 F.3d at 374-75. *United States v. Jefferson*, 215 F.3d 820, 823 (8th Cir. 2000), *cert. denied*, 531 U.S. 911 (2000); *United States v. Lehder-Rivas*, 955 F.2d 1510, 1521 (11th Cir. 1992), *United States v. Douglass*, 780 F.2d 1472, 1479 (9th Cir. 1986); *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

14

**B. Defendants' Claims**

Several defendants filed motions to sever, alleging certain legal theories applicable to them, as well as motions to adopt one anothers' motions.  Defendant Diaz-Antunez moves to join the motions to sever.  In addition, Diaz-Antunez alleges a legal theory specific to his charges. All other defendants[3] simply adopt the severance motions without alleging facts or legal theories specific to them.

The defendants are requesting that each of their cases and counts be severed from all others.  However they have failed, both individually and collectively, to establish misjoinder or to establish that a joint trial would deny or compromise any specific trial right.  Because they are unable to establish prejudice necessary to warrant severance their motions must be denied.

**1. Same Series of Acts or Transactions Under Rule 8**

Without specifying why this RICO conspiracy indictment, which alleges eighty-four overt acts, does not represent the same series of acts or transactions, the defendants assert the government has misjoined defendants and counts.  Moreover, some defendants who are not charged with RICO conspiracy argue that evidence of the RICO conspiracy is irrelevant to their charges under 18 U.S.C. §1959, Violent Crimes in Aid of Racketeering. Defendant Diaz-Antunez, who is charged with murder under the D.C. Code (and the Indictment alleges that that murder was in furtherance of the M-13 enterprise, as set forth in over act "j" of Count One), joins this argument.

In order to prove both the RICO conspiracy and the VICAR offenses, the government must first prove the existence of an enterprise engaged in racketeering activities.  The indictment alleges in Count One, as well as the VICAR counts, that the enterprise is MS-13.  The overt acts,

---

[3] Dennis Gil-Bernardez has filed no motions, neither motions specific to his charges, nor a motion to adopt co-defendants' motions.  As noted in the section on Motions to Adopt Co-Defendants' Motions, the government objects to the adoption of severance motions where the adopting defendant has not set forth specific allegations.

15

as well as the substantive VICAR counts, establish many of the racketeering activities of the enterprise. Thus, each of the overt acts is admissible in a trial involving only the VICAR offenses, and each of the VICAR offenses is admissible in a trial on the RICO conspiracy. Although each defendant is not charged in each overt or substantive act, and such would be a rare case indeed, they are each alleged to have participated in the enterprise. Rule 8(b)

> permits joinder of defendants charged with participating in the same racketeering enterprise or conspiracy, even when different defendants are charged with different acts, so long as indictments indicate all the acts charged against each joined defendant (even separately charged substantive counts) are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with a commonly charged RICO enterprise or conspiracy. (citations omitted)).

*United States v. Irizarry,* 341 F.3d at 289-290 (citations omitted).

Here, defendants Aguilar, and Diaz-Antunez are not charged in the RICO conspiracy. However, the Indictment charges Aguilar with VICAR offenses, and alleges in each VICAR count that the racketeering enterprise is the exact same racketeering enterprise alleged in Count One, the RICO conspiracy count. Indeed, the substantive crime involved in Aguilar's VICAR counts is the brothel (*putaria*) robbery described in overt act "ee" of Count One. Accordingly, the government will rely on the exact same evidence to prove the existence of the racketeering enterprise alleged in RICO conspiracy count (Count One) as well as each and every one of Aguilar's VICAR counts. Moreover, the government will rely on the evidence of Aguilar's participation in the brothel robbery both to prove his guilt as well as prove the existence of the MS-13 enterprise and its pattern of racketeering, as alleged in Count One. Joinder is thus wholly appropriate for defendant Aguilar.

There is similar overlap in the evidence against defendant Diaz-Antunez. The Indictment, in Count 28, charges Diaz-Antunez and Dennis Gil-Bernardez with D.C. Code murder; this count is the only charge against Diaz-Antunez. However, as stated, the Indictment

16

further alleges that this same murder is an overt act in furtherance of the RICO conspiracy charged in Count One. *See Count One, overt act "j."* The evidence will show that Dennis Gil-Bernardez ordered, or "greenlighted," the murder of an MS-13 member for violating the gang's rules.. The evidence will further show that on the night of November 6, 2008, Diaz-Antunez and other MS-13 members, acting on Gil-Bernardez's order, murdered the victim. Thus, evidence concerning the existence of the MS-13 enterprise, including its rules, language, and structure, will be key evidence that the government will introduce to establish the defendant's intent, motive and knowledge in carrying out the MS-13 leader's execution order. Accordingly, because the evidence related to the RICO conspiracy and VICAR counts and Diaz-Antunez's DC code count are inextricably intertwined, Diaz-Antunez is properly joined in this Indictment *See* DC ST § 11-502(3);[4] *United States v. Shepard,* 515 F.2d 1324, 1330-1331 (D.C. Cir. 1975).

### 2. Alleged Disparity of Evidence Resulting in Alleged Spillover Prejudice

Each of the defendants asserts that the evidence against him is *de minimis*, arguing that each was only intercepted in the Court-authorized wiretaps a few times or, in some cases, not at all. Some defendants also allege that they do not know all of the other defendants, or they did not have any dealings with any confidential sources. The defendants argue that there is an alleged disparity in the amount of evidence against each of them, which they claim will result in spillover prejudice that necessitates severance. These arguments are wholly without merit.

It is not necessary that a defendant charged with conspiracy know all the co-conspirators or all the details of the conspiracy. *United States v. Blumenthal,* 332 U.S. 539, 557 (1947)

---

[4] The District of Columbia is unique, in that, "[t]he United States District Court for the District of Columbia has jurisdiction of . . . (a)ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense." DC ST § 11-502(3). Thus, this Court may proceed on the merits of the D.C. murder charge as long as it concludes that it is properly joined to the federal offenses in this case. *See United States v. Shepard,* 515 F.2d 1324, 1330-1331 (D.C. Cir. 1975).

("Secrecy and concealment are essential features of a successful conspiracy…The law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others."); *United States v. Tarantino,* 846 F.2d 1384, 1398 (D.C. Cir. 1987); *United States v. Bollin*, 264 F.3d 391, 405 (4th Cir.), *cert denied sub nom, Tietjen v. United States,* 534 U.S. 935 (2001); *United States v. Sisca,* 503 F.2d 1337, 1345 (2d Cir.), cert denied, 419 U.S. 1008 (1974) ("The fact that not each of the conspirators was acquainted with each of the others is of no significance.")   In a conspiracy as broad MS-13, it is not surprising that all of the defendants do not know each other.  But, as the evidence will show through cooperators, phone calls, recordings of meetings, and other evidence, each of the defendants was aware that there were co-conspirators who were members of MS-13, both in the United States and in other countries.

As stated, the Supreme Court has found a strong preference for joint trials in the federal system, based on the interests of efficiency and a reduced risk of inconsistent verdicts.  See *Zafiro*, 506 U.S. at 539.  Even in highly complex cases, where there is "a great disparity of evidence (i.e., the evidence shows that the defendant is far less culpable than his co-defendants), there is a great preference for joint trials, as less drastic measures than severance, such as limiting instructions  can adequately limit the risk of prejudice." *United States v. White,* 116 F.3d 903, 916 (D.C. Cir. 1997).

Here, none of the defendants claims that he is less culpable than any other, nor could he. Each of the defendants charged in Count One is alleged to have participated in at least two, and often more, overt acts in furtherance of the conspiracy.  The Indictment, and the government's evidence at trial, will show that each of these defendants was a full, knowing, willing and active

participant in the affairs of the MS-13 racketeering enterprise, and each is thus highly culpable. The fact that some defendants are alleged to have been involved in more overt acts than others is of no consequence; nor is the fact that some defendants were intercepted more frequently than others. The government has alleged and expects to prove that Noe Machado-Erazo was involved in at least nine overt acts, including beatings and a murder, in furtherance of the conspiracy; Manuel Saravia was involved in at least fourteen overt acts, including a shooting and a murder; Jose Martinez-Amaya[5] was involved in at least four overt acts, including a murder; Mario Lopez-Ramirez was involved in at least three overt acts, including a shooting, before he was deported; Wilfredo Mejia was involved in at least three overt acts, including the *putaria* robbery, and Juan Melgar-Hernandez was involved in at least seven overt acts, including a discussion about murdering a person in El Salvador. None of this involvement could fairly be characterized as *de minimis* involvement in the conduct of the affairs of MS-13.

Moreover, to the extent that the defendants are arguing that there is a disparity in the number of intercepted calls against each defendant, that is no basis for severance. *Zafiro* and its progeny only discuss "disparity of evidence" and "spillover prejudice" in terms of varying levels of *culpability* among co-defendants, rather than in the number of pieces of evidence. And as stated, the evidence in this case – from cooperating witnesses, search warrants and police contacts, as well as consensual and intercepted calls – establishes that each defendant is highly culpable of the charges in the Indictment.

