**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No. 10-256 (RMC)** |
| | : | |
| **OMAR AGUILAR** | : | **FILED** |
| also known as Flaco | : | |
| | : | **NOV 27 2012** |
| **Defendant** | : | Clerk, U.S. District and Bankruptcy Courts |

## GOVERNMENT'S PROFFER OF PROOF IN
## SUPPORT OF DEFENDANT'S PLEA OF GUILTY

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits the following Proffer of Proof in Support of a Proposed Plea of Guilty by the defendant to Counts Three and Twenty-Three of the Indictment in the above-captioned matter.

The essential elements of the offense assault with a dangerous weapon in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(3), that is, VICAR assault, each of which the government must prove beyond a reasonable doubt to sustain a conviction, are:

First: On or about the time period described in the indictment, an enterprise affecting interstate commerce existed;

Second: The enterprise engaged in racketeering activity;

Third: The defendant committed a crime of violence, that is, assault with a dangerous weapon; and

Fourth: That the defendant's purpose in committing the violent crime was to gain

entrance to, or to maintain, or to increase his position in the enterprise.

The essential elements of use or possession of a firearm during and in relation to a crime of violence are:

First, the defendant committed a crime of violence for which he may be prosecuted in a court of the United States;

Second, that a firearm was used in furtherance of that crime of violence.

### Penalties for the Offense

The maximum penalty for participating in a VICAR assault, in violation of 18 United States Code § 1959(a)(3) is:

(A) a fine not to exceed $250,000;

(B) a term of imprisonment which may not be more than twenty years, or both;

(C) a term of supervised release of at least 5 years, after any period of incarceration;

(D) a special assessment of $100.

The penalties for use of a firearm during and in relation to a crime of violence, in violation of 18 United States code § 924(c) is:

(A) A fine not to exceed $250,0000;

(B) A term of imprisonment of up to life imprisonment;

(C) A minimum term of imprisonment of 7 years, which must run consecutive to any other sentence imposed, include the sentence for Count Three of the Indictment;

(D) A term of supervised release of at least 5 years, after any period of incarceration;

(E) A special assessment of $100.

The United States Sentencing Guidelines § 5E1.2 permits the Court to impose an additional fine

to pay the costs of imprisonment and any term of supervised release and/or probation.

*Factual Proffer*

The following proffer of the Government's evidence is intended only to provide the Court with enough evidence to satisfy the mandate of Rule 11(b)(3) of the Federal Rules of Criminal Procedure. This proffer is not intended to be a disclosure of all the evidence available to the United States nor, to the extent it makes representations concerning anything the defendant said, is it a recitation of all that the defendant said.

Had this matter gone to trial, the Government's evidence would have shown, beyond a reasonable doubt, the following:

1.      Omar Aguilar, also known as Flaco, at all relevant times to this Indictment, was seeking entrance to *La Mara Salvatrucha*, also known as MS-13 (hereafter "MS-13"). MS-13 is a criminal street gang and racketeering enterprise composed primarily of immigrants or descendants of immigrants from El Salvador, with members operating throughout the United States, including within the District of Columbia.

2.      MS-13 is a national and international criminal organization with over 10,000 members regularly conducting gang activities in at least 20 states and the District of Columbia, as well as in Mexico, Honduras, Guatemala, and El Salvador. MS-13 is one of the largest street gangs in the United States, and has been functioning in the United States since at least the 1980s. Gang members actively recruit members, including juveniles, from communities with a large number of immigrants from El Salvador. Members, however, can also have ethnic heritage from other Central American countries.

3.      At all times relevant to this indictment, Aguilar understood the following:

Members of MS-13 are expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members require that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members are expected to use any means necessary to force respect from those who show disrespect, including acts of intimidation and violence.

4. At all times relevant to this indictment, Aguilar understood the following: Members of MS-13 engage in criminal activity, including murders, attempted murders, narcotics distribution, assaults, robberies, extortions, stealing vehicles, and obstructing justice in the form of threatening and intimidating witnesses whom they believe are cooperating with law enforcement. A common practice of MS-13 is to force individuals who are involved in illicit criminal activities, such as prostitution or drug distribution, to routinely pay "rent," or extortion money, to MS-13. MS-13 often forces the payment of rent by violence or threats.

