UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | Criminal No. 10-256 (RMC) |
| GIL BERNARDEZ,<br>also known as Pando | : | |

**FILED**
**DEC -7 2012**
Clerk, U.S. District and
Bankruptcy Courts

## GOVERNMENT'S PROFFER OF PROOF IN
## SUPPORT OF DEFENDANT'S PLEA OF GUILTY

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits the following Proffer of Proof in Support of a Proposed Plea of Guilty by the defendant to Count One of the Indictment in the above-captioned matter.

The essential elements of the offense of conspiracy to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(d), that is, RICO conspiracy, each of which the government must prove beyond a reasonable doubt to sustain a conviction, are:

First, that the defendant knowingly conspired to conduct or participate in the conduct of the affairs of MS-13, an enterprise, through a pattern of racketeering activity;

Second, that MS-13 was an enterprise;

Third, that the activities of MS-13 would affect interstate commerce.

In order to find a "pattern of racketeering activity" for purposes of Count One, the government must prove beyond a reasonable doubt that the defendant agreed that a member of the conspiracy would commit at least two acts of racketeering as described in Count One, and that they were

separate acts. The government must prove also that those acts were in some way related to each other and that there was continuity between them. Acts are related to each other if they are not isolated events, that is, if they have similar purposes, or results, or participants, or victims, or are committed in a similar way, or have other similar distinguishing characteristics, or are part of the affairs of the same enterprise. There is continuity between acts if, for example, they are ongoing over a substantial period of time, or had the potential to continue over a substantial period, or if they are part of the regular way some entity does business or conducts its affairs.

### *Penalties for the Offense*

The penalty for participating in a RICO conspiracy, in violation of 18 United States Code § 1962(d), is set out in 18 United States Code § 1963(a). The maximum penalty, therefore, is:

(A) a fine not to exceed $250,000;

(B) life imprisonment;

(C) a term of supervised release of at least 5 years, after any period of incarceration;

(D) a special assessment of $100.

The United States Sentencing Guidelines § 5E1.2 permits the Court to impose an additional fine to pay the costs of imprisonment and any term of supervised release and/or probation.

### *Factual Proffer*

The following proffer of the Government's evidence is intended only to provide the Court with enough evidence to satisfy the mandate of Rule 11(b)(3) of the Federal Rules of Criminal Procedure. This proffer is not intended to be a disclosure of all the evidence available to the United States nor, to the extent it makes representations concerning anything the defendant said, is it a recitation of all that the defendant said.

Had this matter gone to trial, the Government's evidence would have shown, beyond a

reasonable doubt, the following:

1. Gil Bernardez, also known as Pando, was or has been a member of *La Mara Salvatrucha*, also known as MS-13 (hereafter "MS-13"). MS-13 is a criminal street gang and racketeering enterprise composed primarily of immigrants or descendants of immigrants from El Salvador, with members operating throughout the United States, including within the District of Columbia.

2. MS-13 is a national and international criminal organization with over 10,000 members regularly conducting gang activities in at least 20 states and the District of Columbia, as well as in Mexico, Honduras, Guatemala, and El Salvador. MS-13 is one of the largest street gangs in the United States, and has been functioning in the United States since at least the 1980s. Gang members actively recruit members, including juveniles, from communities with a large number of immigrants from El Salvador. Members, however, can also have ethnic heritage from other Central American countries.

3. Members of MS-13 are expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members require that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members are expected to use any means necessary to force respect from those who show disrespect, including acts of intimidation and violence.

4. Members of MS-13 engage in criminal activity, including murders, attempted murders, narcotics distribution, assaults, robberies, extortions, stealing vehicles, and obstructing justice in the form of threatening and intimidating witnesses whom they believe are cooperating with law enforcement. MS-13 members often use cell phones to plan, coordinate, and carry out these offenses, and to communicate with other MS-13 members in other states and in El Salvador

and other countries. A common practice of MS-13 is to force individuals who are involved in illicit criminal activities, such as prostitution or drug distribution, to routinely pay "rent," or extortion money, to MS-13. MS-13 often forces the payment of rent by violence or threats.