Defendants rely on *United States v. Mardian*, 546 F.2d 973 (D.C. Cir. 1976) to support their claim that somehow they are entitled to severance. However, the appellate court did not find an abuse of discretion in denying severance pre-trial based on a disparity of evidence, notwithstanding the trial defendant's short involvement in the conspiracy, his lack of

---

[5] He is sometimes referred to in the indictment as simply "Jose Martinez", for example, in overt acts "y" and "aa".

19

participation in any recordings, and the extensive evidence presented concerning events which occurred after Mardian was no longer involved in the conspiracy.  The defendant's motion was renewed during trial when his counsel fell ill and was unavailable; co-counsel had little familiarity with the case.  It was *this* denial of severance that the appellate court found erroneous. Accordingly, the government respectfully submits that severance is not appropriate for any defendant in this case.

### 3.  Other Non-Specified Prejudice

Next, some defendants have cited case law addressing other types of prejudice but have set forth no facts suggesting that these legal concepts apply to them.  The defendants who have filed motions to adopt the motions to sever have likewise failed to specify any facts supporting these concepts.

### (a)  Antagonistic defenses

Both Machado-Erazo and Aguilar raise the possibility of inconsistent defenses as a grounds for severance, citing *Zafiro, supra.*  However, the opinion specifically states that "[m]utually antagonistic defenses are not prejudicial per se." *Zafiro* 506 U.S.  at 538.  The Court went on to state that "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id. at 540.* Thus, the Court found no prejudice to the defendants who each claimed innocence and that the drugs belonged to the other, particularly because the jury was instructed to consider the evidence separately as to each defendant.

Here, neither Machado-Erazo nor Aguilar, nor any other defendant, has provided any facts, or any basis whatsoever, from which this Court may conclude that their defenses are antagonistic or inconsistent.  Indeed, they have not identified their defenses at all.  Thus this Court should not consider this basis for severance.

### (b) Prejudicial evidence of gang affiliation[6]

Several defendants argue, without explanation, that evidence related to their affiliation with the MS-13 gang somehow is so prejudicial that it warrants severance.  They cite no authority for this proposition.  In any event, in this RICO conspiracy and VICAR indictment, each of the defendants is alleged to have been a member or associate of MS-13, and each is alleged to have committed various criminal acts as a part of and in furtherance of this gang's activities.   Proving the defendants' association with the gang is an element of each of those counts.  Indeed, "[v]irtually all evidence is prejudicial or it isn't material.  The prejudice must be unfair." *United States v. Cassell*, 292 F.3d 788 (D.C. Cir. 2002) (citing *Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613 (5th Cir. 1977). This highly relevant, probative evidence is extremely material to the government's case against all of the defendants, and is not unfairly prejudicial, let alone a basis for severance.  The defendants' motions should therefore be denied.

### (c)  Non-testifying defendants

Some defendants have raised the specter of testifying co-defendants leaving an inference that non-testifying co-defendants must be guilty, or that a testifying co-defendant will produce evidence prejudicing a non-testifying co-defendant.  Citing to *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995), defendants request severance.  *Breinig* was a very unusual factual situation unlikely to arise in the context of this case.  In *Breinig*, the co-defendant testified that Breinig dominated her, was abusive, had affairs, and committed other bad acts. Under these circumstances, the court held that severance should have been granted.  *Id.* At 852-53.

Here, as the trial has yet to begin, there is no basis to grant a severance on what might happen during the defense case.  Moreover, if a defendant were to testify, the government respectfully submits that the Court should limit any defendant's testimony to relevant, admissible

---

[6] This claim is addressed in greater depth below.   See Section VII, Motion to Exclude Gang Evidence.

evidence, and not allow defendants to unfairly prejudice co-defendants.  If a defendant were to appear to violate that order, the Court could address proper remedies at that time. However, at the present time, the defendants' motions to sever are premature and without any support.

### (d)  Bruton issues

Several defendants have indicated they wish to reserve their right to severance if *Bruton* issues arise.  Although some defendants did provide information to agents, any statements that might be used at trial will only be used to the extent they implicate the speaking defendant.  The government will limit any defendant's statement (though none are in writing) to conform to the dictates of *Bruton*, and will consult with the defense and court on any redactions prior to introducing any such statement into evidence at trial.

## V. DISCOVERY RELATED MOTIONS

### A.  Bill of Particulars

Aguilar and Martinez-Amaya have filed for a Bill of Particulars; each remaining defendant has moved to join this request.  In their Motions, the defendants argue that they are entitled to a lengthy list of specific information necessary to prepare their defense. *See* Doc. Nos. 161, 169, 173. With regard to Count One, the RICO conspiracy charge, the defendants argue that they are entitled to specific dates, times, and locations of certain meetings or other overt acts conducted by the defendants as well names of attendees or participants at these meetings or other overt acts. Additionally, defendants request the disclosure of the date each Defendant joined MS-13, how each was initiated into the enterprise, and the dates, events, statements, or other detailed evidentiary matters that the Government will rely upon in establishing the conspiracy and enterprise. All the motions lack merit and should be denied.

1.  **The Indictment Provides Sufficient Notice to Avoid Prejudice and Surprise**

A district court may, in its discretion, order the filing of a bill of particulars if it finds that a defendant will be unfairly surprised or otherwise prejudiced by the lack of particularly in the indictment. *See* Fed. R. Crim. P. 7(f); *United States v. Pollack*, 534 F.2d 964, 970 (D.C. Cir. 1976); *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987) ("A bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges."); *United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (D.D.C. 1999) ("[T]he Court should grant such motions when necessary to prevent unfair surprise at trial.").  However, a bill of particulars is not required if (1) the indictment provides sufficient notice to the defendant about the charges against him or (2) the information he requests is already available to him or available in some other form. *Butler*, 822 F.2d at 1193.

The indictment need only provide "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Because the purpose of a bill of particulars is to provide clarification of the indictment to the extent necessary, a bill of particulars does not need to include the evidentiary basis for the charges or the government's proof. *See United States v. Mejia*, 448 F.3d 436, 445-46 (D.C. Cir. 2006); *Bazezew*, 783 F. Supp. 2d at 168; *United States v. Brodie, 326 F. Supp. 2d 83, 91 (D.D.C. 2004); Ramirez,* 54 F.Supp.2d at 29.

Specifically, in RICO conspiracy cases, it is sufficient that the indictment allege that (1) the defendant knew of the conspiracy, (2) associated himself with it, and (3) knowingly contributed his efforts to the conspiracy in furtherance of its design. *See* 18 U.S.C. § 1962(c)-(d); *Salinas v. United States,* 522 U.S. 52, 63 (1997) ("There is no requirement of some overt act or

23

specific act in the [RICO] statute."); *United States v. Bridgman*, 523 F.2d 1099, 1108 (D.C. Cir. (1975); *see also United States v. Muyet,* 945 F. Supp. 586, 599 (S.D.N.Y. 1995). In *Muyet,* the defendant was charged with substantive RICO counts and RICO conspiracy. *Id.* at 590. The district court held that the indictment gave sufficient notice because it provided: "(1) the names and aliases of the defendant members of the RICO enterprise and conspiracy; (2) the name of the enterprise; (3) a brief description of the purposes, means and methods of the RICO enterprise; (4) the area in which the enterprise operated; and (5) the approximate duration of the enterprise." *Id.* at 599.

Because a violation of § 1962(d) does not require the commission of any overt act, *Salinas*, 522 U.S. at 63, the indictment need not allege any overt acts and the defendant is not entitled to a bill of particulars disclosing any of the overt acts that the Government may rely on to prove the conspiracy. *See Mejia*, 448 F.3d at 445-46; *United States v. Giese*, 597 F.2d 1170, 1181 (9th Cir. 1979) *United States v. Murray*, 527 F.2d 401, 411 (5th Cir. 1976). In *Mejia*, the defendant was indicted for conspiring to import cocaine into the United States in violation of 21 U.S.C. § 963 after a number of cocaine shipments were intercepted in several South and Central American countries.  *Mejia*, 448 F.3d at 439. Although the indictment did not allege any specific overt acts, the D.C. Circuit upheld the denial of a bill of particulars because a conviction under § 963, like a conviction under § 1962(d), does not require proof of any overt act and, therefore, does not have to allege any overt acts . *Id.* at 445. The indictment itself gave sufficient notice to the defendant to conduct his own investigation in that it identified the object of the conspiracy, the relevant time period, the statute that the conspiracy intended to violate, the requisite mental state, and the countries that the defendant and his co-conspirators acted in**.**  *Id.* at 445-46.

It follows that because the Government does not have to disclose *any* of the overt acts that it intends to prove in furtherance of the RICO conspiracy, it need not provide detailed information about the overt acts that it *does* disclose. *See Bazezew*, 783 F. Supp. 2d at 168 (holding that the Government does not need to disclose the identity of all persons known by the government to have participated in each alleged overt act); *United States v. Hsia*, 24 F. Supp. 2d 14, 31 (D.D.C. 1998) ("[T]he Government need not provide details, including time, place and date, of all overt acts in furtherance of the alleged conspiracy which the government intends to prove at trial.").