5. At all times relevant to this indictment, Aguilar understood the following: MS-13 is organized in the District of Columbia and elsewhere in "cliques," that is, smaller groups operating in a specific city or region. MS-13 cliques sometimes work together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. The cliques operate under the umbrella rules of MS-13. In the District of Columbia and surrounding metropolitan jurisdictions, these cliques include Sailors (SLSW), Normandy (NLS), Peajes, Western (WLS), Uniones (ULS), and Park View. Members from different cliques often work together to commit crimes for the benefit of MS-13 as a whole.

6. At all times relevant to this indictment, Aguilar understood the following: In order to join MS-13, members were required to complete an initiation process, often referred to as

being "jumped in" or "beat in" to the gang. During that initiation, other members of MS-13 would beat the new member, usually until a gang member finishes counting aloud to thirteen. Once jumped in, MS-13 members attended meetings during which they discussed gang rules and business problems involving other gangs, illegal activity being conducted by the gang law enforcement actions targeting MS-13, and suspicions of persons cooperating with law enforcement. Dues was also collected at these meetings for the benefit of, and to be provided to, MS-13 gang members who were imprisoned in the United States, in El Salvador, and elsewhere. MS-13 members also collected dues to buy firearms to be used in the conduct of MS-13's affairs and other illegal activities.

7. At all times relevant to this indictment, Aguilar understood the following: The leaders of individual MS-13 cliques are typically called "shot callers" or "*La Palabra.*" Above the "shot callers" are MS-13 leaders, often referred to as the "big homies," some of whom are incarcerated in El Salvador, who convey their orders through, among other means, the use of telephones. The leaders of MS-13 resolve disputes between gang members, address organizational issues, and participate in significant gang decisions such as whether to assault or murder gang members, associates, and other individuals suspected of cooperating with law enforcement.

8. At all times relevant to this indictment, Aguilar understood the following: Some members of MS-13 signified their membership by wearing tattoos reading "MARA SALVATRUCHA," "MS," "MS-13," or similar slogans, often written in Gothic lettering. The gang colors of MS-13 are blue, black, and white, and members often wear clothing of these colors bearing the number "13". Also, MS-13 members from time to time marked their territory or signified their presence through the use of graffiti with the words "MS" or other identifying

slogans. MS-13 members refer to one another by their gang names or other nicknames and may not know fellow gang members except by these gang names.

9. At all times relevant to this indictment, Aguilar understood the following: Members of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members required that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members were expected to use any means necessary to force respect from those who show disrespect, including acts of intimidation and violence. MS-13's creed is exemplified by one of its mottos, "*Mata, roba, viola, controlla,*" which translates in sum and substance to, "Kill, steal, rape, control."

10. At all times relevant to this indictment, Aguilar understood the following: Members of MS-13 engaged in criminal activity, including murders, attempted murders, narcotics distribution, assaults, robberies, extortions, stealing vehicles, and obstructing justice in the form of threatening and intimidating witnesses that they believed to be cooperating with law enforcement. MS-13 members were required to commit acts of violence to maintain membership and discipline within the gang, including violence against rival gang members or those they perceived to be rival gang members, as well as MS-13 members and associates who violated the gang's rules. As a result of MS-13's frequent use of violence, innocent persons were often injured or killed. Participation in criminal activity by an MS-13 member, particularly violent acts directed at rival gang members or as ordered by the gang leadership, increased the level of respect accorded that member, resulting in that member maintaining or increasing his position in the gang, and possibly resulting in recognition as a leader.

*The Racketeering Enterprise*

11. The evidence presented at any trial would establish beyond a reasonable doubt that MS-13, including its leadership, membership and associates, constituted an enterprise as defined in Section 1959(b)(2) of Title 18, United States Code, that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The evidence would further establish that the enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise.

*Purposes of the Enterprise*

12. The evidence would further establish that the purposes of the enterprise included: (a.) preserving and protecting the power, territory and profits of the enterprise through the use of intimidation, violence, including assaults and murder, and threats of violence, (b.) promoting and enhancing the enterprise and its members' and associates' activities, and (c.) keeping victims in fear of the enterprise and in fear of its members and associates through threats of violence and violence.