5. MS-13 is organized in the District of Columbia and elsewhere in "cliques," that is, smaller groups operating in a specific city or region. MS-13 cliques sometimes work together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. The cliques operate under the umbrella rules of MS-13. In the District of Columbia and surrounding metropolitan jurisdictions, these cliques include Sailors (SLSW), Normandie (NLS), Peajes, Western (WLS), Uniones (ULS), Fultons, and Park View. Members from different cliques often work together to commit crimes for the benefit of MS-13 as a whole. At all times relevant to this Indictment, the defendant was associated with MS-13's Normandie clique.

6. In the United States, MS-13 originated in Los Angeles, California, where, among other things, MS-13 members engaged in turf wars for the control of drug distribution locations. MS-13 quickly spread to states across the country, including Virginia, Maryland, Tennessee, North Carolina, and the District of Columbia.

7. At all times relevant to this Indictment, in order to join MS-13, members were required to complete an initiation process, often referred to as being "jumped in" or "beat in" to the gang. During that initiation, other members of MS-13 would beat the new member, usually until a gang member finishes counting aloud to thirteen.

8. At all times relevant to this Indictment, some members of MS-13 signified their membership by wearing tattoos reading "MARA SALVATRUCHA," "MS," "MS-13," or similar slogans, often written in Gothic lettering. The gang colors of MS-13 are blue, black, and

white, and members often wear clothing of these colors bearing the number "13," or with numbers that, when added together, totaled 13, such as "76." Also, MS-13 members from time to time marked their territory or signified their presence through the use of graffiti with the words "MS" or other identifying slogans. More recently, some MS-13 members have more discreetly and less publicly signified their membership by hiding and avoiding such clothing and tattoos in order to avoid detection by law enforcement. MS-13 members refer to one another by their gang names or other nicknames and may not know fellow gang members except by these gang names.

9. At all times relevant to the Indictment, members of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members required that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members were expected to use any means necessary to force respect from those who show disrespect, including acts of intimidation and violence. MS-13's creed is exemplified by one of its mottos, "*Mata, roba, viola, controlla,*" which translates in sum and substance to, "Kill, steal, rape, control."

10. At all times relevant to this Indictment, members of MS-13 engaged in criminal activity, including murders, attempted murders, narcotics distribution, assaults, robberies, extortions, stealing vehicles, and obstructing justice in the form of threatening and intimidating witnesses that they believed to be cooperating with law enforcement. MS-13 members were required to commit acts of violence to maintain membership and discipline within the gang, including violence against rival gang members or those they perceived to be rival gang members, as well as MS-13 members and associates who violated the gang's rules. As a result of MS-13's frequent use of violence, innocent persons were often injured or killed. Participation in criminal

activity by an MS-13 member, particularly violent acts directed at rival gang members or as ordered by the gang leadership, increased the level of respect accorded that member, resulting in that member maintaining or increasing his position in the gang, and possibly resulting in recognition as a leader.

11. At all times relevant to this Indictment, MS-13 members attended meetings together on a regular basis. During such meetings members commonly discussed gang rules and business, problems involving other gangs, illegal activity being conducted by the gang, law enforcement actions targeting MS-13, and suspicions of persons cooperating with law enforcement.

12. The leaders of individual MS-13 cliques are typically called "shot callers" or "*La Palabra.*" Above the "shot callers" are MS-13 leaders, often referred to as the "big homies," some of whom are incarcerated in El Salvador, who convey their orders through, among other means, the use of telephones. The leaders of MS-13 resolve disputes between gang members, address organizational issues, and participate in significant gang decisions such as whether to assault or murder gang members, associates, and other individuals suspected of cooperating with law enforcement. When such a decision is made to assault or murder gang members, associates, and other individuals suspected of cooperating with law enforcement or to otherwise discipline an MS-13 member, there is said to be a "green light" on that gang member, associate, or other individual.

13. At all times relevant to this Indictment, MS-13 members paid dues that were collected at gang meetings. MS-13 members collected dues for the benefit of, and to be provided to, MS-13 gang members who were imprisoned in the United States, in El Salvador, and elsewhere. On more than one occasion, MS-13 members in the Normandie clique and other

cliques in the metropolitan area transferred funds to MS-13 members incarcerated in prison in El Salvador. MS-13 members also collected dues to buy firearms to be used in the conduct of MS-13's affairs and other illegal activities.

14. At all times relevant to this Indictment, MS-13 members communicated about gang activities with other MS-13 members in the District of Columbia and elsewhere using mobile telephones, telephone text messages, notes or "kites," and other modes of communication. Additionally, MS-13 members used transnational and international money wire transfers to conduct and promote gang activities.