Even those court that have ordered the filing of bills of particulars identifying other co-conspirators and related information, details of substantive offenses or overt acts, such as the specific location, date, or time of acts committed or meetings held by co-conspirators, are evidentiary matters not required by an indictment and not suitable for a bill of particulars. *See Bazezew*, 783 F. Supp. 2d at 168; *Brodie*, 326 F. Supp. 2d at 91-92  (holding that while the Government must disclose the names of other alleged co-conspirators, the Government is not required to prove or disclose how or when the conspiracy was formed or when the defendant joined); *Hsia*, 24 F. Supp. 2d at 31; *United States v. Hubbard*, 474 F. Supp. 64, 80-82 (D.D.C. 1979) (holding that the Government does not need to disclose "minute details").

In this case, the Indictment  charges the defendants with one count of conspiracy to violate RICO and nearly thirty other counts of committing violent crimes in furtherance of their racketeering activity. With regard to Count One – conspiracy to violate RICO – the Government has alleged and identified (1) the name of the enterprise in which the defendants are accused of participating, namely: MS-13, (2) a brief history and overview of MS-13, (3) the general timeframe in which the enterprise has operated, (4) the organization and structure of the

enterprise, (5) the area in which the enterprise operated, (6) the purposes, goals, and means of the enterprise, (7) the federal and state statutes that the defendants conspired to violate, and (8) a culpable mental state. *See* Second Superseding Indictment (Doc. No. 101). As such, the Indictment provides more than sufficient information for each defendant to understand and defend against the RICO conspiracy charge and protect against double-jeopardy.

And, while not required, the Government did disclose 84 overt acts that it may use to prove the existence of the enterprise and the conspiracy. While the level of detail disclosed regarding each overt act varies, at a minimum, the Indictment identifies which defendants participated in each act and the approximate date that each act occurred. However, the defendants still seek far more information than they are entitled to, including very detailed non-Rule 16 evidence that the Government intends to present in its case-in-chief. With regard to Count 1, the defendants have requested such information such as the (1) rank and status of the defendants within MS-13, (2) precise dates that each defendant joined MS-13, met co-defendants, or committed specific acts, (3) specific words or acts committed by each defendant in furtherance of the conspiracy, and (4) locations of meetings or other acts. *See* Def. Martinez Amaya's Mot. For Bill of Particulars (Doc. No. 173); Def. Aguilar's Motion for Bill of Particulars (Doc. No. 169). All of these requests are wholly inappropriate for a bill of particulars, and are more appropriately evidentiary matters for trial.

2. **The Information that Defendants Seek was Already Provided or is Readily Discoverable**

In addition to considering the indictment on its face, the district court should also consider whether the information the defendant seeks has already been disclosed by the government or can be obtained through normal discovery mechanisms. *See Mejia*, 448 F.3d at 446 (*citing United States v. Butler*, 822 F.2d 1191, 1193(D.C. Cir. 1987).). In doing so, the court

26

must ensure that a bill of particulars is not simply a discovery request in masquerade *Bazezew*, 783 F. Supp. 2d at 168 ("[A] bill of particulars is not a discovery device or a tool for allowing the defense to preview the government's theories or the government's evidence."); *United States v. Cisneros*, 26 F. Supp. 2d 24, 55 (D.D.C. 1998) ("[A] bill of particulars is not meant to be a tool for the defense to obtain pre-trial disclosure of all the evidence held by the Government.").

While an open-file discovery policy or other voluminous discovery does not necessarily obviate the need for a bill of particulars, *United States v. Anderson,* 441 F.Supp.2d 15, 19 (D.D.C. 2006), certain disclosures can. *Mejia*, 448 F.3d at 446; In *Mejia*, the defendants claimed unfair surprise when their request for a bill of particulars was denied and two cooperating witnesses later took the stand. *Mejia*, 448 F.3d at 446. The D.C. Circuit held that although the indictment itself did not mention the cooperating witnesses or the drug trafficking activities about which they testified, because DEA reports that had been disclosed to the defendant recounted those witness' pretrial statements, the defendant had sufficient notice. *See id.*

Assuming *arugendo* that the Indictment lacks sufficient clarity on its face regarding the charges against the Defendants, the extensive discovery provided to the Defendants ensures that the Defendants are sufficiently informed of the charges against them and eliminates the risk of unfair surprise at trial. As noted above, the indictment discloses more than 80 overt acts that establish the existence of a RICO conspiracy between all of the Defendants. The government has provided thousands of pages of documents related to these overt acts and substantive crimes, including police reports, forensics reports, reports of investigation related to debriefs of sources, draft transcripts or linesheets and audio of phone calls and meetings, autopsy reports, photographs, telephone records and other information. Indeed, no defendant has claimed a

paucity of discovery, rather, the defendants moved at least three times to extend the deadline for filing of motions, citing "extensive amounts of discovery." *See docket # 142*.

Taken together with the Indictment, the extensive discovery provided to the Defendants has sufficiently apprised them of the charges against them and has given them more than enough information to conduct their own investigation and adequately prepare for trial.

### B. Disclosure of Brady/Giglio/Jencks Materials

A variety of motions have been filed that request the disclosure of, or early disclosure of, information which may be characterized as either *Brady* material, *Giglio* impeachment information within Jencks, or *Jencks* itself. All of these motions are addressed in this section.

Defendant Omar Aguilar requests the Court order the government to disclose impeachment evidence for hearsay declarants, as well as immigration status information of government witnesses. *See Motion and Memorandum for Order Directing the Government to Provide Impeachment Evidence as to All Hearsay Declarants* (Doc. 158); *Defendant Aguilar's Motion to Compel Certain Immigration Status Related Information Pursuant to* Brady *and/or* Giglio (Doc. 171). Defendant Noe Machado-Erazo similarly requests *Brady* and *Giglio* materials, which defendant Aguilar joins, *see Defendants' Motion for Production of* Brady*/*Giglio *Materials* (Doc. 144). Defendant Jose Martinez Amaya also filed a separate request for *Brady*/*Giglio*/*Jencks* material. (Doc. 167), as did defendant Wilfredo Mejia (Doc. 190). The remaining defendants have joined or adopted these motions.

These six motions are essentially requests for early *Giglio* and *Jencks* materials, and requests for *Brady* material. These requests are premature.[8] Moreover, the government has

---

[8] Defendant Aguilar's motion requesting impeachment evidence for all hearsay declarants (Doc. 158) is premature since the government does not yet know who will be testifying or which co-conspirator statements will be introduced at trial. Additionally, it is *Giglio* material that should not be disclosed to the defense until trial.

28

complied and will continue to comply with its *Brady* obligation.  Accordingly the motions should be summarily denied.

The government understands its obligation to disclose the information required by *Brady v. Maryland*, 373 U.S. 83 (1963).  The government is unaware of any *Brady* information, except to the extent it may be contained in, or absent from, materials provided in discovery.[9]  The government knows of no outstanding *Brady* material that requires investigation by the defendants.  Should the government learn of any such *Brady* material, the government will promptly disclose it to defense counsel.

In regards to the *Giglio* and *Jencks* material, the government need not disclose this material until after the witness has testified on direct examination.  *See* 18 U.S.C. § 3500(b) ("After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness which relates to the subject matter as to which the witness has testified."); *United States v. Tarantino*, 846 F.2d 1384, 1414 (D.C. Cir. 1988) (*per curiam*) ("The Jencks Act directs that in a criminal prosecution, statements made by government witnesses or prospective government witnesses are not open to discovery or inspection by the defense until said witnesses have testified on direct examination in the trial of the case.").  The Rules of Criminal Procedure also do not require disclosure until after the witness has testified on direct. *See* Fed. R. Crim. P. 26.2(a).  While the government will adhere to its policy tmandating earlier disclosure than the law demands, there is no requirement under law or policy for disclosure at this date.

With respect to law enforcement witnesses, there is expected to be minimal, if any, outstanding *Giglio*/*Jencks* material.  All police reports related to substantive crimes or overt acts

---

[9] For instance, the failure to intercept a particular defendant on the wiretap could be viewed as *Brady.*  Therefore, all intercepted calls, linesheets, and draft transcripts have been given to defense counsel.

have been provided, albeit redacted to protect civilian information. Many of the reports of investigation have been provided, again, with civilian information redacted.[10]

Moreover, with respect to civilian witnesses and cooperators, there are security concerns if their identities and expected testimony are made public in advance of trial. One of the cardinal rules of MS-13 is not to cooperate with law enforcement upon pain of death. Specific threats against witnesses have been received in this case. Those threats will be the subject of an *ex parte* proffer of proof to be later filed by the government. The government submits that delaying the disclosure of information relating to civilian cooperators and witnesses is not only permitted by law and policy, it is necessary to minimize the potential for witness intimidation or harm. *See United States v. Edelin*, 128 F. Supp. 2d 23, 31–34 (D.D.C. 2001) (finding that if the government complies with *Brady*, the identities and impeachment information of witnesses and informants need not be disclosed until trial).