13. The evidence would further establish that the beginning on a date unknown, but at least as of on or about January 1, 2009, and continuing through on or about April 10, 2010, in the District of Columbia and elsewhere, the defendant, Omar Aguilar, also known as Flaco, being a person seeking entrance to MS-13, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, together with others known and unknown, did knowingly and intentionally assault Mary Colon and others with a dangerous weapon, to wit: a handgun.

14.     On December 11, 2009, five members or associates or persons seeking entrance to of MS-13's Sailors clique, including Wilfredo Mejia (also known as Freddie and Majestic) and Omar R. Aguilar (also known as Omar Rivera-Aguilar and Flaco), planned and committed an armed burglary and robbery at 301 Taylor Street, N.W., Washington, D.C. The residence at this address was used as a bordello, that is, a prostitution house. Its clients included persons from throughout the metropolitan area, including Maryland and Virginia. Mejia, Aguilar, and the others intended to rob the individuals affiliated with the bordello, and to force them to begin making extortion payments to MS-13.

15.     Mejia, who was the leader of the Sailors clique, had told one of the perpetrators of this robbery that he had to commit a crime on behalf of MS-13 before he could be jumped in. Mejia himself then called this person and said he would pick him up on Park Road. In early evening, Mejia picked up all the co-conspirators in a car. As they drove toward Taylor Street, they discussed their plan to rob the bordello and then to demand $100 per week "rent." A Taurus .357 handgun was provided for this plan to rob the bordello; another perpetrator had a knife. Mejia was to continue driving the getaway car, while the others went into the house armed with their weapons. According to a cooperator, Mejia was giving the orders in connection with the robbery.

16.     At approximately 8:00 p.m., on December 11, 2009, Aguilar and another perpetrator entered the Taylor Street bordello first, armed with the loaded gun. Soon after, they called the other two by cell phone, and instructed them to enter the bordello. They ordered the first victim inside the residence while they pointed a gun to her head, then they forced all the victims – three women and two men –to the floor, as the group announced themselves as MS-13

or from "La Mara". One of the groups of MS-13 went through the pockets of two of the victims, and tied the hands of one of the men so he would not get away. Another victim reported being tied up with shoe laces. Each of the victims advised that money was taken from them. While inside, the robbers passed around the weapons. Aguilar did not engage in sexual conduct with another person during the commission of the instant offenses. Aguilar fled the scene after committing the instant offenses.

17. Approximately 15 minutes after the burglars had entered the apartment, the police entered. Aguilar had fled, but the police were able to apprehend the remaining three. Police recovered the knife and gun nearby the arrestees.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

BY: _____
LAURA GWINN
Trial Attorney
United States Department of Justice
Organized Crime & Gang Section

_____
NIHAR MOHANTY
Assistant United States Attorney

*Defendant's Acceptance*

I have read each of the ten (10) pages of this Proffer of Proof and have discussed it with my attorneys, John Carney and Paul Kiyonaga. I fully understand this agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in paragraph one.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this plea agreement. I am satisfied with the legal services provided by my attorney in connection with this plea agreement and matters related to it.

Date: _11 - 27 - 12_ 　　　　 _Omar Aguilar_
　　　　　　　　　　　　　　　OMAR AGUILAR, Defendant


*Attorney's Acknowledgment*

I have read all of the ten (10) pages of this Proffer of Proof, reviewed them with my client, and discussed the provisions of the agreement with my client, fully. These pages accurately and completely set forth the entire plea agreement. I concur in my client's desire to plead guilty as set forth in this agreement.

Date: _11/27/12_ 　　　　 _____
　　　　　　　　　　　　　　　JOHN JAMES CARNEY, Esquire
　　　　　　　　　　　　　　　Attorney for the Defendant

Date: _11-27-12_ 　　　　 _____
　　　　　　　　　　　　　　　PAUL KIYONAGA, Esquire
　　　　　　　　　　　　　　　Attorney for the Defendant