*The Racketeering Enterprise*

15. The evidence presented at any trial would establish beyond a reasonable doubt that MS-13, including its leadership, membership and associates, constituted an "enterprise" as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The evidence would further establish that the enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise.

*Purposes of the Enterprise*

16. The evidence would further establish that the purposes of the enterprise included: (a.) preserving and protecting the power, territory and profits of the enterprise through the use of intimidation, violence, including assaults and murder, and threats of violence, (b.) promoting and enhancing the enterprise and its members' and associates' activities, and (c.) keeping victims in fear of the enterprise and in fear of its members and associates through threats of violence and violence.

17. The evidence would further establish that beginning on a date unknown, but at least as of on or about January 1, 2008, and continuing through on or about July, 2011, in the District of Columbia and elsewhere, the defendant, Gil Bernardez, also known as Pando, being a person employed by and associated with MS-13, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, together with others known and unknown, did knowingly and intentionally conspire to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Section 1959(b)(1) and 1961(1), namely, acts involving Murder in violation of 22 D.C. Code, §§ 2101, 1803, and, 4502, and punishable pursuant to 22 D.C. Code, § 4502(a)(1); acts involving Murder in violation of Maryland Code, Criminal Law §§ 3-402 and 3-403 and the Common Law of Maryland; acts involving Murder in violation of Virginia Code §§ 18.2-32 and 18.2-26. It was part of the conspiracy that the defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

18. On April 7, 2008, the defendant, Dennis Gil-Bernardez, while riding in a vehicle on Quincy Street in Washington, D.C., saw a person he believed to be a rival gang member. He told the driver to stop the vehicle, got out with a gun and crossed the street to the victim, identified as Dimas Perez. Gil-Bernardez shot Perez multiple times, including one shot to the neck. Perez underwent life-saving surgery and was hospitalized for a week.

19. On July 29, 2008, Gil-Bernardez and other MS-13 members were in an apartment complex in Riverdale, Prince George's County, Maryland, when they saw Luis Chavez-Ponce, whom they believed to be a rival gang member. Gil-Bernardez stopped one of the other MS-13 members from chasing after Chavez-Ponce, who was on a bicycle. Gil-Bernardez chased

Chavez-Ponce around the corner of the building and fired several shots, which killed Chavez-Ponce. The gun which Gil-Bernardez used was determined to be the same gun used in the Reston shootings on October 6, 2008.

20. On October 6, 2008, Gil-Bernardez and other MS-13 members confronted three persons at an apartment complex in Reston, Virginia. A surveillance camera shows Gil-Bernardez and his companions at the complex. Gil-Bernardez shot the three victims and fled. The gun which he used was determined to be the same gun used to kill Chavez-Ponce. All of the victims in the Reston case, while seriously injured, survived their injuries.

21. Sometime in 2008, during a Normandie clique meeting, Gil-Bernardez spoke by cell phone with another member of MS-13 who was incarcerated in El Salvador. Immediately after that conversation, Gil-Bernardez announced that there was a "green-light" on Louis Membreno-Zelaya also known as "Brujo." Gil-Bernardez appointed certain MS-13 members and/or associates to begin looking for him. Gil-Bernardez also advised other cliques that Membreno-Zelaya had been green-lighted and that they should kill him. On or about November 6, 2008, in Washington, D.C., acting on Gil-Bernardez's orders, members of MS-13 stabbed Louis Membreno-Zelaya to death.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

BY: /s/ LAURA GWINN
LAURA GWINN
Trial Attorney, Department of Justice

/s/ NIHAR MOHANTY
NIHAR MOHANTY
Assistant United States Attorney

*Defendant's Acceptance*

    I have read each of the ten (10) pages of this Proffer of Proof and have discussed it with my attorneys, William Pupura and Howard Katzoff. I fully understand this agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in paragraph one.

    I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this plea agreement. I am satisfied with the legal services provided by my attorney in connection with this plea agreement and matters related to it.

Date: 12/7/2012

GIL BERNARDEZ, Defendant

*Attorney's Acknowledgment*

    I have read of the ten (10) pages of this Proffer of Proof, reviewed them with my client, and discussed the provisions of the agreement with my client, fully. These pages accurately and completely sets forth the entire plea agreement. I concur in my client's desire to plead guilty as set forth in this agreement.

Date: 12/7/2012

William Pupura, Esquire

Howard Katzoff, Esquire

11