Given these circumstances, and to avoid undue delays during trial, the government proposes that, during trial, the Court permit the government to provide the defendants all *Jencks* and *Giglio* materials, including impeachment evidence for hearsay declarants, not later than 10 a.m. the Friday before the week the witness will testify[11]. This will give the defendants at a minimum three full days to prepare for the witness's testimony, and in some instances where the witness testifies later in the week, additional time that should be more than sufficient—even with the complexities of this case—to prepare for cross-examination. This procedure has been followed by other courts in this jurisdiction and in some instances agreed upon by defense

---

[10] The government expects to provide another thirty to forty ROIs in the near future. Rather than sending them piecemeal, we will scan and burn them to a disc to send along with more complete draft transcripts and other documents that have been received over the last few months.

[11] The government will endeavor to provide materials that are more extensive earlier than this schedule. For instance, the primary cooperator is likely to have more than 50 pages of reports related to debriefs; we would anticipate providing those materials earlier, rather than later.

counsel in those cases.  *See*, *e. g*., *Edelin*, 128 F. Supp. 2d at 31-33 (ordering *Giglio* and *Jencks* material to be disclosed the Thursday before trial to protect witness identities in a complex, multi-defendant drug conspiracy case); *United States v. Eiland*, No. CRIM.04-379, 2006 WL 516743, at *8 (D.D.C. Mar. 2, 2006) (concluding that the Government's proposal to disclose *Jencks* and *Giglio* material the Thursday before witness testimony is reasonable given the safety concerns of government witnesses balanced against the defendants' right to pretrial discovery in a complex, multi-defendant case).

The government agrees that information related to immigration benefits constitutes *Giglio* material, and, therefore, is subject to disclosure. *See United States v. Blanco*, 392 F.3d 382, 392 (9th Cir. 2004) (holding that the government erred in completely suppressing impeachment material of witness's immigrant status); *Curry v. United States*, 658 A.2d 193, 197 (D.C. 1995) (distinguishing exculpatory evidence—as opposed to impeachment evidence—as *Brady* material that should be given as soon as the government comes into possession of it). However, this information should not be disclosed any sooner than other *Giglio/Jencks* materials.. *C.f. Edelin*, 128 F. Supp. 2d at 31-33 (allowing *Giglio* impeachment material not to be disclosed until a few days before the witness testifies, to limit safety concerns).

### C.  Disclosure of Informants

The instant indictment was the result of a lengthy investigation that involved the use of several confidential sources and informants. The defendants now request the pretrial disclosure of the identities of *all* informants who provided information to the Government, regardless of whether individual informants will be called at trial and regardless of whether the individual informant was a participant informant – that is, a person involved in other criminal activity with

31

the defendants – or simply a tipster. (Doc. No. 145). The defendants' Motion lacks merit and should be denied.

Generally, the Government may withhold from disclosure the identity of informants in order to foster communication with law enforcement and ensure the safety of informants from retaliation. *See Roviaro v. United States*, 353 U.S. 53, 59 (1957). While the privilege is not absolute, in order to overcome it, the defendant bears a "heavy burden" in showing that "the informer was an actual participant in or a witness to the offense charged, whose identity is necessary to the defense." *United States v. Mangum*, 100 F.3d 164, 172 (D.C. Cir. 1996); *see United States v. Warren*, 42 F.3d 647, 654 (D.C. Cir. 1994); *United States v. Skeens*, 449 F.2d 1066, 1070-71 (D.C. Cir. 1971). That said, the Supreme Court has instructed district courts to consider the totality of the circumstances in determining the necessity of disclosure, including "the crime charged, possible defenses, the possible significance of the informer's testimony, and other relevant factors." *See Roviaro*, 353 U.S. at 62.

In order to meet his burden, the defendant must establish how or why the identity of the informant is necessary. *Magnum*, 100 F.3d at 172 ("[M]ere speculation that the informer might possibly be of some assistance is not sufficient to meet [the defendant's] burden"); *Skeens*, 449 F.2d at 1070; *United States v. Glover*, 583 F. Supp. 2d 5, 11-12 (D.D.C. 2008); *United States v. Edelin*, 128 F. Supp. $2^d$ 23, 34 (D.D.C. 2001). In *Skeens*, the defendant was arrested for robbery after the police executed a search warrant based on information gained from an informant. *See Skeens*, 449 F.2d at 1067-68. At trial however, the Government presented its case without the informant or his information and there was no evidence that the informant was an actual participant in or witness to the robbery. *Id.* at 1070. Although the defendant argued that based on the detailed information that the informant provided, it could be inferred that the informant was

the getaway driver, the D.C. Circuit held that that was purely speculative and that the defendant had failed to carry meet his burden because there was no actual evidence to suggest the informant was the getaway driver. *Id.* at 1070-71; *see Warren*, 42 F.3d at 654-55.

Likewise, in *Glover*, the defendant, a member of a drug trafficking ring, sought disclosure of several informants in order to "investigate bias, motives to fabricate and to cast doubt upon the credibility of certain witnesses." *Glover*, 538 F. Supp. 2d at 12. In denying the defendant's request, the District Court held that the defendant had failed identify what defenses the informants might help advance or the possible significance of any particular informant. *Id.*

In their Motion to Disclose Identities of Each Confidential Informant, the defendants in this case fail to demonstrate the necessity required to overcome the Government's privilege. Although the defendants request the identities of two general types of informants – participant informants and non-participant informants *i.e.* tipsters – this Circuit has repeatedly held that defendants are not entitled to non-participant informants and are only entitled to learn the identities of participant informants *after* a showing of a necessity. The proffered reasons given by the defendants in their Motion have been exceedingly broad and purely speculative. Like the defendants in *Skeens*, *Warren*, and *Glover*, the defendants in this case have failed to identify or articulate the need for any particular informants' identity, how any particular informant would advance a defense, or the potential significance of any particular informant. As such, the defendants have failed to meet their "heavy burden" in establishing the necessity of the informants' identities and disclosure is not warranted.

However, even if the defendant establishes that the identity of a particular informant would be helpful, the district court must also consider the dangerousness of the defendant. *See Edelin*, 128 F. Supp. 2d at 34. Where the disclosure of an informant's identity would place the

33

informant in danger and the informant's testimony is not exculpatory, disclosure is not appropriate. *Id.* (*citing United States v. Pelton*, 578 F.2d 701, 797-08 (8th Cir. 1978)). In *Edelin*, the defendant was charged in multi-count indictment for participation in violent drug trafficking organization and the Government's investigation involved the use of multiple confidential sources and informants. However, the District Court held that not only had the defendant failed to detail a sufficient basis to believe that the informants would be helpful, but that disclosure of the informants' identities would unnecessarily jeopardize their safety before trial. *Id.* at 34. Therefore, so long as the Government compiled with its *Brady*, *Giglio*, and *Jencks* obligations regarding the informants, no additional disclosures were required. *Id.*

The defendants in this case are members of MS-13, a violent criminal street gang that has many members and associates in the Washington, DC metropolitan area and has a history of witness murder and intimidation. *See, e.g.*,Maria Glod, *Md. gang member sentenced to life*, Washington Post (Sept. 14, 2010) http://voices.washingtonpost.com/crime-scene/maria-glod/md-gang-member-sentenced-to-li.html; Jerry Markon, *MS-13 gang member sentenced to death in N.C.*, Washington Post (Apr. 29, 2010) http://www.washingtonpost.com/wp-dyn/content/article/2010/04/29/AR2010042903226.html  Terry Frieden, *Two convictions, two acquitted in suburban Virginia street gang trial,* CNN Washington Bureau, May 17, 2005, http://articles.cnn.com/2005-05-17/justice/ms13.trial.verdicts_1_ms-13-street-gang-gang-members?_s=PM:LAW. Moreover, persons associated with this case have been threatened[12] and others have been greenlighted.  The disclosure of the informants' identities would directly expose the informants and their families to violence, retaliation, and intimidation by MS-13. Additionally, like the defendant in *Edelin*, the defendants are facing decades of imprisonment

---

[12] As noted previously, the government will file an *ex parte* proffer of threats substantially contemporaneously with the filing of this response.

and there is no evidence to suggest that the informants' prospective testimony would be exculpatory. As a result, the Government's interest in protecting the safety of informants is extremely high and the disclosure of the informants' identities is not warranted.

Except in capital cases, a defendant is not entitled to a witness list in advance of trial. *United States v. Celis*, 608 F.3d 818, 831 (D.C. Cir. 2010) (*citing United States v. Bolden*, 514 F.2d 1301, 1312 (D.C. Cir. 1975)). Therefore, even if the defendant meets his burden and overcomes the Government's privilege, he is still not entitled to the identities of confidential informants before trial. *United States v. Martinez*, 764 F. Supp. 2d 166, 169 (D.D.C. 2011) ("Under *Roviaro*, the defense must only have the opportunity to obtain [the informant's] testimony in some manner during the trial.") To allow the defendants to access the identities of informants before trial would in fact give informants *less protection* than normal witnesses *i.e.* police officers, investigators, etc. *See id.; United States v. Cooper*, 91 F. Supp. 2d 79, 86 (D.D.C. 2000) ("[T]he defendant is not entitled to [the informants'] identities until the government provides its witness list.")

For these reasons, the motion to disclose informants must be denied.

### D.  E-Mail Communications

The government is aware of its obligations to disclose e-mail communications between its agents and witnesses that would constitute *Jencks/Giglio/Brady* or would otherwise be discoverable.  Agents were instructed to retain e-mail communications between themselves and the attorneys, sources, or witnesses.  To the extent such communications may be discoverable, they will be disclosed in accordance with the Court's relevant discovery orders.

### E.  Disclosure of 1006 Summaries

Defendant Aguilar filed a motion for the government to produce any summaries or charts it intends to introduce pursuant to Federal Rule of Evidence 1006.  This motion is premature.

Federal Rule of Evidence 1006 permits a party to present "the contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court" in the form of a chart or other summary.  To some extent, the defendants have already received some summaries or charts.  The government has produced to the defense several maps of cell tower analysis, which, in essence, matches phone cell site data with a location on a map in a summary form.  It is too early for the government to determine whether it will need to create other 1006 summaries in this case.  If additional summaries are needed, they will be provided in sufficient time for an examination by the defense.

### F.  404(b) Evidence

All defendants have either filed or joined a motion seeking any 404(b) evidence which the government will introduce (Docket #160).  Federal Rule of Evidence 404(b) prohibits the introduction of other crimes "evidence to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Such evidence may be admissible for other purposes, such as to prove motive, intent, knowledge, absence of mistake, or other factors relevant to the case.

Evidence of criminal conduct which is intrinsic to the specific crime charged or is inextricably intertwined is universally held not to violate Rule 404(b).  *See United States v. Bowie*, 232 F.3d 923, 927-928 (D.C. Cir. 2000) and cases cited therein.  In *Bowie*, the court emphasized that prohibited 404(b) evidence involves character evidence offered to show that a

person acted in conformity with a particular character trait.  The court went on to state: "Evidence that constitutes the very crime being prosecuted is not of that sort."  *Id.*

In the instant Indictment, which involves a RICO conspiracy and VICAR crimes, the government will prove the existence of the enterprise, the racketeering activities in which it is engaged, the purposes of the enterprise, and the manner and means which the conspirators employ to carry out the purposes of the enterprise.  Thus, to the extent the government will introduce any evidence not specifically referenced in the Indictment (to which cooperators undoubtedly will testify), that criminal activity will be introduced as direct proof of the conspiracy and/or the racketeering enterprise.  *See United States v. Edelin*, 128 F. Supp. $2^d$ at, 48 (D.D.C. 2001) (Lamberth, J.) ("Evidence of other crimes related to the RICO enterprise and drug conspiracy charged does not come within the definition of Rule 404(b)."; *United States v. Badru*, 97 F.3d 1471, 1474-75 (D.C. Cir. 1996) ("In cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an 'other' crime.  The evidence is offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused"); *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992).[13]  Simply put, the government does not intend to introduce any evidence that could be fairly described solely as 404(b) evidence in this case. Accordingly, the government respectfully submits that this Court should deny defendants' 404(b) motion.

---

[13] The defense motion seizes on a single paragraph of *Bowie* in which the court addresses the "completes the story" aspect of intrinsic evidence.  However, to the extent the government, through its cooperators or other witnesses, introduces evidence not specifically referenced in the Indictment,  that evidence will not be offered to "complete the story," but rather to prove the existence of the enterprise and the pattern of racketeering activity.

## VI. MOTIONS TO SUPPRESS

### A. Motions to Suppress Statements

### 1. Factual Background

Four defendants have filed motions to suppress their statements: Lopez-Ramirez, Machado-Erazo, Martinez-Amaya, and Saravia.  Although styled slightly differently, in essence each alleges that there were defects in the Miranda waiver, the statements were involuntary, and, in one instance (Martinez-Amaya), was taken after a request for counsel.  Lopez-Ramirez also asserts a lack of probable cause for his arrest.  None of the defendants have specified the alleged defect in the Miranda waiver, other than to allege that the advising agent did not speak Spanish nor have any of the defendants specified any facts that suggest their waiver or subsequent statement was involuntary. Without such information the government cannot adequately respond to the allegations; the government asserts that none of the defendants have sufficiently placed any issue before the court warranting an evidentiary hearing.[14]

The evidence will show that each of the defendants was advised of his Miranda rights in writing, and each signed a waiver.  Three of the defendants were advised by a Spanish-speaking officer, using a Spanish waiver.  Manuel Saravia was advised in English.  The interviews were relatively brief, with the defendants inculpating themselves to various degrees.

### 2. Probable cause for arrest

Only Lopez-Ramirez has raised this as a basis to support his motion.

On December 10, 2009, Mario Lopez-Ramirez was encountered by Metropolitan Police Officers with the gang unit who were assisting in the investigation of an attempted murder which had occurred the evening before.  He agreed to speak with detectives and denied any knowledge

---

[14] The government may request leave to file a supplementary brief to address any issues that arise during the hearing.

or participation in the shooting.  Subsequently, he was arrested by ICE agents as an alien inadmissible under 8 U.S.C. §1182.[15]  Lopez-Ramirez had been a target of the MS-13 investigation being conducted by ICE, thus, the agents were aware of his immigration status. He was deported to Honduras on or about February 1, 2010.  Some four months later, he was again arrested while trying to cross into the United States at the Arizona-Mexico border.  After adjudication under 18 U.S.C.§1325, illegal re-entry, he was again deported to Honduras on August 12, 2010.  Having again re-entered the country illegally, he was arrested pursuant to the warrant issued in this case in July 2011.

Following his arrest as an illegal alien in December 2009 Lopez-Ramirez was taken to jail in Fairfax County, Virginia, and was brought to ICE offices in Merrifield, Virginia for an interview the following morning.  He was advised of his rights commensurate with the Miranda decision, by a Spanish-speaking agent.  He waived his rights in writing and agreed to speak with the agents.

During the course of the interview, Lopez-Ramirez authorized agents to search his apartment in Washington, D.C., as well as a phone that was in his possession when he was arrested.  He advised agents that he is a member of MS-13, Normandie clique.  After discussing his whereabouts on the evening of December 9, 2009, he accompanied agents to his apartment in accordance with his authorization to search his personal items.  Fraudulent resident alien cards and social security cards were discovered.  Lopez-Ramirez then accompanied agents to his cousins' apartment where agents discovered a gun which was later linked to the shooting on December 9, 2009, with which Lopez-Ramirez is charged in Count One, overt act "cc".

---

[15] Many of the facts presented here are contained within the Report of Investigation supplied to defendant's attorney, including the basis for the defendant's arrest, the fact that he was advised of his rights in Spanish and waived them, and that defendant consented to a search of his personal belongings and his phone.

39

The defendant alleges that there was no probable cause for his arrest, therefore his statement and the consents to search that flow from the arrest should be suppressed.  The search issue will be discussed in section VI-B below.

A law enforcement officer is permitted to arrest a person without a warrant when there is probable cause to believe the person has committed or is committing an offense.  *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004).  The officer's state of mind at the time of the offense is irrelevant, other than to establish what facts he knows.  *Whren v. United States,* 517 U.S. 806, 812-813 (1996).  Thus, there is no requirement that the ultimate charge or disposition of the case be identical or even closely related to the reason for the initial arrest.  *Devenpeck at 152..*

An alien who has entered the United States without the required inspection by an immigration officer must undergo proceedings to determine his eligibility to remain in the United. States.  8 U.S.C. §1225.  While eligibility proceedings are pending, the Secretary of the Department of Homeland Security is authorized to detain the alien.  *Clark v. Suarez Martinez,* 543 U.S. 371, 373 (2005).

Lopez-Ramirez was arrested by ICE agents who had knowledge that he was an inadmissible alien under 8 U.S.C. §1182(a)(6)(A)(i) subject to deportation, and that he was in violation of 18 U.S.C. §1325 which criminalizes entry into the United States except upon a time and place designated by immigration officers.  Whether he was ultimately deported administratively or prosecuted pursuant to the criminal statutes is of no consequence.  Lopez-Ramirez was lawfully detained pursuant to the Immigration Act and lawfully arrested pursuant to the criminal code.

### 3. Voluntariness of the Miranda Waivers and Statements

Law enforcement officers have long been required to advise persons in custody whom they wish to interrogate of certain rights explicated by the Supreme Court in the seminal decision of *Miranda v. Arizona*, 384 U.S. 436 (1966). These rights include advising "the suspect that he has the right to remain silent, that any statements he makes can be used against him in court, that he has the right to consult with counsel, and that if he cannot afford an attorney, one will be provided for him prior to questioning." Id.*,* at 479. If a suspect invokes his rights either by choosing to remain silent or requesting an attorney, the police must cease questioning unless the suspect initiates further contact. *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981).

Although the waiver must be both "knowing and voluntary", *North Carolina v. Butler,* 99 S.Ct. 1755, it need not be explicit. *Burghuis v. Thompson,* 130 S.Ct. 2250 (2010). A voluntary waiver is one which is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U. S. 412, 421 (1986). A statement is involuntary in violation of due process if a defendant's will was overborne in the totality of the circumstance*. United States v. Dickerson*, 530 U.S. 433,434 (2000); *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *Arizona v. Fulminante*, 499 U.S. 279, 285-89 (1991). "If his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

The voluntariness of a Miranda waiver is analyzed using the same guidelines as those used in determining the voluntariness of statements. *See North Carolina v. Butler*, 441 U.S. 369 (1979); *Colorado v. Connelly*, 479 U.S. 157 (1986). Title 18 United States Code, § 3501(b) provides:

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including:

(1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

These factors are not exclusive and the presence or absence of any given factor is not dispositive on voluntariness. *See also United States v. Andaverde,* 64 F.3d 1305 (9th Cir. 1995). Police coercion is a "necessary predicate" to a finding of involuntariness. *Colorado v. Connelly,* 479 U.S. 157, 163-67 (1986) (insane person can make voluntary confession, since police did not know he was insane); *United States v. Reed,* 522 F.3d 354 (D.C. Cir. 2008); *United States v. Van Metre*, 150 F.3d 339, 348 (4th Cir. 1998); *Carter v. Johnson,* 131 F.3d 452 (5th Cir. 1997); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997). A statement is coerced if the suspect's will is overborne. *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). Courts assess the totality of circumstances surrounding the waiver and the statement to determine voluntariness. *Schneckloth v. Bustamente*, 412 U.S. 218, 226 (1973).

The totality of circumstances must demonstrate "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Among the factors to be considered are the defendant's age and education, his criminal record or contacts with police, age, physical and mental condition, explicitness of waiver, length of detention,

length of interrogation, and any language barriers.  Persons who are not fluent in English are as capable of waiving their rights as a native English speaker, provided there is a proper translation of the rights and waiver.  *United States v. Elfgeeh*, 515 F.3d 100, 124-125 (2d Cir. 2008) (Arabic), *United States v. Lei Shi,* 525 F.3d 709, 728-729 (9th Cir. 2008) (Chinese), *United States v. Castro-Higuero,*  473 F.3d 880, 886 (8th Cir. 2007) (Spanish), *Perri v. Director, Dept. of Corrections*, 817 F.2d 448 (7th Cir. 1987) (Italian), *United States v. Yunis*, 859 F.2d 952, 958-959 (D.C. Cir. 1988) (Arabic).   The advice of rights does not have to be presented in a precise rubric, as long as the substance of the rights is conveyed to the suspect.  *Florida v. Powell,* 130 S.Ct. 1195, 1204 (2010).

A defendant who wishes to invoke the *Miranda* right to counsel must do so "unambiguously". *Davis v. United States,* 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).  If the request is not explicit, law enforcement officials are neither required to cease interrogation nor clarify with the suspect whether he wishes counsel.  *Davis,* 512 U.S. at 461-462, 114 S.Ct. at 2350.

### 4.  Individual Defendants

#### (a) Mario Lopez-Rammirez

In addition to his argument that agents lacked probable cause for arrest, Lopez-Ramirez alleges that his unfamiliarity with his rights and the agents' alleged failure to explain them entitles him to suppression of his statement.  However, as outlined above, his rights were explained to him in Spanish by an agent who speaks Spanish and using a Spanish Miranda waiver.  It is not necessary that a person have attained adulthood in the United States in order to understand the fairly simple concepts encompassed by the Miranda waiver:  you (the accused) don't have to talk to police, if you do talk it can be used against you, you can have a lawyer if

you want, if you can't afford a lawyer the government will provide you one for free.  Lopez-Ramirez initialed next to each right as it was explained and signed the waiver.  These facts, particularly when combined with his contacts with law enforcement, and his age (23 years old in December 2009) support a full understanding of his rights.

### (b)  Noe Machado-Erazo

This defendant alleges that agents failed to comply with the dictates of *Miranda.* Similarly to Lopez-Ramirez and Martinez-Amaya, this defendant was advised of his rights in Spanish by a Spanish-speaking agent, using a Spanish document.  Machado-Erazo, who was 28 years old, initialed each paragraph of the document to memorialize his understanding of the advice.  He acknowledged by his signature that he freely and voluntarily waived his rights.  He has failed to direct this Court to any fact that would suggest non-compliance with *Miranda.*

The second ground for suppression that defendant raises is a "coercive atmosphere".  However, once again, Machado-Erazo fails to produce a scintilla of evidence that would suggest any coercion, much less that sufficient to suggest his will was overborne.  Although three agents were present during the interview, they were dressed in civilian clothes, no guns were drawn, there were no threats made toward the defendant.  Machado-Erazo provided some information about MS-13, but was careful to distance himself by stating that he was no longer a member, although he did admit to associating with some NLS (Normandie Locotes Salvatruchas) and some SLSW (Sailors Locotes Salvatrucha Westside, sometimes called Marineros) members.  Although he spoke at length about the concept of a "greenlight" or order to kill, he denied knowing the person he is alleged to have participated in killing in accordance with a greenlight.  The statements he made cleverly combined truthful facts about MS-13 generally with an exculpation of himself from their activities.  Moreover, the interview only lasted approximately

44

90 minutes, during which time the defendant was provided restroom facilities and water. There are no facts which support an allegation of coercion.

### (c)  Jose Martinez-Amaya

Martinez-Amaya, 24 years old, alleges that his statement was not voluntary and that he requested an attorney prior to interrogation. He, like the other defendants, signed a document which advised him of his rights in Spanish; the document was read to him by a Spanish-speaking police officer. Martinez-Amaya initialed to the side of each paragraph and signed the bottom of the document evincing a waiver of his rights and willingness to speak with agents. He only spoke with them for a short time, perhaps 30 minutes. When he invoked, agents discontinued questioning. Like the other defendants, Martinez-Amaya has alleged no facts suggesting his statement was other than voluntary.

### (d)  Manuel Saravia

This defendant alleges without specificity that his statement was not voluntary, that there were promises of leniency, and that he was threatened. The uncontested facts show that he waived his Miranda rights in writing at 8:36 a.m. He provided only a brief oral statement concerning his membership in MS-13, but declined to engage in conversation about substantive crimes or activities of MS-13. His co-defendant, Martinez-Amaya, was interviewed by the same agents; he signed his waiver at 9:04 a.m. Thus, Saravia's interview with the agents was less than 30 minutes. It is highly unlikely that any threats or coercion of any sort occurred during this short period of time; indeed, Saravia does not specify any.

### B.  Motions to Suppress Evidence

Only Machado-Erazo and Martinez-Amaya have moved to suppress physical evidence. In each case, a search warrant, which was provided in discovery, was obtained from the U.S.

District Court for Maryland, and executed at the defendant's residence on or about February 9, 2011. The agent completed the return to the court on or about February 14, 2011, however a signed copy was not provided to him by the court. Electronic items, such as phones and computers, were among the evidence recovered. Another search warrant, which was sent in the discovery package, was obtained from the U.S. District Court for the Eastern District of Virginia to search the electronic items, since they were located at ICE offices in Virginia. Those search warrants were executed on or about March 11, 2011; returns were provided to defense counsel in discovery.

Martinez-Amaya requests this court suppress any evidence because the residential search warrant was not executed within the time delineated by the court. Machado-Erazo makes general claims of a lack of probable cause, failure to obtain a warrant for the search of the electronic items, and a non-specific *Franks* claim.

### 1. Probable Cause for Issuance of the Warrant

In reviewing an affidavit for a search warrant to determine the existence of probable cause, the reviewing court should "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (*citation omitted*). *See also United States v. Thomas*, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (citing *Gates*). Great deference is accorded to the judicial officer's initial determination of probable cause. *See United States v. Johnson*, 437 F.3d 69, 71 (D.C. Cir. 2006); *United States v. Webb*, 255 F.3d 890, 904 (D.C. Cir. 2001). Thus, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution

46

of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109 (1965). Indeed, "[e]ven if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993). The residential warrant was duly issued by Magistrate Judge Connelly in the District of Maryland. Probable cause was established in the affidavit through descriptions of the existence of MS-13, its activities, the defendant's involvement in MS-13, and the likelihood of finding contraband or evidence at the residence. The veracity and basis of knowledge of the primary source is detailed in ¶17, which describes the source as an MS-13 member and states that agents have been able to corroborate some of the information provided.

The affidavit devotes over seven pages to describing the enterprise MS-13. A history of the gang and its members establishes that MS-13 is an "association in fact" enterprise that has continuity. Probable cause that the gang is involved in racketeering activity is shown with a description of the types of crimes in which MS-13 is involved: murder, narcotics trafficking, extortion, and obstruction of justice, among other acts. See, ¶8, Affidavit. The RICO conspiracy indictment returned by the grand jury is also a factor establishes probable cause for the existence of the enterprise; the grand jury necessarily determined the enterprise existed when it returned the indictment, and that each of the defendants was a member of, or associated with, the enterprise. See *United States v. Williams,* 811 F.Supp. 2d 274, 277 (D.C.D.C. 2011)

Separate from noting that the defendants were indicted for RICO conspiracy, the affidavit details information learned from sources, wiretaps, and other investigative tools that demonstrate each of the defendants is a member of MS-13. Specific examples of recordings involving

47

Machado-Erazo participating in gang business are provided in ¶¶32 and 38 through 42. ¶¶45 and 46 detail court-authorized intercepts of Martinez-Amaya discussing a gang meeting,

Information from a source concerning Machado-Erazo's possession of firearms, particularly when combined with the general assertions of the use of firearms by MS-13 members contained in ¶12 provides ample probable cause that firearms may be located in his residence. Additional probable cause that documents or other evidence may be found is established based on the agent's experience as described in ¶15.

2. **Good Faith Basis**

Even if this Court were to find the warrant lacked probable cause, suppression by the trial court would not be the appropriate remedy as the officers conducting the search acted in "objectively reasonable reliance" on the warrant's validity. *United States v. Leon*, 468 U.S. 897, 922 (1984). Ordinarily, the existence of a warrant is sufficient to establish that the officers acted in good faith in conducting the search. *Id.* Suppression in such a case is appropriate only if "the magistrate abandoned his detached and neutral role" in assessing the affidavit, or if "the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926.

The residential warrant was duly issued by Magistrate Judge Connelly in the District of Maryland. There is nothing to suggest that he acted as a "rubber stamp" in issuing the warrant. Thus, the agents could, in good faith, rely on the validity of the warrant in searching the residences.

**3. Execution of the Search Warrant**

Martinez-Amaya complains that the residential warrant was not executed until March 11, 2010. However, the return that he is referencing is the return for the electronic items search

48

warrant, which was issued by the U.S. District Court for the Eastern District of Virginia on March 8, 2011. The evidence will show that the residential search warrant was executed on February 9, 2011, in accordance with the terms of the search warrant.

### 4. *Franks* **Issue**

Machado-Erazo, without any specificity whatsoever, alleges false statements or material omissions in the search warrant.[16] In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1977), the Court held that defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" *and* that "the allegedly false statement is necessary to the finding of probable cause" *Id.* at 155-156. *See also, United States v. Richardson*, 861 F. 2d 291, 293 n. 2 (D.C. Cir. 1988).

The defendant may not rest on a conclusory proffer, but must provide an offer of proof that "point[s] out specifically the portion of the warrant affidavit that is claimed to be false," and must be supported with "[a]ffidavits or sworn or otherwise reliable statements of witnesses," or a satisfactory explanation for the absence of such support. *Franks*, 438 U.S. at 171; *see also United States v. Gaston*, 357 F.3d 77, 80 (D.C. Cir. 2004) (defendant entitled to evidentiary hearing only if attack on affidavit's accuracy is "accompanied by an offer of proof") (internal quotations and citations omitted).

Machado-Erazo fails to offer even a whisper of proof of a false statement or material omission. He is, therefore, entitled to no hearing on this issue; indeed, the court should not even acknowledge this as a basis for suppression.

---

[16] The government assumes Machado-Erazo is referring to the residential warrant, since he also claims there was no warrant for the search of the electronic items, which is patently false.

### C. Motion to Suppress Identification

Defendant Aguilar moves to suppress a single-photo identification by a witness who obviously knows and identified him as "Flaco", a participant in the *putaria* robbery. The discovery was provided to Aguilar's counsel in connection with the Superior Court charges. Since that time, additional interviews have been conducted in which Aguilar was identified by his nickname "Flaco". A confirmatory photograph was shown to ensure this was the person being referred to. This information has not previously been provided to defense counsel out of concern for the safety of the identifiers and their families. Had the original charges against Aguilar arisen in U.S District Court, the details of the single-photo would not have been provided for the same reason.

When a witness knows a defendant well, "there [is] no danger of misidentification." *United States v. Anderson*, 490 F.2d 785, 787 (D.C. Cir. 1974). *See also Green v. United States* 580 A.2d 1325, 1327 (D.C. 1990) ("Plainly the likelihood of undue suggestivity is present only in situations where the perpetrator of the crime is a stranger to the witness and the latter is asked to make identification on the basis of a single photograph or by confrontation with a suspect in handcuffs or in a holding cell. As the government brief points out, the courts of this jurisdiction and others have routinely upheld the practice of showing a witness a single photograph of a personal acquaintance or of someone upon whom the witness had a full opportunity to focus during the commission of the crime); *Melendez v. United States,* 26 A.3d 234, 247 (D.C. 2011).

It is apparent from the identification of Aguilar by a nickname, that the witness knows Aguilar. Thus, there is no danger of misidentification, and the motion should be denied.

Should the Court determine, however, that a hearing is warranted, the government respectfully requests that it be deferred until trial given that the narrow scope of the inquiry.

## VII.  EVIDENTIARY MOTIONS

### A.  Motion to Preclude Admission of Co-Conspirator Evidence

Defendant Machado-Erazo has filed a motion requesting this court prohibit the government from introducing physical evidence seized from co-defendants on relevancy grounds, citing Fed. R. Evid. 401.   Although the government has not yet determined what physical evidence it will introduce at trial, any such evidence will be used to establish the existence of the enterprise and, potentially, a particular defendant's connection to the enterprise.

Evidence which tends to prove the enterprise and its racketeering activities is relevant as a matter of law, whether that evidence is testimonial or documentary.  Thus, evidence of telephone calls in which the participants discuss gang business is admissible to establish the enterprise and its activities as well as direct evidence against the speakers.

The government has not provided an exhibit list to defense counsel yet.  The government has no objection to a renewal of this motion by the defense at the appropriate time, provided such motion is specific as to the item(s) sought to be excluded and the reasons for exclusion.

### B.  Motion to Exclude Gang Evidence

All defendants have joined the Motion to Exclude Gang Evidence which requests that this Court  "exclud[e] all evidence that [defendant]…is a member of *La Mara Salvatrucha* ("MS-13"), or that his affiliation with this gang played any role in his alleged offenses." (Doc. #165). As defendants are charged with RICO conspiracy, VICAR offenses and/or related crimes, and thus the defendants' gang affiliation is essential to proving the existence of the MS-13 enterprise, its pattern of racketeering activity, and defendants' membership therein, this motion is wholly without merit.

51

The Indictment in this case charges the defendants with membership and participation in the affairs of a racketeering enterprise, namely, the MS-13 street gang. Thus, each defendant's gang affiliation is directly relevant and extremely probative to prove the existence of the enterprise, the pattern of activity to which it was engaged and the defendants' membership in the enterprise, whether that defendant is charged with RICO conspiracy,[17] a VICAR offense, or a crime committed in furtherance of the gang's activities. *See e.g.*, *United States v. White*, 116 F.3d 903, 923–25 (D.C. Cir. 1997) (evidence established the existence of an enterprise where it was a drug distribution crew, leaders shared income and cocaine supplies, and the crew protected a geographic marketing area); *United States v. Perholtz*, 842 F.2d 343, 362–63 (D.C. Cir. 1988) (evidence of an enterprise is sufficient where it is shown that associates were united by a form of organization to "function as a continuing unit and thus constitute an enterprise" and can also be inferred from evidence of a pattern of racketeering acts);*United States v. Polanco*, 145 F.3d 536, 539-40 (2d Cir. 1998) (court reversed section1959 conviction because there was insufficient evidence to establish that defendant was a member of the enterprise Red Top Crew); *United States v. Brady*, 26 F.3d 282, 289 (2d Cir. 1994) ("The position-related motivation requirement is an important element that must be satisfied to uphold a Section 1959 conviction.") (internal citation omitted); *Rosa*, 11 F.3d at 340–41 (evidence that defendant was running the organization was sufficient to establish that he was a member of the enterprise); *Castro*, 669 F. Supp. 2d at 291 (the defendant's own admission that he was part of the gang, testimony to his position in the gang, as well as his MS-13 clique tattoo were sufficient to establish his membership to uphold a section 1959 conviction); *United States v. Thomas*, 86 F.3d 647, 652–53 (7th Cir. 1996) (affirming the lower court's admission of gang evidence since it helped show the existence of the

---

[17] Although gang evidence as it applies to a RICO conspiracy charge was not argued in the defense motion, the government anticipates such an argument at the motions hearing and, therefore, has chosen to address it now.

conspiracy and therefore was not *unfairly* prejudicial, even though it may have prejudiced the defendants in the eyes of the jury) (emphasis added); *United States v. Butler*, 71 F.3d 243, 250 (7th Cir. 1995) (recognizing that gang evidence can be prejudicial to a jury, but finding the court has continually held that the probative value of gang evidence can outweigh this prejudice under appropriate circumstances); *United States v.* Lewis, 910 F.2d 1367, 1372 (7th Cir. 1990) (concluding admission of gang evidence was correct since it was "directly relevant to the government's joint venture argument" and the prejudicial nature did not substantially outweigh the probative value); *Campos-Alvarez v. United States*, 16 A.3d 954, 960 (D.C. 2011) (upholding the lower court's admission of gang evidence, stating that it undergoes the same balancing test of any other evidence, since it was essential to the government's motive for the charge of assault with intent to kill).

Moreover, for the VICAR offenses, an essential element of the charge is that the charged defendant committed the violent criminal act in order to maintain or increase his position in the enterprise, and thus his gang affiliation is also extremely probative for that element as well. *See e.g.*, *United States v. Gooch*, 665 F.3d 1318, 1338 (D.C. Cir. 2012) (evidence of gang reputation and social structure of gang was sufficient to prove motive that defendant committed murder under section 1959 in order to maintain or increase membership in the enterprise); *United States v. Jones*, 566 F.3d 353, 365 (3d Cir. 2009) (district court did not abuse its discretion in admitting gang activity evidence since it "went to proving the VICAR offenses"); *United States v. Carson*, 455 F.3d 336, 369-70 (D.C. Cir. 2006) (government sufficiently showed that defendant shot a rival gang member who threatened him to maintain or increase his position in the enterprise because defendant knew it was expected of him as a result of his membership and evidence was admitted showing the gang intimidated, threatened, or killed people or groups who threatened it);

53

*United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996) (evidence of gang's "policies of mutual support, violent retaliatory action, and group expectations of its members" showing that, at least in part, the murders were done to maintain or increase position in the enterprise, was sufficient to convict under section 1959); *United States v. Rosa*, 11 F.3d 315, 340–41 (2d Cir. 1993) (finding evidence that murder was related to a dispute between victim and defendant dealing with a drug distribution site sufficient to establish the motive of maintaining or increasing defendant's position in the enterprise); *United States v. Castro*, 669 F. Supp. 2d 288, 291 (E.D.N.Y. 2009) (defendant's admission that a responsibility as leader of a MS-13 clique was to meet the "quota" of committing violent acts, along with testimony that fulfilling these quotas earns respect and establishes loyalty, was sufficient to establish motive). Thus, courts have uniformly concluded the relevance and necessity of evidence that the defendant was a member of the enterprise, gang, or crew and that the enterprise exists as a violent organization to establish the essential elements of a 1959 charge. Defendants' claims to the contrary are therefore without any basis in law or fact.

The defense position that evidence of the inner-workings of MS-13, gang tattoos, and other crimes are irrelevant to this charge is misplaced, as all of these aspects of the enterprise are admissible to prove the section 1959 and 1962 violations. "Rule 401 defines as 'relevant evidence' evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Abel*, 469 U.S. 45, 50-51 (1984). As the Indictment states, members of MS-13 are required to "commit acts of violence to maintain membership and discipline within the gang" and are expected to "protect the name, reputation, and status of the gang." *Indictment* (Doc. 101, pg. 4). Evidence of gang affiliation, as well as its rules, structure and hierarchy not

only makes the actions alleged in the indictment more probable, but is obligatory to determine the actions of the alleged charges.

The defendants' motion lastly requests that if the Court admits gang evidence, the government be "compelled to stipulate to those essential facts that it claims are necessary to establish through the introduction of gang evidence in its case-in-chief." (Doc. 165, pg. 8). However, contrary to defendants' claims, the government cannot and should not be compelled to stipulate to an essential element to several of the charges.

In its motion, the defense relies on *Old Chief v. United States,* 519 U.S. 172, 174-76 (1997), where the Court allowed a stipulation to the element that defendant was a felon, for a charge of felon in possession of a firearm.  In *Old Chief,* the Supreme Court held that the district court abused its discretion when, in a felon-in-possession prosecution, it rejected the defendant's offer to concede the fact of a prior felony conviction and admitted under Rule 404(b) evidence the prior order of judgment and commitment identifying the predicate felony as assault. The Supreme Court premised its decision on Rule 404(b) but on Rule 403, which authorizes the trial court to exclude otherwise "relevant evidence . . . if its probative value is substantially outweighed by the danger of unfair prejudice." FRE 403.

As a threshold matter, the defense fails to acknowledge that the Supreme Court, in handing down the *Old Chief* ruling, severely limited its scope, holding that "a defendant's Rule 403 objection offering to concede a point generally cannot prevail over the Government's choice to offer evidence showing guilt and all the circumstances surrounding the offense." Id. at 183. And indeed, circuits that have addressed the issue have severely curtailed *Old Chief*'s applicability to felon-in-possession cases.  *See, e.g., United States v. Lang,* 672 F.3d 17 (1st Cir.

2012); *United States v. Fletcher,* 218 Fed.Appx. 354 (5th Cir. 2007); *United States v. Phillipp,* 442 F.3d 1061 (7th Cir. 2006); *United States v. Becht,* 267 F.3d 767 (8th Cir. 2001)

Moreover, the Supreme Court in *Old Chief* cautioned that its compelling the acceptance of stipulations in felon-in-possession cases is an unusual exception that only applies "when the point at issue is a defendant's *legal* status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." *Id.* at 190 [emphasis added].  Not surprisingly, in applying *Old Chief*, the D.C. Circuit has echoed this limitation. *United States v. Crowder*, 141 F.3d 1202, 1207 (D.C. Cir. 1998) ("Proof of status . . . concerns an element that is 'wholly independent of the concrete events' of the charged crime.") (citing *Old Chief*, 519 U.S. at 190).  The challenge to defense stipulations to elements of intent and knowledge survives under a Rule 403 analysis since they are different from a status element; evidence of intent or knowledge create the story of the defendant's "thoughts and actions in perpetrating the offense" that he is charged with.  *Old Chief*, 519 U.S. at 192 (distinguishing defendant's prior felony as "entirely outside the natural sequence of what the defendant is charged with thinking and doing to commit the current offense" ).

In this case, the government seeks to offer evidence of the existence of the MS-13 gang, its rules, its hierarchy and its structure, as those are essential elements of all the racketeering-related charges in the Indictment.  None of these elements relate to any legal status of any defendant.  Moreover, the defendants' gang membership is inextricably intertwined with their motive and intent to commit the various acts alleged in the overt acts of count one and the various substantive counts of the indictment.  The government's gang evidence, and the elements that it must prove, are thus central to its case-in-chief, go well beyond and are separate and apart

from any legal status of any particular defendant, and thus are the inappropriate subject matter for any stipulation.   Simply put, *Old Chief* has absolutely no relevance to this case.

In addition, when the rest of the trial will be proven through witness testimony, as is likely in this case with the RICO conspiracy charge, the jury may find a "gap" and be "puzzled at the missing chapters" when a stipulation breaks up the normal sequence of the trial.  *Id.* at 186–87, 189 ("[the] standard rule that the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case . . . rests on good sense").   *Old Chief* dealt with the stipulation of a status element that was disconnected from the act of the crime charged, *Id.* at 190, but the section 1959 and 1962 charges here deal with elements of intent and knowledge connected to the act of murder, among other violent criminal acts. *See United States v. Carson*, 455 F.3d 336, 369–70 (D.C. Cir. 2006) (defendant's intent in committing the violent criminal act was to further his place in the enterprise); *United States v. White*, 116 F.3d 903, 923–25 (D.C. Cir. 1997) (evidence of knowledge of conspiracy, structure, and organization of enterprise and their drug trafficking business necessary to prove a RICO conspiracy charge).

As the Supreme Court made clear, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Old Chief,* 519 U.S. at 186-87.   Based on the above cited authority, the government requests that the defendants' motion to exclude or stipulate to all gang evidence be denied.

### C. Motion to Strike Alias

The superseding indictment lists one or more nicknames for each of the defendants. Defendants object to the inclusion of the alias in the indictment (Doc. #166; joined by all

defendants), arguing there is no evidence to support its necessity.  Defendants' motion is without any basis in law or fact.

"It is clear ... that `[t]he use of an alias in an indictment and in evidence is permissible if it is necessary to connect defendant with the acts charged.'"  *United States v. Hines,* 955 F.2d 1449, 1454 (11th Cir. 1992) (quoting *United States v. Jorge-Salon*, 734 F.2d 789, 791-92 (11th Cir. 1984)).  "When proof of an alias is relevant to identifying defendant, or otherwise relates to the proof of the acts charged in the indictment, it is permissible for the prosecution to include it in the indictment." *United States v. Moya-Gomez*, 860 F.2d 760, 762 (7th Cir. 1988).

In this case, the government's evidence consists in part of intercepted telephone calls, recorded jail calls, and cooperating witness testimony that will establish that the defendants and other members of MS-13 refer to each other almost exclusively using their gang names, *i.e.*, the aliases alleged in the Indictment.   Without introduction of defendants' alias/gang names, the testimony of cooperators and the relevance of recordings and physical evidence will be utterly lost to the jury.  The introduction into evidence and use of the defendants' gang names/alias is thus highly probative evidence of the existence of the MS-13 enterprise and its rules, and will make clear the identity of the defendants in various MS-13 crimes and activities.  Moreover, none of the defendants' nicknames are nefarious or otherwise suggestive of other criminal activity.  It therefore is difficult to fathom how any defendant is prejudiced by the inclusion of the gang names/alias in the superseding indictment.  Accordingly, the motion should be denied in its entirety.

58

## VIII.  CONCLUSION

For the reasons stated, unless other relief is sought, the government submits the defendants' motions should be denied.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

/s/ Laura Gwinn
LAURA GWINN
Trial Attorney, Criminal Division
United States Department of Justice
1301 Pennsylvania Avenue, 7th Floor
Washington, D.C. 20530

/s/ William J. O'Malley, Jr.
WILLIAM J. O'MALLEY, JR.
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C.   20004

*Certificate of Service*

I hereby certify that a copy of the foregoing and the attached order was delivered to counsel of record via ECF on June 22, 2012.

Laura Gwinn
LAURA GWINN

59