IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action |
| | ) | No. 10-cr-256-RCL-14, 16 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Washington, DC |
| MOISES HUMBERTO RIVERA-LUNA | ) | April 13, 2026 |
| (14), | ) | Time: 10:06 a.m. |
| AND TOKIRO RODAS-RAMIREZ | ) | |
| (16), | ) | |
| Defendants. | ) | |

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For Plaintiff: Nihar Ranjan Mohanty
U.S. ATTORNEY'S OFFICE
FOR THE DISTRICT OF COLUMBIA
Violent Crime and Narcotics
Trafficking Section
555 4th Street, NW
Room 4120
Washington, DC 20530

Mark Levy
United States Attorney's Office
601 D Street NW
Washington, DC 20001

For Defendant (14): Alfred Guillaume, III
LAW OFFICES OF
ALFRED GUILLAUME III, LLC
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

(Appearances continued on the following page.)

A P P E A R A N C E S

For Defendant (16):

Sandi S. Rhee
LAW OFFICE OF SANDI RHEE
10001 Georgetown Pike
Suite 63
Great Falls, VA 22066

Robert A. Feitel
LAW OFFICE OF ROBERT FEITEL
1300 Pennsylvania Avenue NW
Suite 1505
Washington, DC 20008

Spanish interpreters:

Teresa Roman
Manuela Crisp

Witness Spanish Interpreters:

Shelley Blumberg-Lorenzana
Maria McFadden

---

Court Reporter:

Rebecca Monroe, RPR
Official Court Reporter
United States Courthouse, Room 6706
333 Constitution Avenue, NW
Washington, DC 20001

TABLE OF CONTENTS

WITNESSES

On behalf of the Government:


MANUEL SARAVIA Page

Direct examination by Mr. Mohanty............... 5
Cross-examination by Mr. Guillaume.............. 38
Cross-Examination by Ms. Rhee................... 52
Redirect examination by Mr. Mohanty............. 70

DR. ZABUILLAH ALI (testimony read for the record)

Direct examination read by Mr. Levy............. 73

P R O C E E D I N G S

THE DEPUTY CLERK: This is criminal case 10-256, United States of America versus Defendant 14, Moises Humberto Rivera-Luna and Defendant 16, Tokiro Rodas-Ramirez.

For the record, the interpreters were previously sworn.

Starting with the Government, please approach the podium and state your appearance for the record.

MR. MOHANTY: Good morning, Your Honor. Nihar Mohanty, Candace Battle, and Mark Levy for the United States.

MR. GUILLAUME: Good morning, Your Honor. Alfred Guillaume for Mr. Moises Humberto Rivera-Luna, seated to my left at trial table.

MR. FEITEL: Happy Monday, Your Honor. Robert Feitel and Sandi Rhee for defendant Tokiro Rodas-Ramirez, and we're ready to proceed.

THE COURT: All right. You can bring the jury.

MR. MOHANTY: Your Honor?

THE COURT: Yes.

MR. MOHANTY: While Ms. Calloway is out, I did want to alert the Court to one thing. And that is Dr. Ali contacted me over the weekend and he cannot be here today so the parties have agreed to read in his transcript from the prior proceeding as we have with the other medical examiners.

THE COURT: All right.

MR. MOHANTY: Thank you.

(Jury panel enters the courtroom.)

THE COURT: All right. You may be seated. The Government may call your next witness.

MR. MOHANTY: Good morning, Your Honor. Good morning, ladies and gentlemen.

Your Honor, the Government will call Manuel Saravia.

(Oath administered to the witness.)

MANUEL SARAVIA, GOVERNMENT WITNESS

THE DEPUTY CLERK: Thank you. You may be seated.

DIRECT EXAMINATION

BY MR. MOHANTY:

Q. Good morning.

A. Good morning.

Q. Sir, could you begin by stating your first and last name and spelling them both for Judge Lamberth and the ladies and gentlemen of the jury?

A. My name is Manuel Antonio Saravia.

Q. Sir, could I ask you to pull that microphone a little bit closer to you.

Could you spell your first name, please.

A. M-A-N-U-E-L.

Q. And could you spell your last name, sir.

A. S-A-R-A-V-I-A.

Q. Mr. Saravia, how old are you?

A. 46.
Q. Where were you born?
A. El Salvador.
Q. How far did you go to school when you were in El Salvador?
A. Second grade.
Q. And did there come a time when you came to the United States?
A. Yes.
Q. When was that?
A. July 4th -- rather June 4th, 1993.
Q. Did you come here legally or illegally?
A. Legally.
Q. And when you came here, did you continue with your schooling?
A. Yes.
Q. How far did you go in school here in the United States?
A. 11th. 11th.
Q. Do you speak any English, Mr. Saravia?
A. Yes.
Q. Do you just feel more comfortable using an interpreter in this setting?
A. Yes.
Q. I'm going to ask you some questions and then the other lawyers will ask you some questions. If you don't understand any of our questions, please let us know and we will rephrase

the question for you.
A. All right.
Q. After you came to this country, what -- and you finished -- or went to 11th grade, what type of work did you do?
A. Construction. I was a mason working with brick laying and stone laying.
Q. Are you still doing that type of work?
A. Not the same type of work, but I am still working in construction.
Q. Okay. And without telling us where exactly you work or who you work for, could you tell us how long you'd been doing construction?
A. I'm going on four months now.
Q. I want to ask you some questions now about MS-13. When did you first learn about the gang known as MS-13?
A. It was when I was 13 years old in El Salvador.
Q. Did you join the gang when you were in El Salvador?
A. Yes.
Q. Do you remember the name of the clique that you joined in El Salvador?
A. No.
Q. When you -- well, can I ask, do you know if there are any colors that MS-13 uses to represent itself?
A. Yes.
Q. And what are those colors?

A. Blue and white.
Q. And when you were a member of MS-13, is there a way that most MS-13 members wore their hair?
A. Short hair.
Q. Are you familiar with the gang the 18th Street gang?
A. Yes.
Q. And what colors do they usually wear?
A. Red.
Q. What about their hairstyle, do they wear their hair usually one way or the other?
A. Long.
Q. When you came to this country, did you join -- or I guess rejoin MS-13?
A. Yes.
Q. And what clique did you join?
A. Hollywood. The Hollywood.
Q. And the Hollywood clique that you joined, do you remember where it was? Was it in the -- Maryland, Virginia, D.C. or somewhere else?
A. Maryland.
Q. Do you remember who the -- what the nickname of the clique leader of the Hollywood clique was when you joined?
A. Yes.
Q. What was that?
A. Chicano.

Q. Are you familiar with the Normandy clique?
A. Yes.
Q. Are you familiar with somebody named Pando?
A. Yes.
Q. Have you ever met Pando?
A. I just met him once.
Q. Are you familiar with somebody by the nickname Perverso?
A. Yes.
Q. Did you ever meet Perverso in person?
A. No.
Q. Okay. Did there come a time when you left the Hollywood clique and joined the Normandy clique?
A. Yes.
Q. Why did you leave the Hollywood clique?
THE INTERPRETER: Interpreter is going to ask for repetition.
THE WITNESS: Because allegedly I asked -- I had disrespected the leader of the Hollywood clique.
BY MR. MOHANTY:
Q. Okay. And after you allegedly disrespected the leader of the Hollywood clique, what if anything did they do to you?
A. They punish me and left me for dead.
Q. Okay. When you say they punished you, how did they punish you?
A. They -- they beat me for 13 seconds.

Q. And after you'd been beaten, did you have to go to the hospital?
A. Yes.
Q. How long were you in the hospital?
A. Four hours.
Q. After that happened, did there come a time when you joined the Normandy clique?
A. Yes.
Q. Do you remember approximately what month and year that was that you joined the Normandy clique?
A. Like in 2009, around August.
Q. Can I ask you, who was the leader of the Normandy clique when you joined in August of 2009?
A. Cocky.
Q. Do you remember if anyone was assisting him -- assisting Cocky of running the clique when you joined in August of 2009?
A. Yes.
Q. Who was that?
A. Crimen.
Q. Have you heard the nickname Mecri before?
A. Yes.
Q. And are Mecri and Crimen two different people or the same person?
A. The same person.
Q. What about your nickname? What was your nickname in the

Hollywood clique?
A. Cholo.
Q. When you joined the Normandy clique, did you get a new nickname?
A. Yes.
Q. What was that?
A. Mesias.
Q. Who gave you the nickname Mesias?
A. Viejo Santos.
Q. When you were in the Normandy clique, did people sometimes still call you Cholo?
A. No, no, because once I started with Normandy auto -- and they gave me the new gang nickname, then immediately, you know, people just started calling me by that name. I was just Mesias.
Q. Did anyone vouch for you before you joined the Normandy clique?
MS. RHEE: Objection, Your Honor. Leading.
THE COURT: Sustained.
BY MR. MOHANTY:
Q. Before you joined the Normandy clique, who, if anyone, vouched for you?
A. Yes, Viejo Santos.
Q. Why do you think Viejo Santos vouched for you to join the Normandy clique?

MR. GUILLAUME: Objection. Speculation.
MS. RHEE: Objection.
THE COURT: Sustained.
BY MR. MOHANTY:
Q. Do you know why he vouched for you?
A. Because he saw that I was someone who was respected.
Q. Okay. Let me ask you, before you joined the Normandy clique, had you talked to Viejo Santos?
A. No, while I was with Hollywood, I never talked to him. It was only after I was with Normandy.
Q. The person you're referring to as Viejo Santos, did you ever meet him in person?
A. No.
Q. When you joined the Normandy clique, did you get jumped in?
A. Yes.
Q. Did they do that as soon as you joined in, or were you allowed to heal from your injuries first?
A. They waited for me to heal first because Viejo Santos gave that order.
Q. You had testified earlier about somebody named Cocky.
A. Yes.
Q. After he was arrested, did your leadership -- or did your role in the gang change?
A. Yes.
Q. How did it change?

A. I became the second in command.
Q. And who was the first in command of the clique when you became the second?
A. Crimen.
Q. Are you familiar with the word or term "La Hermandad"?
A. Yes.
Q. What is La Hermandad?
A. It is like the cliques united.
Q. Who -- whose idea was it to form La Hermandad?
A. Viejo Santos.
Q. Was there a leader of La Hermandad locally when you were in -- and when I say locally, I mean in the D.C., Maryland, Virginia area -- when you were in the Normandy clique?
A. Yes.
Q. And who was that?
A. Gallo.
Q. Did you have any role in La Hermandad?
A. No, I was just in the group as part of La Hermandad -- as part of Normandy.
Q. You mentioned somebody named Gallo, are you familiar with the name Llago?
A. Yes.
Q. What about the name Gallina, have you heard that?
A. Yes.
Q. And Gallo, Llago, and Gallina, are they the same person or

three different people?
A. Same person.
Q. Okay. After you became the second word in the Normandy clique, about how often would you speak with the person you knew as Viejo Santos?
A. Quite frequently, almost every day.
Q. And when you spoke to him, how did you speak to him?
A. Over the phone.
Q. And when you were speaking to him on the phone, where was Viejo Santos?
A. He was imprisoned in El Salvador.
Q. When you were speaking to Viejo Santos, what if anything did he tell you about where he was from?
A. That he was from El Salvador, but had been here in the United States and he had been deported due to the domestic violence.
Q. Did Viejo Santos tell you what state he had been in here in the United States before he was deported?
A. Los Angeles, California.
Q. Did Viejo Santos ever tell you what his first name was?
A. Yes.
Q. What was that?
A. Moises.
Q. Okay. I want to ask you some questions now about somebody named Zombie.

A. Okay.
Q. Have you ever met a person who went by that nickname?
A. Yes.
Q. How many times did you meet Zombie?
A. Twice.
Q. Okay. I want to ask you some questions about the first time that you met him. Do you remember when approximately that was?
A. The first time I saw him was, like, in the beginning of 2010.
Q. Where was it that you --
THE INTERPRETER: One moment, please.
(Pause.)
THE INTERPRETER: Pardon.
MR. MOHANTY: I'm sorry, madam interpreter. I was asking:
BY MR. MOHANTY:
Q. Where was it that you first saw him in 2010?
A. In Silver Spring, in my home.
Q. And why was he in your house in Silver Spring then?
A. Because we had had a meeting.
Q. A meeting of the Normandy clique?
A. Yes.
Q. And what happened with Zombie at that meeting?
A. He had a knife.

Q. Did you actually see him yourself with the knife?
A. No.
Q. Who said they saw him with a knife at the meeting?
A. Cocky.
Q. And at that time what was Cocky's role in the clique?
A. He was the boss of the clique.
Q. Are there rules in MS-13 about bringing weapons to clique meetings?
A. Yes.
Q. And what's the rule about bringing weapons to a clique meeting?
A. At no moment in time can someone bring a weapon to a meeting. You can -- can't have cell phones either, only the boss can have a cell phone.
Q. Who told you that Zombie had brought a knife to that clique meeting?
A. Cocky.
Q. And as leader of the clique at that time, did Cocky -- was Cocky supposed to let Viejo Santos know what had happened?
MR. GUILLAUME: Objection, Your Honor.
THE COURT: Overruled.
MR. GUILLAUME: Calls for speculation.
BY MR. MOHANTY:
Q. The judge overruled the question, you can answer the question.

A. Repeat the question, please.
Q. As leader of the clique at that time, was Cocky obligated to report to Viejo Santos what had happened?
A. Yes.
Q. Did you later speak to Viejo Santos about Zombie?
A. Yes.
Q. And what did Viejo Santos tell you about Zombie?
A. That he had looked for him in places like Guatemala and there was no Zombie there.
Q. Okay. And when you say that he had looked for him in places like Guatemala and there was no Zombie there, what do you mean?
A. Because when someone comes here and they say that they're part of MS, they have to have a reference in the place where they come from who can vouch for them saying that they're signed up there originally.
Q. Okay. So was Viejo Santos telling you that they could not find a record of a Zombie in Guatemala that was part of the MS-13 gang?
A. Yes.
Q. What did Viejo Santos -- what, if anything, did Viejo Santos ask you to do about Zombie?
A. He gave the order, that was all we could do, he gave the order that we should kill him.
Q. Okay. I want to ask you a couple of questions about your

personal health.
A. Okay.
Q. In 2010, did you have to undergo surgery of some kind?
A. Yes.
Q. What kind of surgery did you have?
A. It was surgery in my back.
Q. Why did you need to have that surgery?
A. Due to a car accident.
Q. Do you remember the day that you had the surgery -- the date I should say?
A. March 8, 2010.
Q. After Viejo Santos had given the order to kill Zombie, did you speak to Gallo?
A. Yes.
Q. And what did Zombie -- excuse me, what did Gallo say?
A. That the man had been found.
Q. And when he said that, who did you -- when he said that "the man had been found," who did you think he was referring to?
A. Zombie.
Q. Did Gallo ask you to come see him?
A. Yes.
Q. And did you do that?
A. Yes.
Q. Do you remember where it was that Gallo lived? And this

is -- I just want to -- in March of 2010?
A. Not exactly, but I know it was -- he lived around Randolph Road.
Q. Was that in Maryland?
A. Yes.
Q. When you went to Gallo's house, was anybody else there?
A. Yes.
Q. Who was that?
A. Mowgli who was from a different clique.
Q. But still MS-13?
A. Yes.
Q. What, if anything, did Gallo give you?
A. He gave me a .22 revolver.
Q. And what did he want you to do with the .22 revolver?
A. To go and pick up Mowgli and give the weapon -- I mean the gun to Mecri.
Q. And when you saw Gallo, did you see whether or not he had a weapon that evening?
A. Yes.
Q. What kind of weapon did he have?
A. A 9-millimeter.
Q. So after you got the .22 revolver from Gallo, where did you go?
A. First I had to go pick up Mecri, and then we had to go pick up Zombie.

Q. When you went to pick up Zombie, were there other members of MS-13 there?
A. Yes.
Q. About how many?
A. Two.
Q. And can I ask you, were you the one driving this whole time?
A. Yes.
Q. Do you remember anything that Zombie was wearing when you picked him up that night?
A. He was wearing like -- with a jacket. What I mean is a suit, like a suit.
Q. Like what I'm wearing?
A. Yes.
Q. Thank you. After you picked up Zombie, Mecri, and these other MS-13 members, where did you go?
A. Gallo gave me an address that was like near a lake and he told me to go there, that he would be waiting there, and that I should bring Zombie.
Q. And did you do that?
A. Yes.
Q. And when you got to near this lake, who got out of your car?
A. Mecri and Zombie.
Q. Bless you.

And when you got to near this lake, was Gallo there?
A. Yes, Gallo was there with another MS who was Mowgli.
Q. And what did Gallo ask you to do with these other MS guys?
A. That I should take away those members of MS-13 from another clique so they wouldn't know who killed Mecri -- I mean Zombie.
Q. And did you do that?
A. Yes.
Q. Did you see Mecri later that night?
A. Yes.
Q. Let me ask you, when you drove off with those other MS-13 guys, as Gallo had told you to do, did you hear any gunshots?
(Sneezing.)
MR. MOHANTY: Bless you.
THE WITNESS: No.
BY MR. MOHANTY:
Q. Okay. So I was asking you if you saw Mecri later that night. Did you see Mecri later that night?
A. Yes.
Q. Where did you see him?
A. I saw him at a McDonald's.
Q. And were you supposed to meet him at the McDonald's?
A. Yes, because I had to give him a ride home to his house.
Q. Okay. And when you were with Mecri that night, after the McDonald's, what if anything did he tell you about the killing of Zombie?

A. Gallo was shooting, and when he noticed that he was scared, Mecri went and he took the 9-millimeter and he shot him.
Q. So that I understand clearly, did Mecri say that both he and Gallo shot or only one of them shot?
A. Yes, both of them shot at him at the same time.
Q. And why did -- why wasn't -- let me ask you.
Was it important for you, as the second word, to know what had happened?
A. Yes.
Q. Did you later speak to Gallo about what happened to the gun that he had used, the 9-millimeter?
A. Yes.
Q. What did he tell you they had done with the gun?
A. He had sent it to El Salvador.
Q. Did you later speak to Viejo Santos about what happened to Zombie?
A. Yes.
Q. What did you tell Zombie -- excuse me.
What did you tell Viejo Santos about Zombie?
A. That the soup had already been cooked.
Q. And when you told him that, do you remember what, if anything, he said back to you?
A. Yes, he said something to me, but I don't remember.
Q. When you were in the Normandy clique back then in 2010, do you remember somebody who used the nickname Silvestre?

A. Yes.
Q. Do you remember before you came to court this morning meeting with me and Ms. Battle played a recording for you?
A. Yes.
Q. Did you recognize who was speaking in that conversation?
A. Yes.
Q. Who was speaking?
A. Silvestre and myself.
Q. And was that a fair and accurate recording of your conversation with Silvestre?
A. Yes.
MR. MOHANTY: Your Honor, at this time the Government would move admission of Government Exhibit 934 and 934A, which is the transcript of that conversation.
THE COURT: Received.
MR. MOHANTY: Ladies and gentlemen, if you could turn to Tab 29 in your transcript book. Your Honor, do you need a transcript?
THE COURT: I have it.
THE INTERPRETER: So do I, Mr. Mohanty, please. Thank you.
MR. MOHANTY: Does anybody else need one?
THE INTERPRETER: What is the tab again?
MR. MOHANTY: 29. Could you play that for us, Ms. Battle.

(The audio recording was played but not transcribed herein.)

BY MR. MOHANTY:

Q. Okay. Mr. Saravia, did you hear that when you were speaking to the person you knew as Silvestre back then, did you hear a part where you said words to the effect of you didn't like how it -- you didn't like how we did it -- how we'd done it?

A. Yes.

Q. What did you mean by that, that you didn't like how you all had done it?

A. Because it was being done close to my house as if they were setting me up.

Q. As if who was setting you up?

A. Gallo.

Q. Did there come a point when you became the leader of the clique?

A. Yes.

Q. Do you recall when that was?

A. It was after this was done to Zombie.

THE INTERPRETER: The interpreter corrects:

THE WITNESS: It was after Zombie was killed.

BY MR. MOHANTY:

Q. Okay. When you were the leader of the Normandy clique here in the D.C., Maryland, Virginia area, did you collect dues?

A. Yes.

Q. And about how much were collected in dues from each member each time that you met?
A. 40- to $50.
Q. How often did you all have meetings?
A. Every -- twice a month.
Q. How else did the clique make money?
A. Selling drugs and setting up rent.
Q. And can you tell us what you mean by rent?
A. We would -- we would charge rent to people who were doing things like selling drugs, they had businesses like that, and also selling girls as whores.
Q. Okay. And so you -- would you make those people that were selling drugs or prostituting women pay the clique money, is that what you mean?
A. Yes, we also did robberies.
Q. Okay. And these things: The rent, the drug selling, the robberies; were those all discussed at your clique meetings?
A. Yes.
Q. When you were the second word of the clique, would it be important for you to know about all of those things as well?
A. Yes.
Q. And what happened to the money that the clique made doing these things: Robberies, drugs, rent -- what happened with all that money?
A. It was for the gang, it was to buy guns.

Q. When you were in the Normandy clique, would you sometimes send money via Western Union to people?
A. Yes, I would send money for Viejo Santos.
Q. And to whom would you send that money for Viejo Santos?
A. Could you repeat the question?
Q. When you wanted to send money to Viejo Santos, do you recall the name of the person who you would send the money to?
A. Julia.
Q. The money that the clique made through these things you've talked about: Robberies, rent, drugs; would you sometimes use that for gang purposes here in the United States?
A. Yes.
Q. What kind of things would you use that money for?
A. We usually used it especially to buy guns.
Q. I want to ask you some questions about somebody named Michelle Rios.
A. Okay.
Q. Did you know somebody by that name?
A. Yes.
Q. Were you in a relationship with her for some time?
A. Yes.
Q. Before you started to -- to be in a relationship with her, to date her, did you know whether she dated somebody named Junior?
A. Yes.

Q. Do you know whether or not she had children by Junior?
A. Yes.
Q. Have you ever met Junior?
A. No.
Q. Do you know what other people in the Normandy clique thought about Junior?
A. Yes.
Q. What did they think about him?
A. That he was a snitch.
Q. Did there come a time when people in the gang thought that Michelle Rios was a snitch?
A. Yes.
Q. And who did they think that she had snitched on?
MS. RHEE: Objection, Your Honor. Relevance.
THE COURT: Overruled.
BY MR. MOHANTY:
Q. You can answer.
A. Pando and -- just one second. Just a second.
That she had snitched on Pando and the second one -- the second in command, what's his --
Q. It's okay if you don't remember.
A. It's not coming to mind right now, but I know it.
Q. Okay. When -- when you found out that some of these -- some of the people in the gang thought that she had snitched on Pando and a person who you said was the second in command --

and let me ask you first, when you say snitch, do you mean that she had cooperated with police?
A. Yes.
Q. And when you say that the gang -- some people in the gang thought she had snitched on Pando and the second in command, do you mean the person who was the second in command of the Normandy clique?
MS. RHEE: Asked and answered, Your Honor.
THE COURT: Overruled.
THE WITNESS: Yes.
BY MR. MOHANTY:
Q. After you learned that that's what some of the people in the gang thought, did you speak with Pando?
A. Yes.
Q. And what did Pando tell you about whether or not she had cooperated?
A. He told me that she had not cooperated. He told me she had not cooperated.
Q. And after you -- did you tell other gang members what Pando had told you?
A. Yes.
Q. And what did they say?
A. They didn't really accept what Pando was saying.
Q. And when you heard that they didn't accept what Pando was saying, what did you start to think?

A. That it wasn't fair to kill a girl like that.

THE INTERPRETER: Interpreter correction: That had children.

BY MR. MOHANTY:

Q. Do you know somebody by the name Blanca?

THE INTERPRETER: Interpreter requests repetition.

BY MR. MOHANTY:

Q. Do you know someone by the name Blanca?

A. Yes.

Q. Do you recall speaking to her in 2010?

A. Yes.

MS. RHEE: Objection, Your Honor.

THE COURT: Overruled.

MS. RHEE: Hearsay.

BY MR. MOHANTY:

Q. After you spoke with Blanca, did you speak with the person known as Perverso?

A. Yes.

Q. And let me ask you first, maybe I forgot this, but the person known as Perverso, had you ever met him face to face?

A. No.

Q. And how did Perverso -- how did you speak to Perverso? On the telephone?

A. Over the phone.

Q. And did you call Perverso or did he call you?

A. He called me.
Q. And when he called you, what did he say about Michelle Rios?
A. That she had some -- that he had some business with her.
Q. And what did you understand it to mean when he told you that he had some business with her?
A. Well, since this was MS-13, basically that was a threat that since she had snitched on Pando and on him, that she was going to be killed.
Q. Okay. At some point did you get arrested in connection with this case, Mr. Saravia?
A. Yes.
Q. Do you remember when that was that you got arrested?
A. 2011.
Q. After you got arrested, was an attorney appointed for you?
A. Yes.
Q. Do you remember that person's name?
A. Conte.
Q. Are there rules in MS-13 about cooperating with law enforcement?
A. Yes.
Q. And what are the rules about cooperating with law enforcement in MS-13?
A. That if you cooperate with law enforcement, that automatically that means death.

Q. And you're -- did you enter a guilty plea in connection with your case?
A. Yes.
Q. And as part of that plea, did you agree to cooperate with the Government?
A. Yes.
Q. Well, if you just told us that the penalty for cooperation is death, why did you plead guilty and agree to cooperate?
A. Because I was already under threat and that was already going to happen to me because when I didn't agree with the gang to kill Michelle Rios and I didn't want to do anything to her and I didn't do anything to her and I didn't kill her, then I -- and I was given -- I was given a green light.
MR. MOHANTY: Your Honor, may I approach the witness with what's been marked as Government Exhibit 1508B, as in boy.
THE COURT: Yes.
BY MR. MOHANTY:
Q. Could you take a look at Government Exhibit 1508, Mr. Saravia. Do you see your signature on the last pages along with Mr. Conte's signature?
A. Yes.
Q. And is that a copy of the plea agreement you entered into when you pled guilty to RICO conspiracy in connection with this case?
A. Yes.

MR. MOHANTY: Your Honor, the Government would move admission of Government Exhibit 1508B, as in boy.

THE COURT: Received.

MS. RHEE: No objection, Your Honor.

BY MR. MOHANTY:

Q. Mr. Saravia, why did you plead guilty to RICO conspiracy in connection with this case?

A. Because what I was doing was not fair and so I was aware of that and took stock of what I'd done.

Q. Okay. And to be fair you were hoping for a lower sentence as one of the reasons, is that right?

A. Yes.

Q. And in exchange for your taking responsibility for what you did in testifying truthfully, what promises did the Government make to you?

A. None.

Q. Do you remember what the maximum sentence you could have received?

A. Life.

Q. Before you were sentenced, do you remember going over something called a presentence report with your lawyer, Mr. Conte?

A. Yes.

Q. And did that report include all the criminal conduct that you did?

A. Yes.
Q. And was that -- did Mr. Conte tell you that the judge who would sentence you, Judge Collyer, would have that report?
A. Yes.
Q. I'm not going to go over everything that you did for the gang, but I want to ask you about a few things.
Do you remember giving a gun to somebody in the gang named Pava?
A. Yes.
Q. And was that so he could shoot a rival gang member?
A. Yes.
Q. And after he shot at a rival gang member, did you help to hide him from police?
A. Yes.
Q. And you had said earlier that you didn't do anything to Michelle Rios. Can I ask you, did you ever hit Michelle Rios?
A. Well, because she was part of the gang and the gang requires discipline, and you have to respect the homeboys and the barrio. And so because she disrespected someone, she had to face discipline and, you know, there was discipline within the clique so she had to be reprimanded.
Q. Okay. So that means you beat her?
A. That's right. She had to be punished because she had not followed the rules and had disrespected the gang and the barrio. And, yes, that is right, I gave the order because she

was part of the gang and so -- and since she disrespected the gang, she had to be punished.
Q. Okay. As you are sitting here today, 2026, do you remember what rule she had violated that required her to be -- to be punished?
A. Yes, she disrespected someone in her clique, she disrespected one of the homeboys.
Q. Okay. But whatever she did to disrespect one of the homeboys, was that something different than her alleged snitching on Pando and the second in command of the clique? Does that make sense?
A. That does have sense -- does make sense.
Q. So was she -- when you ordered discipline for her, was that in relation to something else, not the alleged snitching?
A. No, it was something different.
Q. I want to ask you in case I forgot, something about Zombie. When you went to pick Zombie up the night before he was killed, do you recall what, if anything, you told him about what was going to happen to him?
A. No, just that I -- since we were in my car and I had been recently operated on, we lied to him, I lied to him and told him that he would be taking my spot as leader.
Q. And why did you tell him that?
A. It was the only way for him not to realize that what we were going to do was kill him.

Q. So after you pled guilty and you and your lawyer went over that presentence report, did there come a time when you were, in fact, sentenced by Judge Collyer?
A. Yes.
Q. Do you recall what I asked Judge Collyer to give you as a sentence?
A. 23 years.
Q. And do you recall what sentence she gave you?
A. 20 years.
Q. And was your sentence later reduced to 17 years because of additional cooperation in a different MS-13 case?
A. Yes.
Q. Do you know what your immigration status is now?
A. Yes.
Q. And what is that?
A. I have a work permit.
Q. Are you on what is called supervised release now?
A. Yes.
Q. And are you hoping that after your testimony in this case, that I will ask the judge supervising that to reduce your term of supervised release?
A. Yes.
Q. And what did I tell you about that?
A. You have not promised anything.
MR. MOHANTY: Court's indulgence.

(Pause.)

BY MR. MOHANTY:

Q. Just a couple more questions, Mr. Saravia.

You said that when you joined the Normandy clique, Viejo Santos gave you the nickname Mesias. Do you remember that?

A. Yes.

Q. And why did he give you a new name instead of Cholo?

A. Because there was someone else already in El Salvador named Cholo and they couldn't have someone with the same name here in the United States while there was someone with that name in El Salvador.

Q. Okay. And when you say somebody else, do you mean somebody in El Salvador had the -- in the Normandy clique had the nickname Cholo?

A. Yes. Those are gang rules.

Q. And can I ask you, were you -- after your surgery on March 8th of 2010, were you able to -- the next day or the next couple days would you have been physically able to run?

A. Could you please repeat that question.

Q. Sure. You said you had surgery on March 8th, 2010, for your back injuries from the car accident?

A. Yes.

Q. And my question for you was in -- how long before you could start to run again?

A. Nearly a year.

Q. And you've testified today, and I met with you before court today, right?
A. Yes.
Q. About how many times do you think you have seen me in the last 15 years?
A. Well, this year I saw you twice -- with last year and this year, I've seen you three times already.
Q. Thank you.
MR. MOHANTY: Your Honor, may I approach to retrieve that exhibit?
THE COURT: Yes.
MR. MOHANTY: Thank you, Your Honor. No further questions at this time.
THE COURT: We'll take our morning recess.
(Jury panel leaves the courtroom.)
(Recess.)
THE COURT: Bring your witness.
MR. MOHANTY: I'll step out, Your Honor.
THE DEPUTY CLERK: Jury panel.
(Jury panel enters the courtroom.)
THE COURT: You may be seated. You may cross-examine.
MR. GUILLAUME: Thank you, Your Honor.
THE INTERPRETER: Testing.
(Pause.)

THE INTERPRETER: Your Honor, before we begin, could we instruct the witness to speak into the microphone more carefully. We're having trouble hearing.

MR. GUILLAUME: Ready?

THE INTERPRETER: Yes, sir.

MR. GUILLAUME: Thank you.

CROSS-EXAMINATION

BY MR. GUILLAUME:

Q. Mr. Saravia, you were arrested in 2011, is that right?

A. Yes.

Q. And you have testified again cooperating with law enforcement, is that right?

A. Yes.

Q. You were appointed an attorney?

A. Yes.

Q. You discussed the options that were available to you at that time?

A. Yes.

Q. And you ultimately decided to cooperate, right?

A. Yes.

Q. And cooperation in your case meant telling the law enforcement officials about your activities in the gang before joining Normandy and while with Normandy, correct?

A. Yes.

Q. And, in fact, we heard about some of those things on your

direct examination, some of the acts that you committed in the name of the gang?
A. Yes.
Q. I want to come back to those in a little bit, but I want to -- I want to clear up a few things first.
You testified that you came to the United States legally when you were a teenager, is that right?
A. Yes.
Q. And, sir, you were -- just to be clear, you were not a United States citizen at that time, right?
A. Right.
Q. You've testified that you have, I believe currently in 2026, a work permit to work and live in the United States, is that correct?
A. Yes.
Q. And that's after you served a prison sentence in the United States, is that right?
A. Yes.
Q. And you're currently on what's called supervised release, which means that you're supervised by an agent of some sort -- probation agent or whatever the term is -- by the Federal Government, is that right?
A. Yes.
Q. Sir, I want to ask you some questions about your direct testimony, specifically about the person that you refer to as

Viejo Santos. Okay.
A. Okay.
Q. This is a person you've never met or seen before, is that right?
A. Right.
Q. And you testified that you spoke with this person frequently in the years around 2010, is that correct?
A. Yes.
Q. You believed the person you were speaking to was in the country of El Salvador, is that correct?
A. Yes.
Q. And is that because you had the contact number for that person in El Salvador?
A. No, because he was from MS, and MS is very dangerous and has a lot of power.
Q. Okay. So that wasn't exactly my question. My question was the way in which you contacted Viejo Santos was by telephone, is that right?
A. Yes, yes.
Q. Okay. And in order for you to contact them by phone, you had to have his number and he yours, right?
(Sneezing.)
MR. GUILLAUME: Bless you, Your Honor.
THE WITNESS: Yes.
BY MR. GUILLAUME:

Q. And you had -- and you communicated with him frequently, almost at one point on a daily basis, is that right?
A. Yes.
Q. And you understood that the person you were speaking to, you believed him to be -- his role to be the boss of the Normandy clique, is that right?
A. Yes.
Q. Okay. And, sir, when you contacted this person, was that number saved in your cell phone -- did you have a cell phone? Was it another kind of phone? How did you remember the number?
A. I had a cell phone.
Q. Okay. Sir, you came to the United States on -- in the '90s, is that right?
A. Yes.
Q. I seem to recall you saying the exact date, do you remember what that was?
A. Yes. 1993, June 4th.
Q. And in that -- during that time, you were a teenager, is that right -- or soon to be teenager?
A. Yes.
Q. And, sir, you have -- when you came to this country, you were already a member of MS-13, is that right?
A. Yes.
Q. You had been jumped in, in El Salvador, is that correct?
A. Yes.

Q. But your testimony is that you do not remember the name of that clique?
A. No, I don't.
Q. So to become a member of MS, as you just testified to, it's a very dangerous organization. I'm assuming you had to put in some sort of work to become a member, is that right? -- meaning commit a crime.
A. Yes.
Q. What was it that you had to do in El Salvador to become a member?
A. Well, there was a point in time in El Salvador when MS-13 came to be when they were -- many of them deported from the United States to there. So what happened for a period of time was that MS would bring in new people that were minors just to bring them in, so that they would become more and more powerful.
Q. So that wasn't exactly my question. My question was what did you personally do to become a member?
A. So basically, as I was saying, there was a time in the '90s when people were brought in -- adolescents were recruited into the gang, young people were recruited into the gang and you didn't have to do anything. They just wanted to make the ranks larger.
Q. So is it your testimony that you did not have to do anything to become a member of the gang in El Salvador?

A. No, because the person who jumped me in was someone that my cousin -- one of my cousins knew.
Q. Okay. So just so I'm clear, you were jumped into the gang -- the MS-13 gang in El Salvador because of a family connection you had and you did not, therefore, have to do any work to get in?
A. As I mentioned, during those years of the '90s, MS-13 was recruiting minors in order to become bigger.
Q. Sir, I'm going to take that as a no, but I don't know. So I'll move on to the next question.
One more question about that, sir. I just want to make sure that you don't remember at all the name of that clique in El Salvador?
A. No, I don't.
Q. Okay. Did you have to go through a probationary period, do you remember that?
A. It wasn't like that so much at that time. It was more like they wanted to recruit people.
Q. Okay. Sir, when you got to the United States, at some point you joined the Hollywood clique in Maryland of MS-13, is that right?
A. Yes.
Q. And ultimately, you ended up in a bad way with them because you were disciplined and beat pretty severely, is that right?
A. Yes.

Q. Prior to joining the Hollywood clique, did you let the members of that clique know that you were already a member of MS-13?
A. Yes.
Q. To the best that you remember, were you aware if you told those persons the people that they could contact in El Salvador to confirm your membership?
A. They tried, however, since I spent some time leading a normal life from '93 to 2006, that clique was no longer there.
Q. What clique was that?
A. I don't remember. I don't know. It was -- it was a clique -- I don't remember the clique.
Q. But you remember providing that information back then to the MS-13 members in Hollywood so they could check it, right?
A. When I joined in, I was with Chicano and he didn't care because all he cared about is that I was willing to be violent and I was backing him up. You know, I was next to him beating up people.
So I went around beating up people and doing bad things along with him. And so he didn't care about anything else as long as I was out in the streets doing bad things alongside him.
Q. So because of your reputation in the street, Hollywood didn't need to go any further; is that your testimony?
A. Yes.

Q. Sir, you got here in '93, when did you join Hollywood clique?
A. I was rolling with them towards the end of 2007, and then I got jumped in like in -- towards the end of 2008.
Q. Okay. So when you arrived in '93, when did you start being in the streets, as you say, prior to -- between '93 and 2007, that entire time or was there a time when you were not in the streets?
A. No, it wasn't the whole time. It was more like in 2006, when I was out more in the streets and I realized that MS-13 was around.
Q. So from '93 to 2006, you were not -- your testimony was that you were not involved in any sort of violent or gang-related activity, is that correct?
A. Yes.
Q. And then that all changed when you got with Hollywood, is that right?
A. Yes.
Q. Sir, eventually you testified that you became a member of the Normandy clique, correct?
A. Yes.
Q. And you testified that when you first became a member, the boss of that clique was known as Cocky, is that right?
A. Yes.
Q. And Cocky, excuse me, knew that you had been kicked out of

Hollywood, right?
A. Yes.
Q. Sir, while you were in the Normandy clique, approximately how many members, more or less, were there at the same time as you?
A. Could you repeat the question. Please repeat the question.
Q. Sure. I'm not looking for an exact number, but I just want to have an idea. At the time that you were there in the clique, how many other members would you estimate were there with you?
A. The Normandy clique?
Q. The Normandy clique in D.C. that you were a member of, yes.
A. When I got to Normandy there were about ten. Ten.
Q. And that would have been around what year?
A. 2008.
Q. So just to be clear, you became associated with Normandy around 2008 and up until the time of your arrest, which was around 2011, is that right?
A. No, I met them in 2008 when I was Hollywood. In 2008, I was part of Hollywood, but I met many people from Normandy and I got into Normandy in 2009.
Q. Okay. So from 2009 to sometime in 2011, you were a member of the Normandy clique, is that correct?
A. Yes.
Q. And when you first joined, you testified there was about

ten people in the clique, is that right?
A. When I got in, there were about 12 by then.
Q. Okay. What about when you left in 2011, how big or small did the clique grow in your time there?
A. It never grew. It never grew beyond 10 or 12, it never grew.
Q. Okay. So there were people, I'm assuming, in that clique -- that most of the clique members, they all had some sort of a nickname, right?
A. Yes.
Q. And some of them you didn't know their real names, is that right? -- only by nickname.
A. Yes.
Q. And you interacted with these people in the clique probably on a daily or weekly basis, is that correct?
A. Yes.
MR. GUILLAUME: Court's brief indulgence.
(Pause.)
BY MR. GUILLAUME:
Q. Sir, I want to ask you some questions about the person that you've referred to as Zombie.
A. Okay.
Q. As you've testified, you've played a part in his murder, is that right?
A. Yes.

Q. Your testimony also was that he was killed partly at least because his identity couldn't be verified, is that correct?
A. Yes.
Q. And that would have been important to see if he was an actual member of MS-13 or just pretending to be a member, correct?
A. Yes.
Q. And I want to go back to the day you've testified about that he was killed and you were together, you knew he was going to be killed, right?
A. Yes.
Q. You assured him though that everything was going to be all right?
A. Yes.
Q. He had no idea what was about to happen to him, right, as far as you could see?
A. Right.
Q. In fact, you told him that he was going to get sort of a promotion, be pushed up in the gang, is that correct?
A. Yes.
Q. And instead, you knew he was going to die and took him to where he died, right?
A. Yes.
Q. This was in 2010, March, is that correct?
A. Yes.

Q. And after he died, you continued to be a member of the gang, right?
A. Yes.
Q. At least for another year or so because you didn't get arrested until 2011, is that right?
A. Yes.
Q. Sir, I want to direct your attention to the phone call that we listened to earlier, do you remember that?
A. Yes.
Q. For the record it's --
MR. MOHANTY: Your Honor, I'm sorry to interrupt, I just want to clarify it's not a phone call.
MR. GUILLAUME: The call.
MR. MOHANTY: Conversation.
MR. GUILLAUME: Conversation, I'm sorry. Thank you. Thank you for that correction. The conversation. Not the phone call, but the conversation.
BY MR. GUILLAUME:
Q. The conversation between you and Silvestre, correct?
A. Yes.
MR. GUILLAUME: I believe the exhibit, for the record, is Exhibit 934A, is that correct?
MR. MOHANTY: Yes, Mr. Guillaume.
BY MR. GUILLAUME:
Q. Sir, you heard yourself speaking on that call, right?

A. Yes.
Q. You -- and you can confirm that that was you back in 2010, right?
A. Yes.
Q. And you were talking to a person who was also a member at that time of MS-13 named Silvestre, right?
A. Yes.
Q. And that person -- you were speaking to them face to face, right?
A. No.
Q. How were you speaking to them? Because I clearly am confused about that. Can you tell me how you were speaking to them?
A. It's been a long time, so I'm not sure myself. I know -- I mean, it could have been a phone call, that might have been the only way that we were talking to each other then and had it recorded.
Q. Let's forget about how it was recorded, but you agree that it is you and he speaking, is that okay?
A. Yes.
Q. And one of the things you were talking about was Zombie's murder, right?
A. Yes.
Q. He was asking you about what had happened, correct?
A. Yes.

Q. And isn't it true, sir, that you told him when he first asked you, that you did it, you killed Zombie?
A. No, that I was there with them.
Q. Sir, is it your testimony that -- and we can play the call again if you didn't catch it or hear it -- I want to make sure you listen, but that you didn't say when asked by Silvestre who all -- I know you don't have a transcript in front of you, but I mean to the best of your recollection that you said: Who all -- when he said: Who all did that thing then? And your response was: Yeah, I did it, me.
Do you remember saying that?
MR. GUILLAUME: And, madam interpreter, I'm sorry, it's on page 4 in the middle. I should have told you that.
BY MR. GUILLAUME:
Q. Sir, after having heard that, do you recall saying that to Silvestre?
A. Well, yes, I was there with them. I was there with them and I did that with them. Whether I fired a shot or not, I was involved in that death.
Q. So your testimony is that you did not, in fact, fire the gun -- one of the guns that killed Zombie, is that correct? I just want to make sure I understand correctly.
A. Yes.
Q. And your testimony is that after that murder happened, the gun that was used -- you testified, I believe, on direct

examination -- was sent away. I think you said it was sent to El Salvador, am I making -- am I correct in that?
A. Yes.
Q. And you were a part of sending it to El Salvador as well, correct -- you knew it was going to be sent to El Salvador -- excuse me, that's the question.
You knew it was going to be sent to El Salvador as well, right?
A. No, because after the death of Zombie when I went to pick up Mecri from the McDonald's, the weapons were already gone. I didn't know where they were. I was just told that they were in a safe place.
Q. So the -- so just so I'm clear, that meeting happened the same day, right?
A. Yes, we met at the McDonald's.
Q. And the guns, from that point on -- you never, the guns were gone as far as you knew?
A. Yes.
MR. GUILLAUME: Thank you. No further questions.

CROSS-EXAMINATION

BY MS. RHEE:
Q. Good afternoon, Mr. Saravia.
A. (In English) Good afternoon.
(Through interpreter) Good afternoon.
Q. Sir, you were arrested on February the 9th, 2011, correct?

A. (In English) Yeah.
(Through interpreter) Yes.
Q. And that was more than 15 years ago?
A. Yes.
Q. And at the time that you rejoined MS-13, the Normandy clique, back in 2008, you were a full grown man in your 30s, weren't you?
A. Yes, though I will repeat that in 2008 it was the Hollywood clique that I rejoined. I was in Hollywood first.
Q. Regardless of the clique, when you rejoined an MS-13 gang, you were a full grown man, were you not?
A. (In English) Yes.
(Through interpreter) Yes.
Q. Thank you. So the prosecutor asked you how many times you had met with him in the last 15 years and you stated it was three times, correct?
A. Yes.
Q. I believe you said twice this year and once last year, correct?
A. Yes.
Q. How many times have you met with HSI Agent Brumbelow?
A. Since I've been in jail, with just the ones I've talked to on the phone. I have talked to some on the phone.
Q. How many times do you believe that you spoke to Agent Brumbelow?

A. Could you repeat the question, please.
Q. How many times do you believe you spoke to Agent Brumbelow either in person or over the phone?
MR. MOHANTY: Counsel, could I ask for a time frame. Do you mean in the last 15 years?
BY MS. RHEE:
Q. Well, how about the last two years, how many times have you spoken to Agent Brumbelow?
A. Is that his last name or?
Q. Well, I think that you refer to him as Jason.
A. Okay. Now I understand your question.
Okay. So I -- the whole time I was detained and over the last three years it was more frequently since I learned that they would be bringing Mr. Santos here. So I have been in touch with him, I guess when it was more frequently once a month or two times a month.
Q. When you met with Jason in person, when was that? And I'm going to narrow it down to the last two years. When did you meet with Jason in the last two years?
A. The last time or the first time?
Q. How many times did you meet with him in person in the last two years, whether it be the first -- I'd like to know, first, second, third -- how many times did you meet with him?
A. Twice.
Q. And in that time, did he show you some of the reports that

he prepared in this case?
A. No.
Q. Because in the past he has shown you some reports that he prepared, correct?
A. At the beginning of the case, yes.
Q. At the beginning of what case, sir?
A. This case.
Q. Okay. So if you can just look at me, when -- so Jason showed you reports about this case at the beginning of this case?
A. When I was arrested, when everything started, when all of it started.
Q. Okay. So did you meet with any other law enforcement authorities?
A. Not that I can remember.
Q. So I want to talk to you about your case -- your case. Do you remember the charges against you?
A. Conspiracy, racketeering.
Q. And the Government filed what's known as an information, correct?
A. Yes.
Q. And that was on -- I don't know if you know, but on January the 11th, 2013, correct?
A. As far as I can remember, I was arrested in 2011, so when they filed that, I don't know.

Q. Okay. Did you go over the charges against you with your attorney?
A. Yes.
Q. Okay. And in the information that the Government filed against you, they talked about what's called the overt acts -- your activities, correct?
A. Yes.
Q. And in one overt act on October the 15th in Maryland, you were accused of assaulting individuals in a nightclub in Montgomery County, Maryland, correct?
A. Yes.
Q. And then in another paragraph, you were accused on December the 9th, 2009 of killing an individual -- a member of the STC gang, correct?
MR. MOHANTY: Objection. Counsel, could you point me to where you are?
MS. RHEE: I'm sorry. I'm on page 7, paragraph 2(b) of the information.
THE INTERPRETER: May the interpreter finish rendering the question?
THE WITNESS: No, not kill him, but attempted murder.
BY MS. RHEE:
Q. But that's not all that happened on that day on December the 9th, 2009, is it?
A. No.

Q. Because on December the 9th, 2009, you got a call from an individual named Pava telling you about a rival gang member named Cola, correct?
A. Yes.
Q. And Pava told you that this Cola had insulted him, correct?
A. Yes.
Q. And so you in your car and Pava and another gang member named Shady went to look for Cola, correct?
A. Yes.
Q. And you sat outside Cola's apartment for over two hours waiting for him to come out?
A. Yes.
Q. And you had a gun, correct?
A. No, Pava had it.
Q. Okay. But you knew that Pava had a gun, correct?
A. Yes, because I had given it to him.
Q. And when Cola didn't come out, your blood thirst had not been satisfied so you drove around, correct?
MR. MOHANTY: Objection.
THE COURT: Sustained.
BY MS. RHEE:
Q. When Cola didn't come out, you drove Pava and Shady around looking for more gang members, correct?
A. So basically when we weren't able to do it, we couldn't -- Cola never came out, then Pava suggested a place to go where

there were more STC who had also disrespected us.
Q. So you --
A. Him -- who had disrespected him.
THE INTERPRETER: Interpreter corrects, I beg your pardon.
BY MS. RHEE:
Q. So you drove around first to the Kennedy -- excuse me.
You drove around and went to a school on Kennedy Street, correct?
A. Yes.
Q. Because you thought there would be rival gang members at the school?
A. Since this was a big gang, STC, they would go into different places.
Q. Including a school?
A. Not the only place, but they would get together there too.
Q. And you didn't find anyone, so the three of you drove around, correct?
A. So basically, when you're a member of the gang, you always have your head in the same thing going around looking for rivals. And if one doesn't work out, then you go around and around looking for another one. That's the way it is when you're in the gang.
Q. Mr. Saravia, in what year were you born?
A. 1980.

Q. So in that year, you were 29 years old when you were driving around looking for rival gang members, correct?
A. Yes.
Q. And you were married, weren't you?
A. Yes.
Q. And you had children at that time, didn't you?
A. Yes.
Q. Okay. And the other gang member who was there, Shady, that was your younger brother, wasn't it?
A. Yes.
Q. And so at one point, between the three -- and you were driving your car, correct?
A. It wasn't my car, but I was driving it.
Q. And at one point, Pava thought he saw a rival gang member and told you to stop the car, correct?
A. Yes.
Q. And you stopped the car and let them jump out?
A. Yes.
Q. And you knew that Pava had the gun when you let them out of your car, correct?
A. Yes.
Q. And again, this was Pava and your younger brother, Shady, correct?
MR. MOHANTY: Objection. Asked and answered.
THE COURT: I didn't hear that. The objection was

Pava and your younger -- I thought -- who is the younger brother?

MS. RHEE: Shady.

THE COURT: So the question is who was in the car -- rephrase it.

MR. MOHANTY: The objection is asked and answered.

MS. RHEE: No, the question was who jumped out of the car.

THE COURT: The objection is sustained. That is who you said was in the car. Okay. Just phrase the question that way, is that who you said was in the car.

THE WITNESS: Yes.

BY MS. RHEE:

Q. And the two of them jumped out of the car, correct?

A. Yes.

Q. Because you knew they were going after a rival gang member, correct?

A. Yes.

Q. And you drove around hoping to pick them up?

THE COURT: That's sustained. You've asked that twice.

BY MS. RHEE:

Q. You drove around hoping to pick them up --

THE COURT: Let's stop for lunch.

BY MS. RHEE:

Q. -- after they --

THE COURT: I'll see you all after lunch. We'll come back at 2:00. Don't talk about the case, don't let anyone talk to you about the case. I'll see you at 2:00.

THE JUROR: What time to come back?

THE COURT: 2.

(Jury panel leaves the courtroom.)

THE COURT: The witness can step down.

MS. RHEE: I'm sorry, Your Honor. Did you say 2:00? I couldn't -- what time are they coming back?

THE COURT: 2.

MS. RHEE: Thank you. Let me speak to counsel at the bench off the record first.

(Recess.)

THE COURT: Before we bring the witness, I have a question for -- Number 2 juror wants to raise an issue. She's not feeling well.

THE DEPUTY CLERK: I don't know if they heard you.

THE COURT: Juror Number 2 wants to raise a question about how she's feeling before we bring the witness. Go ahead.

THE DEPUTY CLERK: Do you want me to put her in the witness stand or first seat in the jury box?

THE COURT: First seat in the jury box. Or it's Number 2, she can just sit in her seat.

THE DEPUTY CLERK: Okay.

THE COURT: You can hand her the microphone.

(Juror No. 2 approached and conferred with the Court and counsel as follows:)

THE COURT: I understand you're not feeling well, tell me a little more about that.

THE WITNESS: Yes, sir. I'm just feeling really shaky and weak, and I felt lightheaded some today and it's affecting my vision a little bit. Like my ability to focus, my vision.

THE COURT: Okay. Since we have alternates and we're almost to the end of the trial, I'm willing to excuse you. I know you put a lot of time into this, so I leave it up to you to judge how well you're feeling.

THE JUROR: I felt a little better this morning, but -- and then I thought maybe eating something would help, but I'm not feeling better this afternoon --

THE COURT: Okay.

THE JUROR: -- still.

THE COURT: All right. If you want me to excuse you, I will.

THE JUROR: If that's acceptable.

THE COURT: Okay. Okay.

THE JUROR: I'm just really not feeling well today, I'm sorry.

THE COURT: Okay. I understand. I thank you for

bringing that to my attention. We do want jurors to be able to listen and concentrate on the evidence. So I appreciate you bringing it to my attention.

THE JUROR: Yes, sir.

THE COURT: It's better to do it this way, so thank you very much. Don't discuss anything about the case with any other jurors, just tell them that I've excused you because you weren't feeling well and leave your notes with the clerk as you depart.

THE JUROR: Okay.

THE COURT: And maybe I'll step in the jury room with you and I'll just explain to the jury what we're doing.

THE JUROR: Okay.

THE COURT: I'll be in a short recess.

(Juror excused.)

(Recess.)

THE COURT: You can bring the witness.

(Pause.)

THE COURT: We'll just leave everyone in the seats they're in for now.

THE DEPUTY CLERK: Jury panel.

(Jury panel enters the courtroom.)

THE COURT: All right. You may be seated. We're just going to stay in the same seats you're in for now. I excused juror Number 1 because of her illness, as I mentioned

to you in the jury room, but we'll stay where we are now and we'll get through the remaining witness and you may proceed with your cross-examination.

MS. RHEE: Thank you, Your Honor.

BY MS. RHEE:

Q. Mr. Saravia, before we went on the break we were talking about some of the things that you -- some of the violent crimes that you committed, correct?

A. Yes.

Q. So before we continue, I want to ask you about something that the prosecutor asked you about on direct.

A. Yes.

Q. You testified earlier that on March 8th, 2010, you had some sort of back surgery, correct?

A. Yes.

Q. And you said that it was nearly a year before you could run, correct?

A. Yes.

Q. But that didn't stop you from getting into an -- or excuse me.

That didn't stop you from assaulting people and robbing people in December of that year, correct?

A. Yes.

Q. Also, you, Cocky, and a woman named Liliana had a scheme outside of a nightclub, correct?

A. Yes.
Q. And that scheme was where Liliana would lure men out from the club, correct?
A. Yes.
Q. And you and Cocky would attack these men who came out with baseball bats and other weapons, correct?
A. Yes.
Q. And in spite of your back surgery and not being able to run, you told the agents that you chased a man down and you assaulted him with that baseball bat, correct?
A. Yes.
Q. Now, you talked about -- with the Government -- a plea agreement that you signed, correct?
A. Yes.
Q. And one of the conditions of the plea agreement was that you cooperate with the Government, correct?
A. Yes.
Q. And in order to receive a reduction -- a sentence reduction under 5(k)1.1 you had to talk about not just what you did, but what other people did, correct?
A. Yes.
Q. And in order to get the sentence reduction -- who files the motion for a sentence reduction?
A. I don't know that I can answer that question. I don't know. I mean, when -- in your case, when I was in my case, you

know, there were my lawyers and the prosecutors, so I don't think I can answer that question.
Q. Okay. That's fine.
You talked about the plea agreement that you signed with the prosecutor, correct?
A. Yes.
Q. And you went over the plea agreement with your attorney, correct?
A. Yes.
Q. And this was a very important document because it affected your life, correct?
A. Yes.
Q. And so you wanted to make sure that you knew what your rights were, correct?
A. Yes.
Q. What your options were, correct?
A. Yes.
Q. So in paragraph 18, it says that the Government -- excuse me.
The Government will -- would be evaluating the full nature and extent of your cooperation, correct?
A. Yes.
Q. And they had the discretion not to file a reduction motion, correct?
A. Yes.

Q. Okay. Now, I want to talk to you very briefly about the phone call that you allegedly received from somebody named Perverso.

A. Okay.

Q. You never told anybody about that phone call, did you?

A. No, because I was never asked when I started to cooperate.

(Coughing in the courtroom.)

MS. RHEE: I'm sorry, I didn't hear what you said.

THE INTERPRETER: The interpreter will repeat: No, because I was never asked when I started to cooperate.

BY MS. RHEE:

Q. Because you were never asked.

Okay. So when you were in cooperation, you talked about a lot of people, right?

A. Yes.

Q. People who were already dead you talked about?

A. Yes.

Q. You talked about gangs in El Salvador, correct?

A. Yes.

Q. And I'm not going to even go through the list of everyone that you spoke to, but you spoke about a lot of people, correct?

A. Yes.

Q. And sometimes the Government didn't -- didn't ask you about those people, did they?

A. Yes.
Q. But your responsibility in cooperating was to be complete and truthful, correct?
A. Yes.
Q. And now we know that you had almost monthly conversations with Jason, correct?
MR. MOHANTY: Objection. Misstates the testimony.
THE COURT: Sustained.
BY MS. RHEE:
Q. You had regular conversations with Jason, correct?
A. Yes.
Q. You never mentioned that alleged phone call, correct?
A. Yes.
Q. I wanted to ask you about your girlfriend, Michelle Rios.
A. Yes.
Q. How old were you when you took up with her?
A. I was 30 years old.
Q. And how old was she?
A. I think she was 20. 29.
THE INTERPRETER: Interpreter corrects:
THE WITNESS: 20 to 21 years old.
BY MS. RHEE:
Q. Okay. So the prosecutor asked you about where you, as the leader of MS-13 or the Normandy clique, ordered a punishment against her, correct?

A. Yes.
Q. So I want to ask you about a letter that you wrote to Ms. Rios.
A. Okay.
Q. Would you like to see a copy of the letter?
A. No.
Q. In the letter -- it sounds like a breakup letter, is that right?
MR. MOHANTY: Counsel, may I see a copy of the letter, please.
MS. RHEE: Of course.
THE WITNESS: No.
BY MS. RHEE:
Q. It was not a breakup letter. Okay.
A. No.
Q. Okay. So in the letter, you write: Hey, in that beating I gave you was for lack of respect to the barrio for your role in that. I don't give a fuck.
Is that the same beating that you were referring to when the Government asked you?
A. (In English) Yes.
(Through interpreter) Yes.
Q. And so when you said it was a beating that you gave her, what you meant was a beating that you ordered other members of the gang to commit against her, correct?

A. Yes, because the other members of the gang had seen the disrespect and the act of disrespect that she had committed.
Q. Okay. And you said I'm sorry, I may be mistaken, but you asked for it, is that right?
A. Yes.
MS. RHEE: If I could have just a moment, Your Honor.
(Pause.)
MS. RHEE: I have nothing further for this witness, Your Honor.
THE COURT: Redirect?
MR. MOHANTY: Court's indulgence.

REDIRECT EXAMINATION

BY MR. MOHANTY:
Q. Good afternoon, Mr. Saravia.
A. Good afternoon.
Q. Mr. Saravia, you've answered almost all your questions today in Spanish, but sometimes it looks like you can understand some of the English that the lawyers are saying, is that right?
A. Yes.
Q. Can I ask you to explain why you would prefer to use an interpreter in the court when you're answering questions from lawyers?
A. I feel most comfortable doing it that way. I can ask --
THE INTERPRETER: Interpreter correction:

THE WITNESS: I can understand the questions better.
BY MR. MOHANTY:
Q. So is it fair, though, that you do speak some English?
A. Yes.
Q. And you can speak some English?
A. Yes.
Q. Okay. One of the lawyers, Mr. Guillaume, the tall guy, was asking you some questions about being supervised now, do you remember that?
A. Yes.
Q. Okay. And I want to make sure that the jury understands what you mean by that. Without telling us where you live, can I ask you, the person who you report to, your probation officer, is that a different person than Jason Brumbelow?
A. It is a different person from Jason.
Q. And that person who is supervising you, do you know if his or her title is probation officer?
A. Yes.
Q. Mr. Guillaume asked you some questions about a phone, a cell phone that you used to call Viejo Santos back in, I guess, 2009 into 2010; do you remember that?
A. Yes.
Q. Do you know if the law enforcement agents in this case recovered that cell phone?
A. No.

Q. The lawyers for the defendants were asking you several questions about crimes that you committed?
A. Yes.
Q. Can I ask you, all the crimes that they went through, were those all for MS-13?
A. Yes.
Q. Ms. Rhee was asking you some questions about a time in December --
(Phone ringing.)
THE INTERPRETER: Interpreter is going to request repetition.
BY MR. MOHANTY:
Q. Ms. Rhee was asking you some questions about a time in December when you chased after somebody with a baseball bat?
A. Yes.
Q. About how long after your surgery did you do that?
A. About a year after. As I said, it took me about a year, you know, to -- to almost -- to start running. So it was almost a year before I could run.
Q. When you met with -- when you met with me those three times over these last 15 years, was Agent Brumbelow there?
A. Yes.
Q. When you met with Agent Brumbelow sometimes, was your own lawyer, Mr. Conte there?
A. Yes.

Q. Did anyone threaten you to testify in a certain way today?
A. No.
Q. Did anybody pressure you to testify in any certain way today?
A. No.
Q. And when you met with me in these three times in the last 15 years, did I show you any reports of any kind?
A. No.
Q. Did anybody tell you what to say in court today?
A. No.
MR. MOHANTY: Thank you, Your Honor. No further questions at this time.
THE COURT: All right. You can step down.
(Witness excused.)
THE COURT: All right. Do you have a witness that is -- you're going to read the testimony of?
MR. MOHANTY: We do, Your Honor.
(Pause.)
MR. LEVY: And, Your Honor, did you get a copy?
THE COURT: I did.
(Testimony of ZABUILLAH ALI read for the record below.)

DIRECT EXAMINATION

BY MR. LEVY:
Q. Good afternoon. Can you please state and spell your name.
A. It's Zabuillah Ali. The first name is Z-A-B-U-I-L-L-A-H,

and the last name is spelled A-L-I.
Q. Where are you employed?
A. I'm a retired medical examiner.
Q. Can you say that again?
A. Retired medical examiner.
Q. Okay. And is that in Maryland, is that correct?
A. Yes.
Q. And you said you're a retired medical examiner?
A. That's correct. I retired from the Office of the Chief Medical Examiner in Baltimore.
Q. What year did you retire?
A. In June of this year.
Q. Congratulations on retirement.
A. Thank you.
Q. And how long were you a medical examiner for the office?
A. For 23 years.
Q. 23 years?
A. Yes.
Q. Okay. And what do you currently do now?
A. I just work as -- part-time, based on contract with the medical examiner's office.
Q. Okay. Can you pull that mic a little closer to you. I want to make sure that we hear you okay.
And as a medical examiner -- and now you're a contractor, is that correct?

A. That's correct, yes.
Q. What does an assistant medical examiner do?
A. Basically performing autopsies on all unnatural suspicious deaths and try to determine the cause and manner of death.
Q. Okay. And where did you receive your medical training?
A. I received my medical degree overseas in Germany.
Q. If you could, give us a brief description of your educational background.
A. Yeah. After my medical degree, I received my medical degree, I was trained in pathology at the University of Mississippi in Jackson, Mississippi. And then I did my training in forensic pathology in Baltimore.
Q. And you said your training at the University of Mississippi Medical Center, was that also your residency?
A. That's correct, yes.
Q. And after finishing your training, did you do a fellowship?
A. I did, yes.
Q. Where was that fellowship?
A. In Baltimore, in forensic pathology.
Q. Was it also at the Office of the Chief Medical Examiner?
A. Yes.
Q. You said it was in forensic pathology, is that correct?
A. That's correct, yes.
Q. If you could, please explain to the ladies and gentlemen of the jury what exactly is forensic pathology?

A. Forensic pathology is the field of medicine which is mainly involved with identification and interpretation of human injuries.
Q. Are you a member of any professional boards or organizations?
A. Yes. I'm a member of the American Association of Medical Examiners.
Q. Are you licensed in forensic pathology?
A. Yes, I am.
Q. In which states?
A. The State of Maryland.
Q. And in your 23 years, and I guess currently being a contractor, how many autopsies would you say you've performed or participated in?
A. About 9,000 autopsies.
Q. Have you testified as an expert before?
A. Yes, I did.
Q. In which courts?
A. In many jurisdictions, the State of Maryland, in Washington, D.C., in federal courts, and State of Pennsylvania.
Q. Do you recall which federal courts you've testified in?
A. Can you repeat that question, please?
Q. I'm sorry?
A. Can you repeat the question?
Q. Can you state which federal courts could you have -- courts

you have previously testified in?
A. In Greenbelt.
Q. Okay. And how many times have you testified as an expert?
A. About 295 times.
MR. LEVY: Your Honor, at this time the Government would ask that Dr. Ali be tendered or deemed an expert in forensic pathology.
MR. FEITEL: Your Honor, I'll stand in for Mr. Guillaume: No objection.
And then I say: No objection as well.
BY MR. LEVY:
Q. If you could, tell us what is an autopsy?
A. An autopsy is basically a medical examination that has two parts, the first part, the so-called external examination where I examine a decedent from the outside, height, weight, clothing, what type of injuries I can see from the outside. And the second part is the internal examination where I examine a decedent's internal organs looking for any type of injuries or disease processes to explain why this person died.
Q. And when you conduct your examination externally and internally, do you memorialize your findings or observations?
A. No, I take notes during my examination.
Q. Okay. What do you do with your notes?
A. We use the so-called body diagrams.
Q. Do you compound your findings into a report?

A. Yes.
Q. And when you're taking notes, do you also photograph the body?
A. That's correct, yes.
Q. And you mentioned something about diagrams?
A. Diagrams and photographs, yes.
Q. I want to return -- I want to turn your attention to July 30th, 2008.
Did you perform an autopsy on a gentleman named Luis Chavez-Ponce?
A. Yes, I did.
Q. Did you follow the procedures that you discussed when you defined what an autopsy is?
A. Yes, I did.
Q. Did you perform an external examination of his body?
A. Yes, I did.
Q. And did you determine his height?
A. Yes. His height was 5'8.
Q. What about weight?
A. His weight was 124 pounds.
Q. And after performing your examination, did you reach a conclusion as to the cause of death?
A. Yes.
Q. What was that?
A. The cause of death was multiple gunshot wounds.

Q. Did you also reach a conclusion as to the manner of death?
A. Yes, I did.
Q. What was that?
A. The manner of death was homicide.
Q. Now, you mentioned that you followed the procedures in this case and would that also include taking photographs of Mr. Chavez Ponce's body?
A. Yes.
Q. I'm going to ask Ms. Battle to show you and only you what's been previously marked as Government Exhibit 403 to 407. I'm going to ask you to review those, and let me know once you're finished reviewing.
A. Yes.
Q. Do you recognize these exhibits?
A. Yes.
Q. What are they?
A. Those are pictures taken during the autopsy of Mr. Ponce.
Q. And are these pictures a true and accurate depiction of how Mr. Ponce or Mr. Chavez-Ponce presented during the autopsy?
A. Yes, they do.

MR. LEVY: Your Honor, at this time the Government asks that what's been previously marked as Government's Exhibits 403 through 407 now be admitted into evidence.

THE COURT: They're received.

MR. LEVY: May it be published to the jury as well?

THE COURT: You may.

BY MR. LEVY:

Q. I'm going to start out of order with the numbering.

MR. LEVY: Ms. Battle, if you could please publish Government Exhibit 405.

BY MR. LEVY:

Q. Now, Dr. Ali, I see that in this particular photo there's a number card. Could you tell the ladies and gentlemen of the jury what is that number card?

A. The number just above the right ear is the assigned autopsy number.

Q. Is that number unique to each autopsy that is performed?

A. Yes. Each autopsy has a unique number.

Q. And do you see any injuries present in this photo?

A. Yes, two gunshot wounds. One is on the right side of the face just below the right ear, and one is on the right back of the head.

Q. Okay. And so in gunshot wound -- can you point on your screen where gunshot wound A is, please?

A. Do I have a pointer?

Q. You draw on the screen.

A. It's not working.

Q. Can you please describe gunshot wound A?

A. It is a round injury just below the right ear; that's gunshot wound A. And gunshot wound B is an injury to the back

of the head where the hair was shaved.
Q. And is that common to shave a decedent's head when there's an injury to the --
A. Yes.
Q. What's the purpose of that?
A. Just to see the exact injury. With hair, you cannot see the injury.
Q. And how would you describe gunshot wounds A and B, as far as you can tell, if those are entrance or exit wounds?
A. Yeah, these are both entrance wounds.
Q. How are you able to determine an entrance wound from an exit wound?
A. First thing -- I mean, I've done a lot of cases, so one is the experience. Second, we use the shape and size of the wound to see if it's an exit or entrance. We also use the bones to see if it's fractured to see if it's an entrance or exit wound.
Q. You have detailed that both of these wounds are entrance wounds, is that correct?
A. That's correct, yes.
MR. LEVY: Ms. Battle, can you please publish Government's Exhibit 404.
BY MR. LEVY:
Q. If you could please tell us what we're looking at in this photo?
A. Yeah. There is an injury to the -- sort of to the left

side of the mouth. So this is an exit wound from the gunshot A to the right side of the face.
Q. And were you able to tell how the bullet traveled for gunshot wound A?
A. Yes, the bullet traveled from back to front, right to left and upward.
Q. When you're determining, I guess, what you call the trajectory of a bullet, how is the body oriented at that time?
A. The body is oriented face up.
Q. And so are you able to tell how the body was positioned at the time that the gunshot wounds were inflicted?
A. No, I cannot.
Q. And I noticed that -- I notice there is another injury also depicted in this photo. What is that?
A. There is another injury on the forehead, this is associated with the gunshot wound to the right back of the head. So this is where the bullet came out.
Q. Would this be the exit wound for gunshot B?
A. That's correct, yes.
Q. And could you detail how that gunshot wound traveled or how that gunshot traveled?
A. Yeah, the bullet traveled from back to front, right to left and upwards.
Q. And how would you describe, as far as the degree of injury of gunshot wound A and B, how would you describe the degree of

injury?
A. The gunshot A to the right side of the face is a potentially fatal wound. Meaning if you don't seek medical attention soon, it's going to cause infection and bleeding and the person will die.
The gunshot wound to the back of the head caused significant injuries to the brain and caused multiple skull fractures. So this injury is considered a rapidly fatal wound.
Q. And how did you distinguish rapidly fatal from potentially fatal?
A. A rapidly fatal wound means will occur within minutes; could be 5 minutes, 10 minutes, but it is very fast.
Potentially fatal wound means it can occur within days, hours, or weeks.
MR. LEVY: Ms. Battle, if you could please show Government's Exhibit 407.
BY MR. LEVY:
Q. And what are we looking at here in this?
A. This photograph shows the back of the decedent, Mr. Ponce, a gunshot wound to the right upper back just to the right where the tattoo is. And there is also another gunshot wound to the back of the right side of the head, that would be gunshot wound B I described before.
The one on the right upper back I described -- I described it as wound C.

Q. And you mentioned that there is a tattoo on his back, is that correct?
A. That's correct.
Q. How would you describe some of the tattoos?
A. I don't describe the tattoos.
Q. But is it fair to say like there is depicted some mask or something, happy/sad mask and a female it looks like in a portion of it?
A. I'm really bad in describing the tattoos, I'm sorry. I just make a note of where they're located, that's it.
Q. We're looking at gunshot wound C, is that correct? -- in the back area?
A. Gunshot wound C, yes, ma'am.
MR. LEVY: And, Ms. Battle, if you could please show what's Government Exhibit 403.
BY MR. LEVY:
Q. Let me ask you, gunshot wound C in Exhibit 407, that we were just looking at, was that an entrance or exit wound?
A. This is an entrance wound on the right of back.
Q. And then back to 403?
A. The bullet came out or exited the body on the right side of the chest.
Q. Okay. And how would you describe this wound?
A. The bullet injured the right lung, so this is considered a rapidly fatal wound because it would cause bleeding very

rapidly.

MR. LEVY: If you could please show Government's Exhibit 406, please.

BY MR. LEVY:

Q. What are we looking at in Government's 406?

A. This photograph shows the inside of the right arm. So just below the armpit and that a gunshot wound -- two gunshot wound injuries.

Q. Which one is the entrance wound?

A. The lower one is the entrance and the upper one is the exit.

Q. Now, in any of the gunshot wounds that you noticed or that you observed, were there any gun powder stippling?

A. Yes, ma'am. The gunshot wound to the right of the face showed evidence of stippling.

Q. What does that indicate to you when you see gunpowder stippling?

A. When a gun is discharged, part of the gunpowder will also exit the muzzle of the gun. So if the gun is close to the target, it will leave marks behind, like a tattoo on the skin, and that would indicate that the gun was at close proximity to the target.

Q. You noticed that with gunshot wound A, is that correct?

A. That's correct, yes.

MR. LEVY: Ms. Battle, could you please put up 405

again.
BY MR. LEVY:
Q. And is that gunshot wound A, the one around the jawline?
A. That's correct, yes.
Q. And you said you noticed that there was some gunpowder stippling for that wound?
A. Yes.
Q. And when you see gunpowder stippling, are you able to determine the distance of the muzzle from skin?
A. That would be an estimation. So based -- for the majority of handguns used in this country, that would be a distance somewhere between 18 to 24 inches.
Q. 24 inches. So two feet, is that correct?
A. That's correct, yes.
MR. LEVY: Court's indulgence.
No further questions, Your Honor.
MR. FEITEL: No questions, Your Honor.
MR. GUILLAUME: No questions, Your Honor.
MR. LEVY: And then there's a bench conference.
BY MR. LEVY:
Q. Do you see Exhibit 405 on your screen, Doctor?
A. Yes, I do.
Q. I know we previously talked about a tattoo that was on his back. In this image, Exhibit 405, do you see a tattoo present?
A. The tattoo?

Q. Yes. Do you see a tattoo present?
A. Yes.
Q. Let me ask you, was this how Mr. Chavez-Ponce was presented to you?
A. Yes.
Q. This tattoo was present when you first observed his body?
A. Yes.

MR. LEVY: No further questions, Your Honor.

(The reading of the testimony of ZABUILLAH ALI concluded.)

THE COURT: All right. Any other witnesses for the Government?

MR. MOHANTY: Your Honor, we have no further witnesses. With the Court's permission, I'll read in some stipulations though before we rest.

THE COURT: All right.

MR. MOHANTY: Good afternoon, ladies and gentlemen. I have several stipulations to read to you, some of these may have -- you may have already heard before.

The parties agree and stipulate as follows:

Government's Exhibit 139A through E are photographs taken on or about September 29th, 2025, of defendant Moises Humberto Rivera-Luna. The photos fairly and accurately depict Mr. Rivera-Luna and his tattoos on that day.

Number 2, the Government Exhibits 140A through F are photographs taken on or about September 29th, 2025, of

defendant Tokiro Rodas-Ramirez. The photos fairly and accurately depict Mr. Rodas-Ramirez and his tattoos on that day.

Number 3, Government Exhibit 120A is a translation of Government Exhibit 120, the MS-13 rules. The translation was prepared by a certified translator.

Government Exhibit 703A is a translation of Government Exhibit 703, a letter from Tokiro Rodas-Ramirez to Jorge Solorzano. The translation was prepared by a certified translator.

Government Exhibit 704A is a translation of Government Exhibit 704, a letter from Dennis Gil-Bernardez to Jorge Solorzano. The translation was prepared by a certified translator.

Government Exhibit 817 is a record of the climatological observations, which documents the records of the National Oceanographic and Atmospheric Administration for weather at three locations in Montgomery County, Maryland during the months of March 2020.

The parties further stipulate that each of the translation and transcripts of recorded calls, clique meetings, and other recordings in this case was prepared by a certified translator. The translators translated from Spanish to English to the best of their ability. However, the translators did not know the identity of the speakers in the recordings. That

information was provided to them by the Government.

Number 8, Tokiro Rodas-Ramirez was arrested for possession of false identification documents on or about November 16, 2008, and he was held in jail until he was deported from the United States on or about November 23, 2009.

Moises Humberto Rivera-Luna was deported from the United States on or about December 28th, 1994. The parties stipulate that Government's Exhibits 907, 915, 916, 917, 918, 921, 922, 923, 924, 925, 926, 928, 929, 930, 931, 932, and 934 are accurate transcriptions and translations of recordings in Government Exhibits 907A, 915A, 916A, 917A, 918A, 921A, 922A, 923A, 924A, 925A, 926A, 928A, 929A, 930A, 931A, 932A and 934A.

The parties do not dispute the accuracy of the transcriptions or translations -- excuse me -- however, the defendants do not agree that the person identified as the speaker in the transcripts is accurate.

We have additional stipulations, Your Honor.

The parties agree and stipulate as follows:

While performing the autopsy on the body of Luis Chavez-Ponce on July 30th, 2008, Dr. Ali recovered a bullet fragment from one of the gunshot wounds to Mr. Ponce's head. He gave that to a Prince George's County, Maryland police officer who attended the autopsy.

On March -- excuse me. On March 5th, 2009, FBI Special Agent Gregg Horner received two copper jacket bullets

from Detective Steve Campbell of the Prince George's County, Maryland, Police Department.

On March 11th, 2009, Agent Horner gave both copper jacket bullets to Susan Sharp, now know as Susan Anderton, of the Fairfax County, Virginia, Police Department.

Parties also stipulate that Government Exhibit 2001-MZ through 2005-MZ are fair and accurate copies of photos taken on or about November 6, 2008. Parties also stipulate that Government Exhibit 303 are true and accurate copies of T-Mobile records for the telephone number 240-441-0877 and were kept in the regular course of business.

Government Exhibit 304 are true and accurate copies of T-Mobile records with telephone number (204) 646-2102 kept in the regular course of business. Government Exhibit 305 are true and accurate copies of Cricket records for telephone number (240) 706-1200 kept in the regular course of business.

During the trial, counsel for the Government referred to Exhibits 401, 402, 408 through 412 and 418 and 419. Government's Exhibit 401-CP, 402-CP, 408-CP through 412-CP and 418-CP and 419-CP are true and accurate copies of the exhibits that were admitted.

Your Honor, I think without objection, the Government will move in a series of exhibits, the first are pursuant to Rule 803(6) and 902(11), governing business records, Your Honor.

The Government will move in Government Exhibit 301, which are Western Union records showing transfers to Julia Abarca and Domatila de la Paz. As well as Government Exhibit 30 -- excuse me 307, visitation records for Dennis Gil-Bernardez. 308, visitation records for Tokiro Rodas-Ramirez.

Government Exhibit 311, which is a record of deportable alien for Moises Humberto Rivera-Luna.

Government Exhibit 313A, which are Western Union records showing transfers to Domatila de la Paz Ramos.

Government Exhibit 601A-DP, which are redacted medical records for Dimas Perez.

And pursuant to Rule 803(8), the Government would move in Government Exhibit 155B, which are Guatemalan records relating to Moises Humberto Rivera-Luna. And Government Exhibit 155C, which is a true and accurate translation of those records.

THE COURT: Without objection, they're all received.

MR. MOHANTY: Your Honor, may I publish some of those?

THE COURT: You may.

MR. MOHANTY: Ms. Battle, could you start by showing the ladies and gentlemen of the jury, Government Exhibit 901-MZ. I'm sorry, 201.

Could you go to 202MZ, 203-MZ, 204, and 205, please.

Ms. Battle, could you show the ladies and gentlemen of the jury and Judge Lamberth Government Exhibit 301, the Western Union records.

Can I ask you, Ms. Battle, how many pages is that document? Five pages, could you blow it up a little bit so we could see the name of the sender and the name of the payee.

Okay. Thank you. We'll have this entire exhibit when you begin your deliberations, ladies and gentlemen.

Ms. Battle, could you show Government Exhibit 307, please. Could you blow that up, please, Ms. Battle. And could you scroll down, please. Is there another page to this, Ms. Battle? Could you blow that up a little bit, please. Thank you, Ms. Battle.

Could you show the ladies and gentlemen, Government Exhibit 308, please. Could you blow that up, please. Could you scroll down, please. Thank you, Ms. Battle.

Could you show Government Exhibit 311, Ms. Battle. Could you blow up the top and -- thank you.

Can you all see that?

Can you scroll down to the bottom of that page, Ms. Battle. Could you blow up near the bottom, it looks like a G. Konrad has signed that, dated December 19th, 1994.

Could you show Government Exhibit 313A, Ms. Battle. And could you blow up that exhibit a little bit, please. Thank you, Ms. Battle. And, Ms. Battle, may I ask you, how many

pages is that exhibit? Could you go to the next page, please, could you blow that up a little bit, please.

Can you all see that?

Can you go to page 3, Ms. Battle. Could you go to page 4, Ms. Battle. Okay. Thank you.

Could you pull up and show -- I should say, Your Honor, may you show -- Ms. Battle, will you please show the ladies and gentlemen of the jury Government Exhibit 155B. And could you -- thank you. Could you show 155C, which is the true and accurate translation of those records. And could you blow up -- thank you, Ms. Battle.

Can everybody see that?

Ms. Battle, could you go to the next page of that document, please. Could you zoom in towards the bottom where it says in case of emergency notify. Thank you, Ms. Battle.

And, Ms. Battle, could you show the ladies and gentlemen of the jury, Government Exhibit 601A-DP. These are the medical records for Dimas Perez. Could you go to the next page and blow it up, please. Could you go to the next page, please -- or, I'm sorry, I might have you scroll down to that paragraph. I should have said that.

Thank you. Court's indulgence.

(Pause.)

MR. MOHANTY: Thank you, Ms. Battle.

Your Honor, with that, the Government rests. Thank

you.

THE COURT: Let me speak to counsel.

(Bench conference.)

THE COURT: Each of you want to say -- save your motions and do you want to say that you have no witnesses? Then I'll excuse the jury while we talk about instructions.

MR. FEITEL: All we have is a stipulation to read.

THE COURT: Oh, you want to read it. Okay.

MR. FEITEL: Yes, sir.

THE COURT: All right. I'll go in order then.

(End of bench conference.)

THE COURT: All right. Mr. Guillaume.

MR. GUILLAUME: Thank you, Your Honor. Your Honor, no witnesses. We would rest.

THE COURT: Okay.

MR. FEITEL: Your Honor, with respect to my client, we have one stipulation, which I'll put on the Elmo and read. I'm not allowed to touch anything.

Ladies and gentlemen, good afternoon. This -- this stipulation provides as follows:

The United States and defendant Tokiro Rodas-Ramirez, do hereby agree and stipulate as follows:

Special Agent Jason Brumbelow interviewed Luis Moreno Axume, also known as Junior, on October 20th, 2010. With respect to the shooting of Dimas Perez on or about April 8th,

2010, Agent Brumbelow wrote in part that:

Moreno Axume said that Rodas-Ramirez and Gil-Bernardez picked him and Rios up in Washington, D.C. Moreno Axume said he, Rios, Gil-Bernardez, Rodas-Ramirez were together in a van. Moreno Axume said that Rodas-Ramirez was driving the van.

And then it's signed by all the parties.

And with that, Your Honor, the Defense rests.

THE COURT: All right. Anything further from the Government?

MR. MOHANTY: No, Your Honor.

THE COURT: Okay. All right. We'll take a short recess at this time. 10 minutes or 15.

(Jury panel leaves the courtroom.)

THE COURT: Okay. First, I'll take any motions from the defendants.

MR. GUILLAUME: Your Honor, on behalf of Moises Humberto Rivera-Luna, we make a motion for judgment of acquittal pursuant to Rule 29. We'll submit without argument.

MR. FEITEL: Good afternoon, Your Honor. On behalf of my client, we also move for judgment of acquittal pursuant to Rule 29. And Your Honor denied this motion the last time we were all together. I'm not going to belabor the point, I suppose we'll all have the pleasure of hearing oral argument in summation about these particular claims in Court beginning

tomorrow. So with that, we have nothing further to add.

THE COURT: Okay. Anything the Government wants to say?

MR. MOHANTY: Your Honor, we'll submit as well. We know that the Court is very aware of the standard at this time. We think we certainly have met it to go to the jury. Thank you.

THE COURT: All right. Both motions are denied.

In terms of instructions, the Government has proposed additional Pinkerton instructions, which we did not do last time. And I guess I need to get the -- we'll come to that last.

Are there other objections to the instructions that we need to discuss other than Pinkerton?

MR. FEITEL: Yes, Your Honor. The instructions mirror almost precisely the ones that were given at the last trial, but they were tweaked to reflect, you know, differences in the witnesses or some minor aspect of the evidence, but on behalf of my client and I think that Mr. Guillaume is going to join in, I do object to paragraph -- excuse me, page 25, line 9 to 15; and page 25, line 16 to 19, which is an instruction about overt acts of witness tampering and obstruction of justice.

And if you -- if you read the language, I don't think that the evidence, even viewed in the light most favorable to

the Government, comes close to satisfying it. For witness tampering, the conduct, under the Court's instruction, must involve the use of physical force or the threat of physical force against another or attempt to do so or intimidation, threats, or attempt to do so.

There was some talk -- I mean, I don't know if Your Honor remembers the evidence, there was some talk about trying to find out who some of the witnesses might be, I think that applied by the testimony of the witness to Mr. Gil-Bernardez's case in Virginia. And as far as the evidence of record was, nothing ever came of it. I don't think it's sufficient and there was no evidence that the basis of the -- what anyone was going to do with the information was physical force or intimidation. So I don't think this is an overt act that's been sufficiently proven.

And similarly, with respect to obstruction of justice, it requires that someone must corruptly or by threat or force influence, obstruct or impede or endeavor to do the same with respect to the administration of justice.

Now, I don't think on the facts of this case unless there's something I've forgotten, I was paying attention, that there was anything sufficient to trigger the obstruction of justice requirement as well.

To be fair, I did argue this last time, but I think the evidence was weaker at this trial than at the last one

about these -- about these matters.

I'd ask that they be removed from the overt act formula. There's a reference to them also on page 21 to the extortion and to witness tampering, they are numbers 3 and 5. I don't really think this is sufficient in light of the evidence that was adduced in this case.

THE COURT: All right. Any other objection?

MR. FEITEL: Yeah, I do object to the Pinkerton instruction.

THE COURT: I'm sorry?

MR. FEITEL: I do object to the last minute effort to add Pinkerton. And I can try to articulate why, unless Your Honor is not going to allow it, in which case, I'll be glad to say nothing and sit down.

THE COURT: All right. That objection is overruled.

As to the Pinkerton, what's the objection?

MR. FEITEL: Well, first, I'm not sure -- we only heard about this like at 1:20 in the afternoon on the day that I thought we were going do summations, there is a last minute aspect to this.

I am not, by any means, a Pinkerton expert, but I do think it needs a conspiracy to be charged, which Counts 2 and 3 against my client are substantive offenses, they're not conspiracy charges. Had they been charged as a conspiracy and substantive offense, I think the Government could have gotten

it, but they didn't do that.

The other part is, Your Honor, is that we had a trial before in which no one asked for Pinkerton. We had been methodically -- Ms. Rhee and I -- planning our defense around the instructions that were given at the beginning in this case and the ones from the last trial.

We were not anticipating -- no one told us and certainly not until the last day that they were going to try to hold our client responsible basically under strict liability under Pinkerton. And had we known, I'll -- I'm not sure I can articulate it now -- there are things we may have done differently.

I just think as a matter of general fairness, this is not the way to proceed and the trial is over. I mean, the Government didn't say anything about this when we had our original charging conference and I do think, you know, with all due respect, this is too little and too late.

I ask Your Honor not to give it. You know, if we ever have to do this again, we can talk about it, but I don't think in the context of this trial, on the day that we're prepared to sum up, that we should be changing the legal theory of criminal liability against my client for Counts 2 and 3.

You know, the Government has aiding and abetting built into the indictment for those two counts. They're not charged as conspiracies, and I don't think Pinkerton liability

should be imposed against my -- or the attempt to be done should be accepted by this Court at this time.

MR. MOHANTY: Your Honor, the -- frankly, the Government made a mistake last trial in not asking --

THE COURT: I'm sorry?

MR. MOHANTY: Frankly, the Government made a mistake in December in not asking for that instruction. I think it's a little -- a little bit much for Mr. Feitel to act like he's under -- that he's suffering some unfair surprise. As the Court knows, we do not have to give -- we do not have to charge aiding and abetting, we do not have to charge Pinkerton conspiracy to ask for that instruction.

And I really am hard pressed to see how he would have done anything differently in this case. I'm sure whether we were asking for Pinkerton liability or not, the plan would be to attack the credibility of our cooperating witnesses, and in particular Luis Moreno Axume on that incident. And I really am at a loss to see how he would have done anything differently.

Your Honor, there is one minor thing I would raise with regard to the instructions, Your Honor. And that is on page 10 of the proposed instructions, the Court on lines 14 through 19 has the standard instruction on inconsistent testimony. And with regard to other inconsistent prior testimony -- and we didn't have any of that in this case.

We do have the prior statement of Mr. Luis Moreno

that is a stipulation, but I would ask that we remove lines 14 through 19 of page 10 because they just don't apply.

Thank you, Your Honor.

THE COURT: Do you know what he's talking about? Okay.

MR. MOHANTY: Your Honor, would you like me to speak louder? I'm sorry.

THE COURT: He knows what you're talking about. Okay.

MR. MOHANTY: Okay. Thank you, Your Honor.

THE COURT: The objection to the Pinkerton instruction is overruled. In my original instructions, even from last time, talked about how to prove a conspiracy and those are the same as I gave last time. So I think that a fuller description of Pinkerton is appropriate and I'll give the Pinkerton addition then.

In light of the hour, I'm not sure we can get through all of this before the close of today, but I will start reading at some point. So we'll take a recess and I'll figure how far we can go today and then at the end of today we'll talk about how to structure tomorrow. Who can -- get what time for tomorrow's session.

So we'll take a short recess now.

THE DEPUTY CLERK: All rise.

(Recess.)

THE COURT: Okay. After consulting with the parties, I'm going to go ahead and read the final instructions as we discussed and get as far as we can by 5:00.

I'll stop right before -- after I get through the elements and before I read the last couple of pages and explain to the jury I'll give them those last parts tomorrow and tell them I usually do this at the end of trial, but that we're going to save the closing arguments after the -- and that I'll give them a copy of the instructions. They'll have the written instructions with them during their deliberations.

So you can bring the jury. My clerk is bringing you the -- what I'm going to be reading from, the copies. I have the original here.

(Pause.)

THE COURT: I think it took an hour and 45 minutes last time, so we'll try and get this in an hour and 30 this time. I'll talk fast.

THE DEPUTY CLERK: Jury panel.

(Jury panel enters the courtroom.)

THE COURT: You may be seated.

All right. Ladies and gentlemen, I'm going to give you instructions on the law that applies in this case and tomorrow morning counsel will give you their closing arguments. I will give you these instructions in writing so you'll have them with you in the jury room, but I'm required to read them

to you as well.

During your deliberations you may, if you want, refer to these instructions. While you may refer to any particular part of the instruction, you're to consider the instructions as a whole. You may not follow some and ignore others. If you have any questions about the instructions, you should feel free to send me a note. Please return your instructions to me with -- when your verdict is returned.

My function is to conduct this trial in an orderly, fair, and efficient manner, to rule on questions of law and to instruct you on the law that applies in this case. It is your duty to accept the law as I instruct you. You should consider all the instructions I provide you as a whole. You may not ignore or refuse to follow any of them.

Your function, as the jury, is to determine what the facts in this case are. You are the sole judges of the facts. While it's my responsibility to decide what is admitted as evidence during the trial, you alone decide what weight, if any, to give to that evidence. You alone decide the credibility or the believability of the witnesses.

As human beings, we all have personal likes and dislikes, opinions, and prejudices and biases. Generally, we're aware of these things, but you should also consider the possibility that you have implicit biases; that is biases of which you may not be consciously aware. Personal prejudices,

preferences, or biases have no place in a courtroom where the goal is to arrive at a just and impartial verdict.

All people deserve fair treatment in the legal system, regardless of any personal characteristic, such as race, national or ethnic origin, religion, age, disability, sex, gender identity or expression, sexual orientation, education, or income level, or any other personal characteristic. You should determine the facts solely from a fair consideration of the evidence.

You may not take anything that I may have said or done during the trial as indicated how I think you should decide this case. If you believe that I have expressed or indicated any such opinion, you should ignore it. Your verdict in this case is your sole and exclusive duty and responsibility.

If any reference by me or the attorneys to evidence is different from your own memory of the evidence, it's your memory that should control during your deliberations. During your deliberations you may consider only the evidence properly admitted in this trial. The evidence in this case consists of the sworn testimony of the witnesses here on the witness stand, the exhibits that were admitted into evidence, and the facts of which I took judicial notice and the facts stipulated to by the parties.

I may take what is called judicial notice of public

acts, places, facts, and events that I consider to be matters of common knowledge or matters that can be determined easily through undisputed sources.

In this case, I took judicial notice that the defendant Moises Humberto Rivera-Luna was convicted of misdemeanor infliction of corporal injury on a spouse or cohabitant on November 29th, 1994, in the Superior Court of Los Angeles, California, Case Number 94MO4984. When I take judicial notice of a particular fact, you may regard that fact as proven evidence. Because you are the sole judges of the facts; however, you're not required to accept any fact that is judicially noticed.

During the trial, you were told that the parties had stipulated, that is agreed, to certain facts. You should consider any stipulation of fact to be undisputed evidence. When you consider the evidence, you are permitted to draw from the facts that you find have been proven such reasonable inferences as you feel are justified in light of your experience. You should give any evidence such weight as in your judgment it's fairly entitled to receive.

The statements and arguments of the lawyers are not evidence. They're only intended to assist you in understanding the evidence. Simply -- similarly, the questions of the lawyers are not evidence.

The indictment is merely the formal way of charging

or accusing a person of a crime. You must not consider the indictment as evidence of any kind. You may not consider it as any evidence of defendants' guilt or draw any inference of guilt from the indictment.

Every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial unless and until the Government has proven he is guilty beyond a reasonable doubt. This burden of proof never shifts throughout the trial. The law does not require a defendant to prove his innocence or produce any evidence at all. If you find that the Government has proven beyond a reasonable doubt every element of an offense with which a defendant is charged, then it is your duty to find him guilty of that offense.

On the other hand, if you find the Government has failed to prove any element of an offense beyond a reasonable doubt, it is your duty to find the defendant not guilty of that offense. The Government has the burden of proving the defendants guilty beyond a reasonable doubt.

In civil cases, it's only necessary to prove that a fact is more likely true than not or in some cases that its truth is highly probable. But in criminal cases, like this one, the Government's proof must be more powerful than that; it must be beyond a reasonable doubt. Reasonable doubt, as the name implies, is a doubt based on reason. A doubt for which

you have a reason based upon the evidence or lack of evidence in the case. If after careful, honest, and impartial consideration of all the evidence, you cannot say that you are firmly convinced of the defendant's guilt, then you have a reasonable doubt.

Reasonable doubt is the kind of doubt that would cause a reasonable person after careful and thoughtful reflection to hesitate to act in the graver or more important matters in life. However, it is not an imaginary doubt, nor a doubt based on speculation or guesswork; it's a doubt based on reason. The Government is not required to prove guilt beyond all doubt or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt.

There are two types of evidence from which you may determine what the facts are in this case, direct evidence and circumstantial evidence. When a witness, such as an eyewitness, asserts actual knowledge of a fact, that witness's testimony is direct evidence. On the other hand, evidence of facts and circumstances from which reasonable inferences may be drawn is what we call circumstantial evidence.

Let me give you an example. Assume a person looked out a window and saw that snow was falling; if he later testified in court about what he'd seen, his testimony would be direct evidence that snow was falling at the time he saw it happen. Assume, however, he looked out the window and saw no

snow on the evidence [sic] and then went to sleep and saw snow on the ground after he woke up. His testimony about what he had seen would be circumstantial evidence that it had snowed while he was asleep.

The law says that both direct and circumstantial evidence are acceptable as means of proving a fact. The law does not favor one form of evidence over another. It's for you to decide how much weight to give to any particular evidence, whether it is direct or circumstantial. You are permitted to give equal weight to both.

Circumstantial evidence does not require a greater degree of certainty than direct evidence. In reaching a verdict in this case, you should consider all of the evidence presented, both direct and circumstantial.

One of the questions that you were asked when we were selecting this jury was whether the nature of the charges would affect your ability to reach a fair and impartial verdict. We asked you that question because you must not allow the nature of the charge or of the charges together to affect your verdict. You must consider only the evidence that's presented in this case and reach a fair and impartial verdict.

The lawyers in this case sometimes objected when the other side asked a question, made an argument, or offered evidence that the objecting lawyer believed was not proper. You must not hold such objections against the lawyer who made

them or the party that he or she represents. It's the lawyer's responsibility to object to evidence that they believe is not admissible.

If during the course of the trial I sustained an objection to a lawyer's question, you should just ignore the question and you must not speculate as to what the answer would have been.

If after a witness answered a question I ruled that the answer should be stricken, you should ignore both the question and the answer and they should play no part in your deliberations.

Likewise, exhibits as to which I sustained an objection or which I ordered stricken are not evidence, and you must not consider them in your deliberations. In determining whether the Government has proven the charges against the defendants beyond a reasonable doubt, you must consider the testimony of all the witnesses who testified. You are the sole judges of the credibility of the witnesses. You alone determine whether to believe any witness and the extent to which any witness should be believed.

Judging a witness's credibility means evaluating whether the witness has testified truthfully and whether the witness accurately observed, recalled, and described the matters about which the witness testified. You should evaluate the credibility of witnesses free from prejudices and biases.

You may consider anything that in your judgment affects the credibility of any witness.

For example, you may consider the demeanor and the behavior of the witness here on the witness stand, the witness's manner of testifying, whether the witness impresses you as having an accurate memory and recollection, whether the witness has any reason for not telling the truth, whether the witness had a meaningful opportunity to observe the matters about which he or she has testified, whether the witness has any interest in the outcome of this case or stands to gain anything by testifying, or has friendship or hostility to other people concerned with this case.

In evaluating the accuracy of a witness's memory, you may consider the circumstances surrounding the event, including the time that has elapsed between the event and any later recollections of the event, and the circumstances under which the witness was asked to recall the details of the event.

You may consider whether any inconsistencies or consistencies in the witness's testimony are between the witness's testimony and any previous statements made by the witness.

You may also consider any consistencies or inconsistencies between the witness's testimony and any other evidence that you credit. You may consider whether any inconsistencies are the result of lapses in memory, mistake,

misunderstanding, intentional falsehood are differences in perception.

You may consider the reasonableness or unreasonableness, the probability or improbability of the testimony of a witness in determining whether to accept it as true and accurate. You may consider the witness -- whether the witness has been contradicted or supported by other evidence that you credit. If you believe that any witness has shown him or herself to be biased or prejudiced, for or against either side in this trial or motivated by self-interest, you may consider and determine whether such bias or prejudice has colored the testimony of that witness so as to effect the desire and capability of that witness to tell the truth.

You should give the testimony of each witness such weight as in your judgment it's fairly entitled to receive. You have heard the testimony from various -- from various accomplices and cooperating witnesses. The Government is permitted to use a witness who testifies that he or she participated in the offenses charged against the defendant, although the testimony of such witness should be considered with caution. You should give his or her testimony such weight as in your judgment it deserves.

You also heard testimony -- evidence, rather, that various witnesses entered into a plea agreement with the Government, pursuant to which the witnesses agreed to testify

truthfully in this case, and the Government agreed in some cases to dismiss a charge against him or her, to decline prosecution against -- of a case against him or her, to bring the witness's cooperation to the attention of his or her sentencing judge, or to file papers with his or her judge which would permit the judge to impose a more lenient sentence than the judge might otherwise be able to impose.

If you -- in fact, if you -- you have heard evidence that some witnesses have received a reduced sentence, dismissal of charges, or other favorable treatment as a result of their cooperation, the Government is permitted to enter into this kind of plea agreement. You, in turn, may accept the testimony of such a witness and convict a defendant on the basis of this testimony alone if it convinces you of a defendant's guilt beyond a reasonable doubt.

A witness who has entered into a plea agreement is under the same obligation to tell the truth as any other witness. The plea agreement does not protect him or her against a prosecution for perjury or making a false statement should he or she lie under oath in this court.

However, you may consider whether a witness has entered into such an agreement, has an interest different from other types of witnesses. You may consider whether the plea agreement a witness entered into with the Government has motivated him or her to testify falsely against a defendant.

The testimony of a witness who has entered into a plea agreement shall be considered with caution. You should give the testimony as much weight as in your judgment it deserves. As I've just explained to you, you've heard testimony that Carlos Silva, Manuel Saravia, Jorge Solorzano, and Antonio Urrutia-Barrera have been convicted of a crime and sentenced. A witness's prior criminal conviction is admitted into evidence solely for your consideration in evaluating his or her credibility as a witness.

Admittedly, the witness's previous conviction for the same charge or charges for which the defendants are on trial may not be considered as evidence of the defendant's guilt. The defendant is entitled to have the issue of his or her guilt determined solely on the basis of the evidence against him or her and not on whether another party has been convicted of the same charge or charges with which the defendants are accused.

For these reasons, you may consider the witness's prior convictions only in evaluating the believability of the witnesses.

Testimony from a law enforcement officer or agent, including a current or former police officer or agent shall be evaluated by you just as any other evidence in the case. In evaluating the officer's credibility, you should use the same guidelines that you apply to the testimony of any witness. In no event should you give either greater or lesser weight to the

testimony of any witness merely because he or she is a police officer or law enforcement officer or agent.

Every defendant in a criminal case has an absolute right not to testify. Defendants, with the advice of their respective counsel, have chosen to exercise this right. You must not hold their decision against them. It would be improper for you to speculate as to the reason or reasons for their decision or even to discuss their decision during your deliberations.

You must not assume the defendants guilt -- are guilty because they chose not to testify. You must not draw any inference of -- at all from their decision not to testify.

In this case, the following witnesses provided testimony, expressed opinions concerning the following subjects. A, Sergeant Ray Betts testified as an expert witness on MS-13 specifically in its structure, organization, leadership, language, rules, practice, signs, history, and methods.

Dr. Wayne Williams performed the autopsy of Louis Membreno-Zelaya and testified as to the cause and manner of death.

Julien Mason testified as an expert in the field of firearm and toolmark identification.

Dr. Laron Locke performed the autopsy of Felipe Enriquez and testified to the cause and manner of death.

Dr. Zabuillah Ali performed the autopsy of Luis Chavez-Ponce and testified by written -- read to you today -- testified to the cause and manner of death.

FBI Agent John Orlando testified concerning cellular technology in the analysis of a historical cellular telephone and cell site records.

If scientific, technical, or otherwise specialized knowledge might assist the judge in understanding the evidence or in determining a fact in issue, then a witness who possesses knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters.

You're not bound to accept the witness's opinion. If you find that the opinion is not based on sufficient education or experience, that the reasons supporting the opinion are not sound, or that the opinion is outweighed by other evidence, then you may completely or partially disregard the opinion. You should consider this evidence with all the other evidence in the case and give it as much weight as you think it fairly deserves.

The law treats prior inconsistent statements differently depending on the circumstances in which they were made. I'll explain how you should evaluate those statements.

You've heard evidence that some witnesses made statements on earlier occasions, that these statements may be consistent with their testimony here at trial. The earlier

statements were brought to your attention to help you in evaluating the credibility of the witness and as evidence in the case.

If you find that the earlier statements were consistent with the witness's present testimony in court, you may consider this consistency in judging the credibility of the witness here at trial and as proof that what was said in the earlier statements was true. It is for you to decide whether a witness made a statement on an earlier occasion, whether such statement was, in fact, consistent with the witness's in-court testimony.

The burden is on the Government to prove beyond a reasonable doubt not only that each offense was committed, but also that the defendants are the persons who committed them. In deciding whether Government has proved beyond a reasonable doubt that the defendants are the persons who committed the offense, you may consider any matter, any evidence relating to the identities of those persons.

A number of factors may affect the accuracy of identification of a defendant by a witness including: One, the witness's opportunity to observe the criminal act and the person committing it. Including, but not limited to, the length of the encounter, the distance between the various parties, the lighting conditions at the time and the witness's state of mind at the time of the offense.

Two, any subsequent identification and the circumstances surrounding that identification, including the witness's state of mind when making the identification, any suggestion or circumstances that may have influenced the witness and any statements or actions by law enforcement officers concerning the identification.

Three, any failure of a witness to identify a defendant as the person who committed the offense.

Four, any -- an identification by the witness of another person as the person who committed the offense.

And, five, any other facts that may have been brought to your attention by the remaining evidence that you conclude bears upon the accuracy of the witness's in-court or out-of-court identification of a defendant.

Based upon any identifications by the witnesses and all additional evidence you have heard, you must be satisfied beyond a reasonable doubt that the defendants are the persons who committed these offenses before you may convict them. If the evidence concerning the identification of the defendant is not convincing beyond a reasonable doubt, then you must find the defendant not guilty of that offense.

During the course of the trial you've heard certain tape recorded conversations, which are obtained through the use of wire interceptions, commonly referred to as wiretaps. The term "intercept" means to obtain the contents of any wire or

oral communications used by -- using an intercepting device. The wire interceptions or wiretaps in this case were court ordered; that is, they were approved by a judge and the Government's use of these interceptions was lawful.

During the course of this trial you heard the phrase "consensual tape recording." As I told you at the beginning of this trial, this term should not be confused with the phrase "wire interception" or "wiretap." A wired interception or a wiretap is a court ordered interception of communications, which does not require the consent of the parties to the conversation.

The consensual tape recording, on the other hand, is a recording where one party to the conversation consents to the conversation being tape recorded. It is lawful to conduct consensual tape recordings and the other party or parties to the conversation do not have to consent to the taping. Consensual tape recorded conversations may occur over the telephone or face to face.

Tape recordings of telephone conversations in Spanish identified by witnesses have been received in evidence. Ordinarily, where conversations are in English, transcripts of these tape recorded conversations are furnished for the convenience and guidance of the jury. The tapes in this case present a different situation. As you noted, conversations in these tapes are in Spanish. Those transcripts present a

translation of words spoken in Spanish are admitted as evidence, you should treat those transcripts as you would any other evidence in this trial in according those portions such weight and credibility as you think they merit.

Even if you read or speak Spanish, however, you must accept the translations as presented in the transcripts. You may not substitute your understanding of the meaning of Spanish for that of the translator. I won't be sending the tapes back with you during your deliberations because the tapes are in Spanish; and the Spanish language, even if you understand it, is not what we're using during this trial.

With respect to those conversations, you've heard testimony that many of these conversations were intercepted and recorded pursuant to the authorization of a judge of this court. You are specifically instructed that the interception and recording of telephone conversation pursuant to court authorization and the use of those recordings in a trial, such as this one, is legal. You must not concern yourself with the legality or propriety of such interceptions.

I have admitted documents that are in Spanish with an English translation. Although, some of you may know Spanish, it is important that all jurors consider the same evidence; therefore, you must accept the English translation that you've been given.

You have heard evidence that defendant Moises

Humberto Rivera-Luna was deported following a conviction in a domestic assault case in California. You've also heard evidence that defendant Tokiro Rodas-Ramirez was deported. You may only use this evidence as proof of their identity in this case. Moises Humberto Rivera-Luna and Tokiro Rodas-Ramirez are only on trial for the charges in the indictment.

Rivera-Luna is not charged in this case with any offense relating to his deportation or conviction in domestic assault case; nor is Rodas-Ramirez charged in this case with any offense relating to his deportation. Therefore, you may not use this evidence to conclude that Moises Humberto Rivera-Luna and Tokiro Rodas-Ramirez have a bad character or that they have a criminal personality. The law does not allow you to convict a defendant simply because you may believe that he has done bad things not specifically charged as crimes in this case.

Certain records from Guatemala were introduced showing that defendant Moises Humberto Rivera-Luna was in custody there for a period of time in 2022. This evidence was admitted for a limited purpose. The limited purpose is for your consideration on the issue of identity.

The Government -- it contends that this -- certain references then -- these records are relevant to showing that Mr. Rivera-Luna is the person referred to as Viejo Santos. You're free to accept or reject this evidence as you see fit as

with any other evidence.

The circumstances of why he was held in custody in Guatemala are not relevant. You may not speculate as to why he was in custody there. Beyond the limited purpose of this evidence, i.e. whether it tends to establish the identity of Mr. Rivera-Luna as Viejo Santos, this evidence has no relevance as to whether Mr. Rivera-Luna was involved in any of the charges charged in the indictment -- any of the crimes charged in the indictment.

You may find the defendant guilty of a specific crime charged in the indictment without finding that he personally committed each of the acts that make up the crime or that he was present while the crime was being committed.

Any person who in some way intentionally participants in the commission of a crime can be found guilty either as an aider and abettor or as the principal. It makes no difference which label you attach, the person is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime.

To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed.

Some affirmative conduct by the defendant in planning

or carrying out the crime is necessary. Mere physical presence by the defendant at the place and time the crime is committed, is not by itself sufficient to establish his guilt.

For purposes of aider and abetter liability, the Government is not required to prove that anyone discussed or agreed upon a specific time or method of committing the crime. The Government is not required to prove that the crime was committed in the particular way planned or agreed upon. Nor may the Government prove that the principal offender and the person alleged to be the aider and abetter directly communicated with each other.

I'm about to instruct you on the elements of each of the offenses with which the defendants are charged with respect to each charge, regardless of whether the defendant is an aider and abettor or principal offender, the Government must prove beyond a reasonable doubt that the defendant personally acted with the intent for the offense with which he is charged.

It is not necessary that all the people who committed the crime be caught or identified. It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone, and the defendant knowingly and intentionally aided and abetted in committing the crime.

Count 1 in the indictment charges the defendants with a specific form of conspiracy. That is a conspiracy to violate the law prohibiting racketeer influenced and corrupt

organizations. This is commonly known as RICO conspiracy and I'll refer to it as such in these instructions.

Count 1 of the indictment reads as follows:

Beginning on a date unknown to the grand jury but since at least the 1990s, continuing up through and including May 2013 in the District of Columbia, the District of Maryland, and elsewhere, Moises Humberto Rivera-Luna, also known as Santos, also known as Viejo Santos; Tokiro Rodas-Ramirez, also known as Johnny, also known as Perverso; together with others known and unknown, each being a person employed by and associated with MS-13 an enterprise which engaged in, and the activities of which affected interstate and foreign commerce unlawfully, knowingly, and intentionally did conspire to violate Title 18, United States Code Section 1962(c), that is to conduct and participate directly and indirectly in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and (5), which pattern of racketeering activity consisted of multiple acts, including offenses chargeable under the following provisions of District of Columbia and Maryland law:

A, murder, in violation of District of Columbia Code, Sections 22-2101 and 2103, and in violation of Maryland Code Criminal Law Sections 2-201, 2-204, 2-205, 2-206 in the Common Law of Maryland.

B, robbery, in violation of District of Columbia Code, Section 22-2801, in violation of Maryland Code, Criminal Law Sections 3-402 and 3-403 and the Common Law of Maryland.

And C, extortion, in violation of District of Columbia Code, Section 22-3251, and Maryland Code, Criminal Law, Section 3-701, 3-705 in the common law of Maryland.

And multiple acts regarding the following -- involving the following provisions of federal narcotics law. D, Sections 841(a)(1) and 846 of Title 21, United States Code. And multiple acts indictable under the following provisions of federal law:

E, 18 U.S.C., Section 1512, witness retaliation tampering.

F, 18 U.S.C., 1503, obstruction of justice.

It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise. Defendants are charged with violating 18 U.S.C., Section 1962(d), a portion of the law on the racketeering influence and corrupt organizations. That portion reads as follows: It shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of the RICO Act.

19 -- Section 1963 -- 1962 of the RICO Act provides that it shall be unlawful for any person employed by or

associated with any enterprises engaged in or the activities of which affect interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity or a collection of unlawful debt.

The word "racketeering" has certain connotations in our society. For your purposes all that matters is the way that Congress used the term in the statute, which I'll explain to you in a moment, any other connotations of the term should have no bearing on your determination of whether the defendant is guilty of the charges against him.

In order to satisfy its burden of proof as to Count 1, the Government must prove the following elements beyond a reasonable doubt.

First, an enterprise existed as charged in the indictment. Second, the enterprise engaged in or its activities affected interstate or foreign commerce. Third, the defendant was employed by or associated with the enterprise. Fourth, the defendant knowingly and willfully became a member of the conspiracy.

The conspiracy charged in the indictment is to participate in the conduct of the affairs of the enterprise where the enterprise engaged in a pattern of racketeering activity.

The first element that the Government must prove

beyond a reasonable doubt that an enterprise existed as charged in the indictment. Enterprise is a group of people who have associated together for a common purpose of engaging in a course of conduct over the period of time. This group of people, in addition to having a common purpose, must have an ongoing organization, either formal or informal, and it must have personnel who function as a continuing unit.

Although the activities -- identities, I'm sorry, of the persons may change from time to time, this group of people does not have to be a legally cognizable entity, such as a partnership or organization. This group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose.

The Government has charged in this -- that the enterprise in this is La Mara Salvatrucha or MS-13, including the leadership, members, and associates and that the common purposes include:

A, preserving and protecting the power, territory, reputation, profits of the enterprise through the use of intimidation, violence, threats of violence, assaults and murder.

B, promoting and enhancing the enterprise and activities of its members and associates by committing crimes, including but not limited to murder, attempted murder, narcotics, trafficking, theft of vehicles, robberies,

extortion, human smuggling, and other criminal activities.

C, keeping victims, potential victims, and community members in fear of the enterprise and its members and associates through violence and threats of violence.

D, providing financial support and information to MS-13 members, including those incarcerated in the United States and El Salvador.

And E, providing assistance to other MS-13 members who committed crimes for or on behalf of the gang to hinder, obstruct, and prevent law enforcement officers from identifying the offenders, apprehending the offenders, and successfully prosecuting and punishing the offenders.

If you find that the Government has proven there was a group of people characterized by, One, a common purpose; Two, an ongoing formal or informal organization; Three, personnel who function as a continuing unit, then you may find that an enterprise existed.

If you find that this enterprise existed, you must also determine whether this enterprise continued in an essentially unchanged form during the substantially entire period charged in the indictment. This does not mean that everyone involved has to be the same, but the core of the enterprise has to be the same throughout.

The second element the Government must prove beyond a reasonable doubt is that the enterprise was engaged in or had

an effect upon interstate or foreign commerce.

Interstate commerce means the movement of goods, services, money, and individuals between states or between a state and the District of Columbia, or a U.S. Territory or possession or between the United States and a foreign state or nation.

The Government must prove that the enterprise engaged in interstate or foreign commerce or that its activities affected interstate or foreign commerce in any way, no matter how minimal. It does not have to prove that the racketeering activity affected interstate or foreign commerce, although the racketeering did affect interstate or foreign commerce is sufficient to satisfy this element. It is not necessary to prove that the acts of the defendant affected interstate or foreign commerce, as long as the acts of the enterprise had such effect.

In addition, the Government is not required to prove that the defendant knew he was affecting interstate or foreign commerce. Finally, there is no requirement that the activity affecting interstate commerce be legal.

Third element the Government must prove beyond a reasonable doubt is the defendant was associated with the enterprise, it's not required the defendant be associated with the enterprise for the entire time that the enterprise exempted -- existed or that the defendant knew everyone was

associated with the enterprise at some time.

It is required, however, the Government prove beyond a reasonable doubt that at some time during the period indicated in the indictment the defendant himself was associated with the enterprise.

A person cannot be associated with the enterprise if he did not know -- if he does not know of the enterprise's existence or the nature of its activities. Thus, in order to prove this element, the Government must prove beyond a reasonable doubt that the defendant was connected by -- to the enterprise in some meaningful way and that he knew of the existence of the enterprise and the general nature of its activities.

The fourth element the Government must prove beyond a reasonable doubt is the defendant knowingly and willfully became a member of the conspiracy. A conspiracy is a kind of criminal partnership, a combination or agreement of two or more persons who join together to accomplish some unlawful purpose.

In order to prove a conspiracy, the Government must establish that at least two or more persons entered the unlawful agreement charged in the indictment; that is, an agreement to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity, and that the defendant knowingly and willfully became a member of the conspiracy.

You need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement. Similarly you need not find that the alleged conspirators stated in words or writing that what the scheme was, its object, or person or every precise detail of a scheme or means by which its object or purpose was to be accomplished. What the Government must prove is there is mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act.

The focus of this element is on the defendant's agreement to participate in the objective of the enterprise, to engage in a pattern of racketeering activity, and not on the defendant's agreement to commit individual acts. The Government must prove the defendant participated in some manner, however slight, in the overall objective of the conspiracy and that the conspiracy itself involved or would have involved the commission of at least two racketeering acts. The extent of the defendant's participation has no bearing on the defendant's guilt.

A conspirator's liability is not measured by the extent of or duration of its participation, each member may perform separate and distinct acts and may perform them at different times. Some conspirators may play -- play major roles, others may play minor roles. An equal role is not what

the law requires.

The term racketeering activity, as charged in the indictment requires the term:

One, murder, in violation of District of Columbia Code, Sections 22-2110 and 2103; in violation of Maryland Code Criminal Law Section 2-201, 2-204, 2-205, 2-206, and the Common Law of Maryland.

Two, robbery in violation of District of Columbia Code, Section 22-2801, in violation of Maryland Code Criminal Law Section 3-402 and 3-403 and the Common Law of Maryland.

Three, extortion in violation of District of Columbia Code, Section 22-3251, and Maryland Code Criminal Law 3-701 and 3-705 and the Common Law of Maryland.

Four, offenses involving trafficking in controlled substances in violation of Title 21 United States Code, Sections 841 and 846.

Five, acts indictable under Title 18 United States Code, Section 1512, relating to tampering with witness, victim, or an informant, and Section 1503, obstruction of justice.

I'll define those crimes a little later.

The term "pattern of racketeering activity" requires at least two acts of racketeering activity that are related to the enterprise and to each other and that pose a threat of continued criminal activity.  It's not sufficient for the Government to prove that only two of the alleged racketeering

acts were committed or intended to be committed, a series of disconnected acts does not constitute a pattern and a series of disconnected crimes does not consist of a pattern of racketeering activity, nor do they amount to or pose a threat of continued criminal activity -- racketeering activity.

To prove the alleged racketeering acts are related, the Government must prove that the acts had the same or similar purposes, results, participants, victims, or methods of conviction -- commission or that they are otherwise interrelated by distinguishing characteristics or not isolated events.

To prove the alleged racketeering activity posed a threat of continued racketeering activity, the Government must establish the acts are a part of a long-term association that existed for criminal purposes. The Government is not required to prove that the defendant personally committed two such acts, although you may conclude that the defendant agreed to participant in the conduct of the enterprise for proof that he agreed to commit or actually committed such acts.

You're further instructed the Government is not required to prove the defendant knew all of the other conspirators or that it agreed with each of them to violate the law. Instead the focus of this count is on the defendant's own agreement to join or remain in the conspiracy charge. What is important is the Government prove the defendant knowingly

adopted the goal of furthering or facilitating the criminal behavior. Or, in other words, the defendant knew generally about the pattern of racketeering activity and agreed to facilitate the racketeering scheme in some manner, and not that the defendant himself committed the crimes encompassing the pattern of racketeering activity.

The Government is not required to prove that each conspirator explicitly agreed with every other coconspirator to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity or knew all his fellow conspirators or is aware of all the details of the conspiracy; rather to establish sufficient knowledge it is only required the defendant knew the general nature and common purpose of the conspiracy, and that the conspiracy exist -- extended beyond his individual role. Moreover, the elements of a RICO conspiracy, such as the conspiratorial agreement, the defendant's knowledge of it, and defendant's participation in the conspiracy may be inferred from circumstantial evidence.

I want to caution you, however, that defendant's mere presence at the scene of the alleged crime does not, by itself, make him a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make a member -- a defendant a member.

A person may know or be friendly with a criminal without being a criminal himself. Mere similarity of conduct

of the fact that the alleged conspirators may have assembled together and discussed common names and interest does not necessarily establish proof of the existence of a conspiracy.

I also want to caution you that mere knowledge or acquiescence without participation in the unlawful plan is not sufficient. Moreover, the fact that the acts of the defendant without knowledge merely happens to further the purposes of the objectives of the conspiracy does not make the defendant a member. More is required under the law. What is necessary is the defendant must participate with the knowledge of at least some of the purposes of the objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful acts.

In sum, before you may find the conspiracy element of Count 1, the Government must have proven beyond a reasonable doubt, the defendant, with an understanding of the unlawful character of the conspiracy, intentionally engaged, advised, or assisted in it for the purpose of furthering the unlawful illegal undertaking.

It is for you to determine whether the racketeering activities alleged in the indictment were part of the conspiracy.

Murder: First degree murder is the intentional killing of another person with willfulness, deliberation, and premeditation.

Willful means that the murder actually -- the person actually intended to kill the victim. "Deliberately" means that the person was conscious of the intent to kill.

Premeditated means the person thought about the killing, that there was enough time before the killing, though it may have been only brief, for the assailant to consider the decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.

Second degree murder is the killing of another person with either the intent to kill or the intent to inflict serious bodily harm that death would be the likely result. Second degree murder does not require premeditation or deliberation.

Attempted murder is a substantial step beyond mere preparation toward the commission of murder in the first or second degree. In order to prove attempt, the Government must show that the assailant had the apparent ability at that time to commit the crime of murder and the requisite intent.

Robbery. Robbery is the taking away of property from another by force or threat of force with the intent to permanently deprive the victim of the property. Property means anything of value.

Extortion under Maryland and District of Columbia law, extortion occurs when a defendant or defendants obtained property from the complainant with the complainant's consent

where that consent was obtained through use of actual threat and force of violence by threat -- or by threats of economic injury.

Federal narcotics law. According to federal law, Title 21, United States Code, Section 841(a), possession with the intent to distribute a controlled substance means that the defendant possessed a controlled substance knowingly and intentionally with the specific intent to distribute the controlled substance. Distribute means to transfer or attempt to transfer a controlled substance to another person. Although no payment is required for that exchange.

The Government charges the controlled substance here was cocaine, which by law is a controlled substance. Conspiracy to possess with intent to distribute or to distribute a controlled substance, pursuant to 21 U.S.C. Section 846, means there was an agreement between two or more persons to commit the crimes of possession with intent to distribute or distribution of a controlled substance. And that defendant intentionally joined in that agreement.

Witness tampering. Witness tampering in violation of 18 U.S.C. Section 1512 requires two elements for the purposes of this case. First, the conduct must involve the use of physical force or the threat of physical force against another or attempt to do so or intimidation, threats, or attempts to do so.

Second, the conduct must be done with the intent to cause another to withhold testimony from an official proceeding or hinder, delay, or prevent the communication to a law enforcement officer of the United States. Any information relating to the commission or possible commission of a federal offense.

Obstruction of justice. The federal obstruction of justice statute is codified at 18 U.S.C. Section 1503. It provides that whoever corruptly or by threats of force influences, disrupts, or impedes or endeavors to inflict -- to influence, obstruct, or impede the due administration of justice is guilty of a crime.

This law is aimed at a variety of means by which the orderly and due process of the administration of justice may be impeded, thwarted, or corrupted. The due administration of justice includes, but is not limited to a grand jury proceeding or investigation. The sweep of the statute extends to any corrupt endeavor or effort to interfere with the juror's function in the discharge of his duties.

The keyword in the statute is "endeavor." As used in the statute, endeavor means any effort or any act, however contrived, to obstruct, impede, or interfere with a grand jury or trial proceeding. It's the endeavor which is the gist of the crime.

Success of the endeavor is not an element of the

crime. Any effort however -- whether successful or not that is made for the purpose of corrupting, obstructing, or impeding the proceedings is condemned. The word "corruptly" as used in the statute means simply having the improper motive or purpose of obstructing justice.

The law does not require that the federal proceeding be pending at the time of the use of force or threat or that the individual know whether any proceeding is federal or local, as long as the proceeding itself was reasonably foreseeable. And the intent of the force or threat was to obstruct the proceeding and the actions were likely to effect such a proceeding.

In order to convict the defendant of the RICO conspiracy charged in Count 1, all 12 of you must agree as to which type or types of predicate racketeering activity were intended as part of the conspiracy the defendant joined. For example at least two acts of murder or robbery or witness tampering, or one of each or any combination thereof.

On the verdict form, you will first be asked whether you find a defendant guilty or not guilty of the charge in Count 1. If you find the defendant guilty, you will be asked to specify what type or types of racketeering activity you find to have been the objectives of the conspiracy he joined. You'll be asked separately about murder, robbery, extortion, federal narcotics law, witness tampering, and obstruction of

justice.

Special findings. If you find the Government proved beyond a reasonable doubt the defendants committed the offense of conspiracy to participate in a racketeering influenced corrupt organization, you should go on to make two special findings whether the Government has proven beyond a reasonable doubt the defendant Tokiro Rodas-Ramirez did unlawfully and with deliberate premeditation kill and murder Luis Miguel Chavez-Ponce on or about July 29th, 2008, in violation of Maryland law.

Whether the Government has proven beyond a reasonable doubt that one or more individuals on the authorization of defendant Moises Humberto Rivera-Luna did feloniously, willfully, and with deliberate premeditation kill and murder Felipe Leonardo Enriquez, also known as Zombie, on or about March 21 -- March 31st, 2010, in violation of Maryland law.

Okay. I've just got to read a little more on Count 2 and we'll be through for the day.

Count 2. Tokiro Rodas-Ramirez is charged with violation of Title 18, United States Code, Section 1959, by either committing or conspiring to commit a violent crime with reference to a racketeering enterprise. Section 1959 reads as follows:

Whoever, for the purpose of gaining entrance to or maintaining or increasing possession -- position in an

enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assaults relating -- resulting in serious bodily injury upon or threatens to commit a crime of violence against any individual in violation of the laws of any state or the United States or attempts or conspires to do so is guilty of a crime.

Count 2, realleges and incorporates the allegations concerning the existence and purposes of the enterprise in paragraphs 1 through 14 of Count 1 of the indictment.

And then reads as follows:

On or about April 7th, 2008, in the District of Columbia as consideration for the receipt of and as consideration for a promise in the agreement to pay anything of pecuniary value from MS-13, and for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, the defendant Tokiro Rodas-Ramirez, also known as Perverso, also known as Johnny, and others known to the grand jury unlawfully, knowingly, and intentionally did assault with a dangerous weapon Dimas Perez in violation of D.C. Code Section 22-402.

In order to prove a violation of Section 1959, the Government must establish beyond a reasonable doubt each of the following five elements of the offense:

First, an enterprise affecting interstate or foreign commerce existed.

Second, the enterprise was engaged in racketeering activity.

Third, the defendant had or was seeking a position in the enterprise.

Fourth, the defendant committed or aided and abetted in the commission of the alleged crime of violence.

And fifth, the defendant's general purpose in committing the crime of violence was to gain entrance to or maintain or increase his position in the enterprise.

The first element that the Government must prove beyond a reasonable doubt is that an enterprise existed and the enterprise was engaged in or had an effect upon foreign commerce.

The Government has charged the same enterprise with these counts as in Count 1, the RICO conspiracy count, that is MS-13, including its leadership, members, and associates. I've already instructed you on what's necessary for the Government to prove the existence of an enterprise that was engaged in or had an effect upon interstate or foreign commerce.

The second element the Government must prove beyond a reasonable doubt is the enterprise engaged in racketeering activity.

I've already instructed you about the types of racketeering activity charged in this case. As I explained, racketeering activity includes such offenses as murder in

violation of laws of the District of Columbia in Maryland; robbery, extortion, narcotics trafficking, witness tampering, and obstruction of justice. It's for you to determine whether the enterprise engaged in those activities as charged.

You should give the words "engaged in" their ordinary every day meaning for an enterprise to be charged, engaged rather, in racketeering activities. It's enough to show that the enterprise committed or engaged or was planning to commit racketeering activity within a period of time short of under all of the circumstances though it is appropriate to say that the enterprise would engage in racketeering activity.

However, unlike Count 1, the Government is not required to prove beyond a reasonable doubt that the enterprise engaged in a pattern of racketeering activity; that is at least two racketeering acts.

The Government is only required to prove beyond a reasonable doubt that the enterprise was engaged in racketeering activity to satisfy the second element.

The third element the Government must prove beyond a reasonable doubt is the defendant was seeing or had a position in the enterprise. To establish this element, the Government must prove the defendant was actively engaged in promoting the illegal activities of the enterprise. And he, by his acts, was attempting to become a member of the enterprise.

It is not enough to prove the defendant was doing

business with the enterprise. The Government must prove that he was actually a member of the enterprise or that he was actively seeking membership in the enterprise.

The fourth element the Government must prove beyond a reasonable doubt is the defendant committed or aided and abetted in the commission of the alleged crime of violence charged in the indictment. Under the aiding and abetting statute, it is not necessary for the Government to prove the defendant himself physically committed the crime with which he's charged in order for the Government to sustain its burden of proof. A person who aids and abets another to commit an offense is just as guilty of that offense as if he committed it himself.

Accordingly, you may find the defendant aided and abetted in the commission of the offense if you find the Government has proven beyond a reasonable doubt that another person actually committed the offense and the defendant aided or abetted that person in the commission of the offense.

As you can see, the first element is that you find that another person has committed a crime of violence. No one can be convicted of aiding and abetting the criminal acts of another if no crime was committed by the other person in the first place, but if you do find that a crime was committed, then you must consider whether the defendant aided or abetted the commission of that crime. In order to determine that

question, you should follow my instructions on aiding and abetting.

The fifth element the Government must prove beyond a reasonable doubt is the defendant's general purpose in committing or aiding and abetting the commission of the charged crime of violence was to gain entrance to or maintain or increase his position in the enterprise.

The Government is not required to prove this was the defendant's sole or principal motive. In determining whether a defendant's purpose in committing the crime was to gain entrance to or maintain or increase his position in the enterprise, you should give the words "gain entrance," "maintain," and "increase" their ordinary meanings. You should consider all the facts and circumstances in making that determination.

For example, you may consider evidence that the crime, if proven, was committed in order to maintain discipline within the enterprise, and served to maintain the defendant's position in the enterprise. If the defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise or if he committed the crime because he thought it would enhance his position or prestige within the enterprise or if he committed it because he thought it was necessary to maintain the position he already held, then this element would be established.

The crime of violence charged against Tokiro Rodas-Ramirez in Count 2 is assault with a dangerous weapon. The elements of assault with a dangerous weapon, each of which the Court must -- the Government must prove beyond a reasonable doubt are:

One, Tokiro Rodas-Ramirez attempted or aided and abetted an attempt with force or violence to injure Dimas Perez. Two, at the time he or the person he aided and abetted had the apparent present ability to injure Dimas Perez. Three, he or the person he aided and abetted to perform the acts consulted -- constituting the assault. And, four, he or the person he aided and abetted committed the assault with a dangerous weapon.

A dangerous weapon, under the District of Columbia law is defined as one which is likely to produce death or great bodily injury by use made of it.

There is a Count 3 of the indictment which charges the defendant Tokiro Rodas-Ramirez with the crime of using a firearm to commit -- or carrying a firearm during the commission or discharging a firearm during the commission of or possessing a firearm in furtherance of a crime of violence. The indictment reads:

On or about April 7th, 2008, in the District of Columbia, the defendant Tokiro Rodas-Ramirez, also known as Perverso, also known as Johnny, and another known to the grand

jury unlawfully, willfully, and knowingly did use and carry a firearm during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely assault with a dangerous weapon in aid of racketeering as alleged in Count 2, and did possess, brandish, and discharge the firearm in furtherance of the offense charged in Count 2.

You'll recall that in Count 2 of the indictment on which I just instructed you, the charges against Tokiro Rodas-Ramirez with the assault of Dimas Perez under Count 3, defendant is charged with using, carrying, brandishing, discharging, and possessing a firearm during and in furtherance of the crime of assault with a dangerous weapon in aiding -- in aid of racketeering or with aiding and abetting another person as charged in Count 2.

If upon all of the evidence in regard to -- you find the Government has failed to prove Count 2 beyond a reasonable doubt, then you need not proceed to Count 3. Count 3 is only considered if you find the defendant guilty of count 2, specifically you may deliberate on Count 3 only if you find the defendant guilty of Count 2, and that will be on the verdict form.

In reaching your verdict on Count 3, you may consider the verdict -- the evidence on Count 2 only for the purpose of determining whether the elements of Count 3 have been satisfied. The Government must prove each of the following

elements beyond a reasonable doubt to sustain its burden of proving the defendant guilty.

First, defendant used or possessed a firearm or aided and abetted one who did so. Second, the defendant did so knowingly and intentionally. And, third, defendant did so knowing -- during and in relation to a crime of violence.

The first element the Government must prove beyond a reasonable doubt is the defendant committed or aided and abetted the commission of a crime of violence for which he may be prosecuted in a court of the United States. Defendant is charged in Count 2 with assault with a dangerous weapon in aid of racketeering, which is a crime of violence; however, it is up for you to determine whether the Government has proved beyond a reasonable doubt the defendant committed or aided in committed -- aided and abetted committing that crime of violence.

The second element the Court -- the Government must prove beyond a reasonable doubt is the defendant knowingly used or carried a firearm, or aided and abetted the use of carrying a firearm during and in relation to, or that the defendant knowingly possessed or the defendant knowingly discharged a firearm in furtherance of the commission of the crime referenced in that count or that he aided and abetted another person to do so.

A firearm is any weapon that will or was designed to

or may be readily converted to expel a projective [sic] by the action of an explosive.

Use of a firearm means proof beyond a reasonable doubt of active employment of the firearm by a person during and in relation to the commission of the crime of violence. This does not mean that the person must actually fire or attempted to fire the weapon, although there would obviously -- that -- those would obviously constitute use of the weapon, brandishing and displaying or even referring to the weapon, so that others present knew the person had the firearm available if needed, all constitute use of the firearm. However, the mere possession of a firearm, at or near the sight of the crime without active employment, as I just described it, is not sufficient to constitute use of the firearm.

Carrying a weapon means proof beyond a reasonable doubt that the person had the weapon within his control in such a way that it furthered the commission of the crime of violence or was an integral part of the commission of the crime.

A person did not necessarily have to hold the firearm physically, that is have actual possession of it on his person. If you find the person had dominion and control over the place where the firearm was located and the power and intention to exercise control over the firearm in such a way that it furthered the commission of the crime of violence, you may find that the Government has proven a person carried the weapon. It

is not sufficient -- it is not sufficient to prove carrying it if all the Government has proven is that the firearm was transported in a vehicle in which a person was riding, there must be proof that the person knew of the weapon's presence and had the power and intention to exercise control of the weapon so that it was available for its use in the commission of a crime if the need arose.

Possession of a firearm in furtherance of the crime means proof beyond a reasonable doubt that the person had the possession of the firearm and that such possession was in furtherance of that crime.

Possession means that the person either had physical possession of the firearm on his person, or that he had dominion and control over the place where the firearm was located, had the power and intention to exercise control over the firearm. Possession may be sole or joint. If one person alone possesses something, that is sole possession; however, it is possible that more than one person may have the power and intention to exercise control over the firearm; this is called joint possession. If you find the defendant had such power and intention, then he possessed the firearm, even if he possessed it jointly with another.

Possession cannot be found solely because the defendant associated with another person who did not possess the firearm or solely because he was near to the firearm or

solely because he knew the firearm was present. These facts may be considered by you, however, in connection with all of the evidence making your decision whether the defendant possessed the firearm.

To possess a firearm in furtherance of the crime means the firearm helped forward, advance, or promote the commission of the crime. The mere possession of the firearm at the scene of the crime is not sufficient under this definition. The firearm must have played some part in furthering the crime in order for this element to be satisfied.

To satisfy this element, you must also find that the person carried or used the firearm knowingly. This means that he carried the firearm purposely and voluntarily and not by accident or mistake. It also means he knew that the weapon was a firearm, as we commonly use the word. However, the Government is not required to prove that the person knew that he's breaking the law.

In order to find that the defendant aided and abetted the use in carrying a firearm during and in relation to or the possession of a firearm in furtherance of the assault with a dangerous weapon in aid of racketeering, Count 3, the Government must prove beyond a reasonable doubt defendant acted with the advanced knowledge that another participant would use or carry a firearm during and in relation to or possess a firearm in furtherance of the commission of assault with a

dangerous weapon in aid of racketeering.

If you find the defendant guilty of using or carrying a firearm during and in relation to carrying -- possessing a firearm in furtherance of or aiding and abetting the use or carrying a firearm during and in relation to possessing a firearm in furtherance of the assault with a dangerous weapon in aid of racketeering, you must then determine whether the defendant Tokiro Rodas-Ramirez brandished and discharged or aided and abetted the brandishing and discharging of a firearm during and in relation to the assault and dangerous weapon in aid of racketeering.

In order to find the defendant aided and abetted the brandishing of a firearm during and in relation to the assault with a dangerous weapon, the Government must prove beyond a reasonable doubt that the defendant acted with advance knowledge that another participant would display or make the presence of a firearm known for the purpose of intimidation.

The defendant need not have had actual advance knowledge that a participant would only actually brandish the firearm. The requirement is satisfied if the defendant knew or participated or intended to brandish the firearm to intimidate if the need arose.

You must also determine that the fire -- whether the defendant [sic] was discharged, even accidentally. To aid and abet -- using, carrying, or possession of a firearm that was

discharged, the defendant need not have advance knowledge that the discharge would occur.

And advance knowledge means knowledge at a time when the defendant chose to begin or continue the defendant's participation in the violent crime. The defendant chose to continue the defendant's participation, if the defendant learned of the firearm and continued to participate. The defendant did not chose to continue to participate if the defendant learned of the firearm too late for the defendant to reasonably walk away.

On the verdict form, you must -- as to Count 3 you must determine whether the Government has proven beyond a reasonable doubt that the defendant Tokiro Rodas-Ramirez used, carried, or possessed or aided and abetting the use, carrying, or possessing a firearm during and in relation to the assault with a dangerous weapon in aid of racketeering. If you find the Government has proven beyond a reasonable doubt the defendant Tokiro Rodas-Ramirez used, carried, or possessed or aided and abetted the use, carrying, or a possession of a firearm during and in relation to the assault with a dangerous weapon in aid of racketeering, you must then determine whether the defendant Tokiro Rodas-Ramirez brandished and discharged or aided and abetted the brandishing and discharging of a firearm during and in relation to the assault with a dangerous weapon in aid of racketeering. Your verdict must be unanimous as to

any and all selections.

A conspiracy is a kind of partnership in crime. Its members may be responsible for each other's actions. A defendant is responsible for any offense committed by another member of the conspiracy if the defendant was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, as a natural consequence of the conspiracy.

In order to find Tokiro Rodas-Ramirez guilty of Counts 2 and 3 under this theory you must find beyond a reasonable doubt that, one, there is conspiracy to kill rival gang members. Two, the offense was committed by a co-conspirator, Tokiro Rodas-Ramirez. Three, Tokiro Rodas-Ramirez was a member of the conspiracy to kill rival gang members at the time of the offense.

Four, the offense was committed during the existence of the conspiracy. Five, the offense was committed in furtherance of the conspiracy. And, six, the offense was a reasonably foreseeable consequence of the conspiracy. It is not necessary to find that the crime was intended as part of the original plan, only that it was a foreseeable consequence of the original plan.

In order to determine whether a conspiracy existed at the time of the crime and whether Tokiro Rodas-Ramirez was a member, you must find, beyond a reasonable doubt, the following

two elements:

One, beginning on a date unknown but since at least the late 1990s continuing up through and including May 2013, an agreement existed between two or more people to kill rival gang members. This does not have to be a formal agreement or a plan in which everyone involved sat down together and worked out the details. On the other hand, merely because people get together and talk about common interest or do common things, does not necessarily show an agreement exists to commit the crime that allegedly was the subject of the charged conspiracy. It is enough that the Government prove beyond a reasonable doubt that there was a common understanding among those involved to kill gang members.

Two, Tokiro Rodas-Ramirez intentionally joined in that agreement. It's not necessary to find that he agreed to all the details of the crime or that he even knew the identity of all the other people the Government has claimed were participating in the agreement.

A person may become a member of a conspiracy even if that person agrees to play only a minor part, so long as that person understands the unlawful nature of the plan and voluntarily and intentionally joins in it with the intent to advance or further the unlawful nature and object of the conspiracy.

But mere presence at the scene of the agreement or

the crime and merely being present with other participants does not show that Tokiro Rodas-Ramirez knowingly joined in that. Similarly, unknowingly acting in a way that helps the participants without more does not make a person part of the conspiracy.

In addition, merely knowing about the agreement itself, without more, does not make Tokiro Rodas-Ramirez a part of the conspiracy. A conspiracy can be proved indirectly by facts and circumstances that lead to a conclusion that a conspiracy existed. The Government's burden is to prove that such facts and circumstances existed and led to that conclusion in this particular case.

In deciding whether an agreement existed, you may consider the facts -- acts and statements of all the alleged participants in deciding whether Tokiro Rodas-Ramirez became a member of that conspiracy, you may consider only his acts and statements.

Someone's intent ordinarily cannot be proved directly because there is no way of knowing what a person is actually thinking. But you may infer someone's intent from the surrounding circumstances. You may consider any statement made or acts done by the defendant, and all other facts and circumstances received in evidence which indicate his intent.

You may infer, but you're not required to infer, that a person intends the natural and probable consequences of acts

he intentionally did or did not do. It's entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the Government has proven beyond a reasonable doubt that the defendant acted with the necessary state of mind.

I think that's enough for the day. Let me talk to counsel before I release you for the day.

(Bench conference.)

THE COURT: Anything else you all think I need to say before I let them go?

MR. MOHANTY: Not from the Government, Your Honor.

MR. GUILLAUME: No, Your Honor.

MR. FEITEL: Your Honor, before we go, before we adjourn, at least one matter I think we should take up -- we can do it outside the presence of the jury, though it will be brief.

(End of bench conference.)

THE COURT: Now, as I have told you on many occasions, don't talk about the case, don't let anyone talk to you about the case. Most importantly, you don't ever talk about -- anything about the case until I give you my final instructions. We'll have the closing arguments in the morning and we'll seat the final jury.

Alternates still show up because we'll see what the final shape of the jury is tomorrow morning. And, alternates, you're still important, so we don't know -- as you saw today, we don't know who will be seated at the end. So I'll see all of you tomorrow at 10:00.

You're at a critical point, so please come back. I promise not to read forever tomorrow. I only have like five pages left. You'll hear arguments tomorrow.

(Jury panel leaves the courtroom.)

THE COURT: Is this off the record?

MR. FEITEL: No, I think on the record would be good.

THE COURT: Okay.

MR. FEITEL: Good morning -- good afternoon, Your Honor.

I think it might be prudent for Your Honor to inquire briefly of the defendants, particularly my client, about exercising --

THE COURT: Yes.

MR. FEITEL: -- his right to testify or not. I think it was presumed that we weren't going to, it happened last time but, you know, better we should ask while we're all here.

THE COURT: I agree.

MR. FEITEL: That's one.

THE COURT: Let me ask each defendant to come forward.

MR. FEITEL: Sure.

THE COURT: I want to talk to you directly and make sure you understand you have a right to testify on your own behalf, you also have a right not to testify. It's totally your choice. Your attorney advised me that you had chosen not to testify, but it is still up to you at this point, and I just want to make sure you fully understand your rights, and you have determined that you would not testify at your trial; is that correct?

DEFENDANT RIVERA-LUNA: Yes, Your Honor.

THE COURT: Okay. Thank you.

As you just heard me say to your codefendant, you certainly have a right to testify. You also have a right not to testify. It's something you need to talk to your attorney about it. I assume you all already have, but I just want to make sure you understand your rights, you have elected not to testify, is that correct?

DEFENDANT RODAS-RAMIREZ: Yes, Your Honor.

THE COURT: Thank you very much.

MR. FEITEL: Your Honor, two other brief matters.

One is since we now are down to 14 jurors, I would ask if Your Honor would consider putting the juror in what was seat 16 in the vacant seat so that the area in front of the jurors could be open and we could move about.

THE COURT: I agree.

MR. FEITEL: You know I think --

THE COURT: I agree.

MR. FEITEL: That's advocacy. Right. Standing behind the lectern is just talking, that's a lecture.

Second, is -- I don't know if Your Honor can help us out here, Your Honor may know that the Government counsel have the -- have the privilege of entering the building by skipping the line, but for diminutive defense counsel we have to wait. And tomorrow is one of the naturalization ceremonies days. And Your Honor may not have observed it, but hundreds of people come, they bring their families. I once waited for more than an hour to get inside the building.

I was -- if Your Honor could help us out if there's something you could do, if I sent a draft order saying that the marshals could take us to the front of the line. If you would -- if there's anything else that can be done, I don't really know what to do, but I don't want to be out there waiting -- my mental health will suffer if I have to wait an hour and 20 minutes in that line.

THE COURT: I'll see what can be done.

MR. FEITEL: I'd appreciate that.

And that's all for today.

THE COURT: Okay.

MR. FEITEL: Thank you.

THE COURT: I think there's an easier way to see if

the marshal can bring you around to John Marshal or something or other. I don't know if that's open now, but there's probably a way we can do something.

MR. FEITEL: Well, if not -- I mean, you know, Ms. Rhee and I are getting -- I'm not -- this is not a complaint. But we're getting up at 6 in the morning as it is to get here by 8. We come here at 8, we'll be in the line until 10. So there's a practical limit to how early we can get here.

THE COURT: I understand.

MR. FEITEL: Okay. And it's not for lack of trying either. Thank you, Your Honor.

THE COURT: Let's talk about time. What's the Government expecting?

MR. LEVY: Your Honor, I'm expecting about 90 minutes for my closing.

THE COURT: For the opening [sic]?

MR. LEVY: I'm sorry?

THE COURT: For the opening and closing?

MR. LEVY: Yes.

THE COURT: And how long for rebuttal?

MR. MOHANTY: 15, 20 minutes.

MR. LEVY: Mr. Mohanty expects 15 to 20 minutes.

THE COURT: What are the defendants talking about?

MR. GUILLAUME: Your Honor, I would request on behalf

of my client, an hour. I don't know that I'll use it all, but I would request an hour.

MR. FEITEL: Well, since brevity is the soul of wit, I will ask for no more than 46 minutes to do my summation. And I'll hope to get done -- when I tried -- last time I asked for 37 and I think Your Honor was keeping track. I was getting concerned, so I'll ask for 46.

THE COURT: Okay. We'll see if we get started on time. Okay.

MR. FEITEL: All right. Thank you.

THE COURT: Let me see counsel off the record one other thing then.

(Proceedings concluded at 5:06 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, REBECCA MONROE, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 28th day of April, 2026



Rebecca Monroe, RPR
Official Court Reporter
Room 6706
333 Constitution Avenue, N.W.
Washington, D.C. 20001

## $

**$50** [1] - 25:3

## '

**'90s** [3] - 41:13, 42:19, 43:7
**'93** [5] - 44:9, 45:1, 45:5, 45:6, 45:12

## 1

**1** [11] - 63:25, 122:23, 123:3, 125:13, 134:15, 138:14, 138:21, 140:9, 141:15, 142:12
**10** [6] - 47:5, 83:12, 95:13, 100:21, 101:2, 160:8
**10-256** [1] - 4:2
**10-cr-256-RCL-14** [1] - 1:3
**10001** [1] - 2:3
**10:00** [1] - 157:5
**10:06** [1] - 1:6
**11th** [5] - 6:17, 7:4, 55:23, 90:3
**12** [3] - 47:2, 47:5, 138:14
**120** [1] - 88:5
**120A** [1] - 88:4
**124** [1] - 78:20
**13** [3] - 1:6, 7:16, 9:25
**1300** [1] - 2:6
**1350** [1] - 1:22
**139A** [1] - 87:20
**14** [7] - 1:6, 1:20, 4:3, 100:21, 101:1, 140:9, 158:21
**140A** [1] - 87:24
**15** [10] - 37:5, 53:3, 53:15, 54:5, 72:21, 73:7, 95:13, 96:21, 160:22, 160:23
**1503** [3] - 124:14, 131:19, 137:8
**1505** [1] - 2:6
**1508** [1] - 31:18
**1508B** [2] - 31:15, 32:2
**1512** [3] - 124:12, 131:18, 136:21
**155B** [2] - 91:14, 93:8
**155C** [2] - 91:16, 93:9
**15th** [1] - 56:8
**16** [7] - 1:7, 1:3, 2:2, 4:4, 89:4, 96:21, 158:23
**17** [1] - 35:10
**18** [11] - 66:18, 86:12, 123:14, 123:17, 124:12, 124:14, 124:18, 131:17, 136:21, 137:8, 139:20
**18th** [1] - 8:5
**19** [4] - 96:21, 100:22, 101:2, 124:24
**1959** [3] - 139:20, 139:22, 140:21
**1961(1** [1] - 123:18
**1962** [1] - 124:24
**1962(c** [1] - 123:14
**1962(d** [1] - 124:19
**1963** [1] - 124:24
**1980** [1] - 58:25
**1990s** [2] - 123:5, 154:3
**1993** [2] - 6:10, 41:17
**1994** [3] - 89:7, 92:22, 105:7
**19th** [1] - 92:22
**1:20** [1] - 98:18

## 2

**2** [23] - 61:6, 61:11, 61:16, 61:19, 61:24, 62:2, 87:24, 98:22, 99:22, 139:17, 139:19, 140:7, 145:2, 146:5, 146:6, 146:7, 146:14, 146:16, 146:18, 146:20, 146:23, 147:11, 153:10
**2(b** [1] - 56:17
**2-201** [2] - 123:24, 131:6
**2-204** [2] - 123:24, 131:6
**2-205** [2] - 123:24, 131:6
**2-206** [2] - 123:24, 131:6
**20** [6] - 35:9, 68:19, 68:21, 159:19, 160:22, 160:23
**20001** [3] - 1:19, 2:15, 162:13
**20008** [1] - 2:7
**2001-MZ** [1] - 90:7
**20036** [1] - 1:23
**2005-MZ** [1] - 90:7
**2006** [3] - 44:9, 45:9, 45:12
**2007** [2] - 45:3, 45:6
**2008** [14] - 45:4, 46:15, 46:17, 46:19, 53:6, 53:8, 78:8, 89:4, 89:20, 90:8, 139:9, 140:11, 145:23
**2009** [12] - 10:11, 10:13, 10:16, 46:21, 46:22, 56:13, 56:24, 57:1, 71:21, 89:5, 89:24, 90:3
**201** [1] - 91:24
**2010** [17] - 15:10, 15:18, 18:3, 18:11, 19:1, 22:24, 29:10, 36:17, 36:20, 40:7, 48:24, 50:2, 64:13, 71:21, 94:24, 95:1, 139:16
**2011** [8] - 30:14, 38:9, 46:18, 46:22, 47:3, 49:5, 52:25, 55:24
**2013** [3] - 55:23, 123:6, 154:3
**2020** [1] - 88:19
**2022** [1] - 120:19
**2025** [2] - 87:21, 87:25
**2026** [4] - 1:6, 34:3, 39:13, 162:7
**202MZ** [1] - 91:25
**203-MZ** [1] - 91:25
**204** [2] - 90:13, 91:25
**205** [1] - 91:25
**20530** [1] - 1:17
**20th** [1] - 94:24
**21** [7] - 68:21, 98:3, 124:9, 131:15, 136:5, 136:15, 139:16
**2103** [2] - 123:23, 131:5
**22** [3] - 19:13, 19:14, 19:22
**22-2101** [1] - 123:23
**22-2110** [1] - 131:5
**22-2801** [2] - 124:2, 131:9
**22-3251** [2] - 124:5, 131:12
**22-402** [1] - 140:20
**22066** [1] - 2:4
**23** [5] - 35:7, 74:16, 74:17, 76:12, 89:5
**24** [2] - 86:12, 86:13
**240** [1] - 90:16
**240-441-0877** [1] - 90:11
**25** [2] - 96:20, 96:21
**28th** [2] - 89:7, 162:7
**29** [6] - 23:17, 23:24, 59:1, 68:19, 95:19, 95:22
**295** [1] - 77:4
**29th** [4] - 87:21, 87:25, 105:7, 139:9
**2:00** [3] - 61:3, 61:4, 61:9

## 3

**3** [15] - 88:4, 93:4, 98:4, 98:22, 99:22, 145:17, 146:9, 146:17, 146:19, 146:22, 146:24, 150:21, 152:11, 153:10
**3-402** [2] - 124:3, 131:10
**3-403** [2] - 124:3, 131:10
**3-701** [2] - 124:6, 131:12
**3-705** [2] - 124:6, 131:13
**30** [3] - 68:17, 91:4, 102:16
**301** [2] - 91:1, 92:2
**303** [1] - 90:9
**304** [1] - 90:12
**305** [1] - 90:14
**307** [2] - 91:4, 92:9
**308** [3] - 1:22, 91:5, 92:15
**30s** [1] - 53:6
**30th** [2] - 78:8, 89:20
**311** [2] - 91:7, 92:17
**313A** [2] - 91:9, 92:23
**31st** [1] - 139:16
**333** [2] - 2:14, 162:12
**37** [1] - 161:6
**38** [1] - 3:6

## 4

**4** [2] - 51:13, 93:5
**40** [1] - 25:3
**401** [1] - 90:18
**401-CP** [1] - 90:19
**402** [1] - 90:18
**402-CP** [1] - 90:19
**403** [4] - 79:10, 79:23, 84:15, 84:20
**404** [1] - 81:21
**405** [4] - 80:5, 85:25, 86:21, 86:24
**406** [2] - 85:3, 85:5
**407** [4] - 79:10, 79:23, 83:16, 84:17
**408** [1] - 90:18
**408-CP** [1] - 90:19
**412** [1] - 90:18
**412-CP** [1] - 90:19
**4120** [1] - 1:16
**418** [1] - 90:18
**418-CP** [1] - 90:20
**419** [1] - 90:18
**419-CP** [1] - 90:20
**45** [1] - 102:15
**46** [3] - 6:1, 161:4, 161:7
**4th** [4] - 1:16, 6:10, 41:17

## 5

**5** [4] - 3:5, 83:12, 98:4, 123:18
**5'8** [1] - 78:18
**5(k)1.1** [1] - 65:19
**52** [1] - 3:6
**555** [1] - 1:16
**5:00** [1] - 102:3
**5:06** [1] - 161:13
**5th** [1] - 89:24

## 6

**6** [2] - 90:8, 160:6
**601** [1] - 1:19
**601A** [2] - 91:11, 93:17
**601A-DP** [2] - 91:11, 93:17
**63** [1] - 2:3
**646-2102** [1] - 90:13
**6706** [2] - 2:14, 162:12

## 7

**7** [1] - 56:17
**70** [1] - 3:7
**703** [1] - 88:8
**703A** [1] - 88:7
**704** [1] - 88:12
**704A** [1] - 88:11
**706-1200** [1] - 90:16
**73** [1] - 3:9
**7th** [2] - 140:11, 145:23

## 8

**8** [4] - 18:11, 89:2, 160:7
**803(6** [1] - 90:24
**803(8** [1] - 91:13
**817** [1] - 88:15
**841** [1] - 131:16
**841(a** [1] - 136:5
**841(a)(1** [1] - 124:9
**846** [3] - 124:9, 131:16, 136:16
**8th** [4] - 36:17, 36:20,

64:13, 94:25

## 9

**9** [1] - 96:20
**9,000** [1] - 76:15
**9-millimeter** [3] - 19:21, 22:2, 22:11
**90** [1] - 160:15
**901-MZ** [1] - 91:24
**902(11** [1] - 90:24
**907** [1] - 89:8
**907A** [1] - 89:11
**915** [1] - 89:8
**915A** [1] - 89:11
**916** [1] - 89:8
**916A** [1] - 89:11
**917** [1] - 89:8
**917A** [1] - 89:11
**918** [1] - 89:8
**918A** [1] - 89:11
**921** [1] - 89:9
**921A** [1] - 89:11
**922** [1] - 89:9
**922A** [1] - 89:11
**923** [1] - 89:9
**923A** [1] - 89:12
**924** [1] - 89:9
**924A** [1] - 89:12
**925** [1] - 89:9
**925A** [1] - 89:12
**926** [1] - 89:9
**926A** [1] - 89:12
**928** [1] - 89:9
**928A** [1] - 89:12
**929** [1] - 89:9
**929A** [1] - 89:12
**930** [1] - 89:9
**930A** [1] - 89:12
**931** [1] - 89:9
**931A** [1] - 89:12
**932** [1] - 89:9
**932A** [1] - 89:12
**934** [2] - 23:13, 89:9
**934A** [3] - 23:13, 49:22, 89:12
**94MO4984** [1] - 105:8
**9th** [4] - 52:25, 56:13, 56:24, 57:1

## A

**A-L-I** [1] - 74:1
**a.m** [1] - 1:6
**Abarca** [1] - 91:3
**abet** [1] - 151:25
**abets** [1] - 143:11
**abetted** [21] - 121:20, 122:22, 141:5, 143:6, 143:15, 143:18, 143:24, 145:7, 145:8, 145:10, 145:12, 147:4, 147:9, 147:15, 147:19, 147:23, 150:18, 151:9, 151:12, 152:19, 152:23
**abetter** [2] - 122:4, 122:10
**abetting** [9] - 99:23, 100:11, 143:7, 143:21, 144:2, 144:5, 146:13, 151:4, 152:14
**abettor** [2] - 121:16, 122:15
**ability** [6] - 62:8, 88:24, 108:17, 135:17, 145:9, 162:6
**able** [10] - 36:17, 36:18, 57:24, 63:1, 65:8, 81:11, 82:3, 82:10, 86:8, 112:7
**absolute** [1] - 114:3
**accept** [10] - 28:23, 28:24, 103:12, 105:11, 111:5, 112:12, 115:12, 119:6, 119:23, 120:25
**acceptable** [2] - 62:21, 108:6
**accepted** [1] - 100:2
**accident** [3] - 18:8, 36:21, 150:14
**accidentally** [1] - 151:24
**accomplices** [1] - 111:17
**accomplish** [2] - 129:18, 130:9
**accomplished** [1] - 130:6
**accomplishment** [1] - 134:12
**according** [2] - 119:3, 136:4
**accordingly** [1] - 143:14
**accuracy** [4] - 89:13, 110:13, 116:19, 117:13
**accurate** [14] - 23:9, 79:18, 89:10, 89:16, 90:7, 90:9, 90:12, 90:15, 90:20, 91:16, 93:10, 110:6, 111:6, 162:4
**accurately** [3] - 87:22, 88:2, 109:23
**accused** [3] - 56:9, 56:12, 113:16
**accusing** [1] - 106:1
**acquiescence** [1] - 134:5
**acquittal** [2] - 95:19, 95:21
**Act** [2] - 124:23, 124:24
**act** [9] - 56:8, 70:2, 97:14, 98:2, 100:8, 107:8, 116:21, 130:10, 137:21
**acted** [4] - 122:16, 150:22, 151:15, 156:6
**acting** [1] - 155:3
**Action** [1] - 1:3
**action** [1] - 148:2
**actions** [4] - 117:5, 121:24, 138:11, 153:3
**active** [2] - 148:4, 148:13
**actively** [2] - 142:22, 143:3
**activities** [15] - 38:22, 56:6, 123:12, 125:1, 125:17, 126:8, 126:23, 127:1, 128:8, 129:8, 129:13, 134:21, 142:4, 142:7, 142:23
**activity** [34] - 45:14, 123:17, 123:19, 124:17, 125:4, 125:24, 128:11, 128:19, 129:24, 130:13, 131:2, 131:21, 131:22, 131:24, 132:4, 132:5, 132:12, 132:13, 133:3, 133:6, 133:10, 138:15, 138:22, 140:1, 140:16, 141:2, 141:22, 141:24, 141:25, 142:9, 142:11, 142:14, 142:18
**acts** [35] - 39:1, 56:5, 96:22, 105:1, 121:12, 121:18, 123:19, 124:7, 124:10, 124:16, 128:14, 128:15, 130:14, 130:18, 130:23, 131:17, 131:22, 132:1, 132:2, 132:6, 132:7, 132:14, 132:16, 132:19, 134:6, 134:13, 138:17, 142:15, 142:23, 143:21, 145:10, 155:14, 155:16, 155:22, 155:25
**actual** [5] - 48:5, 107:17, 136:1, 148:20, 151:18
**add** [2] - 96:1, 98:12
**addition** [4] - 101:16, 126:5, 128:17, 155:6
**additional** [4] - 35:11, 89:17, 96:10, 117:16
**address** [1] - 20:17
**adduced** [1] - 98:6
**adjourn** [1] - 156:16
**administered** [1] - 5:8
**Administration** [1] - 88:17
**administration** [4] - 97:19, 137:11, 137:14, 137:15
**admissible** [1] - 109:3
**admission** [2] - 23:13, 32:2
**admitted** [9] - 79:23, 90:21, 103:17, 104:20, 104:22, 113:7, 119:1, 119:20, 120:20
**admittedly** [1] - 113:10
**adolescents** [1] - 42:20
**adopted** [1] - 133:1
**advance** [6] - 150:6, 151:15, 151:18, 152:1, 152:3, 154:23
**advanced** [1] - 150:23
**advice** [1] - 114:4
**advised** [2] - 134:17, 158:5
**advocacy** [1] - 159:3
**affairs** [6] - 123:16, 124:17, 125:4, 125:22, 129:23, 133:9
**affect** [5] - 108:17, 108:19, 116:19, 125:2, 128:12
**affected** [6] - 66:10, 123:12, 125:17, 128:9, 128:11, 128:14
**affecting** [4] - 62:8, 128:18, 128:20, 140:24
**affects** [1] - 110:1
**afternoon** [12] - 52:22, 52:23, 52:24, 62:16, 70:14, 70:15, 73:24, 87:16, 94:19, 95:20, 98:18, 157:13
**age** [1] - 104:5
**agent** [6] - 39:20, 39:21, 90:3, 113:20, 113:21, 114:2
**Agent** [10] - 53:21, 53:24, 54:2, 54:8, 72:21, 72:23, 89:25, 94:23, 95:1, 115:4
**agents** [2] - 65:9, 71:23
**ago** [1] - 53:3
**agree** [12] - 31:4, 31:8, 31:10, 50:18, 87:19, 89:15, 89:18, 94:22, 138:14, 157:22, 158:25, 159:2
**agreed** [13] - 4:23, 105:14, 111:25, 112:1, 122:6, 122:8, 124:16, 132:17, 132:19, 132:22, 133:3, 133:8, 154:15
**agreement** [31] - 31:22, 65:13, 65:15, 66:4, 66:7, 111:24, 112:12, 112:16, 112:18, 112:22, 112:24, 113:2, 129:17, 129:21, 129:22, 130:3, 130:12, 130:14, 132:24, 133:16, 136:16, 136:19, 140:13, 154:4, 154:5, 154:9, 154:15, 154:18, 154:25, 155:6, 155:13
**agrees** [1] - 154:20
**ahead** [2] - 61:20, 102:2
**aid** [11] - 146:4, 146:13, 147:11, 150:21, 151:1, 151:7, 151:11, 151:24, 152:16, 152:21, 152:25
**aided** [23] - 121:20, 122:21, 141:5, 143:5, 143:14, 143:17, 143:24, 145:6, 145:8, 145:10, 145:12,

147:3, 147:8, 147:14, 147:15, 147:19, 147:23, 150:18, 151:9, 151:12, 152:14, 152:19, 152:23
**aider** [4] - 121:16, 122:4, 122:10, 122:14
**aiding** [10] - 99:23, 100:11, 134:12, 143:7, 143:21, 144:1, 144:5, 146:12, 146:13, 151:4
**aids** [1] - 143:11
**aimed** [1] - 137:13
**alert** [1] - 4:21
**Alfred** [2] - 1:20, 4:11
**ALFRED** [1] - 1:21
**ALI** [3] - 3:8, 73:21, 87:9
**Ali** [6] - 4:21, 73:25, 77:6, 80:7, 89:20, 115:1
**alien** [1] - 91:8
**allegations** [1] - 140:7
**alleged** [16] - 34:9, 34:14, 68:12, 122:10, 130:1, 130:3, 131:25, 132:6, 132:12, 133:20, 134:1, 134:21, 141:6, 143:6, 146:5, 155:14
**allegedly** [4] - 9:17, 9:20, 67:2, 154:10
**allow** [3] - 98:13, 108:18, 120:13
**allowed** [2] - 12:17, 94:18
**almost** [8] - 14:6, 41:2, 62:11, 68:5, 70:16, 72:18, 72:19, 96:16
**alone** [5] - 103:18, 103:19, 109:18, 112:14, 149:17
**alongside** [1] - 44:22
**alternates** [3] - 62:10, 157:1, 157:2
**AMERICA** [1] - 1:3
**America** [1] - 4:3
**American** [1] - 76:6
**amount** [1] - 132:4
**analysis** [1] - 115:5
**AND** [1] - 1:7
**Anderton** [1] - 90:4
**Angeles** [2] - 14:19, 105:8
**answer** [7] - 16:24, 27:17, 65:24, 66:2, 109:6, 109:9, 109:10
**answered** [5] - 28:8, 59:24, 60:6, 70:16, 109:8
**answering** [1] - 70:22
**anticipating** [1] - 99:7
**Antonio** [2] - 5:18, 113:6
**apartment** [1] - 57:10
**apparent** [2] - 135:17, 145:9
**appearance** [1] - 4:8
**appearances** [1] - 1:25
**applied** [1] - 97:9
**applies** [2] - 102:22, 103:11
**apply** [2] - 101:2, 113:24
**appointed** [2] - 30:15, 38:14
**appreciate** [2] - 63:2, 159:21
**apprehending** [1] - 127:11
**approach** [3] - 4:7, 31:14, 37:9
**approached** [1] - 62:2
**appropriate** [2] - 101:15, 142:10
**approved** [1] - 118:3
**April** [5] - 1:6, 94:25, 140:11, 145:23, 162:7
**area** [4] - 13:13, 24:24, 84:12, 158:23
**argue** [1] - 97:24
**argument** [3] - 95:19, 95:24, 108:23
**arguments** [5] - 102:8, 102:23, 105:21, 156:24, 157:8
**arm** [1] - 85:6
**armpit** [1] - 85:7
**arose** [2] - 149:7, 151:22
**arrest** [1] - 46:17
**arrested** [10] - 12:22, 30:10, 30:13, 30:15, 38:9, 49:5, 52:25, 55:11, 55:24, 89:2
**arrive** [1] - 104:2
**arrived** [1] - 45:5
**articulate** [2] - 98:12, 99:11
**asleep** [1] - 108:4
**aspect** [2] - 96:18, 98:20
**assailant** [2] - 135:6, 135:17
**assault** [19] - 120:2, 120:9, 140:19, 145:2, 145:3, 145:11, 145:12, 146:4, 146:9, 146:12, 147:11, 150:20, 150:25, 151:6, 151:10, 151:13, 152:15, 152:20, 152:24
**assaulted** [1] - 65:10
**assaulting** [2] - 56:9, 64:21
**assaults** [3] - 126:20, 140:2
**assembled** [1] - 134:1
**asserts** [1] - 107:17
**assigned** [1] - 80:10
**assist** [2] - 105:22, 115:8
**assistance** [1] - 127:8
**assistant** [1] - 75:2
**assisted** [1] - 134:18
**assisting** [2] - 10:15
**associated** [13] - 46:16, 82:15, 121:22, 123:11, 125:1, 125:18, 126:3, 128:22, 128:23, 129:1, 129:5, 129:6, 149:24
**associates** [4] - 126:16, 126:23, 127:4, 141:16
**association** [2] - 132:14, 133:22
**Association** [1] - 76:6
**assume** [4] - 107:21, 107:25, 114:10, 158:15
**assuming** [2] - 42:5, 47:7
**assured** [1] - 48:12
**Atmospheric** [1] - 88:17
**attach** [1] - 121:17
**attack** [2] - 65:5, 100:16
**attempt** [7] - 97:4, 97:5, 100:1, 135:16, 136:9, 136:24, 145:7
**attempted** [5] - 56:21, 126:24, 135:14, 145:6, 148:7
**attempting** [1] - 142:24
**attempts** [2] - 136:24, 140:6
**attended** [1] - 89:23
**attention** [9] - 49:7, 63:1, 63:3, 78:7, 83:4, 97:21, 112:4, 116:1, 117:12
**attorney** [6] - 30:15, 38:14, 56:2, 66:7, 158:5, 158:14
**Attorney's** [1] - 1:18
**ATTORNEY'S** [1] - 1:14
**attorneys** [1] - 104:16
**audio** [1] - 24:1
**August** [3] - 10:11, 10:13, 10:16
**authorities** [1] - 55:14
**authorization** [3] - 119:14, 119:17, 139:12
**auto** [1] - 11:12
**automatically** [2] - 30:25, 133:23
**autopsies** [3] - 75:3, 76:13, 76:15
**autopsy** [14] - 77:12, 77:13, 78:9, 78:13, 79:17, 79:19, 80:10, 80:12, 80:13, 89:19, 89:23, 114:19, 114:24, 115:1
**available** [3] - 38:16, 148:10, 149:6
**Avenue** [4] - 1:22, 2:6, 2:14, 162:12
**aware** [6] - 32:8, 44:5, 96:5, 103:23, 103:25, 133:11
**Axume** [5] - 94:24, 95:2, 95:4, 95:5, 100:17

## B

**background** [1] - 75:8
**backing** [1] - 44:17
**bad** [6] - 43:23, 44:19, 44:21, 84:9, 120:12, 120:15
**Baltimore** [3] - 74:10, 75:12, 75:19
**Barrera** [1] - 113:6
**barrio** [3] - 33:19, 33:25, 69:17
**baseball** [3] - 65:6, 65:10, 72:14
**based** [8] - 74:20, 86:10, 106:25, 107:1, 107:10, 115:13, 117:15
**basis** [5] - 41:2, 47:15, 97:12, 112:13, 113:14
**bat** [2] - 65:10, 72:14
**bats** [1] - 65:6
**Battle** [25] - 4:10, 23:25, 81:20, 83:15, 84:14, 85:25, 91:22, 92:1, 92:4, 92:9, 92:10, 92:13, 92:16, 92:17, 92:21, 92:23, 92:25, 93:4, 93:5, 93:7, 93:13, 93:15, 93:16, 93:24
**battle** [5] - 23:3, 79:9, 80:4, 92:12, 93:11
**bearing** [2] - 125:10, 130:19
**bears** [1] - 117:13
**beat** [3] - 9:25, 33:22, 43:24
**beaten** [1] - 10:1
**beating** [6] - 44:17, 44:19, 69:16, 69:19, 69:23, 69:24
**became** [11] - 13:1, 13:3, 14:3, 24:15, 45:19, 45:22, 46:16, 125:19, 129:16, 129:24, 155:15
**become** [9] - 42:4, 42:6, 42:9, 42:15, 42:18, 42:25, 43:8, 142:24, 154:19
**BEFORE** [1] - 1:10
**beg** [1] - 58:4
**begin** [4] - 5:15, 38:1, 92:8, 152:4
**beginning** [9] - 15:9, 55:5, 55:6, 55:9, 95:25, 99:5, 118:6, 123:4, 154:2
**behalf** [7] - 3:3, 95:17, 95:20, 96:19, 127:9, 158:4, 160:25
**behavior** [2] - 110:4, 133:2
**behind** [2] - 85:20, 159:4
**beings** [1] - 103:21
**belabor** [1] - 95:23
**believability** [2] - 103:20, 113:18
**below** [4] - 73:21, 80:16, 80:24, 85:7
**Bench** [2] - 94:3, 156:10
**bench** [4] - 61:13, 86:19, 94:11, 156:19
**Bernardez** [4] - 88:12, 91:5, 95:3, 95:4

**Bernardez's** [1] - 97:9
**best** [4] - 44:5, 51:8, 88:24, 162:6
**better** [5] - 62:14, 62:16, 63:5, 71:1, 157:21
**Betts** [1] - 114:15
**between** [14] - 45:6, 49:19, 59:11, 86:12, 110:15, 110:19, 110:23, 116:23, 128:3, 128:5, 130:8, 136:16, 154:4
**beyond** [56] - 47:5, 106:8, 106:12, 106:16, 106:19, 106:24, 107:11, 107:13, 109:16, 112:15, 116:12, 116:15, 117:17, 117:20, 121:4, 122:16, 122:20, 125:14, 126:1, 127:24, 128:21, 129:2, 129:9, 129:14, 133:15, 134:15, 135:14, 139:3, 139:6, 139:11, 140:22, 141:11, 141:20, 142:13, 142:16, 142:19, 143:4, 143:16, 144:3, 145:4, 146:16, 147:1, 147:7, 147:14, 147:18, 148:3, 148:15, 149:9, 150:22, 151:14, 152:12, 152:17, 153:10, 153:25, 154:11, 156:5
**bias** [1] - 111:11
**biased** [1] - 111:9
**biases** [5] - 103:22, 103:24, 104:1, 109:25
**big** [2] - 47:3, 58:13
**bigger** [1] - 43:8
**bit** [8] - 5:19, 39:4, 62:8, 92:5, 92:12, 92:24, 93:2, 100:8
**Blanca** [3] - 29:5, 29:8, 29:16
**bleeding** [2] - 83:4, 84:25
**bless** [3] - 20:25, 21:13, 40:23
**blood** [1] - 57:17
**blow** [10] - 92:5, 92:10, 92:12, 92:15, 92:18, 92:21, 92:24, 93:2, 93:10, 93:19
**blue** [1] - 8:1
**Blumberg** [1] - 2:10
**Blumberg-Lorenzana** [1] - 2:10
**boards** [1] - 76:4
**bodily** [3] - 135:12, 140:3, 145:16
**body** [10] - 77:24, 78:3, 78:15, 79:7, 82:8, 82:9, 82:10, 84:21, 87:6, 89:19
**bones** [1] - 81:15
**book** [1] - 23:17
**born** [2] - 6:2, 58:24
**boss** [4] - 16:6, 16:14, 41:5, 45:23
**bottom** [3] - 92:20, 92:21, 93:14
**bound** [1] - 115:12
**box** [2] - 61:22, 61:23
**boy** [2] - 31:15, 32:2
**brain** [1] - 83:7
**brandish** [3] - 146:5, 151:19, 151:21
**brandished** [2] - 151:8, 152:22
**brandishing** [5] - 146:10, 148:9, 151:9, 151:13, 152:23
**break** [1] - 64:6
**breaking** [1] - 150:17
**breakup** [2] - 69:7, 69:14
**brevity** [1] - 161:3
**brick** [1] - 7:5
**brief** [5] - 47:17, 75:7, 135:6, 156:18, 158:20
**briefly** [2] - 67:1, 157:16
**bring** [14] - 4:17, 16:12, 20:19, 37:17, 42:14, 42:15, 61:15, 61:20, 63:17, 102:11, 112:3, 121:23, 159:11, 160:1
**bringing** [6] - 16:7, 16:10, 54:14, 63:1, 63:3, 102:11
**brother** [3] - 59:9, 59:22, 60:2
**brought** [4] - 16:15, 42:20, 116:1, 117:11
**Brumbelow** [9] - 53:21, 53:25, 54:2, 54:8, 71:14, 72:21, 72:23, 94:23, 95:1
**building** [2] - 159:7, 159:12
**built** [1] - 99:24
**bullet** [8] - 82:3, 82:5, 82:8, 82:17, 82:22, 84:21, 84:24, 89:20
**bullets** [2] - 89:25, 90:4
**burden** [8] - 106:8, 106:18, 107:13, 116:12, 125:12, 143:10, 147:1, 155:10
**business** [7] - 30:4, 30:6, 90:11, 90:14, 90:16, 90:24, 143:1
**businesses** [1] - 25:10
**buy** [2] - 25:25, 26:14
**BY** [49] - 5:12, 9:19, 11:20, 12:4, 15:17, 16:23, 21:15, 24:2, 24:22, 27:16, 28:11, 29:4, 29:7, 29:15, 31:17, 32:5, 36:2, 38:8, 40:25, 47:19, 49:18, 49:24, 51:14, 52:21, 54:6, 56:22, 57:21, 58:6, 60:13, 60:22, 60:25, 64:5, 67:11, 68:9, 68:22, 69:13, 70:13, 71:2, 72:12, 73:23, 77:11, 80:2, 80:6, 81:22, 83:17, 84:16, 85:4, 86:2, 86:20

## C

**California** [3] - 14:19, 105:8, 120:2
**Calloway** [1] - 4:20
**Campbell** [1] - 90:1
**Candace** [1] - 4:10
**cannot** [7] - 4:22, 81:6, 82:12, 107:3, 129:6, 149:23, 155:18
**capability** [1] - 111:13
**car** [15] - 18:8, 20:23, 34:20, 36:21, 57:7, 59:12, 59:13, 59:15, 59:17, 59:20, 60:4, 60:8, 60:10, 60:11, 60:14
**card** [2] - 80:8, 80:9
**care** [2] - 44:15, 44:20
**cared** [1] - 44:16
**careful** [2] - 107:2, 107:7
**carefully** [1] - 38:3
**Carlos** [1] - 113:5
**carried** [6] - 147:19, 148:25, 150:12, 150:13, 152:14, 152:18
**carry** [2] - 146:1, 150:24
**carrying** [13] - 122:1, 145:19, 146:10, 147:19, 148:15, 149:1, 150:19, 151:2, 151:3, 151:5, 151:25, 152:14, 152:19
**case** [69] - 4:2, 30:11, 31:2, 31:24, 32:7, 34:16, 35:11, 35:19, 38:21, 55:1, 55:5, 55:6, 55:7, 55:9, 55:10, 55:16, 61:3, 61:4, 63:6, 65:25, 71:23, 79:6, 88:22, 93:15, 97:10, 97:20, 98:6, 98:13, 99:5, 100:14, 100:24, 102:22, 103:11, 103:16, 104:12, 104:14, 104:20, 105:4, 106:5, 107:2, 107:15, 108:13, 108:21, 108:22, 110:10, 110:12, 112:1, 112:3, 113:22, 114:3, 114:13, 115:18, 116:3, 118:2, 118:23, 120:2, 120:5, 120:7, 120:9, 120:16, 136:22, 141:24, 155:12, 156:21, 156:22, 156:23
**Case** [1] - 105:8
**cases** [5] - 81:13, 106:20, 106:21, 106:22, 112:2
**catch** [1] - 51:5
**caught** [1] - 122:19
**caused** [2] - 83:6, 83:7
**caution** [4] - 111:21, 113:2, 133:19, 134:4
**cell** [8] - 16:13, 16:14, 41:9, 41:11, 71:20, 71:24, 115:6
**cellular** [2] - 115:4, 115:5
**Center** [1] - 75:14
**ceremonies** [1] - 159:9
**certain** [7] - 73:1, 73:3, 105:14, 117:22, 120:17, 120:22, 125:6
**certainly** [3] - 96:6, 99:8, 158:13
**certainty** [2] - 107:12, 108:12
**CERTIFICATE** [1] - 162:1
**certified** [4] - 88:6, 88:9, 88:13, 88:22
**certify** [1] - 162:3
**change** [3] - 12:23, 12:25, 126:9
**changed** [1] - 45:16
**changing** [1] - 99:21
**character** [2] - 120:12, 134:17
**characteristic** [2] - 104:4, 104:8
**characteristics** [1] - 132:10
**characterized** [1] - 127:14
**charge** [10] - 25:9, 100:10, 100:11, 108:19, 112:2, 113:11, 113:16, 122:14, 132:24, 138:20
**chargeable** [1] - 123:20
**charged** [36] - 98:22, 98:24, 99:25, 106:13, 111:19, 120:7, 120:9, 120:15, 121:8, 121:9, 121:11, 122:13, 122:17, 124:18, 125:15, 125:21, 126:1, 126:14, 127:21, 129:21, 131:2, 138:14, 139:19, 141:14, 141:24, 142:4, 142:6, 143:7, 143:10, 144:5, 145:1, 146:6, 146:10, 146:14, 147:11, 154:10
**charges** [16] - 55:17, 56:1, 98:24, 108:16, 108:19, 109:15, 112:10, 113:11, 113:16, 120:6, 121:8, 122:23, 125:11, 136:12,

145:17, 146:8
**charging** [2] - 99:16, 105:25
**chased** [2] - 65:9, 72:14
**Chavez** [7] - 78:10, 79:7, 79:19, 87:3, 89:20, 115:2, 139:9
**Chavez-Ponce** [6] - 78:10, 79:19, 87:3, 89:20, 115:2, 139:9
**check** [1] - 44:14
**chest** [1] - 84:22
**Chicano** [2] - 8:25, 44:15
**Chief** [2] - 74:9, 75:20
**children** [3] - 27:1, 29:3, 59:6
**choice** [2] - 135:8, 158:5
**Cholo** [5] - 11:2, 11:11, 36:7, 36:9, 36:14
**chose** [4] - 114:11, 152:4, 152:5, 152:8
**chosen** [2] - 114:5, 158:5
**circumstances** [14] - 107:19, 110:14, 110:16, 115:21, 117:2, 117:4, 121:2, 142:10, 144:14, 155:9, 155:11, 155:21, 155:23, 156:4
**circumstantial** [8] - 107:16, 107:20, 108:3, 108:5, 108:9, 108:11, 108:14, 133:18
**citizen** [1] - 39:10
**civil** [1] - 106:20
**claimed** [1] - 154:17
**claims** [1] - 95:25
**clarify** [1] - 49:12
**clear** [5] - 39:5, 39:9, 43:3, 46:16, 52:13
**clearly** [2] - 22:3, 50:11
**clerk** [2] - 63:8, 102:11
**CLERK** [9] - 4:2, 5:10, 37:19, 61:18, 61:21, 61:25, 63:21, 101:24, 102:18
**client** [8] - 94:16, 95:21, 96:19, 98:23, 99:9, 99:22, 157:16, 161:1
**climatological** [1] - 88:16
**clique** [81] - 7:19, 8:15, 8:17, 8:21, 8:22, 9:1, 9:12, 9:14, 9:18, 9:21, 10:7, 10:10, 10:12, 10:16, 11:1, 11:3, 11:10, 11:17, 11:21, 11:25, 12:8, 12:14, 13:2, 13:13, 14:4, 15:22, 16:5, 16:6, 16:7, 16:10, 16:15, 16:18, 17:2, 19:9, 21:5, 22:24, 24:16, 24:23, 25:6, 25:13, 25:17, 25:19, 25:22, 26:1, 26:9, 27:5, 28:7, 33:21, 34:6, 34:10, 36:4, 36:13, 41:6, 42:2, 43:12, 43:20, 44:1, 44:2, 44:9, 44:10, 44:12, 45:2, 45:20, 45:23, 46:3, 46:9, 46:11, 46:12, 46:23, 47:1, 47:4, 47:8, 47:14, 53:6, 53:9, 53:10, 68:24, 88:21
**cliques** [1] - 13:8
**close** [5] - 24:11, 85:19, 85:21, 97:1, 101:18
**closer** [2] - 5:20, 74:22
**closing** [5] - 102:8, 102:23, 156:24, 160:16, 160:19
**clothing** [1] - 77:16
**club** [1] - 65:3
**co** [1] - 153:13
**co-conspirator** [1] - 153:13
**cocaine** [1] - 136:13
**Cocky** [12] - 10:14, 10:16, 12:20, 16:4, 16:17, 16:18, 16:19, 17:2, 45:23, 45:25, 64:24, 65:5
**Cocky's** [1] - 16:5
**coconspirator** [1] - 133:8
**Code** [20] - 123:14, 123:18, 123:22, 123:23, 124:2, 124:5, 124:9, 131:5, 131:9, 131:12, 131:15, 131:18, 136:5, 139:20, 140:20
**codefendant** [1] - 158:12
**codified** [1] - 137:8
**cognizable** [1] - 126:10
**cohabitant** [1] - 105:7
**Cola** [6] - 57:3, 57:5, 57:8, 57:17, 57:22, 57:25
**Cola's** [1] - 57:10
**collect** [1] - 24:24
**collected** [1] - 25:1
**collection** [1] - 125:5
**Collyer** [3] - 33:3, 35:3, 35:5
**colored** [1] - 111:12
**colors** [3] - 7:23, 7:25, 8:7
**Columbia** [14] - 123:6, 123:21, 123:22, 124:1, 124:5, 128:4, 131:4, 131:8, 131:11, 135:23, 140:12, 142:1, 145:14, 145:24
**COLUMBIA** [2] - 1:1, 1:14
**combination** [2] - 129:17, 138:18
**comfortable** [2] - 6:20, 70:24
**coming** [2] - 27:22, 61:10
**command** [7] - 13:1, 13:2, 27:20, 27:25, 28:5, 28:6, 34:10
**commerce** [15] - 123:12, 125:2, 125:17, 128:1, 128:2, 128:8, 128:9, 128:11, 128:12, 128:15, 128:19, 128:20, 140:25, 141:13, 141:19
**commission** [24] - 121:15, 121:22, 130:18, 132:9, 135:15, 137:5, 141:6, 143:6, 143:15, 143:18, 143:25, 144:5, 145:20, 147:9, 147:22, 148:5, 148:17, 148:18, 148:24, 149:6, 150:7, 150:25
**commit** [13] - 42:7, 69:25, 124:16, 130:14, 132:19, 135:18, 136:17, 139:21, 140:4, 142:8, 143:11, 145:19, 154:9
**commits** [1] - 140:2
**committed** [47] - 39:1, 64:8, 70:2, 72:2, 116:13, 116:14, 116:16, 117:8, 117:10, 117:18, 121:12, 121:13, 121:18, 122:2, 122:8, 122:18, 122:20, 127:9, 132:1, 132:16, 132:19, 133:5, 139:3, 141:5, 142:8, 143:5, 143:9, 143:12, 143:17, 143:20, 143:22, 143:23, 144:17, 144:19, 144:21, 144:23, 145:12, 147:8, 147:14, 147:15, 153:4, 153:6, 153:7, 153:12, 153:16, 153:17
**committing** [10] - 116:22, 121:21, 122:6, 122:22, 126:23, 139:21, 141:8, 144:5, 144:10, 147:15
**Common** [5] - 123:24, 124:3, 131:6, 131:10, 131:13
**common** [12] - 81:2, 105:2, 124:6, 126:3, 126:5, 126:16, 127:14, 133:13, 134:2, 154:8, 154:12
**commonly** [3] - 117:24, 123:1, 150:15
**communicated** [2] - 41:1, 122:11
**communication** [1] - 137:3
**communications** [2] - 118:1, 118:9
**community** [1] - 127:2
**complainant** [1] - 135:25
**complainant's** [1] - 135:25
**complaint** [1] - 160:6
**complete** [2] - 68:2, 162:5
**completely** [1] - 115:16
**compound** [1] - 77:25
**concentrate** [1] - 63:2
**concern** [1] - 119:18
**concerned** [2] - 110:12, 161:7
**concerning** [6] - 114:14, 115:4, 115:11, 117:6, 117:19, 140:8
**conclude** [3] - 117:12, 120:11, 132:17
**concluded** [2] - 87:9, 161:13
**conclusion** [4] - 78:22, 79:1, 155:9, 155:11
**condemned** [1] - 138:3
**conditions** [2] - 65:15, 116:24
**conduct** [20] - 32:24, 77:20, 97:2, 103:9, 118:14, 121:25, 123:15, 123:16, 124:17, 125:2, 125:3, 125:22, 126:4, 129:22, 132:18, 133:9, 133:25, 136:22, 137:1
**conference** [6] - 86:19, 94:3, 94:11, 99:16, 156:10, 156:19
**conferred** [1] - 62:2
**confirm** [2] - 44:7, 50:2
**confused** [2] - 50:12, 118:7
**congratulations** [1] - 74:13
**Congress** [1] - 125:8
**connected** [1] - 129:10
**Connecticut** [1] - 1:22
**connection** [6] - 30:10, 31:1, 31:23, 32:7, 43:5, 150:2
**connotations** [2] - 125:6, 125:9
**conscious** [1] - 135:3
**consciously** [1] - 103:25
**consensual** [4] - 118:6, 118:12, 118:15, 118:17
**consent** [4] - 118:10, 118:16, 135:25, 136:1
**consents** [1] - 118:13
**consequence** [3] - 153:7, 153:19,

153:21
**consequences** [1] - 155:25
**consider** [39] - 103:4, 103:12, 103:23, 104:19, 105:1, 105:15, 105:16, 106:1, 106:2, 108:13, 108:20, 109:14, 109:16, 110:1, 110:3, 110:14, 110:18, 110:22, 110:24, 111:3, 111:6, 111:11, 112:21, 112:23, 113:17, 115:17, 116:6, 116:17, 119:22, 135:6, 143:24, 144:14, 144:16, 146:22, 155:14, 155:16, 155:21, 156:3, 158:22
**consideration** [6] - 104:9, 107:3, 113:8, 120:21, 140:12, 140:13
**considered** [7] - 83:8, 84:24, 111:20, 113:2, 113:12, 146:18, 150:2
**consist** [1] - 132:3
**consisted** [1] - 123:19
**consistencies** [2] - 110:19, 110:22
**consistency** [1] - 116:6
**consistent** [3] - 115:25, 116:5, 116:10
**consists** [1] - 104:20
**conspiracies** [1] - 99:25
**conspiracy** [59] - 31:23, 32:6, 55:18, 98:22, 98:24, 100:12, 101:13, 122:24, 123:1, 124:15, 125:20, 125:21, 129:16, 129:19, 129:25, 130:2, 130:17, 132:24, 133:12, 133:14, 133:16, 133:18, 133:21, 133:22, 134:3, 134:8, 134:11, 134:14, 134:17, 134:22, 136:14, 138:14, 138:16, 138:23, 139:4, 141:15, 153:2, 153:5, 153:6, 153:8, 153:11, 153:14, 153:17, 153:18, 153:19, 153:23, 154:10, 154:19, 154:24, 155:5, 155:8, 155:10, 155:16
**conspirator** [3] - 124:16, 133:8, 153:13
**conspirator's** [1] - 130:21
**conspiratorial** [1] - 133:16
**conspirators** [5] - 130:4, 130:24, 132:22, 133:11, 134:1
**conspire** [2] - 123:13, 124:21
**conspires** [1] - 140:6
**conspiring** [1] - 139:21
**constitute** [4] - 132:2, 148:8, 148:11, 148:14
**constitutes** [1] - 162:4
**constituting** [1] - 145:11
**Constitution** [2] - 2:14, 162:12
**construction** [3] - 7:5, 7:9, 7:12
**consulted** [1] - 145:11
**consulting** [1] - 102:1
**contact** [3] - 40:12, 40:20, 44:6
**contacted** [3] - 4:21, 40:17, 41:8
**conte** [1] - 30:18
**Conte** [3] - 32:22, 33:2, 72:24
**conte's** [1] - 31:20
**contends** [1] - 120:22
**contents** [1] - 117:25
**CONTENTS** [1] - 3:1
**context** [1] - 99:20
**continue** [5] - 6:13, 64:10, 152:4, 152:6, 152:8
**continued** [7] - 1:25, 49:1, 127:19, 131:24, 132:5, 132:13, 152:7
**continuing** [4] - 123:5, 126:7, 127:16, 154:3
**contract** [1] - 74:20
**contractor** [2] - 74:25, 76:13
**contradicted** [1] - 111:7
**contrived** [1] - 137:22
**control** [8] - 104:18, 148:16, 148:21, 148:23, 149:5, 149:14, 149:15, 149:19
**controlled** [9] - 131:14, 136:6, 136:7, 136:9, 136:10, 136:12, 136:13, 136:15, 136:18
**convenience** [1] - 118:23
**conversation** [13] - 23:5, 23:10, 23:14, 49:14, 49:15, 49:16, 49:17, 49:19, 118:11, 118:13, 118:14, 118:16, 119:16
**conversations** [10] - 68:5, 68:10, 117:23, 118:17, 118:19, 118:21, 118:22, 118:24, 119:12, 119:13
**converted** [1] - 148:1
**convict** [4] - 112:13, 117:18, 120:14, 138:13
**convicted** [4] - 105:5, 113:6, 113:15, 143:21
**conviction** [5] - 113:7, 113:10, 120:1, 120:8, 132:9
**convictions** [1] - 113:18
**convinced** [1] - 107:4
**convinces** [1] - 112:14
**convincing** [1] - 117:20
**cooked** [1] - 22:20
**cooperate** [8] - 30:24, 31:4, 31:8, 38:19, 65:16, 67:6, 67:10, 130:9
**cooperated** [4] - 28:2, 28:16, 28:17, 28:18
**cooperating** [6] - 30:19, 30:22, 38:11, 68:2, 100:16, 111:17
**cooperation** [7] - 31:7, 35:11, 38:21, 66:21, 67:13, 112:4, 112:11
**copies** [6] - 90:7, 90:10, 90:12, 90:15, 90:20, 102:12
**copper** [2] - 89:25, 90:3
**copy** [5] - 31:22, 69:5, 69:9, 73:19, 102:9
**core** [1] - 127:22
**corporal** [1] - 105:6
**correct** [91] - 38:23, 39:14, 40:7, 40:10, 41:24, 45:14, 45:20, 46:23, 47:15, 48:2, 48:6, 48:19, 48:24, 49:19, 49:22, 50:24, 51:21, 52:2, 52:5, 52:25, 53:16, 53:19, 55:4, 55:20, 55:23, 56:6, 56:10, 56:14, 57:3, 57:5, 57:8, 57:13, 57:15, 57:18, 57:23, 58:9, 58:18, 59:2, 59:12, 59:15, 59:20, 59:23, 60:14, 60:17, 64:8, 64:14, 64:17, 64:22, 64:25, 65:3, 65:6, 65:10, 65:13, 65:16, 65:20, 66:5, 66:8, 66:11, 66:14, 66:16, 66:21, 66:24, 67:18, 67:22, 68:3, 68:6, 68:10, 68:12, 68:25, 69:25, 74:6, 74:9, 74:25, 75:1, 75:15, 75:22, 75:23, 78:4, 81:18, 81:19, 82:19, 84:2, 84:3, 84:11, 85:23, 85:24, 86:4, 86:13, 86:14, 158:9, 158:17
**correction** [3] - 29:2, 49:16, 70:25
**correctly** [1] - 51:22
**corrects** [3] - 24:20, 58:4, 68:20
**corrupt** [4] - 122:25, 124:20, 137:18, 139:5
**corrupted** [1] - 137:15
**corrupting** [1] - 138:2
**corruptly** [3] - 97:17, 137:9, 138:3
**coughing** [1] - 67:7
**counsel** [13] - 54:4, 56:15, 61:12, 62:3, 69:9, 90:17, 94:2, 102:23, 114:5, 156:9, 159:6, 159:8, 161:11
**count** [4] - 132:23, 141:15, 146:18, 147:23
**Count** [30] - 122:23, 123:3, 125:13, 134:15, 138:14, 138:21, 139:17, 139:19, 140:7, 140:9, 141:15, 142:12, 145:2, 145:17, 146:5, 146:6, 146:7, 146:9, 146:14, 146:16, 146:17, 146:19, 146:20, 146:22, 146:23, 146:24, 147:11, 150:21, 152:11
**country** [5] - 7:3, 8:12, 40:10, 41:21, 86:11
**Counts** [3] - 98:22, 99:22, 153:10
**counts** [2] - 99:24, 141:15
**County** [5] - 56:10, 88:18, 89:22, 90:1, 90:5
**couple** [4] - 17:25, 36:3, 36:18, 102:5
**course** [8] - 69:11, 90:11, 90:14, 90:16, 109:4, 117:22, 118:5, 126:4
**court** [16] - 23:2, 37:1, 70:22, 73:9, 107:23, 112:20, 116:5, 116:10, 117:13, 117:14, 118:2, 118:9, 119:15, 119:16, 146:3, 147:10
**COURT** [101] - 1:1, 4:17, 4:19, 4:25, 5:3, 11:19, 12:3, 16:21, 23:15, 23:19, 27:15, 28:9, 29:13, 31:16, 32:3, 37:11, 37:14, 37:17, 37:21, 57:20, 59:25, 60:4, 60:9, 60:20, 60:24, 61:2, 61:6, 61:8, 61:11, 61:15, 61:19, 61:23, 62:1, 62:4, 62:10, 62:17, 62:19, 62:22, 62:25, 63:5, 63:11, 63:14, 63:17, 63:19, 63:23, 68:8, 70:10, 73:13, 73:15, 73:20, 79:24, 80:1, 87:10, 87:15, 91:18, 91:21,

94:2, 94:4, 94:8, 94:10, 94:12, 94:15, 95:9, 95:12, 95:15, 96:2, 96:8, 98:7, 98:10, 98:15, 100:5, 101:4, 101:8, 101:11, 102:1, 102:15, 102:20, 156:11, 156:20, 157:10, 157:12, 157:18, 157:22, 157:24, 158:2, 158:11, 158:19, 158:25, 159:2, 159:20, 159:23, 159:25, 160:10, 160:13, 160:17, 160:19, 160:21, 160:24, 161:8, 161:11, 162:1
**Court** [13] - 2:13, 2:13, 4:21, 62:2, 95:25, 96:5, 100:2, 100:10, 100:21, 105:7, 145:4, 147:17, 162:11
**Court's** [7] - 35:25, 47:17, 70:11, 86:15, 87:13, 93:22, 97:2
**Courthouse** [1] - 2:14
**courtroom** [10] - 5:2, 37:15, 37:20, 61:7, 63:22, 67:7, 95:14, 102:19, 104:1, 157:9
**courts** [5] - 76:18, 76:20, 76:21, 76:25
**cousin** [1] - 43:2
**cousins** [1] - 43:2
**credibility** [11] - 100:16, 103:20, 109:18, 109:21, 109:25, 110:2, 113:9, 113:23, 116:2, 116:6, 119:4
**credit** [2] - 110:24, 111:8
**Cricket** [1] - 90:15
**Crime** [1] - 1:15
**crime** [69] - 42:7, 106:1, 113:6, 121:10, 121:12, 121:13, 121:15, 121:17, 121:19, 121:21, 121:22, 121:23, 122:1, 122:2, 122:6, 122:7, 122:19, 122:20, 122:22, 133:20, 135:18, 137:12, 137:24, 138:1, 139:21, 140:4, 140:6, 141:6, 141:8, 143:6, 143:9, 143:20, 143:22, 143:23, 143:25, 144:6, 144:10, 144:17, 144:20, 144:21, 145:1, 145:18, 145:21, 146:2, 146:12, 147:6, 147:9, 147:12, 147:15, 147:22, 148:5, 148:12, 148:17, 148:18, 148:24, 149:7, 149:8, 149:11, 150:5, 150:7, 150:8, 150:9, 152:5, 153:2, 153:20, 153:24, 154:9, 154:16, 155:1
**Crimen** [3] - 10:19, 10:22, 13:4
**crimes** [11] - 64:7, 72:2, 72:4, 120:15, 121:8, 126:23, 127:9, 131:20, 132:3, 133:5, 136:17
**criminal** [18] - 4:2, 32:24, 99:22, 106:5, 106:22, 113:7, 114:3, 116:21, 120:13, 127:1, 129:17, 131:24, 132:5, 132:15, 133:1, 133:24, 133:25, 143:21
**Criminal** [7] - 1:3, 123:24, 124:2, 124:5, 131:6, 131:9, 131:12
**Crisp** [1] - 2:9
**critical** [1] - 157:6
**cross** [2] - 37:22, 64:3
**Cross** [2] - 3:6, 3:6
**CROSS** [2] - 38:7, 52:20
**cross-examination** [1] - 64:3
**CROSS-EXAMINATION** [2] - 38:7, 52:20
**Cross-examination** [2] - 3:6, 3:6
**cross-examine** [1] - 37:22
**current** [1] - 113:21
**custody** [3] - 120:19, 121:2, 121:4

## D

**D.C** [8] - 8:18, 13:12, 24:24, 46:12, 76:20, 95:3, 140:20, 162:13
**daily** [2] - 41:2, 47:15
**dangerous** [19] - 40:14, 42:5, 140:2, 140:19, 145:2, 145:3, 145:13, 145:14, 146:4, 146:12, 147:11, 150:21, 151:1, 151:6, 151:10, 151:14, 152:16, 152:20, 152:24
**date** [5] - 18:10, 26:23, 41:15, 123:4, 154:2
**Dated** [1] - 162:7
**dated** [2] - 26:23, 92:22
**days** [3] - 36:18, 83:14, 159:9
**DC** [6] - 1:5, 1:17, 1:19, 1:23, 2:7, 2:15
**de** [2] - 91:3, 91:10
**dead** [2] - 9:22, 67:16
**death** [14] - 30:25, 31:8, 51:19, 52:9, 75:4, 78:22, 78:25, 79:1, 79:4, 114:21, 114:25, 115:3, 135:12, 145:15
**deaths** [1] - 75:4
**debt** [1] - 125:5
**decedent** [2] - 77:15, 83:19
**decedent's** [2] - 77:18, 81:2
**December** [9] - 56:12, 56:23, 57:1, 64:22, 72:8, 72:14, 89:7, 92:22, 100:7
**decide** [7] - 103:17, 103:18, 103:19, 104:12, 108:8, 116:8, 156:2
**decided** [1] - 38:19
**deciding** [3] - 116:15, 155:13, 155:15
**decision** [6] - 114:6, 114:8, 114:12, 135:7, 150:3
**decline** [1] - 112:2
**deemed** [1] - 77:6
**DEFENDANT** [2] - 158:10, 158:18
**defendant** [121] - 4:15, 87:21, 88:1, 94:21, 105:5, 106:5, 106:7, 106:10, 106:13, 106:17, 111:19, 112:13, 112:25, 113:13, 114:3, 116:20, 117:8, 117:14, 117:19, 117:21, 119:25, 120:3, 120:14, 120:18, 121:10, 121:20, 121:21, 121:25, 122:2, 122:14, 122:16, 122:21, 124:15, 125:10, 125:18, 125:19, 128:14, 128:18, 128:22, 128:23, 128:25, 129:4, 129:10, 129:15, 129:24, 130:15, 132:16, 132:17, 132:21, 132:25, 133:2, 133:5, 133:13, 133:23, 134:6, 134:8, 134:10, 134:16, 135:24, 136:7, 136:19, 138:13, 138:16, 138:20, 138:21, 139:7, 139:13, 140:16, 141:3, 141:5, 142:20, 142:22, 142:25, 143:5, 143:9, 143:14, 143:17, 143:24, 144:19, 145:18, 145:24, 146:10, 146:18, 146:20, 147:2, 147:3, 147:4, 147:5, 147:8, 147:10, 147:14, 147:18, 147:20, 147:21, 149:20, 149:24, 150:3, 150:18, 150:22, 151:2, 151:8, 151:12, 151:15, 151:18, 151:20, 151:24, 152:1, 152:4, 152:5, 152:6, 152:8, 152:9, 152:13, 152:18, 152:22, 153:4, 153:5, 155:22, 156:6, 157:24
**Defendant** [4] - 1:20, 2:2, 4:3, 4:4
**defendant's** [18] - 107:4, 112:14, 113:12, 130:11, 130:14, 130:19, 130:20, 132:23, 133:17, 133:19, 141:7, 144:4, 144:9, 144:10, 144:18, 152:4, 152:6
**defendants** [19] - 72:1, 89:15, 95:16, 106:19, 109:16, 113:11, 113:16, 114:4, 114:10, 116:14, 116:16, 117:17, 122:13, 122:23, 124:18, 135:24, 139:3, 157:16, 160:24
**Defendants** [1] - 1:8
**defendants'** [1] - 106:3
**Defense** [1] - 95:8
**defense** [2] - 99:4, 159:8
**define** [1] - 131:20
**defined** [3] - 78:13, 123:17, 145:15
**definition** [1] - 150:8
**degree** [10] - 75:6, 75:9, 75:10, 82:24, 82:25, 108:12, 134:23, 135:10, 135:13, 135:16
**delay** [1] - 137:3
**deliberate** [3] - 139:8, 139:14, 146:19
**deliberately** [1] - 135:2
**deliberation** [2] - 134:24, 135:13
**deliberations** [9] - 92:8, 102:10, 103:2, 104:18, 104:19, 109:11, 109:14, 114:9, 119:9
**demeanor** [1] - 110:3
**denied** [2] - 95:22, 96:8
**Dennis** [2] - 88:12, 91:4
**depart** [1] - 63:9
**Department** [2] - 90:2, 90:5
**depict** [2] - 87:22, 88:2
**depicted** [2] - 82:14, 84:6
**depiction** [1] - 79:18
**deportable** [1] - 91:8
**deportation** [2] - 120:8, 120:10
**deported** [7] - 14:15, 14:18, 42:12, 89:5,

89:6, 120:1, 120:3
**deprive** [1] - 135:21
**DEPUTY** [9] - 4:2, 5:10, 37:19, 61:18, 61:21, 61:25, 63:21, 101:24, 102:18
**describe** [7] - 80:23, 81:8, 82:24, 82:25, 84:4, 84:5, 84:23
**described** [5] - 83:23, 83:24, 83:25, 109:23, 148:13
**describing** [1] - 84:9
**description** [2] - 75:7, 101:15
**deserve** [1] - 104:3
**deserves** [3] - 111:22, 113:4, 115:19
**designed** [1] - 147:25
**desire** [1] - 111:13
**detail** [2] - 82:20, 130:5
**detailed** [1] - 81:17
**details** [4] - 110:17, 133:11, 154:7, 154:16
**detained** [1] - 54:12
**Detective** [1] - 90:1
**determination** [2] - 125:10, 144:15
**determine** [19] - 75:4, 78:17, 81:11, 86:9, 103:15, 104:8, 107:15, 109:19, 111:11, 127:19, 134:20, 142:3, 143:25, 147:13, 151:7, 151:23, 152:12, 152:21, 153:23
**determined** [3] - 105:2, 113:14, 158:8
**determining** [7] - 82:7, 109:14, 111:5, 115:9, 144:9, 146:24, 156:5
**device** [1] - 118:1
**diagrams** [3] - 77:24, 78:5, 78:6
**die** [2] - 48:21, 83:5
**died** [3] - 48:22, 49:1, 77:19
**difference** [1] - 121:16
**differences** [2] - 96:17, 111:1
**different** [13] - 10:22, 14:1, 19:9, 34:9, 34:15, 35:11, 58:14, 71:14, 71:15, 104:17, 112:22, 118:24, 130:24
**differently** [4] - 99:12, 100:14, 100:18, 115:21
**Dimas** [7] - 91:12, 93:18, 94:25, 140:20, 145:7, 145:9, 146:9
**diminutive** [1] - 159:8
**direct** [12] - 39:1, 39:24, 49:7, 51:25, 64:11, 107:15, 107:18, 107:24, 108:5, 108:9, 108:12, 108:14
**Direct** [2] - 3:5, 3:9
**DIRECT** [2] - 5:11, 73:22
**directly** [5] - 122:10, 123:15, 125:3, 155:18, 158:2
**disability** [1] - 104:5
**discharge** [3] - 137:19, 146:5, 152:2
**discharged** [6] - 85:18, 147:21, 151:8, 151:24, 152:1, 152:22
**discharging** [4] - 145:20, 146:11, 151:9, 152:23
**discipline** [5] - 33:18, 33:20, 34:13, 144:17
**disciplined** [1] - 43:24
**disconnected** [2] - 132:2, 132:3
**discretion** [1] - 66:23
**discuss** [3] - 63:6, 96:14, 114:8
**discussed** [6] - 25:17, 38:16, 78:12, 102:3, 122:5, 134:2
**disease** [1] - 77:19
**dislikes** [1] - 103:22
**dismiss** [1] - 112:2
**dismissal** [1] - 112:9
**display** [1] - 151:16
**displaying** [1] - 148:9
**dispute** [1] - 89:13
**disregard** [1] - 115:16
**disrespect** [3] - 34:8, 70:2
**disrespected** [9] - 9:18, 9:20, 33:19, 33:24, 34:1, 34:6, 34:7, 58:1, 58:3
**disrupts** [1] - 137:10
**distance** [3] - 86:9, 86:11, 116:23
**distinct** [1] - 130:23
**distinguish** [1] - 83:9
**distinguishing** [1] - 132:10
**distribute** [6] - 136:6, 136:8, 136:9, 136:14, 136:15, 136:18
**distribution** [1] - 136:18
**District** [15] - 123:6, 123:20, 123:22, 124:1, 124:4, 128:4, 131:4, 131:8, 131:11, 135:23, 140:11, 142:1, 145:14, 145:23
**DISTRICT** [4] - 1:1, 1:1, 1:11, 1:14
**Doctor** [1] - 86:21
**document** [3] - 66:10, 92:5, 93:14
**documents** [3] - 88:16, 89:3, 119:20
**Domatila** [2] - 91:3, 91:10
**domestic** [3] - 14:15, 120:2, 120:8
**dominion** [2] - 148:21, 149:14
**done** [18] - 22:13, 24:6, 24:10, 24:11, 24:19, 32:9, 81:13, 99:11, 100:1, 100:14, 100:18, 104:11, 120:15, 137:1, 155:22, 159:16, 159:20, 161:5
**doubt** [61] - 106:8, 106:12, 106:17, 106:19, 106:24, 106:25, 107:5, 107:6, 107:9, 107:10, 107:12, 107:13, 109:16, 112:15, 116:13, 116:16, 117:17, 117:20, 122:16, 122:20, 125:14, 126:1, 127:25, 128:22, 129:3, 129:10, 129:15, 134:16, 139:3, 139:7, 139:12, 140:22, 141:11, 141:21, 142:13, 142:17, 142:20, 143:5, 143:16, 144:4, 145:5, 146:17, 147:1, 147:8, 147:14, 147:18, 148:4, 148:16, 149:9, 150:22, 151:15, 152:13, 152:17, 153:11, 153:25, 154:11, 156:6
**down** [11] - 54:18, 61:8, 65:9, 73:13, 92:11, 92:16, 92:20, 93:20, 98:14, 154:6, 158:21
**DP** [2] - 91:11, 93:17
**DR** [1] - 3:8
**Dr** [7] - 4:21, 77:6, 80:7, 89:20, 114:19, 114:24, 115:1
**draft** [1] - 159:14
**draw** [4] - 80:21, 105:16, 106:3, 114:11
**drawn** [1] - 107:20
**driving** [5] - 20:6, 59:2, 59:12, 59:13, 95:6
**drove** [8] - 21:10, 57:18, 57:22, 58:7, 58:8, 58:17, 60:19, 60:23
**drug** [1] - 25:16
**drugs** [5] - 25:7, 25:10, 25:13, 25:23, 26:10
**due** [6] - 14:15, 18:8, 99:17, 137:11, 137:14, 137:15
**dues** [2] - 24:24, 25:1
**duration** [1] - 130:22
**during** [40] - 41:18, 43:7, 77:22, 79:17, 79:19, 88:19, 90:17, 102:10, 103:2, 103:18, 104:11, 104:18, 105:13, 109:4, 114:8, 117:22, 118:5, 119:9, 119:11, 127:20, 129:3, 145:19, 145:20, 146:2, 146:11, 147:6, 147:20, 148:4, 150:19, 150:24, 151:3, 151:5, 151:10, 151:13, 152:15, 152:20, 152:24, 153:16, 156:3
**duties** [1] - 137:19
**duty** [4] - 103:12, 104:14, 106:13, 106:17

## E

**ear** [3] - 80:10, 80:16, 80:24
**early** [1] - 160:8
**easier** [1] - 159:25
**easily** [1] - 105:2
**eating** [1] - 62:15
**economic** [1] - 136:2
**education** [3] - 104:7, 115:10, 115:13
**educational** [1] - 75:8
**effect** [7] - 24:5, 111:12, 128:1, 128:16, 138:11, 141:12, 141:19
**efficient** [1] - 103:10
**effort** [4] - 98:11, 137:18, 137:21, 138:1
**either** [11] - 16:13, 54:3, 111:9, 113:25, 121:15, 126:6, 130:8, 135:11, 139:21, 149:12, 160:12
**El** [26] - 6:3, 6:4, 7:16, 7:17, 7:20, 14:11, 14:14, 22:14, 36:8, 36:10, 36:13, 40:10, 40:13, 41:24, 42:9, 42:11, 42:25, 43:4, 43:13, 44:6, 52:2, 52:4, 52:5, 52:7, 67:18, 127:7
**elapsed** [1] - 110:15
**elected** [1] - 158:16
**element** [24] - 106:12, 106:16, 125:25, 127:24, 128:13, 128:21, 129:9, 129:14, 130:11, 134:14, 137:25, 141:10, 141:20, 142:18, 142:19, 142:21, 143:4, 143:19, 144:3, 144:25, 147:7, 147:17, 150:10, 150:11
**elements** [10] - 102:5, 122:12, 125:13, 133:15, 136:21, 140:23, 145:3, 146:24, 147:1, 154:1
**Elmo** [1] - 94:17
**elsewhere** [1] - 123:7
**emergency** [1] - 93:15

**employed** [4] - 74:2, 123:10, 124:25, 125:18
**employment** [2] - 148:4, 148:13
**encompassing** [1] - 133:5
**encounter** [1] - 116:23
**end** [6] - 45:3, 45:4, 62:11, 101:20, 102:7, 157:4
**End** [2] - 94:11, 156:19
**endeavor** [6] - 97:18, 137:18, 137:20, 137:21, 137:23, 137:25
**endeavors** [1] - 137:10
**ended** [1] - 43:23
**enforcement** [12] - 30:20, 30:23, 30:24, 38:12, 38:22, 55:13, 71:23, 113:20, 114:2, 117:5, 127:10, 137:4
**engage** [2] - 130:13, 142:11
**engaged** [20] - 123:11, 125:1, 125:16, 125:23, 127:25, 128:7, 134:17, 140:1, 140:16, 141:1, 141:12, 141:18, 141:21, 142:4, 142:5, 142:6, 142:8, 142:14, 142:17, 142:22
**engaging** [1] - 126:3
**English** [12] - 6:18, 52:23, 53:1, 53:12, 69:21, 70:18, 71:3, 71:5, 88:23, 118:21, 119:21, 119:23
**enhance** [1] - 144:22
**enhancing** [1] - 126:22
**Enriquez** [2] - 114:25, 139:15
**enter** [2] - 31:1, 112:11
**entered** [8] - 31:22, 111:24, 112:16, 112:22, 112:24, 113:1, 129:20, 130:2
**entering** [1] - 159:7
**enterprise** [65] - 123:11, 123:16, 124:18, 125:15, 125:16, 125:18, 125:22, 125:23, 126:1, 126:2, 126:15, 126:19, 126:22, 127:3, 127:17, 127:18, 127:19, 127:23, 127:25, 128:7, 128:15, 128:23, 128:24, 129:1, 129:5, 129:6, 129:11, 129:12, 129:23, 130:12, 131:23, 132:18, 133:9, 139:22, 140:1, 140:8, 140:16, 140:24, 141:1, 141:4, 141:9, 141:11, 141:12, 141:14, 141:18, 141:21, 142:4, 142:6, 142:8, 142:11, 142:13, 142:17, 142:21, 142:23, 142:24, 143:1, 143:2, 143:3, 144:7, 144:12, 144:18, 144:19, 144:21, 144:23
**enterprise's** [2] - 125:4, 129:7
**enterprises** [1] - 125:1
**enters** [4] - 5:2, 37:20, 63:22, 102:19
**entire** [4] - 45:7, 92:7, 127:20, 128:24
**entirely** [1] - 156:1
**entitled** [3] - 105:20, 111:15, 113:13
**entity** [1] - 126:10
**entrance** [16] - 81:9, 81:10, 81:11, 81:15, 81:16, 81:17, 84:18, 84:19, 85:9, 85:10, 139:24, 140:15, 141:8, 144:6, 144:11, 144:12
**equal** [2] - 108:10, 130:25
**especially** [1] - 26:14
**essentially** [1] - 127:20
**establish** [8] - 121:5, 122:3, 129:20, 132:14, 133:12, 134:3, 140:22, 142:21
**established** [1] - 144:25
**estimate** [1] - 46:9
**estimation** [1] - 86:10
**ethnic** [1] - 104:5
**evaluate** [2] - 109:24, 115:22
**evaluated** [1] - 113:22
**evaluating** [7] - 66:20, 109:21, 110:13, 113:8, 113:18, 113:23, 116:2
**evening** [1] - 19:18
**event** [5] - 110:14, 110:15, 110:16, 110:17, 113:25
**events** [2] - 105:1, 132:11
**eventually** [1] - 45:19
**evidence** [89] - 63:2, 79:23, 85:15, 96:18, 96:25, 97:7, 97:10, 97:12, 97:25, 98:6, 103:18, 103:19, 104:9, 104:16, 104:17, 104:19, 104:20, 104:22, 105:10, 105:15, 105:16, 105:19, 105:22, 105:23, 105:24, 106:2, 106:3, 106:11, 107:1, 107:3, 107:14, 107:15, 107:16, 107:18, 107:20, 107:24, 108:1, 108:3, 108:6, 108:7, 108:8, 108:11, 108:12, 108:13, 108:20, 108:24, 109:2, 109:13, 110:24, 111:7, 111:23, 112:8, 113:8, 113:12, 113:14, 113:22, 115:8, 115:15, 115:17, 115:23, 116:2, 116:17, 117:12, 117:16, 117:19, 118:20, 119:2, 119:3, 119:22, 119:25, 120:3, 120:4, 120:11, 120:19, 120:25, 121:1, 121:5, 121:6, 133:18, 144:16, 146:15, 146:23, 150:3, 155:23, 156:2, 156:4
**exact** [3] - 41:15, 46:7, 81:6
**exactly** [5] - 7:10, 19:2, 40:16, 42:17, 75:25
**EXAMINATION** [5] - 5:11, 38:7, 52:20, 70:12, 73:22
**examination** [14] - 3:5, 3:6, 3:7, 3:9, 39:1, 52:1, 64:3, 77:13, 77:14, 77:17, 77:20, 77:22, 78:15, 78:21
**Examination** [1] - 3:6
**examine** [3] - 37:22, 77:15, 77:17
**examiner** [6] - 74:3, 74:5, 74:8, 74:15, 74:24, 75:2
**Examiner** [2] - 74:10, 75:20
**examiner's** [1] - 74:21
**Examiners** [1] - 76:7
**examiners** [1] - 4:24
**example** [4] - 107:21, 110:3, 138:17, 144:16
**exchange** [2] - 32:13, 136:11
**exclusive** [1] - 104:14
**excuse** [14] - 18:15, 22:18, 45:25, 52:6, 58:7, 62:11, 62:19, 64:19, 66:18, 89:14, 89:24, 91:4, 94:6, 96:20
**excused** [4] - 63:7, 63:15, 63:25, 73:14
**exempted** [1] - 128:25
**exercise** [5] - 114:5, 148:23, 149:5, 149:15, 149:19
**exercising** [1] - 157:17
**Exhibit** [42] - 23:13, 31:15, 31:18, 32:2, 49:22, 79:10, 80:5, 81:21, 83:16, 84:15, 84:17, 85:3, 86:21, 86:24, 87:20, 88:4, 88:5, 88:7, 88:8, 88:11, 88:12, 88:15, 90:7, 90:9, 90:12, 90:14, 90:19, 91:1, 91:4, 91:7, 91:9, 91:11, 91:14, 91:16, 91:24, 92:2, 92:9, 92:15, 92:17, 92:23, 93:8, 93:17
**exhibit** [5] - 37:10, 49:21, 92:7, 92:24, 93:1
**exhibits** [5] - 79:14, 90:20, 90:23, 104:22, 109:12
**Exhibits** [5] - 79:23, 87:24, 89:8, 89:11, 90:18
**exist** [1] - 133:14
**existed** [13] - 125:15, 126:1, 127:17, 127:18, 128:25, 132:15, 140:25, 141:11, 153:23, 154:4, 155:10, 155:11, 155:13
**existence** [6] - 129:8, 129:12, 134:3, 140:8, 141:18, 153:16
**exists** [1] - 154:9
**exit** [9] - 81:9, 81:12, 81:15, 81:16, 82:1, 82:18, 84:18, 85:11, 85:19
**exited** [1] - 84:21
**expected** [1] - 144:20
**expecting** [2] - 160:14, 160:15
**expects** [1] - 160:23
**expel** [1] - 148:1
**experience** [4] - 81:14, 105:19, 115:10, 115:14
**expert** [6] - 76:16, 77:3, 77:6, 98:21, 114:15, 114:22
**explain** [7] - 63:12, 70:21, 75:24, 77:19, 102:5, 115:22, 125:8
**explained** [2] - 113:4, 141:24
**explicitly** [1] - 133:8
**explosive** [1] - 148:2
**express** [1] - 130:2
**expressed** [2] - 104:12, 114:14
**expression** [1] - 104:6
**extended** [1] - 133:15
**extends** [1] - 137:17
**extent** [4] - 66:21, 109:19, 130:19, 130:22
**external** [2] - 77:14, 78:15
**externally** [1] - 77:20
**extortion** [8] - 98:4, 124:4, 127:1, 131:11, 135:23, 135:24, 138:24, 142:2
**eyewitness** [1] - 107:17

## F

**face** [12] - 29:20, 33:20, 50:8, 80:16, 82:2, 82:9, 83:2, 85:14, 118:18
**facilitate** [1] - 133:4
**facilitating** [1] - 133:1
**fact** [16] - 35:3, 38:25, 48:18, 51:20, 105:9, 105:11, 105:15, 106:21, 107:17, 108:6, 112:8, 115:9, 116:10, 134:1, 134:6
**factors** [1] - 116:19
**facts** [20] - 97:20, 103:16, 104:8, 104:22, 104:23, 105:1, 105:11, 105:14, 105:17, 107:15, 107:19, 117:11, 144:14, 150:1, 155:9, 155:11, 155:14, 155:22, 156:2
**failed** [2] - 106:16, 146:16
**failure** [1] - 117:7
**fair** [13] - 23:9, 29:1, 32:8, 32:10, 71:3, 84:6, 90:7, 97:24, 103:10, 104:3, 104:9, 108:17, 108:21
**Fairfax** [1] - 90:5
**fairly** [5] - 87:22, 88:1, 105:20, 111:15, 115:18
**fairness** [1] - 99:13
**falling** [2] - 107:22, 107:24
**Falls** [1] - 2:4
**false** [2] - 89:3, 112:19
**falsehood** [1] - 111:1
**falsely** [1] - 112:25
**familiar** [6] - 8:5, 9:1, 9:3, 9:7, 13:5, 13:20
**families** [1] - 159:11
**family** [1] - 43:4
**far** [10] - 6:4, 6:16, 48:16, 52:17, 55:24, 81:8, 82:24, 97:10, 101:19, 102:3
**fast** [2] - 83:12, 102:17
**fatal** [7] - 83:3, 83:8, 83:9, 83:10, 83:11, 83:13, 84:25
**favor** [1] - 108:7
**favorable** [2] - 96:25, 112:10
**FBI** [2] - 89:24, 115:4
**fear** [1] - 127:3
**February** [1] - 52:25
**federal** [12] - 76:20, 76:21, 76:25, 124:8, 124:11, 136:4, 137:5, 137:7, 138:6, 138:8, 138:25
**Federal** [1] - 39:21
**feet** [1] - 86:13
**Feitel** [3] - 2:5, 4:14, 100:8
**FEITEL** [27] - 2:5, 4:14, 77:8, 86:17, 94:7, 94:9, 94:16, 95:20, 96:15, 98:8, 98:11, 98:17, 156:15, 157:11, 157:13, 157:19, 157:23, 158:1, 158:20, 159:1, 159:3, 159:21, 159:24, 160:4, 160:11, 161:3, 161:10
**Felipe** [2] - 114:24, 139:15
**fellow** [1] - 133:11
**fellowship** [2] - 75:16, 75:18
**feloniously** [1] - 139:13
**felt** [2] - 62:7, 62:14
**female** [1] - 84:7
**few** [2] - 33:6, 39:5
**field** [2] - 76:1, 114:22
**fifth** [2] - 141:7, 144:3
**figure** [1] - 101:19
**file** [2] - 66:23, 112:5
**filed** [3] - 55:19, 55:25, 56:4
**files** [1] - 65:22
**final** [4] - 102:2, 156:23, 156:25, 157:2
**finally** [1] - 128:19
**financial** [1] - 127:5
**findings** [4] - 77:21, 77:25, 139:2, 139:6
**fine** [1] - 66:3
**finish** [1] - 56:19
**finished** [2] - 7:3, 79:12
**finishing** [1] - 75:16
**fire** [4] - 51:20, 148:6, 148:7, 151:23
**firearm** [60] - 114:23, 145:19, 145:20, 145:21, 146:2, 146:6, 146:11, 147:3, 147:19, 147:20, 147:22, 147:25, 148:3, 148:4, 148:10, 148:11, 148:12, 148:14, 148:19, 148:22, 148:23, 149:2, 149:8, 149:10, 149:13, 149:14, 149:16, 149:19, 149:21, 149:25, 150:1, 150:4, 150:5, 150:6, 150:7, 150:9, 150:12, 150:13, 150:15, 150:19, 150:20, 150:24, 150:25, 151:3, 151:4, 151:5, 151:6, 151:9, 151:13, 151:17, 151:20, 151:21, 151:25, 152:7, 152:9, 152:15, 152:20, 152:23
**fired** [1] - 51:18
**firmly** [1] - 107:4
**first** [44] - 5:15, 5:21, 7:15, 12:17, 12:18, 13:2, 14:20, 15:6, 15:9, 15:18, 19:24, 28:1, 29:19, 39:5, 45:22, 46:25, 51:1, 53:9, 54:20, 54:22, 58:7, 61:13, 61:22, 61:23, 73:25, 77:14, 81:13, 87:6, 90:23, 95:15, 98:17, 125:15, 125:25, 134:23, 135:15, 136:22, 138:19, 140:24, 141:10, 143:19, 143:23, 147:3, 147:7
**fit** [1] - 120:25
**five** [6] - 92:5, 117:11, 131:17, 140:23, 153:17, 157:7
**focus** [3] - 62:8, 130:11, 132:23
**follow** [4] - 78:12, 103:5, 103:14, 144:1
**followed** [2] - 33:24, 79:5
**following** [12] - 1:25, 114:13, 114:14, 120:1, 123:20, 124:7, 124:8, 124:10, 125:13, 140:23, 146:25, 153:25
**follows** [9] - 62:3, 87:19, 89:18, 94:20, 94:22, 123:3, 124:21, 139:23, 140:10
**FOR** [2] - 1:1, 1:14
**force** [13] - 97:3, 97:4, 97:13, 97:18, 135:20, 136:2, 136:23, 137:9, 138:7, 138:10, 145:7
**foregoing** [1] - 162:4
**forehead** [1] - 82:15
**foreign** [14] - 123:12, 125:2, 125:17, 128:1, 128:5, 128:8, 128:9, 128:11, 128:12, 128:15, 128:18, 140:24, 141:12, 141:19
**forensic** [7] - 75:12, 75:19, 75:22, 75:25, 76:1, 76:8, 77:7
**foreseeable** [3] - 138:9, 153:19, 153:21
**forever** [1] - 157:7
**forget** [1] - 50:18
**forgot** [2] - 29:19, 34:16
**forgotten** [1] - 97:21
**form** [7] - 13:9, 108:7, 122:24, 127:20, 138:19, 146:21, 152:11
**formal** [5] - 105:25, 126:6, 127:15, 130:2, 154:5
**formed** [1] - 135:9
**former** [1] - 113:21
**formula** [1] - 98:3
**forward** [2] - 150:6, 157:25
**four** [6] - 7:13, 10:5, 117:9, 131:14, 145:11, 153:16
**fourth** [4] - 125:19, 129:14, 141:5, 143:4
**fractured** [1] - 81:16
**fractures** [1] - 83:8
**fragment** [1] - 89:21
**frame** [1] - 54:4
**frankly** [2] - 100:3, 100:6
**free** [3] - 103:6, 109:25, 120:25
**frequently** [5] - 14:6, 40:7, 41:1, 54:13, 54:15
**friendly** [1] - 133:24
**friendship** [1] - 110:11
**front** [5] - 51:7, 82:5, 82:22, 158:23, 159:15
**fuck** [1] - 69:18
**full** [4] - 53:6, 53:11, 66:20, 162:5
**fuller** [1] - 101:15
**fully** [1] - 158:7
**function** [5] - 103:9, 103:15, 126:7, 127:16, 137:19
**furnished** [1] - 118:22
**furtherance** [13] - 145:21, 146:6, 146:11, 147:22, 149:8, 149:11, 150:5, 150:20, 150:25, 151:4, 151:6, 153:7, 153:18
**furthered** [2] - 148:17, 148:24
**furthering** [3] - 133:1, 134:18, 150:9

## G

**gain** [5] - 110:10, 141:8, 144:6, 144:10, 144:12
**gaining** [2] - 139:24, 140:14
**Gallina** [2] - 13:23, 13:25
**Gallo** [19] - 13:16, 13:20, 13:25, 18:13, 18:15, 18:21, 18:25, 19:12, 19:17, 19:22, 20:17, 21:1, 21:2, 21:3, 21:11, 22:1, 22:4, 22:10, 24:14
**Gallo's** [1] - 19:6
**gang** [56] - 7:15, 7:17, 8:5, 11:13, 12:23, 17:19, 25:25, 26:11, 27:10, 27:24, 28:4, 28:13, 28:19, 31:10, 33:6, 33:7, 33:10, 33:12, 33:17, 33:24, 34:1, 34:2, 36:15, 38:22, 39:2, 42:21, 42:25, 43:4, 45:14, 48:19, 49:2, 53:10, 56:14, 57:2, 57:7, 57:23, 58:11, 58:13, 58:19, 58:23, 59:2, 59:8, 59:14, 60:16, 69:25, 70:1, 127:9, 153:12, 153:14,

154:4, 154:13
**gang-related** [1] - 45:14
**gangs** [1] - 67:18
**gender** [1] - 104:6
**general** [5] - 99:13, 129:12, 133:13, 141:7, 144:4
**generally** [2] - 103:22, 133:2
**gentleman** [1] - 78:9
**gentlemen** [14] - 5:6, 5:17, 23:16, 75:24, 80:8, 87:16, 91:23, 92:1, 92:8, 92:14, 93:8, 93:17, 94:19, 102:21
**George's** [2] - 89:22, 90:1
**Georgetown** [1] - 2:3
**Germany** [1] - 75:6
**Gil** [5] - 88:12, 91:5, 95:3, 95:4, 97:9
**Gil-Bernardez** [4] - 88:12, 91:5, 95:3, 95:4
**Gil-Bernardez's** [1] - 97:9
**girl** [1] - 29:1
**girlfriend** [1] - 68:14
**girls** [1] - 25:11
**gist** [1] - 137:23
**given** [7] - 18:12, 31:13, 57:16, 96:16, 99:5, 119:24
**glad** [1] - 98:13
**goal** [2] - 104:2, 133:1
**goods** [1] - 128:2
**governing** [1] - 90:24
**Government** [150] - 3:3, 4:7, 5:4, 5:7, 23:12, 23:13, 31:5, 31:15, 31:18, 32:1, 32:2, 32:14, 39:22, 55:19, 56:4, 65:12, 65:16, 66:18, 66:20, 67:24, 69:20, 77:5, 79:10, 79:21, 80:5, 84:15, 87:11, 87:24, 88:4, 88:5, 88:7, 88:8, 88:11, 88:12, 88:15, 89:1, 89:11, 90:6, 90:9, 90:12, 90:14, 90:17, 90:22, 91:1, 91:3, 91:7, 91:9, 91:11, 91:13, 91:14, 91:15, 91:23, 92:2, 92:9, 92:14, 92:17, 92:23, 93:8, 93:17, 93:25, 95:10, 96:2, 96:9, 97:1, 98:25, 99:15, 99:23, 100:4, 100:6, 106:7, 106:11, 106:15, 106:18, 107:11, 109:15, 111:17, 111:25, 112:1, 112:11, 112:24, 116:12, 116:15, 120:22, 122:5, 122:7, 122:9, 122:15, 125:13, 125:25, 126:14, 127:13, 127:24, 128:7, 128:17, 128:21, 129:2, 129:9, 129:14, 129:19, 130:7, 130:15, 131:25, 132:7, 132:13, 132:15, 132:20, 132:25, 133:7, 134:15, 135:16, 136:12, 139:2, 139:6, 139:11, 140:22, 141:10, 141:14, 141:17, 141:20, 142:12, 142:16, 142:19, 142:21, 143:1, 143:4, 143:8, 143:10, 143:16, 144:3, 144:8, 145:4, 146:16, 146:25, 147:7, 147:13, 147:17, 148:25, 149:2, 150:16, 150:22, 151:14, 152:12, 152:17, 154:11, 154:17, 156:5, 156:13, 159:6, 160:14
**GOVERNMENT** [1] - 5:9
**Government's** [11] - 79:22, 81:21, 83:16, 85:2, 85:5, 87:20, 89:8, 90:19, 106:23, 118:4, 155:10
**grade** [2] - 6:5, 7:4
**grand** [5] - 123:4, 137:16, 137:22, 140:18, 145:25
**graver** [1] - 107:8
**great** [1] - 145:15
**Great** [1] - 2:4
**greater** [2] - 108:11, 113:25
**green** [1] - 31:13
**Greenbelt** [1] - 77:2
**Gregg** [1] - 89:25
**grew** [3] - 47:5, 47:6
**ground** [1] - 108:2
**group** [6] - 13:18, 126:2, 126:4, 126:9, 126:11, 127:14
**grow** [1] - 47:4
**grown** [2] - 53:6, 53:11
**Guatemala** [5] - 17:8, 17:11, 17:18, 120:17, 121:3
**Guatemalan** [1] - 91:14
**guess** [6] - 8:12, 54:15, 71:20, 76:12, 82:7, 96:11
**guesswork** [1] - 107:10
**guidance** [1] - 118:23
**guidelines** [1] - 113:24
**Guillaume** [8] - 1:20, 4:12, 49:23, 71:7, 71:19, 77:9, 94:12, 96:19
**GUILLAUME** [26] - 1:21, 4:11, 12:1, 16:20, 16:22, 37:23, 38:4, 38:6, 38:8, 40:23, 40:25, 47:17, 47:19, 49:13, 49:15, 49:18, 49:21, 49:24, 51:12, 51:14, 52:19, 86:18, 94:13, 95:17, 156:14, 160:25
**Guillaume............** [1] - 3:6
**guilt** [11] - 106:3, 106:4, 107:4, 107:11, 107:13, 112:14, 113:12, 113:13, 114:10, 122:3, 130:20
**guilty** [26] - 31:1, 31:8, 31:23, 32:6, 35:1, 106:8, 106:14, 106:17, 106:19, 114:11, 117:21, 121:10, 121:15, 121:17, 125:11, 137:12, 138:20, 138:21, 140:6, 143:12, 146:18, 146:20, 147:2, 151:2, 153:9
**gun** [14] - 19:16, 22:10, 22:13, 33:7, 51:21, 51:25, 57:13, 57:15, 59:19, 85:13, 85:18, 85:19, 85:21
**gunpowder** [4] - 85:16, 85:18, 86:5, 86:8
**guns** [5] - 25:25, 26:14, 51:21, 52:16
**gunshot** [31] - 78:25, 80:15, 80:18, 80:19, 80:23, 80:25, 81:8, 82:1, 82:4, 82:11, 82:16, 82:18, 82:20, 82:21, 82:25, 83:2, 83:6, 83:20, 83:21, 83:22, 84:11, 84:13, 84:17, 85:7, 85:12, 85:14, 85:23, 86:3, 89:21
**gunshots** [1] - 21:11
**guy** [1] - 71:7
**guys** [2] - 21:3, 21:11

## H

**hair** [5] - 8:3, 8:4, 8:9, 81:1, 81:6
**hairstyle** [1] - 8:9
**hand** [5] - 62:1, 106:15, 107:18, 118:12, 154:7
**handguns** [1] - 86:11
**happy** [1] - 4:14
**happy/sad** [1] - 84:7
**hard** [1] - 100:13
**harm** [1] - 135:12
**head** [8] - 58:20, 80:17, 81:1, 81:2, 82:16, 83:6, 83:22, 89:21
**heal** [2] - 12:17, 12:18
**health** [2] - 18:1, 159:18
**hear** [8] - 21:11, 24:3, 24:5, 51:5, 59:25, 67:8, 74:23, 157:8
**heard** [21] - 10:20, 13:23, 28:24, 38:25, 49:25, 51:15, 61:18, 87:18, 98:18, 111:16, 111:23, 112:8, 113:4, 115:23, 117:16, 117:22, 118:5, 119:12, 119:25, 120:2, 158:12
**hearing** [2] - 38:3, 95:24
**hearsay** [1] - 29:14
**height** [3] - 77:15, 78:17, 78:18
**held** [3] - 89:4, 121:2, 144:24
**HELD** [1] - 1:10
**help** [5] - 33:12, 62:15, 116:1, 159:5, 159:13
**helped** [1] - 150:6
**helps** [1] - 155:3
**hereby** [2] - 94:22, 162:3
**herein** [1] - 24:1
**Hermandad** [6] - 13:5, 13:7, 13:9, 13:11, 13:17, 13:18
**herself** [1] - 111:9
**hesitate** [1] - 107:8
**hide** [1] - 33:13
**highly** [1] - 106:22
**himself** [6] - 121:22, 129:4, 133:5, 133:25, 143:9, 143:13
**hinder** [2] - 127:9, 137:3
**historical** [1] - 115:5
**history** [1] - 114:17
**hit** [1] - 33:16
**hold** [4] - 99:9, 108:25, 114:6, 148:19
**Hollywood** [21] - 8:16, 8:17, 8:22, 9:11, 9:14, 9:18, 9:21, 11:1, 12:9, 43:20, 44:1, 44:14, 44:23, 45:1, 45:16, 46:1, 46:19, 46:20, 53:8, 53:9
**home** [2] - 15:19, 21:22
**homeboys** [3] - 33:18, 34:7, 34:9
**homicide** [1] - 79:4
**honest** [1] - 107:2
**Honor** [81] - 4:9, 4:11, 4:14, 4:18, 5:5, 5:7, 11:18, 16:20, 23:12, 23:17, 27:14, 28:8, 29:12, 31:14, 32:1, 32:4, 37:9, 37:12, 37:18, 37:23, 38:1, 40:23, 49:11, 61:9, 64:4, 70:6, 70:9, 73:11, 73:17, 73:19, 77:5, 77:8, 79:21, 86:16, 86:17, 86:18, 87:8, 87:12, 89:17, 90:22, 90:25, 91:19, 93:7, 93:25, 94:13, 94:16, 95:8, 95:11, 95:17, 95:20, 95:22, 96:4, 96:15, 97:7,

98:13, 99:2, 99:18, 100:3, 100:19, 100:20, 101:3, 101:6, 101:10, 156:13, 156:14, 156:15, 157:14, 157:15, 158:10, 158:18, 158:20, 158:22, 159:5, 159:6, 159:10, 159:13, 160:12, 160:15, 160:25, 161:6
**HONORABLE** [1] - 1:10
**hope** [1] - 161:5
**hoping** [4] - 32:10, 35:19, 60:19, 60:23
**Horner** [2] - 89:25, 90:3
**hospital** [2] - 10:2, 10:4
**hostility** [1] - 110:11
**hour** [7] - 101:17, 102:15, 102:16, 159:12, 159:19, 161:1, 161:2
**hours** [3] - 10:5, 57:10, 83:14
**house** [4] - 15:20, 19:6, 21:22, 24:11
**HSI** [1] - 53:21
**human** [3] - 76:2, 103:21, 127:1
**HUMBERTO** [1] - 1:6
**Humberto** [14] - 4:3, 4:12, 87:22, 89:6, 91:8, 91:15, 95:18, 105:5, 120:1, 120:5, 120:11, 120:18, 123:7, 139:13
**hundreds** [1] - 159:10

**I**

**i.e** [1] - 121:5
**idea** [3] - 13:9, 46:8, 48:15
**identification** [11] - 76:2, 89:3, 114:23, 116:20, 117:1, 117:2, 117:3, 117:6, 117:9, 117:14, 117:19
**identifications** [1] - 117:15
**identified** [3] - 89:15, 118:20, 122:19
**identify** [1] - 117:7
**identifying** [1] - 127:10
**identities** [2] - 116:18, 126:8
**identity** [7] - 48:2, 88:25, 104:6, 120:4, 120:21, 121:5, 154:16
**ignore** [5] - 103:5, 103:14, 104:13, 109:5, 109:9
**III** [2] - 1:20, 1:21
**illegal** [2] - 134:19, 142:23
**illegally** [1] - 6:11
**illness** [1] - 63:25
**image** [1] - 86:24
**imaginary** [1] - 107:9
**immediately** [1] - 11:13
**immigration** [1] - 35:13
**impartial** [4] - 104:2, 107:2, 108:17, 108:21
**impede** [3] - 97:18, 137:11, 137:22
**impeded** [1] - 137:15
**impedes** [1] - 137:10
**impeding** [1] - 138:2
**implicit** [1] - 103:24
**implies** [1] - 106:25
**important** [8] - 22:7, 25:20, 48:4, 66:10, 107:8, 119:22, 132:25, 157:3
**importantly** [1] - 156:22
**impose** [2] - 112:6, 112:7
**imposed** [1] - 100:1
**impresses** [1] - 110:5
**imprisoned** [1] - 14:11
**improbability** [1] - 111:4
**improper** [2] - 114:7, 138:4
**IN** [1] - 1:1
**in-court** [2] - 116:10, 117:13
**incarcerated** [1] - 127:6
**inches** [2] - 86:12, 86:13
**incident** [1] - 100:17
**include** [3] - 32:24, 79:6, 126:17
**includes** [2] - 137:16, 141:25
**including** [13] - 58:15, 110:14, 113:21, 116:20, 116:22, 117:2, 123:5, 123:19, 126:15, 126:24, 127:6, 141:16, 154:3
**income** [1] - 104:7
**inconsistencies** [3] - 110:18, 110:23, 110:25
**inconsistent** [3] - 100:22, 100:23, 115:20
**incorporates** [1] - 140:7
**increase** [4] - 141:9, 144:7, 144:11, 144:13
**increasing** [2] - 139:25, 140:15
**indicate** [3] - 85:16, 85:21, 155:23
**indicated** [3] - 104:11, 104:13, 129:4
**indictable** [2] - 124:10, 131:17
**indictment** [23] - 99:24, 105:25, 106:2, 106:4, 120:6, 121:8, 121:9, 121:11, 122:23, 123:3, 125:16, 125:21, 126:2, 127:21, 129:4, 129:21, 131:3, 134:21, 140:9, 143:7, 145:17, 145:22, 146:7
**indirectly** [3] - 123:15, 125:3, 155:8
**individual** [6] - 56:13, 57:2, 130:14, 133:15, 138:8, 140:4
**individuals** [3] - 56:9, 128:3, 139:12
**indulgence** [5] - 35:25, 47:17, 70:11, 86:15, 93:22
**infection** [1] - 83:4
**infer** [3] - 155:20, 155:24
**inference** [2] - 106:3, 114:12
**inferences** [2] - 105:18, 107:19
**inferred** [1] - 133:18
**inflict** [2] - 135:11, 137:10
**inflicted** [1] - 82:11
**infliction** [1] - 105:6
**influence** [3] - 97:18, 124:20, 137:11
**influenced** [3] - 117:4, 122:25, 139:4
**influences** [1] - 137:10
**informal** [2] - 126:6, 127:15
**informant** [1] - 131:19
**information** [8] - 44:13, 55:19, 56:4, 56:18, 89:1, 97:13, 127:5, 137:4
**injure** [2] - 145:7, 145:9
**injured** [1] - 84:24
**injuries** [8] - 12:17, 36:21, 76:3, 77:16, 77:18, 80:14, 83:7, 85:8
**injury** [15] - 80:24, 80:25, 81:3, 81:6, 81:7, 81:25, 82:13, 82:15, 82:24, 83:1, 83:8, 105:6, 136:3, 140:3, 145:16
**innocence** [2] - 106:6, 106:10
**innocent** [1] - 106:6
**inquire** [1] - 157:15
**inside** [2] - 85:6, 159:12
**instead** [3] - 36:7, 48:21, 132:23
**instruct** [4] - 38:2, 103:11, 103:12, 122:12
**instructed** [5] - 119:15, 132:20, 141:17, 141:23, 146:8
**instruction** [8] - 96:21, 97:2, 98:9, 100:7, 100:12, 100:22, 101:12, 103:4
**instructions** [22] - 94:6, 96:9, 96:10, 96:13, 96:15, 99:5, 100:20, 100:21, 101:12, 102:2, 102:9, 102:10, 102:22, 102:24, 103:3, 103:4, 103:6, 103:7, 103:13, 123:2, 144:1, 156:24
**insulted** [1] - 57:5
**integral** [1] - 148:18
**intended** [7] - 105:22, 121:24, 132:1, 135:2, 138:16, 151:21, 153:20
**intends** [1] - 155:25
**intent** [17] - 122:17, 135:3, 135:8, 135:11, 135:18, 135:20, 136:6, 136:8, 136:14, 136:17, 137:1, 138:10, 154:22, 155:18, 155:20, 155:23
**intention** [6] - 134:12, 148:22, 149:5, 149:15, 149:19, 149:21
**intentional** [2] - 111:1, 134:23
**intentionally** [11] - 121:14, 122:21, 123:13, 134:17, 136:8, 136:19, 140:19, 147:5, 154:14, 154:22, 156:1
**interacted** [1] - 47:14
**intercept** [1] - 117:25
**intercepted** [1] - 119:13
**intercepting** [1] - 118:1
**interception** [4] - 118:8, 118:9, 119:15
**interceptions** [4] - 117:24, 118:2, 118:4, 119:19
**interest** [5] - 110:10, 111:10, 112:22, 134:2, 154:8
**interfere** [2] - 137:18, 137:22
**internal** [2] - 77:17, 77:18
**internally** [1] - 77:21
**interpretation** [1] - 76:2
**INTERPRETER** [17] - 9:15, 15:12, 15:14, 23:20, 23:23, 24:20, 29:2, 29:6, 37:24, 38:1, 38:5, 56:19, 58:4, 67:9, 68:20, 70:25, 72:10
**interpreter** [18] - 6:20, 9:15, 15:15, 24:20, 29:2, 29:6, 51:12, 52:24, 53:2, 53:13, 56:19, 58:4, 67:9, 68:20, 69:22, 70:22, 70:25, 72:10
**interpreters** [3] - 2:8,

2:10, 4:5
**interrelated** [1] - 132:10
**interrupt** [1] - 49:11
**interstate** [14] - 123:12, 125:2, 125:17, 128:1, 128:2, 128:8, 128:9, 128:11, 128:12, 128:14, 128:18, 128:20, 140:24, 141:19
**interviewed** [1] - 94:23
**intimidate** [1] - 151:21
**intimidation** [5] - 97:4, 97:14, 126:20, 136:24, 151:17
**introduced** [1] - 120:17
**investigation** [1] - 137:17
**involve** [2] - 97:3, 136:22
**involved** [9] - 45:13, 51:19, 76:2, 121:7, 127:22, 130:17, 130:18, 154:6, 154:12
**involving** [2] - 124:8, 131:14
**isolated** [1] - 132:10
**issue** [4] - 61:16, 113:13, 115:9, 120:21
**itself** [6] - 7:23, 122:3, 130:17, 133:20, 138:9, 155:7

## J

**jacket** [3] - 20:11, 89:25, 90:4
**Jackson** [1] - 75:11
**jail** [2] - 53:22, 89:4
**January** [1] - 55:22
**Jason** [9] - 54:10, 54:17, 54:19, 55:8, 68:6, 68:10, 71:14, 71:15, 94:23
**jawline** [1] - 86:3
**John** [2] - 115:4, 160:1
**Johnny** [3] - 123:9, 140:18, 145:25
**join** [8] - 7:17, 8:12, 8:15, 11:24, 45:1, 96:20, 129:18, 132:24
**joined** [23] - 7:19, 8:17, 8:22, 9:12, 10:6, 10:10, 10:13, 10:16, 11:3, 11:16, 11:21, 12:7, 12:14, 12:16, 36:4, 43:20, 44:15, 46:25, 136:19, 138:16, 138:23, 154:14, 155:2
**joining** [2] - 38:23, 44:1
**joins** [1] - 154:22
**joint** [2] - 149:16, 149:20
**jointly** [1] - 149:22
**Jorge** [3] - 88:9, 88:13, 113:5
**Judge** [5] - 5:16, 33:3, 35:3, 35:5, 92:2
**JUDGE** [2] - 1:10, 1:11
**judge** [11] - 16:24, 33:2, 35:20, 62:13, 112:5, 112:6, 112:7, 115:8, 118:3, 119:14
**judges** [3] - 103:16, 105:10, 109:18
**judging** [2] - 109:21, 116:6
**judgment** [7] - 95:18, 95:21, 105:20, 110:1, 111:15, 111:22, 113:3
**judicial** [4] - 104:23, 104:25, 105:4, 105:9
**judicially** [1] - 105:12
**Julia** [2] - 26:8, 91:2
**Julien** [1] - 114:22
**July** [4] - 6:10, 78:8, 89:20, 139:9
**jump** [1] - 59:17
**jumped** [7] - 12:14, 41:24, 43:1, 43:3, 45:4, 60:7, 60:14
**June** [3] - 6:10, 41:17, 74:12
**Junior** [5] - 26:24, 27:1, 27:3, 27:6, 94:24
**jurisdictions** [1] - 76:19
**JUROR** [8] - 61:5, 62:14, 62:18, 62:21, 62:23, 63:4, 63:10, 63:13
**juror** [5] - 61:16, 61:19, 63:15, 63:25, 158:22
**Juror** [1] - 62:2
**juror's** [1] - 137:18
**jurors** [5] - 63:1, 63:7, 119:22, 158:21, 158:24
**jury** [34] - 4:17, 5:17, 37:19, 61:22, 61:23, 63:11, 63:12, 63:21, 64:1, 71:11, 75:25, 79:25, 80:9, 91:23, 92:2, 93:8, 93:17, 94:6, 96:6, 102:6, 102:11, 102:18, 102:25, 103:15, 108:16, 118:23, 123:4, 137:16, 137:22, 140:18, 146:1, 156:17, 156:25, 157:2
**JURY** [1] - 1:9
**Jury** [8] - 5:2, 37:15, 37:20, 61:7, 63:22, 95:14, 102:19, 157:9
**justice** [14] - 96:23, 97:17, 97:19, 97:23, 124:14, 131:19, 137:7, 137:8, 137:12, 137:14, 137:16, 138:5, 139:1, 142:3
**justified** [1] - 105:18

## K

**keeping** [2] - 127:2, 161:6
**Kennedy** [2] - 58:7, 58:8
**kept** [3] - 90:11, 90:13, 90:16
**keyword** [1] - 137:20
**kicked** [1] - 45:25
**kidnaps** [1] - 140:1
**kill** [18] - 17:24, 18:12, 29:1, 31:11, 31:12, 34:25, 56:21, 135:2, 135:3, 135:7, 135:9, 135:11, 139:8, 139:14, 153:11, 153:14, 154:4, 154:12
**killed** [9] - 21:5, 24:21, 30:9, 34:17, 48:1, 48:9, 48:10, 51:2, 51:21
**killing** [7] - 21:24, 56:13, 134:24, 135:5, 135:9, 135:10
**kind** [11] - 18:3, 18:5, 19:20, 26:13, 41:10, 73:7, 106:2, 107:6, 112:12, 129:16, 153:2
**knife** [4] - 15:25, 16:1, 16:3, 16:15
**knowing** [3] - 147:6, 155:6, 155:19
**knowingly** [16] - 121:21, 122:21, 123:13, 125:19, 129:15, 129:24, 132:25, 136:7, 140:19, 146:1, 147:5, 147:18, 147:21, 150:12, 155:2
**knowledge** [15] - 105:2, 107:17, 115:8, 115:10, 133:12, 133:17, 134:4, 134:7, 134:10, 150:23, 151:16, 151:19, 152:1, 152:3
**known** [21] - 7:15, 29:17, 29:20, 45:23, 55:19, 94:24, 99:10, 123:1, 123:7, 123:8, 123:9, 123:10, 139:15, 140:17, 140:18, 145:24, 145:25, 151:17
**knows** [2] - 100:10, 101:8
**Konrad** [1] - 92:22

## L

**label** [1] - 121:17
**lack** [3] - 69:17, 107:1, 160:11
**ladies** [14] - 5:6, 5:16, 23:16, 75:24, 80:8, 87:16, 91:23, 92:1, 92:8, 92:14, 93:8, 93:16, 94:19, 102:21
**lake** [3] - 20:17, 20:22, 21:1
**Lamberth** [2] - 5:16, 92:2
**LAMBERTH** [1] - 1:10
**language** [3] - 96:24, 114:17, 119:10
**lapses** [1] - 110:25
**larger** [1] - 42:23
**Laron** [1] - 114:24
**last** [36] - 5:15, 5:23, 31:19, 37:5, 37:6, 53:15, 53:18, 54:5, 54:7, 54:9, 54:13, 54:18, 54:19, 54:20, 54:21, 72:21, 73:6, 74:1, 95:22, 96:10, 96:12, 96:16, 97:24, 97:25, 98:11, 98:19, 99:6, 99:8, 100:4, 101:13, 101:14, 102:5, 102:6, 102:16, 157:20, 161:5
**late** [3] - 99:17, 152:9, 154:3
**Law** [11] - 123:24, 123:25, 124:3, 124:6, 131:6, 131:7, 131:10, 131:12, 131:13
**law** [41] - 30:19, 30:22, 30:24, 38:11, 38:21, 55:13, 71:23, 102:22, 103:10, 103:11, 103:12, 106:9, 108:5, 108:6, 113:20, 114:2, 115:20, 117:5, 120:13, 122:25, 123:21, 124:6, 124:8, 124:11, 124:19, 127:10, 131:1, 132:23, 134:9, 135:24, 136:4, 136:13, 137:3, 137:13, 138:6, 138:25, 139:10, 139:16, 145:15, 150:17
**LAW** [3] - 1:21, 2:2, 2:5
**lawful** [3] - 118:4, 118:14, 126:12
**laws** [2] - 140:5, 142:1
**lawyer** [5] - 32:21, 35:1, 72:24, 108:24, 108:25
**lawyer's** [2] - 109:1, 109:5
**lawyers** [9] - 6:24, 66:1, 70:18, 70:23, 71:7, 72:1, 105:21, 105:24, 108:22
**laying** [2] - 7:5, 7:6
**lead** [1] - 155:9
**leader** [11] - 8:22, 9:18, 9:20, 10:12, 13:11, 16:18, 17:2, 24:15, 24:23, 34:22, 68:24
**leadership** [4] - 12:22, 114:17, 126:16, 141:16
**leading** [2] - 11:18, 44:8
**learn** [1] - 7:15

**learned** [4] - 28:12, 54:13, 152:7, 152:9
**least** [12] - 48:1, 49:4, 123:5, 124:16, 129:20, 130:18, 131:22, 134:10, 138:17, 142:14, 154:2, 156:16
**leave** [5] - 9:14, 62:12, 63:8, 63:19, 85:20
**leaves** [4] - 37:15, 61:7, 95:14, 157:9
**lectern** [1] - 159:4
**lecture** [1] - 159:4
**led** [1] - 155:11
**left** [8] - 4:13, 9:11, 9:22, 47:3, 81:25, 82:5, 82:22, 157:8
**legal** [4] - 99:21, 104:3, 119:18, 128:20
**legality** [1] - 119:19
**legally** [4] - 6:11, 6:12, 39:6, 126:10
**legitimate** [1] - 126:12
**length** [1] - 116:23
**lenient** [1] - 112:6
**Leonardo** [1] - 139:15
**less** [1] - 46:4
**lesser** [1] - 113:25
**letter** [9] - 69:2, 69:5, 69:7, 69:10, 69:14, 69:16, 88:8, 88:12
**level** [1] - 104:7
**LEVY** [27] - 73:19, 73:23, 77:5, 77:11, 79:21, 79:25, 80:2, 80:4, 80:6, 81:20, 81:22, 83:15, 83:17, 84:14, 84:16, 85:2, 85:4, 85:25, 86:2, 86:15, 86:19, 86:20, 87:8, 160:15, 160:18, 160:20, 160:23
**Levy** [2] - 1:18, 4:10
**Levy............** [1] - 3:9
**liability** [6] - 99:9, 99:22, 99:25, 100:15, 122:4, 130:21
**licensed** [1] - 76:8
**lie** [1] - 112:20
**lied** [2] - 34:21
**life** [4] - 32:19, 44:9, 66:11, 107:9
**light** [5] - 31:13, 96:25, 98:5, 101:17, 105:18
**lightheaded** [1] - 62:7
**lighting** [1] - 116:24
**likely** [4] - 106:21, 135:12, 138:11, 145:15
**likewise** [1] - 109:12
**Liliana** [2] - 64:24, 65:2
**limit** [1] - 160:8
**limited** [6] - 116:22, 120:20, 121:4, 126:24, 137:16
**line** [6] - 96:20, 96:21, 159:8, 159:15, 159:19, 160:7
**lines** [2] - 100:21, 101:1
**list** [1] - 67:20
**listen** [2] - 51:6, 63:2
**listened** [1] - 49:8
**live** [2] - 39:13, 71:12
**lived** [2] - 18:25, 19:2
**Llago** [2] - 13:21, 13:25
**LLC** [1] - 1:21
**local** [1] - 138:8
**locally** [2] - 13:11, 13:12
**located** [3] - 84:10, 148:22, 149:15
**locations** [1] - 88:18
**Locke** [1] - 114:24
**long-term** [1] - 132:14
**look** [3] - 31:18, 55:8, 57:8
**looked** [4] - 17:8, 17:10, 107:21, 107:25
**looking** [11] - 46:7, 57:23, 58:20, 58:22, 59:2, 77:18, 81:23, 83:18, 84:11, 84:18, 85:5
**looks** [3] - 70:17, 84:7, 92:21
**Lorenzana** [1] - 2:10
**Los** [2] - 14:19, 105:7
**loss** [1] - 100:18
**louder** [1] - 101:7
**Louis** [1] - 114:19
**lower** [2] - 32:10, 85:10
**Luis** [7] - 78:9, 89:19, 94:23, 100:17, 100:25, 115:1, 139:8
**Luna** [19] - 4:4, 4:12, 87:22, 87:23, 89:6, 91:8, 91:15, 95:18, 105:5, 120:1, 120:5, 120:7, 120:12, 120:18, 120:24, 121:6, 121:7, 123:7, 139:13
**LUNA** [2] - 1:6, 158:10
**lunch** [2] - 60:24, 61:2
**lung** [1] - 84:24
**lure** [1] - 65:2

## M

**M-A-N-U-E-L** [1] - 5:22
**ma'am** [2] - 84:13, 85:14
**madam** [2] - 15:15, 51:12
**maims** [1] - 140:2
**maintain** [7] - 141:9, 144:6, 144:11, 144:13, 144:17, 144:18, 144:24
**maintaining** [2] - 139:25, 140:15
**major** [1] - 130:24
**majority** [1] - 86:10
**man** [5] - 18:16, 18:18, 53:6, 53:11, 65:9
**manner** [10] - 75:4, 79:1, 79:4, 103:10, 110:5, 114:20, 114:25, 115:3, 130:16, 133:4
**MANUEL** [2] - 3:4, 5:9
**Manuel** [3] - 5:7, 5:18, 113:5
**Manuela** [1] - 2:9
**Mara** [1] - 126:15
**March** [12] - 18:11, 19:1, 36:17, 36:20, 48:24, 64:13, 88:19, 89:24, 90:3, 139:16
**maria** [1] - 2:11
**Mark** [2] - 1:18, 4:10
**marked** [3] - 31:15, 79:10, 79:22
**marks** [1] - 85:20
**married** [1] - 59:4
**marshal** [1] - 160:1
**Marshal** [1] - 160:1
**marshals** [1] - 159:15
**Maryland** [32] - 8:18, 8:20, 13:12, 19:4, 24:24, 43:20, 56:8, 56:10, 74:6, 76:11, 76:19, 88:18, 89:22, 90:2, 123:6, 123:21, 123:23, 123:25, 124:2, 124:3, 124:5, 124:6, 131:5, 131:7, 131:9, 131:10, 131:12, 131:13, 135:23, 139:10, 139:16, 142:1
**mask** [2] - 84:6, 84:7
**Mason** [1] - 114:22
**mason** [1] - 7:5
**mathematical** [1] - 107:12
**matter** [4] - 99:13, 116:17, 128:9, 156:16
**matters** [9] - 98:1, 105:1, 105:2, 107:9, 109:24, 110:8, 115:11, 125:7, 158:20
**maximum** [1] - 32:17
**McDonald's** [5] - 21:20, 21:21, 21:24, 52:10, 52:15
**McFadden** [1] - 2:11
**mean** [23] - 13:12, 17:12, 19:15, 20:11, 21:5, 24:9, 25:8, 25:14, 28:1, 28:6, 30:5, 36:12, 50:15, 51:8, 54:5, 65:25, 71:12, 81:13, 97:6, 99:14, 127:21, 148:6, 160:4
**meaning** [4] - 42:6, 83:3, 119:7, 142:6
**meaningful** [2] - 110:8, 129:11
**meanings** [1] - 144:13
**means** [29] - 30:25, 33:22, 39:20, 83:11, 83:13, 98:21, 108:6, 109:21, 117:25, 128:2, 130:6, 135:1, 135:2, 135:4, 135:21, 136:6, 136:9, 136:16, 137:13, 137:21, 138:4, 148:3, 148:15, 149:9, 149:12, 150:6, 150:12, 150:14, 152:3
**meant** [2] - 38:21, 69:24
**measured** [1] - 130:21
**Mecri** [14] - 10:20, 10:22, 19:16, 19:24, 20:15, 20:24, 21:5, 21:8, 21:16, 21:17, 21:23, 22:2, 22:3, 52:10
**medical** [16] - 4:24, 74:3, 74:5, 74:8, 74:15, 74:21, 74:24, 75:2, 75:5, 75:6, 75:9, 77:13, 83:3, 91:12, 93:18
**Medical** [4] - 74:10, 75:14, 75:20, 76:6
**medicine** [1] - 76:1
**meet** [8] - 9:9, 12:12, 15:4, 21:21, 54:19, 54:21, 54:23, 55:13
**meeting** [9] - 15:21, 15:22, 15:24, 16:3, 16:11, 16:13, 16:16, 23:3, 52:13
**meetings** [4] - 16:8, 25:4, 25:17, 88:21
**member** [44] - 8:2, 25:1, 33:10, 33:12, 41:22, 42:4, 42:6, 42:10, 42:18, 42:25, 44:2, 45:19, 45:22, 46:12, 46:22, 48:5, 49:1, 50:5, 56:13, 57:2, 57:7, 58:19, 59:8, 59:14, 60:16, 76:4, 76:6, 125:19, 129:16, 129:25, 130:22, 133:21, 133:23, 134:9, 142:24, 143:2, 153:5, 153:14, 153:25, 154:19, 155:16
**members** [29] - 8:3, 20:1, 20:16, 21:4, 28:19, 44:2, 44:14, 46:4, 46:9, 47:8, 57:23, 58:11, 59:2, 69:24, 70:1, 126:16, 126:23, 127:3, 127:6, 127:8, 130:1, 133:22, 141:16, 153:3, 153:12, 153:15, 154:5, 154:13
**membership** [3] - 44:7, 143:3, 144:21
**Membreno** [1] - 114:20
**Membreno-Zelaya** [1] - 114:20
**memorialize** [1] - 77:21
**memory** [5] - 104:17, 104:18, 110:6, 110:13, 110:25
**men** [2] - 65:2, 65:5
**mental** [1] - 159:18
**mentioned** [7] - 13:20, 43:7, 63:25, 68:12, 78:5, 79:5, 84:1
**mere** [9] - 122:1,

133:19, 133:21, 133:25, 134:4, 135:14, 148:12, 150:7, 154:25
**merely** [6] - 105:25, 114:1, 134:7, 154:7, 155:1, 155:6
**merit** [1] - 119:4
**Mesias** [4] - 11:7, 11:8, 11:15, 36:5
**met** [21] - 9:5, 9:6, 15:2, 15:7, 25:2, 27:3, 29:20, 37:1, 40:3, 46:19, 46:20, 52:15, 53:15, 53:21, 54:17, 72:20, 72:23, 73:6, 96:6, 130:2
**method** [1] - 122:6
**methodically** [1] - 99:4
**methods** [2] - 114:18, 132:8
**mic** [1] - 74:22
**Michelle** [7] - 26:16, 27:11, 30:2, 31:11, 33:16, 68:14
**microphone** [3] - 5:19, 38:2, 62:1
**middle** [1] - 51:13
**might** [6] - 50:15, 93:20, 97:8, 112:7, 115:8, 157:15
**Miguel** [1] - 139:8
**mind** [4] - 27:22, 116:25, 117:3, 156:7
**minimal** [1] - 128:10
**minor** [4] - 96:18, 100:19, 130:25, 154:20
**minors** [2] - 42:14, 43:8
**minute** [2] - 98:11, 98:19
**minutes** [10] - 83:11, 83:12, 95:13, 102:15, 159:19, 160:15, 160:22, 160:23, 161:4
**mirror** [1] - 96:16
**misdemeanor** [1] - 105:6
**Mississippi** [3] - 75:11, 75:13
**misstates** [1] - 68:7
**mistake** [4] - 100:4, 100:6, 110:25, 150:14
**mistaken** [1] - 70:3
**misunderstanding** [1] - 111:1
**Mobile** [2] - 90:10, 90:13
**Mohanty** [4] - 1:13, 4:10, 23:20, 160:23
**MOHANTY** [63] - 4:9, 4:18, 4:20, 5:1, 5:5, 5:12, 9:19, 11:20, 12:4, 15:15, 15:17, 16:23, 21:13, 21:15, 23:12, 23:16, 23:22, 23:24, 24:2, 24:22, 27:16, 28:11, 29:4, 29:7, 29:15, 31:14, 31:17, 32:1, 32:5, 35:25, 36:2, 37:9, 37:12, 37:18, 49:11, 49:14, 49:23, 54:4, 56:15, 57:19, 59:24, 60:6, 68:7, 69:9, 70:11, 70:13, 71:2, 72:12, 73:11, 73:17, 87:12, 87:16, 91:19, 91:22, 93:24, 95:11, 96:4, 100:3, 100:6, 101:6, 101:10, 156:13, 160:22
**Mohanty............** [1] - 3:7
**Mohanty.............** [1] - 3:5
**MOISES** [1] - 1:6
**Moises** [15] - 4:3, 4:12, 14:23, 87:21, 89:6, 91:8, 91:15, 95:17, 105:5, 119:25, 120:5, 120:11, 120:18, 123:7, 139:13
**moment** [4] - 15:12, 16:12, 70:6, 125:9
**Monday** [1] - 4:14
**money** [12] - 25:6, 25:13, 25:22, 25:24, 26:2, 26:3, 26:4, 26:6, 26:7, 26:9, 26:13, 128:3
**MONROE** [1] - 162:3
**Monroe** [2] - 2:13, 162:11
**Montgomery** [2] - 56:10, 88:18
**month** [4] - 10:9, 25:5, 54:16
**monthly** [1] - 68:5
**months** [2] - 7:13, 88:19
**Moreno** [6] - 94:23, 95:2, 95:4, 95:5, 100:17, 100:25
**moreover** [2] - 133:15, 134:6
**morning** [14] - 4:9, 4:11, 5:5, 5:6, 5:13, 5:14, 23:2, 37:14, 62:14, 102:23, 156:24, 157:2, 157:13, 160:6
**most** [5] - 8:3, 47:8, 70:24, 96:25, 156:22
**motion** [4] - 65:23, 66:23, 95:18, 95:22
**motions** [3] - 94:5, 95:15, 96:8
**motivated** [2] - 111:10, 112:25
**motive** [2] - 138:4, 144:9
**mouth** [1] - 82:1
**move** [8] - 23:13, 32:1, 43:10, 90:23, 91:1, 91:14, 95:21, 158:24
**movement** [1] - 128:2
**Mowgli** [3] - 19:9, 19:15, 21:2
**MR** [141] - 4:9, 4:11, 4:14, 4:18, 4:20, 5:1, 5:5, 5:12, 9:19, 11:20, 12:1, 12:4, 15:15, 15:17, 16:20, 16:22, 16:23, 21:13, 21:15, 23:12, 23:16, 23:22, 23:24, 24:2, 24:22, 27:16, 28:11, 29:4, 29:7, 29:15, 31:14, 31:17, 32:1, 32:5, 35:25, 36:2, 37:9, 37:12, 37:18, 37:23, 38:4, 38:6, 38:8, 40:23, 40:25, 47:17, 47:19, 49:11, 49:13, 49:14, 49:15, 49:18, 49:21, 49:23, 49:24, 51:12, 51:14, 52:19, 54:4, 56:15, 57:19, 59:24, 60:6, 68:7, 69:9, 70:11, 70:13, 71:2, 72:12, 73:11, 73:17, 73:19, 73:23, 77:5, 77:8, 77:11, 79:21, 79:25, 80:2, 80:4, 80:6, 81:20, 81:22, 83:15, 83:17, 84:14, 84:16, 85:2, 85:4, 85:25, 86:2, 86:15, 86:17, 86:18, 86:19, 86:20, 87:8, 87:12, 87:16, 91:19, 91:22, 93:24, 94:7, 94:9, 94:13, 94:16, 95:11, 95:17, 95:20, 96:4, 96:15, 98:8, 98:11, 98:17, 100:3, 100:6, 101:6, 101:10, 156:13, 156:14, 156:15, 157:11, 157:13, 157:19, 157:23, 158:1, 158:20, 159:1, 159:3, 159:21, 159:24, 160:4, 160:11, 160:15, 160:18, 160:20, 160:22, 160:23, 160:25, 161:3, 161:10
**MS** [37] - 11:18, 12:2, 17:14, 21:2, 21:3, 27:14, 28:8, 29:12, 29:14, 32:4, 40:14, 42:4, 42:14, 52:21, 54:6, 56:17, 56:22, 57:21, 58:6, 60:3, 60:7, 60:13, 60:22, 60:25, 61:9, 61:12, 64:4, 64:5, 67:8, 67:11, 68:9, 68:22, 69:11, 69:13, 70:6, 70:8
**MS-13** [41] - 7:14, 7:15, 7:23, 8:2, 8:3, 8:13, 16:7, 17:19, 19:10, 20:2, 20:16, 21:4, 21:10, 30:7, 30:19, 30:23, 35:11, 41:22, 42:11, 43:4, 43:7, 43:20, 44:3, 44:14, 45:10, 48:5, 50:6, 53:5, 53:10, 68:24, 72:5, 88:5, 114:16, 123:11, 123:16, 126:15, 127:6, 127:8, 140:14, 140:15, 141:16
**multiple** [5] - 78:25, 83:7, 123:19, 124:7, 124:10
**murder** [22] - 47:23, 50:22, 51:24, 56:21, 123:22, 126:21, 126:24, 131:4, 134:23, 135:1, 135:10, 135:13, 135:14, 135:15, 135:18, 138:17, 138:24, 139:8, 139:14, 141:25
**murders** [1] - 140:1
**must** [71] - 97:2, 97:17, 106:1, 106:23, 106:24, 108:18, 108:20, 108:25, 109:6, 109:14, 109:16, 114:6, 114:10, 114:11, 117:16, 117:20, 119:5, 119:18, 119:23, 121:21, 122:15, 125:13, 125:25, 126:5, 126:6, 127:18, 127:24, 128:7, 128:21, 129:9, 129:14, 129:19, 130:7, 130:15, 132:7, 132:13, 134:10, 134:15, 135:9, 135:16, 136:22, 137:1, 138:14, 140:22, 141:10, 141:20, 142:19, 142:22, 143:1, 143:4, 143:24, 144:3, 145:4, 146:25, 147:7, 147:17, 148:6, 149:4, 150:9, 150:11, 150:22, 151:7, 151:14, 151:23, 152:11, 152:12, 152:21, 152:25, 153:10, 153:25
**mutual** [1] - 130:7
**muzzle** [2] - 85:19, 86:9

## N

**N.W** [1] - 162:12
**name** [27] - 5:15, 5:18, 5:21, 5:23, 7:19, 11:14, 13:21, 13:23, 14:20, 26:7, 26:18, 29:5, 29:8, 30:17, 36:7, 36:9, 36:10, 39:2, 42:1, 43:12, 54:9, 73:24, 73:25, 74:1, 92:6, 106:25
**named** [15] - 9:3, 12:20, 13:20, 14:25, 26:15, 26:23, 33:8, 36:8, 50:6, 57:2, 57:3, 57:8, 64:24, 67:2, 78:9
**namely** [1] - 146:3
**names** [2] - 47:11, 134:2
**narcotics** [5] - 124:8, 126:25, 136:4,

138:25, 142:2
**Narcotics** [1] - 1:15
**narrow** [1] - 54:18
**nation** [1] - 128:6
**National** [1] - 88:17
**national** [1] - 104:5
**natural** [2] - 153:7, 155:25
**naturalization** [1] - 159:9
**nature** [8] - 66:21, 108:16, 108:18, 129:8, 129:12, 133:13, 154:21, 154:23
**near** [6] - 20:17, 20:22, 21:1, 92:21, 148:12, 149:25
**nearly** [2] - 36:25, 64:16
**necessarily** [3] - 134:3, 148:19, 154:9
**necessary** [11] - 106:20, 122:1, 122:18, 128:13, 134:9, 141:17, 143:8, 144:24, 153:20, 154:15, 156:6
**need** [15] - 18:7, 23:17, 23:22, 44:24, 96:11, 96:14, 130:1, 130:3, 146:17, 149:7, 151:18, 151:22, 152:1, 156:11, 158:14
**needed** [1] - 148:11
**needs** [1] - 98:22
**never** [13] - 12:9, 40:3, 47:5, 52:16, 57:25, 67:5, 67:6, 67:10, 67:12, 68:12, 106:9
**new** [4] - 11:3, 11:13, 36:7, 42:14
**next** [9] - 5:4, 36:17, 43:10, 44:17, 93:1, 93:13, 93:18, 93:19
**nickname** [14] - 8:21, 9:7, 10:20, 10:25, 11:4, 11:8, 11:13, 15:2, 22:25, 36:5, 36:14, 47:9, 47:12
**night** [6] - 20:10, 21:8, 21:17, 21:23, 34:17
**nightclub** [2] - 56:9, 64:25
**Nihar** [2] - 1:13, 4:9
**none** [1] - 32:16
**normal** [1] - 44:9
**Normandy** [39] - 9:1, 9:12, 10:7, 10:10, 10:12, 11:3, 11:10, 11:12, 11:16, 11:21, 11:25, 12:7, 12:10, 12:14, 13:13, 13:19, 14:3, 15:22, 22:24, 24:23, 26:1, 27:5, 28:7, 36:4, 36:13, 38:23, 41:6, 45:20, 46:3, 46:11, 46:12, 46:13, 46:16, 46:20, 46:21, 46:23, 53:5, 68:24
**note** [2] - 84:10, 103:7
**noted** [1] - 118:24
**notes** [5] - 63:8, 77:22, 77:23, 78:2, 162:5
**nothing** [4] - 70:8, 96:1, 97:11, 98:14
**notice** [5] - 82:13, 104:23, 104:25, 105:4, 105:9
**noticed** [6] - 22:1, 82:13, 85:12, 85:23, 86:5, 105:12
**notify** [1] - 93:15
**November** [4] - 89:4, 89:5, 90:8, 105:7
**Number** [8] - 61:16, 61:19, 61:24, 63:25, 87:24, 88:4, 89:2, 105:8
**number** [15] - 40:12, 40:21, 41:9, 41:10, 46:7, 80:8, 80:9, 80:10, 80:11, 80:12, 80:13, 90:10, 90:13, 90:16, 116:19
**numbering** [1] - 80:3
**numbers** [1] - 98:4
**NW** [5] - 1:16, 1:19, 1:22, 2:6, 2:14

## O

**oath** [1] - 112:20
**Oath** [1] - 5:8
**object** [7] - 96:20, 98:8, 98:11, 109:2, 130:5, 130:6, 154:23
**objected** [1] - 108:22
**objecting** [1] - 108:24
**objection** [24] - 11:18, 12:1, 12:2, 16:20, 27:14, 29:12, 32:4, 56:15, 57:19, 59:24, 59:25, 60:6, 60:9, 68:7, 77:9, 77:10, 90:22, 91:18, 98:7, 98:15, 98:16, 101:11, 109:5, 109:13
**objections** [2] - 96:13, 108:25
**objective** [2] - 130:12, 130:16
**objectives** [3] - 134:8, 134:11, 138:23
**obligated** [1] - 17:2
**obligation** [1] - 112:17
**observations** [2] - 77:21, 88:16
**observe** [2] - 110:8, 116:21
**observed** [4] - 85:13, 87:6, 109:23, 159:10
**obstruct** [5] - 97:18, 127:10, 137:11, 137:22, 138:10
**obstructing** [2] - 138:2, 138:5
**obstruction** [9] - 96:22, 97:16, 97:22, 124:14, 131:19, 137:7, 138:25, 142:3
**obtain** [1] - 117:25
**obtained** [3] - 117:23, 135:24, 136:1
**obviously** [2] - 148:7, 148:8
**occasion** [1] - 116:9
**occasions** [2] - 115:24, 156:21
**occur** [4] - 83:11, 83:13, 118:17, 152:2
**occurs** [1] - 135:24
**Oceanographic** [1] - 88:17
**October** [2] - 56:8, 94:24
**OF** [9] - 1:1, 1:3, 1:9, 1:14, 1:21, 2:2, 2:5, 3:1, 162:1
**offender** [2] - 122:9, 122:15
**offenders** [3] - 127:11, 127:12
**offense** [31] - 98:25, 106:12, 106:14, 106:16, 106:18, 116:13, 116:17, 116:25, 117:8, 117:10, 117:21, 120:8, 120:10, 122:17, 137:6, 139:3, 140:23, 143:12, 143:15, 143:17, 143:18, 146:6, 153:4, 153:6, 153:12, 153:15, 153:16, 153:17, 153:18
**offenses** [7] - 98:23, 111:19, 117:18, 122:13, 123:20, 131:14, 141:25
**offered** [1] - 108:23
**office** [2] - 74:15, 74:21
**Office** [3] - 1:18, 74:9, 75:20
**OFFICE** [3] - 1:14, 2:2, 2:5
**officer** [8] - 71:14, 71:17, 89:23, 113:20, 113:21, 114:2, 137:4
**officer's** [1] - 113:23
**officers** [2] - 117:6, 127:10
**OFFICES** [1] - 1:21
**official** [1] - 137:2
**Official** [2] - 2:13, 162:11
**OFFICIAL** [1] - 162:1
**officials** [1] - 38:22
**often** [2] - 14:4, 25:4
**old** [7] - 5:25, 7:16, 59:1, 68:16, 68:17, 68:18, 68:21
**once** [6] - 9:6, 11:12, 53:18, 54:15, 79:11, 159:11
**One** [1] - 127:14
**one** [60] - 4:21, 8:10, 15:12, 20:6, 22:4, 23:22, 27:18, 27:19, 32:11, 34:7, 34:8, 41:2, 43:2, 43:11, 50:21, 51:21, 56:8, 58:21, 58:22, 59:11, 59:14, 65:15, 71:7, 80:15, 80:16, 81:13, 83:24, 85:9, 85:10, 86:3, 89:21, 94:17, 97:25, 99:3, 99:7, 100:19, 106:23, 108:7, 108:15, 116:20, 118:13, 119:18, 131:4, 133:22, 138:18, 139:12, 143:20, 145:6, 145:15, 147:4, 149:16, 149:18, 153:11, 154:2, 156:16, 157:23, 158:21, 159:9, 161:11
**ones** [3] - 53:22, 96:16, 99:6
**ongoing** [2] - 126:6, 127:15
**open** [2] - 158:24, 160:2
**opening** [2] - 160:17, 160:19
**operated** [1] - 34:21
**opinion** [7] - 104:13, 115:11, 115:12, 115:13, 115:14, 115:15, 115:16
**opinions** [2] - 103:22, 114:14
**opportunity** [2] - 110:8, 116:21
**options** [2] - 38:16, 66:16
**oral** [2] - 95:24, 118:1
**order** [26] - 12:19, 17:23, 17:24, 18:12, 33:25, 40:20, 43:8, 65:18, 65:22, 80:3, 94:10, 125:12, 129:8, 129:19, 135:16, 138:13, 140:21, 143:10, 143:25, 144:17, 150:10, 150:18, 151:12, 153:9, 153:23, 159:14
**ordered** [6] - 34:13, 68:24, 69:24, 109:13, 118:3, 118:9
**orderly** [2] - 103:9, 137:14
**ordinarily** [2] - 118:21, 155:18
**ordinary** [2] - 142:5, 144:13
**organization** [6] - 42:5, 114:16, 126:6, 126:11, 127:15, 139:5
**organizations** [3] - 76:5, 123:1, 124:20
**organized** [2] - 126:11, 126:12
**organs** [1] - 77:18
**orientation** [1] - 104:6
**oriented** [2] - 82:8, 82:9
**origin** [1] - 104:5
**original** [5] - 99:16, 101:12, 102:13, 153:21, 153:22
**originally** [1] - 17:16
**Orlando** [1] - 115:4
**otherwise** [3] - 112:7, 115:7, 132:9

**out-of-court** [1] - 117:14
**outcome** [1] - 110:10
**outside** [5] - 57:10, 64:25, 77:15, 77:16, 156:17
**outweighed** [1] - 115:15
**overall** [1] - 130:16
**overruled** [7] - 16:21, 16:24, 27:15, 28:9, 29:13, 98:15, 101:12
**overseas** [1] - 75:6
**overt** [5] - 56:5, 56:8, 96:22, 97:14, 98:2
**own** [4] - 72:23, 104:17, 132:23, 158:3

## P

**p.m** [1] - 161:13
**Page** [1] - 3:4
**page** [16] - 1:25, 51:13, 56:17, 92:11, 92:20, 93:1, 93:4, 93:5, 93:13, 93:19, 96:20, 96:21, 98:3, 100:21, 101:2
**pages** [6] - 31:19, 92:4, 92:5, 93:1, 102:5, 157:8
**Pando** [13] - 9:3, 9:5, 27:18, 27:19, 27:25, 28:5, 28:13, 28:15, 28:19, 28:23, 28:24, 30:8, 34:10
**panel** [11] - 5:2, 37:15, 37:19, 37:20, 61:7, 63:21, 63:22, 95:14, 102:18, 102:19, 157:9
**papers** [1] - 112:5
**paragraph** [5] - 56:12, 56:17, 66:18, 93:21, 96:20
**paragraphs** [1] - 140:9
**pardon** [2] - 15:14, 58:5
**part** [29] - 13:18, 13:19, 17:14, 17:18, 24:5, 31:4, 33:17, 34:1, 46:20, 47:23, 52:4, 74:20, 77:14, 77:17, 85:18, 95:1, 99:2, 103:4, 109:10, 124:15, 132:14, 134:21, 138:16, 148:18, 150:9, 153:20, 154:20, 155:4, 155:7
**part-time** [1] - 74:20
**partially** [1] - 115:16
**participant** [4] - 132:18, 150:23, 151:16, 151:19
**participants** [5] - 121:14, 132:8, 155:1, 155:4, 155:15
**participate** [10] - 123:15, 125:3, 125:22, 129:22, 130:12, 133:9, 134:10, 139:4, 152:7, 152:8
**participated** [5] - 76:14, 111:19, 121:23, 130:15, 151:21
**participating** [1] - 154:18
**participation** [6] - 130:19, 130:22, 133:17, 134:5, 152:5, 152:6
**particular** [8] - 80:7, 95:25, 100:17, 103:3, 105:9, 108:8, 122:8, 155:12
**particularly** [1] - 157:16
**parties** [15] - 4:22, 87:19, 88:20, 89:7, 89:13, 89:18, 90:6, 90:8, 95:7, 102:1, 104:24, 105:13, 116:24, 118:10, 118:15
**partly** [1] - 48:1
**partnership** [3] - 126:11, 129:17, 153:2
**parts** [2] - 77:14, 102:6
**party** [4] - 109:1, 113:15, 118:13, 118:15
**past** [1] - 55:3
**pathology** [8] - 75:10, 75:12, 75:19, 75:22, 75:25, 76:1, 76:8, 77:7
**pattern** [13] - 123:17, 123:18, 125:4, 125:23, 129:23, 130:13, 131:21, 132:2, 132:3, 133:3, 133:6, 133:10, 142:14
**pause** [4] - 37:25, 63:18, 73:18, 102:14
**Pause** [5] - 15:13, 36:1, 47:18, 70:7, 93:23
**Pava** [12] - 33:8, 57:2, 57:5, 57:7, 57:14, 57:15, 57:22, 57:25, 59:14, 59:19, 59:22, 60:1
**pay** [2] - 25:13, 140:13
**payee** [1] - 92:6
**paying** [1] - 97:21
**payment** [1] - 136:11
**Paz** [2] - 91:3, 91:10
**pecuniary** [1] - 140:14
**penalty** [1] - 31:7
**pending** [1] - 138:7
**Pennsylvania** [2] - 2:6, 76:20
**people** [42] - 10:22, 11:10, 11:14, 14:1, 25:9, 25:12, 26:2, 27:5, 27:10, 27:24, 28:4, 28:12, 42:14, 42:20, 42:21, 43:18, 44:6, 44:18, 44:19, 46:20, 47:1, 47:7, 47:14, 64:21, 64:22, 65:20, 67:14, 67:16, 67:21, 67:25, 104:3, 110:12, 122:18, 126:2, 126:5, 126:9, 127:14, 130:9, 154:4, 154:7, 154:17, 159:10
**perception** [1] - 111:2
**Perez** [7] - 91:12, 93:18, 94:25, 140:20, 145:8, 145:9, 146:9
**perform** [5] - 78:9, 78:15, 130:23, 145:10
**performed** [5] - 76:13, 80:12, 114:19, 114:24, 115:1
**performing** [3] - 75:3, 78:21, 89:19
**period** [7] - 42:13, 43:15, 120:19, 126:4, 127:21, 129:3, 142:9
**perjury** [1] - 112:19
**permanently** [1] - 135:21
**permission** [1] - 87:13
**permit** [3] - 35:16, 39:13, 112:6
**permitted** [4] - 105:16, 108:9, 111:18, 112:11
**person** [93] - 9:9, 10:23, 10:24, 12:11, 12:12, 13:25, 14:2, 14:4, 15:2, 24:4, 26:7, 27:25, 28:6, 29:16, 29:20, 39:25, 40:3, 40:6, 40:9, 40:13, 41:4, 41:8, 43:1, 47:20, 50:5, 50:8, 54:3, 54:17, 54:21, 71:13, 71:14, 71:15, 71:16, 77:19, 83:5, 89:15, 106:1, 107:7, 107:21, 116:22, 117:8, 117:10, 120:24, 121:14, 121:17, 122:10, 123:10, 124:21, 124:25, 129:6, 130:5, 133:24, 134:24, 135:1, 135:3, 135:4, 135:10, 136:10, 143:11, 143:17, 143:18, 143:20, 143:22, 145:8, 145:10, 145:12, 146:13, 147:24, 148:4, 148:6, 148:10, 148:16, 148:19, 148:20, 148:21, 148:25, 149:3, 149:4, 149:9, 149:12, 149:13, 149:16, 149:18, 149:24, 150:12, 150:16, 154:19, 154:20, 154:21, 155:4, 155:19, 155:25
**person's** [1] - 30:17
**personal** [5] - 18:1, 103:21, 103:25, 104:4, 104:7
**personality** [1] - 120:13
**personally** [5] - 42:18, 121:11, 121:18, 122:16, 132:16
**personnel** [2] - 126:7, 127:15
**persons** [9] - 44:6, 116:14, 116:16, 116:18, 117:17, 126:9, 129:18, 129:20, 136:17
**Perverso** [11] - 9:7, 9:9, 29:17, 29:20, 29:22, 29:25, 67:3, 123:9, 140:17, 145:25
**phone** [23] - 14:8, 14:9, 16:14, 29:24, 40:20, 41:9, 41:10, 41:11, 49:7, 49:12, 49:17, 50:15, 53:23, 54:3, 67:2, 67:5, 68:12, 71:19, 71:20, 71:24, 72:9
**phones** [1] - 16:13
**photo** [4] - 80:7, 80:14, 81:24, 82:14
**photograph** [3] - 78:2, 83:19, 85:6
**photographs** [4] - 78:6, 79:6, 87:20, 87:25
**photos** [3] - 87:22, 88:1, 90:8
**phrase** [3] - 60:10, 118:5, 118:7
**physical** [7] - 97:3, 97:13, 122:1, 136:23, 149:12
**physically** [3] - 36:18, 143:9, 148:20
**pick** [8] - 19:15, 19:24, 20:1, 34:17, 52:9, 60:19, 60:23
**picked** [3] - 20:10, 20:15, 95:3
**pictures** [2] - 79:17, 79:18
**Pike** [1] - 2:3
**Pinkerton** [14] - 96:10, 96:14, 98:8, 98:12, 98:16, 98:21, 99:3, 99:10, 99:25, 100:11, 100:15, 101:11, 101:15, 101:16
**place** [9] - 17:14, 52:12, 57:25, 58:16, 104:1, 122:2, 143:23, 148:21, 149:14
**places** [4] - 17:8, 17:11, 58:14, 105:1
**Plaintiff** [2] - 1:4, 1:13
**plan** [6] - 100:15, 134:5, 153:21, 153:22, 154:5, 154:21
**planned** [1] - 122:8
**planning** [3] - 99:4, 121:25, 142:8
**play** [7] - 23:24, 51:4, 109:10, 130:24, 130:25, 154:20

**played** [4] - 23:3, 24:1, 47:23, 150:9
**plea** [13] - 31:1, 31:4, 31:22, 65:12, 65:15, 66:4, 66:7, 111:24, 112:12, 112:16, 112:18, 112:23, 113:2
**plead** [2] - 31:8, 32:6
**pleasure** [1] - 95:24
**pled** [2] - 31:23, 35:1
**podium** [1] - 4:8
**point** [14] - 24:15, 30:10, 41:2, 42:11, 43:20, 52:16, 56:15, 59:11, 59:14, 80:18, 95:23, 101:19, 157:6, 158:6
**pointer** [1] - 80:20
**police** [5] - 28:2, 33:13, 89:22, 113:21, 114:1
**Police** [2] - 90:2, 90:5
**Ponce** [9] - 78:10, 79:17, 79:19, 83:19, 87:3, 89:20, 115:2, 139:9
**Ponce's** [2] - 79:7, 89:21
**portion** [3] - 84:8, 124:19, 124:20
**portions** [1] - 119:3
**pose** [2] - 131:23, 132:4
**posed** [1] - 132:12
**position** [10] - 139:25, 140:15, 141:3, 141:9, 142:20, 144:7, 144:11, 144:19, 144:22, 144:24
**positioned** [1] - 82:10
**possess** [5] - 136:14, 146:5, 149:24, 150:5, 150:24
**possessed** [8] - 136:7, 147:3, 147:21, 149:21, 150:4, 152:14, 152:18
**possesses** [2] - 115:9, 149:17
**possessing** [5] - 145:21, 146:11, 151:3, 151:5, 152:15
**possession** [20] - 89:3, 128:5, 136:5, 136:17, 139:25, 148:12, 148:20, 149:8, 149:10, 149:12, 149:13, 149:16, 149:17, 149:20, 149:23, 150:7, 150:20, 151:25, 152:19
**possibility** [1] - 103:24
**possible** [2] - 137:5, 149:18
**potential** [1] - 127:2
**potentially** [3] - 83:3, 83:9, 83:13
**pounds** [1] - 78:20
**powder** [1] - 85:13
**power** [7] - 40:15, 126:18, 148:22, 149:5, 149:15, 149:18, 149:20
**powerful** [2] - 42:16, 106:23
**practical** [1] - 160:8
**practice** [1] - 114:17
**precise** [1] - 130:5
**precisely** [1] - 96:16
**predicate** [1] - 138:15
**prefer** [1] - 70:21
**preferences** [1] - 104:1
**prejudice** [1] - 111:11
**prejudiced** [1] - 111:9
**prejudices** [3] - 103:22, 103:25, 109:25
**premeditated** [2] - 135:4, 135:8
**premeditation** [4] - 134:25, 135:13, 139:8, 139:14
**preparation** [1] - 135:15
**prepared** [7] - 55:1, 55:4, 88:6, 88:9, 88:13, 88:22, 99:21
**presence** [6] - 122:1, 133:20, 149:4, 151:17, 154:25, 156:17
**present** [12] - 80:14, 86:24, 87:1, 87:6, 116:5, 118:24, 118:25, 121:13, 145:9, 148:10, 150:1, 155:1
**presented** [5] - 79:19, 87:3, 108:14, 108:20, 119:6
**presentence** [2] - 32:21, 35:2
**preserving** [1] - 126:18
**pressed** [1] - 100:13
**pressure** [1] - 73:3
**prestige** [1] - 144:22
**presumed** [2] - 106:5, 157:20
**presumption** [1] - 106:6
**pretending** [1] - 48:5
**pretty** [1] - 43:24
**prevent** [2] - 127:10, 137:3
**previous** [2] - 110:20, 113:10
**previously** [5] - 4:5, 77:1, 79:10, 79:22, 86:23
**Prince** [2] - 89:22, 90:1
**principal** [4] - 121:16, 122:9, 122:15, 144:9
**prison** [1] - 39:16
**privilege** [1] - 159:7
**probability** [1] - 111:4
**probable** [2] - 106:22, 155:25
**probation** [3] - 39:21, 71:13, 71:17
**probationary** [1] - 43:15
**procedures** [2] - 78:12, 79:5
**proceed** [4] - 4:16, 64:2, 99:14, 146:17
**proceeding** [9] - 4:23, 137:2, 137:16, 137:23, 138:6, 138:8, 138:9, 138:11, 138:12
**Proceedings** [1] - 161:13
**proceedings** [2] - 138:3, 162:6
**process** [1] - 137:14
**processes** [1] - 77:19
**produce** [2] - 106:10, 145:15
**professional** [1] - 76:4
**profits** [1] - 126:19
**prohibiting** [1] - 122:25
**projective** [1] - 148:1
**promise** [2] - 140:13, 157:7
**promised** [1] - 35:24
**promises** [1] - 32:14
**promote** [1] - 150:6
**promoting** [2] - 126:22, 142:22
**promotion** [1] - 48:19
**proof** [12] - 106:9, 106:23, 116:7, 120:4, 125:12, 132:18, 134:3, 143:11, 148:3, 148:15, 149:4, 149:9
**proper** [1] - 108:24
**properly** [1] - 104:19
**property** [4] - 135:19, 135:21, 135:25
**proposed** [2] - 96:9, 100:21
**propriety** [1] - 119:19
**prosecuted** [2] - 146:3, 147:10
**prosecuting** [1] - 127:12
**prosecution** [2] - 112:3, 112:19
**prosecutor** [4] - 53:14, 64:11, 66:5, 68:23
**prosecutors** [1] - 66:1
**prostituting** [1] - 25:13
**protect** [1] - 112:18
**protecting** [1] - 126:18
**prove** [60] - 101:13, 106:10, 106:16, 106:20, 107:11, 107:13, 116:12, 122:5, 122:7, 122:9, 122:15, 125:13, 125:25, 127:24, 128:7, 128:10, 128:14, 128:17, 128:21, 129:2, 129:9, 129:14, 129:19, 130:7, 130:15, 131:25, 132:6, 132:7, 132:12, 132:16, 132:21, 132:25, 133:7, 135:16, 140:21, 141:10, 141:18, 141:20, 142:13, 142:16, 142:19, 142:22, 142:25, 143:1, 143:4, 143:8, 144:3, 144:8, 145:4, 146:16, 146:25, 147:7, 147:18, 149:1, 150:16, 150:22, 151:14, 154:11, 155:10
**proved** [5] - 116:15, 139:2, 147:13, 155:8, 155:18
**proven** [17] - 97:15, 105:10, 105:17, 106:8, 106:11, 109:15, 127:13, 134:15, 139:6, 139:11, 143:16, 144:17, 148:25, 149:2, 152:12, 152:17, 156:5
**provide** [1] - 103:13
**provided** [2] - 89:1, 114:13
**provides** [3] - 94:20, 124:24, 137:9
**providing** [3] - 44:13, 127:5, 127:8
**proving** [3] - 106:18, 108:6, 147:2
**provisions** [4] - 123:20, 124:8, 124:10, 124:22
**proximity** [1] - 85:21
**prudent** [1] - 157:15
**public** [1] - 104:25
**publish** [3] - 80:4, 81:20, 91:19
**published** [1] - 79:25
**pull** [3] - 5:19, 74:22, 93:6
**punish** [2] - 9:22, 9:23
**punished** [4] - 9:23, 33:23, 34:2, 34:5
**punishing** [1] - 127:12
**punishment** [1] - 68:24
**purpose** [22] - 81:5, 120:20, 121:4, 126:3, 126:5, 126:12, 126:13, 127:14, 129:18, 130:6, 133:14, 134:18, 138:2, 138:4, 139:24, 140:14, 141:7, 144:4, 144:10, 146:23, 151:17
**purposely** [1] - 150:13
**purposes** [10] - 26:11, 122:4, 125:7, 126:17, 132:8, 132:15, 134:7, 134:11, 136:21, 140:8
**pursuant** [8] - 90:23, 91:13, 95:19, 95:21, 111:25, 119:14, 119:16, 136:15
**pushed** [1] - 48:19
**put** [5] - 42:5, 61:21, 62:12, 85:25, 94:17
**putting** [1] - 158:22

## Q

**questions** [30] - 6:23, 6:24, 6:25, 7:14, 14:24, 15:6, 17:25, 26:15, 36:3, 37:13, 39:24, 47:20, 52:19, 70:16, 70:22, 71:1, 71:8, 71:19, 72:2, 72:7, 72:13, 73:12, 86:16, 86:17, 86:18, 87:8, 103:6, 103:10, 105:23, 108:15
**quite** [1] - 14:6

## R

**race** [1] - 104:5
**racketeer** [1] - 122:25
**racketeering** [53] - 55:18, 123:17, 123:19, 124:17, 124:19, 125:4, 125:6, 125:23, 128:10, 128:12, 129:23, 130:13, 130:18, 131:2, 131:21, 131:22, 131:25, 132:4, 132:5, 132:6, 132:12, 132:13, 133:3, 133:4, 133:6, 133:10, 134:20, 138:15, 138:22, 139:4, 139:22, 140:1, 140:16, 141:1, 141:21, 141:24, 141:25, 142:7, 142:9, 142:11, 142:14, 142:15, 142:18, 146:4, 146:13, 147:12, 150:21, 151:1, 151:7, 151:11, 152:16, 152:21, 152:25
**raise** [3] - 61:16, 61:19, 100:19
**RAMIREZ** [2] - 1:7, 158:18
**Ramirez** [36] - 4:4, 4:15, 88:1, 88:2, 88:8, 89:2, 91:6, 94:21, 95:2, 95:4, 95:5, 120:3, 120:5, 120:9, 120:12, 123:8, 139:7, 139:19, 140:17, 145:2, 145:6, 145:18, 145:24, 146:9, 151:8, 152:13, 152:18, 152:22, 153:9, 153:13, 153:14, 153:24, 154:14, 155:2, 155:7, 155:15
**Ramos** [1] - 91:10
**Randolph** [1] - 19:2
**Ranjan** [1] - 1:13
**ranks** [1] - 42:22
**rapidly** [5] - 83:8, 83:9, 83:11, 84:25, 85:1
**rather** [4] - 6:10, 111:23, 133:12, 142:7
**Ray** [1] - 114:15
**reach** [4] - 78:21, 79:1, 108:17, 108:21
**reaching** [2] - 108:12, 146:22
**read** [18] - 3:8, 3:9, 4:23, 73:16, 73:21, 87:13, 87:17, 94:7, 94:8, 94:17, 96:24, 102:2, 102:5, 102:25, 115:2, 119:5, 139:17, 157:7
**readily** [1] - 148:1
**reading** [3] - 87:9, 101:18, 102:12
**reads** [5] - 123:3, 124:20, 139:22, 140:10, 145:22
**ready** [2] - 4:16, 38:4
**real** [1] - 47:11
**realize** [1] - 34:24
**realized** [1] - 45:10
**realleges** [1] - 140:7
**really** [8] - 28:23, 62:6, 62:23, 84:9, 98:5, 100:13, 100:17, 159:17
**reason** [6] - 106:25, 107:1, 107:11, 110:7, 114:7, 144:20
**reasonable** [57] - 105:17, 106:8, 106:12, 106:16, 106:19, 106:24, 107:5, 107:6, 107:7, 107:13, 107:19, 109:16, 112:15, 116:13, 116:15, 117:17, 117:20, 122:16, 122:20, 125:14, 126:1, 127:25, 128:22, 129:3, 129:10, 129:15, 134:15, 139:3, 139:6, 139:11, 140:22, 141:11, 141:21, 142:13, 142:17, 142:20, 143:5, 143:16, 144:4, 145:4, 146:16, 147:1, 147:8, 147:14, 147:18, 148:3, 148:15, 149:9, 150:22, 151:15, 152:13, 152:17, 153:11, 153:25, 154:11, 156:6
**reasonableness** [1] - 111:3
**reasonably** [3] - 138:9, 152:10, 153:19
**reasons** [5] - 32:11, 113:17, 114:7, 115:14, 135:8
**Rebecca** [1] - 2:13
**REBECCA** [1] - 162:3
**rebecca** [1] - 162:11
**rebuttal** [1] - 160:21
**recalled** [1] - 109:23
**receipt** [1] - 140:12
**receive** [4] - 65:18, 75:5, 105:20, 111:15
**received** [13] - 23:15, 32:3, 32:18, 67:2, 75:6, 75:9, 79:24, 89:25, 91:18, 112:9, 118:20, 155:23, 156:3
**recently** [1] - 34:21
**recess** [5] - 37:14, 63:14, 95:13, 101:19, 101:23
**Recess** [4] - 37:16, 61:14, 63:16, 101:25
**recognize** [2] - 23:5, 79:14
**recollection** [2] - 51:8, 110:6
**recollections** [1] - 110:16
**record** [14] - 3:8, 4:5, 4:8, 17:18, 49:10, 49:22, 61:13, 73:21, 88:15, 91:7, 97:10, 157:10, 157:11, 161:11
**recorded** [8] - 50:17, 50:18, 88:21, 117:23, 118:14, 118:17, 118:22, 119:14
**recording** [7] - 23:3, 23:9, 24:1, 118:6, 118:12, 118:13, 119:16
**recordings** [6] - 88:22, 88:25, 89:10, 118:15, 118:19, 119:17
**records** [18] - 88:16, 90:10, 90:13, 90:15, 90:24, 91:2, 91:4, 91:5, 91:10, 91:12, 91:14, 91:17, 92:3, 93:10, 93:18, 115:6, 120:17, 120:23
**recovered** [2] - 71:24, 89:20
**recruit** [1] - 43:18
**recruited** [2] - 42:20, 42:21
**recruiting** [1] - 43:8
**red** [1] - 8:8
**redacted** [1] - 91:11
**Redirect** [1] - 3:7
**redirect** [1] - 70:10
**REDIRECT** [1] - 70:12
**reduce** [1] - 35:20
**reduced** [2] - 35:10, 112:9
**reduction** [5] - 65:18, 65:22, 65:23, 66:23
**refer** [5] - 39:25, 54:10, 103:2, 103:3, 123:2
**reference** [4] - 17:14, 98:3, 104:16, 139:22
**referenced** [1] - 147:23
**references** [1] - 120:23
**referred** [4] - 47:21, 90:17, 117:24, 120:24
**referring** [4] - 12:11, 18:18, 69:19, 148:9
**reflect** [1] - 96:17
**reflection** [1] - 107:8
**refuse** [1] - 103:14
**regard** [4] - 100:20, 100:23, 105:9, 146:15
**regarding** [1] - 124:7
**regardless** [3] - 53:10, 104:4, 122:14
**regular** [4] - 68:10, 90:11, 90:14, 90:16
**reject** [1] - 120:25
**rejoin** [1] - 8:13
**rejoined** [3] - 53:5, 53:9, 53:10
**related** [3] - 45:14, 131:22, 132:6
**relating** [7] - 91:15, 116:17, 120:8, 120:10, 131:18, 137:5, 140:3
**relation** [14] - 34:14, 146:2, 147:6, 147:20, 148:5, 150:19, 150:24, 151:3, 151:5, 151:10, 151:13, 152:15, 152:20, 152:24
**relationship** [2] - 26:20, 26:22
**release** [4] - 35:17, 35:21, 39:19, 156:9
**relevance** [2] - 27:14, 121:7
**relevant** [3] - 120:23, 121:3, 156:4
**religion** [1] - 104:5
**remain** [1] - 132:24
**remaining** [2] - 64:2, 117:12
**remains** [1] - 106:6
**remember** [37] - 7:19, 8:17, 8:21, 10:9, 10:15, 15:7, 18:9, 18:25, 20:9, 22:21, 22:23, 22:25, 23:2, 27:21, 30:13, 30:17, 32:17, 32:20, 33:7, 34:3, 36:5, 41:10, 41:15, 42:1, 43:12, 43:16, 44:5, 44:11, 44:12, 44:13, 49:8, 51:11, 55:15, 55:17, 55:24, 71:9, 71:21
**remembers** [1] - 97:7
**remove** [1] - 101:1
**removed** [1] - 98:2
**rendering** [1] - 56:20
**rent** [6] - 25:7, 25:8, 25:9, 25:16, 25:23, 26:10
**repeat** [10] - 17:1, 26:5, 36:19, 46:6, 53:8, 54:1, 67:9, 76:22, 76:24
**repetition** [3] - 9:16, 29:6, 72:11
**rephrase** [2] - 6:25, 60:5
**report** [7] - 17:3, 32:21, 32:24, 33:3, 35:2, 71:13, 77:25
**REPORTER** [1] - 162:1

**Reporter** [3] - 2:13, 2:13, 162:11
**reports** [4] - 54:25, 55:3, 55:9, 73:7
**represent** [1] - 7:23
**represents** [1] - 109:1
**reprimanded** [1] - 33:21
**reputation** [2] - 44:23, 126:19
**request** [3] - 72:10, 160:25, 161:2
**requests** [1] - 29:6
**require** [5] - 106:10, 108:11, 118:10, 135:13, 138:6
**required** [20] - 34:4, 102:25, 105:11, 107:11, 122:5, 122:7, 128:17, 128:23, 129:2, 132:15, 132:21, 133:7, 133:13, 134:9, 136:11, 142:13, 142:16, 144:8, 150:16, 155:24
**requirement** [3] - 97:23, 128:19, 151:20
**requires** [6] - 33:18, 97:17, 131:1, 131:3, 131:21, 136:21
**requisite** [1] - 135:18
**residency** [1] - 75:14
**respect** [9] - 33:18, 69:17, 94:16, 94:25, 97:16, 97:19, 99:17, 119:12, 122:13
**respected** [1] - 12:6
**respective** [1] - 114:5
**response** [1] - 51:10
**responsibility** [5] - 32:13, 68:2, 103:17, 104:15, 109:2
**responsible** [3] - 99:9, 153:3, 153:4
**rest** [2] - 87:14, 94:14
**rests** [2] - 93:25, 95:8
**result** [3] - 110:25, 112:10, 135:12
**resulting** [1] - 140:3
**results** [1] - 132:8
**retaliation** [1] - 124:12
**retire** [1] - 74:11
**retired** [4] - 74:3, 74:5, 74:8, 74:9
**retirement** [1] - 74:13
**retrieve** [1] - 37:9
**return** [2] - 78:7, 103:7
**returned** [1] - 103:8
**review** [1] - 79:11
**reviewing** [1] - 79:12
**revolver** [3] - 19:13, 19:14, 19:22
**Rhee** [6] - 2:2, 4:15, 72:7, 72:13, 99:4, 160:5
**RHEE** [31] - 2:2, 11:18, 12:2, 27:14, 28:8, 29:12, 29:14, 32:4, 52:21, 54:6, 56:17, 56:22, 57:21, 58:6, 60:3, 60:7, 60:13, 60:22, 60:25, 61:9, 61:12, 64:4, 64:5, 67:8, 67:11, 68:9, 68:22, 69:11, 69:13, 70:6, 70:8
**Rhee..................** [1] - 3:6
**RICO** [8] - 31:23, 32:6, 123:1, 124:23, 124:24, 133:16, 138:13, 141:15
**ride** [1] - 21:22
**riding** [1] - 149:3
**rights** [3] - 66:14, 158:7, 158:16
**ringing** [1] - 72:9
**Rios** [10] - 26:16, 27:11, 30:3, 31:11, 33:16, 68:14, 69:3, 95:3, 95:4
**rise** [1] - 101:24
**rival** [10] - 33:10, 33:12, 57:2, 58:11, 59:2, 59:14, 60:16, 153:11, 153:14, 154:4
**rivals** [1] - 58:21
**RIVERA** [2] - 1:6, 158:10
**Rivera** [19] - 4:4, 4:12, 87:22, 87:23, 89:6, 91:8, 91:15, 95:18, 105:5, 120:1, 120:5, 120:7, 120:12, 120:18, 120:24, 121:6, 121:7, 123:7, 139:13
**RIVERA-LUNA** [2] - 1:6, 158:10
**Rivera-Luna** [19] - 4:4, 4:12, 87:22, 87:23, 89:6, 91:8, 91:15, 95:18, 105:5, 120:1, 120:5, 120:7, 120:12, 120:18, 120:24, 121:6, 121:7, 123:7, 139:13
**Road** [1] - 19:3
**robberies** [5] - 25:15, 25:17, 25:23, 26:10, 126:25
**robbery** [7] - 124:1, 131:8, 135:19, 138:17, 138:24, 142:2
**robbing** [1] - 64:21
**Robert** [2] - 2:5, 4:14
**ROBERT** [1] - 2:5
**Rodas** [36] - 4:4, 4:15, 88:1, 88:2, 88:8, 89:2, 91:6, 94:21, 95:2, 95:4, 95:5, 120:3, 120:5, 120:9, 120:12, 123:8, 139:7, 139:19, 140:17, 145:2, 145:6, 145:18, 145:24, 146:9, 151:8, 152:13, 152:18, 152:22, 153:9, 153:13, 153:14, 153:24, 154:14, 155:2, 155:7, 155:15
**RODAS** [2] - 1:7, 158:18
**Rodas-Ramirez** [36] - 4:4, 4:15, 88:1, 88:2, 88:8, 89:2, 91:6, 94:21, 95:2, 95:4, 95:5, 120:3, 120:5, 120:9, 120:12, 123:8, 139:7, 139:19, 140:17, 145:2, 145:6, 145:18, 145:24, 146:9, 151:8, 152:13, 152:18, 152:22, 153:9, 153:13, 153:14, 153:24, 154:14, 155:2, 155:7, 155:15
**RODAS-RAMIREZ** [2] - 1:7, 158:18
**role** [7] - 12:23, 13:17, 16:5, 41:5, 69:17, 130:25, 133:15
**roles** [2] - 130:25
**rolling** [1] - 45:3
**Roman** [1] - 2:8
**room** [3] - 63:11, 64:1, 102:25
**Room** [3] - 1:16, 2:14, 162:12
**round** [1] - 80:24
**ROYCE** [1] - 1:10
**RPR** [2] - 2:13, 162:11
**Rule** [4] - 90:24, 91:13, 95:19, 95:22
**rule** [3] - 16:10, 34:4, 103:10
**ruled** [1] - 109:8
**rules** [7] - 16:7, 30:19, 30:22, 33:24, 36:15, 88:5, 114:17
**run** [5] - 36:18, 36:24, 64:17, 65:9, 72:19
**running** [2] - 10:16, 72:18

## S

**S-A-R-A-V-I-A** [1] - 5:24
**safe** [1] - 52:12
**Salvador** [26] - 6:3, 6:4, 7:16, 7:17, 7:20, 14:11, 14:14, 22:14, 36:8, 36:11, 36:13, 40:10, 40:13, 41:24, 42:9, 42:11, 42:25, 43:4, 43:13, 44:6, 52:2, 52:4, 52:5, 52:7, 67:18, 127:7
**Salvatrucha** [1] - 126:15
**Sandi** [2] - 2:2, 4:15
**SANDI** [1] - 2:2
**Santos** [34] - 11:9, 11:23, 11:24, 12:8, 12:11, 12:18, 13:10, 14:5, 14:10, 14:12, 14:17, 14:20, 16:19, 17:3, 17:5, 17:7, 17:17, 17:21, 17:22, 18:12, 22:15, 22:19, 26:3, 26:4, 26:6, 36:5, 40:1, 40:17, 54:14, 71:20, 120:24, 121:6, 123:8
**Saravia** [16] - 5:7, 5:18, 5:25, 6:18, 24:3, 30:11, 31:19, 32:6, 36:3, 38:9, 52:22, 58:24, 64:6, 70:14, 70:16, 113:5
**SARAVIA** [2] - 3:4, 5:9
**sat** [2] - 57:10, 154:6
**satisfied** [5] - 57:18, 117:16, 146:25, 150:10, 151:20
**satisfy** [4] - 125:12, 128:13, 142:18, 150:11
**satisfying** [1] - 97:1
**save** [2] - 94:4, 102:8
**saved** [1] - 41:9
**saw** [14] - 12:6, 15:9, 15:18, 16:3, 19:17, 21:16, 21:20, 37:6, 59:14, 107:22, 107:24, 107:25, 108:1, 157:3
**scared** [1] - 22:1
**scene** [3] - 133:20, 150:8, 154:25
**scheme** [5] - 64:24, 65:2, 130:4, 130:5, 133:4
**school** [5] - 6:4, 6:16, 58:8, 58:12, 58:15
**schooling** [1] - 6:14
**scientific** [2] - 107:12, 115:7
**screen** [3] - 80:19, 80:21, 86:21
**scroll** [4] - 92:11, 92:16, 92:20, 93:20
**seat** [6] - 61:22, 61:23, 61:24, 156:25, 158:23
**seated** [7] - 4:12, 5:3, 5:10, 37:21, 63:23, 102:20, 157:4
**seats** [2] - 63:19, 63:24
**second** [29] - 6:5, 13:1, 13:3, 14:3, 22:7, 25:19, 27:18, 27:19, 27:20, 27:25, 28:5, 28:6, 34:10, 54:23, 77:17, 81:14, 125:16, 127:24, 135:10, 135:12, 135:16, 137:1, 141:1, 141:20, 142:18, 147:4, 147:17, 159:5
**seconds** [1] - 9:25
**Section** [22] - 1:15, 123:14, 124:2, 124:5, 124:6, 124:12, 124:19, 124:24, 131:6, 131:9, 131:10, 131:12, 131:18, 131:19, 136:5, 136:16, 136:21, 137:8, 139:20, 139:22, 140:20, 140:21
**Sections** [7] - 123:18, 123:23, 123:24, 124:3, 124:9, 131:5, 131:16
**see** [40] - 16:1, 18:21,

19:17, 21:8, 21:17, 21:19, 31:19, 48:4, 48:16, 61:2, 61:4, 69:5, 69:9, 77:16, 80:7, 80:14, 81:6, 81:15, 81:16, 85:16, 86:8, 86:21, 86:24, 87:1, 92:6, 92:19, 93:3, 93:12, 100:13, 100:18, 120:25, 143:19, 157:1, 157:4, 159:20, 159:25, 161:8, 161:11
**seeing** [1] - 142:20
**seek** [1] - 83:3
**seeking** [2] - 141:3, 143:3
**seem** [1] - 41:15
**selecting** [1] - 108:16
**selections** [1] - 153:1
**self** [1] - 111:10
**self-interest** [1] - 111:10
**selling** [5] - 25:7, 25:10, 25:11, 25:13, 25:16
**send** [6] - 26:2, 26:3, 26:4, 26:6, 26:7, 103:7
**sender** [1] - 92:6
**sending** [2] - 52:4, 119:8
**sense** [3] - 34:11, 34:12
**sent** [6] - 22:14, 52:1, 52:5, 52:7, 159:14
**sentence** [12] - 32:10, 32:17, 33:3, 35:6, 35:8, 35:10, 39:16, 65:18, 65:22, 65:23, 112:6, 112:9
**sentenced** [3] - 32:20, 35:3, 113:7
**sentencing** [1] - 112:5
**separate** [1] - 130:23
**separately** [1] - 138:24
**September** [2] - 87:21, 87:25
**Sergeant** [1] - 114:15
**series** [3] - 90:23, 132:1, 132:2
**serious** [2] - 135:11, 140:3
**served** [2] - 39:16, 144:18
**services** [1] - 128:3
**session** [1] - 101:22
**setting** [4] - 6:21, 24:12, 24:13, 25:7
**several** [2] - 72:1, 87:17
**severely** [1] - 43:24
**sex** [1] - 104:6
**sexual** [1] - 104:6
**Shady** [5] - 57:8, 57:22, 59:8, 59:22, 60:3
**shaky** [1] - 62:7
**shall** [4] - 113:2, 113:21, 124:21, 124:25
**shape** [2] - 81:14, 157:2
**Sharp** [1] - 90:4
**shave** [1] - 81:2
**shaved** [1] - 81:1
**Shelley** [1] - 2:10
**shifts** [1] - 106:9
**shoot** [1] - 33:10
**shooting** [2] - 22:1, 94:25
**short** [5] - 8:4, 63:14, 95:12, 101:23, 142:9
**shot** [6] - 22:2, 22:4, 22:5, 33:12, 51:18
**show** [21] - 54:25, 73:7, 79:9, 83:15, 84:14, 85:2, 92:1, 92:9, 92:14, 92:17, 92:23, 93:6, 93:7, 93:9, 93:16, 135:17, 142:7, 154:9, 155:2, 157:1
**showed** [2] - 55:9, 85:15
**showing** [5] - 91:2, 91:10, 91:22, 120:18, 120:23
**shown** [2] - 55:3, 111:8
**shows** [2] - 83:19, 85:6
**sic** [4] - 108:1, 148:1, 151:24, 160:17
**side** [8] - 80:15, 82:1, 82:2, 83:2, 83:22, 84:21, 108:23, 111:10
**sight** [1] - 148:12
**signature** [2] - 31:19, 31:20
**signed** [5] - 17:16, 65:13, 66:4, 92:22, 95:7
**significant** [1] - 83:7
**signs** [1] - 114:17
**Silva** [1] - 113:5
**Silver** [2] - 15:19, 15:20
**Silvestre** [8] - 22:25, 23:8, 23:10, 24:4, 49:19, 50:6, 51:6, 51:16
**similar** [1] - 132:7
**similarity** [1] - 133:25
**similarly** [5] - 97:16, 105:23, 130:3, 133:21, 155:3
**simply** [3] - 105:23, 120:14, 138:4
**sit** [2] - 61:24, 98:14
**site** [1] - 115:6
**sitting** [1] - 34:3
**situation** [1] - 118:24
**six** [1] - 153:18
**size** [1] - 81:14
**skill** [1] - 115:10
**skin** [2] - 85:20, 86:9
**skipping** [1] - 159:7
**skull** [1] - 83:7
**sleep** [1] - 108:1
**slight** [1] - 130:16
**small** [1] - 47:3
**smuggling** [1] - 127:1
**sneezing** [2] - 21:12, 40:22
**snitch** [3] - 27:9, 27:11, 28:1
**snitched** [5] - 27:13, 27:19, 27:24, 28:5, 30:8
**snitching** [2] - 34:10, 34:14
**snow** [4] - 107:22, 107:24, 108:1
**snowed** [1] - 108:3
**so-called** [2] - 77:14, 77:24
**society** [1] - 125:7
**sole** [7] - 103:16, 104:14, 105:10, 109:17, 144:9, 149:16, 149:17
**solely** [6] - 104:8, 113:8, 113:14, 149:23, 149:25, 150:1
**Solorzano** [3] - 88:9, 88:13, 113:5
**someone** [12] - 12:6, 16:12, 17:13, 29:8, 33:19, 34:6, 36:8, 36:9, 36:10, 43:1, 97:17, 122:21
**sometime** [1] - 46:22
**sometimes** [7] - 11:10, 26:1, 26:10, 67:24, 70:17, 72:23, 108:22
**somewhere** [2] - 8:19, 86:12
**soon** [3] - 12:16, 41:19, 83:4
**sorry** [18] - 15:15, 49:11, 49:15, 51:12, 56:17, 61:9, 62:24, 67:8, 70:3, 76:23, 84:9, 91:24, 93:20, 98:10, 100:5, 101:7, 126:8, 160:18
**sort** [7] - 39:20, 42:6, 45:13, 47:9, 48:18, 64:14, 81:25
**soul** [1] - 161:3
**sound** [1] - 115:15
**sounds** [1] - 69:7
**soup** [1] - 22:20
**sources** [1] - 105:3
**Spanish** [13] - 2:8, 2:10, 70:17, 88:23, 118:19, 118:25, 119:1, 119:5, 119:7, 119:10, 119:20, 119:21
**speaker** [1] - 89:16
**speakers** [1] - 88:25
**speaking** [13] - 14:9, 14:12, 23:5, 23:7, 24:4, 29:10, 40:9, 41:4, 49:25, 50:8, 50:11, 50:12, 50:19
**special** [2] - 139:2, 139:5
**Special** [2] - 89:25, 94:23
**specialized** [1] - 115:7
**specific** [4] - 121:10, 122:6, 122:24, 136:8
**specifically** [5] - 39:25, 114:16, 119:15, 120:15, 146:19
**specify** [1] - 138:22
**speculate** [3] - 109:6, 114:7, 121:3
**speculation** [3] - 12:1, 16:22, 107:10
**spell** [3] - 5:21, 5:23, 73:24
**spelled** [1] - 74:1
**spelling** [1] - 5:16
**spent** [1] - 44:8
**spite** [1] - 65:8
**spoken** [3] - 54:8, 119:1, 130:8
**spot** [1] - 34:22
**spouse** [1] - 105:6
**Spring** [2] - 15:19, 15:20
**stand** [4] - 61:22, 77:8, 104:21, 110:4
**standard** [2] - 96:5, 100:22
**standing** [1] - 159:3
**stands** [1] - 110:10
**start** [7] - 28:25, 36:24, 45:5, 72:18, 80:3, 91:22, 101:18
**started** [8] - 11:12, 11:14, 26:22, 55:11, 55:12, 67:6, 67:10, 161:8
**starting** [1] - 4:7
**State** [3] - 76:11, 76:19, 76:20
**state** [11] - 4:8, 14:17, 73:24, 76:25, 115:11, 116:25, 117:3, 128:4, 128:5, 140:5, 156:7
**statement** [5] - 100:25, 112:19, 116:9, 116:10, 155:21
**statements** [12] - 105:21, 110:20, 115:20, 115:22, 115:24, 116:1, 116:4, 116:8, 117:5, 155:14, 155:17
**STATES** [3] - 1:1, 1:3, 1:11
**States** [33] - 1:18, 2:14, 4:3, 4:10, 6:7, 6:16, 14:15, 14:18, 26:11, 36:10, 39:6, 39:10, 39:13, 39:17, 41:12, 42:13, 43:19, 89:5, 89:7, 94:21, 123:14, 123:18, 124:9, 127:7, 128:5, 131:15, 131:17, 136:5, 137:4, 139:20, 140:5, 146:3, 147:10
**states** [2] - 76:10, 128:3
**stating** [1] - 5:15
**status** [1] - 35:13
**statute** [7] - 125:8, 137:8, 137:17, 137:20, 137:21, 138:4, 143:8
**stay** [2] - 63:24, 64:1
**STC** [3] - 56:13, 58:1, 58:13
**stenographic** [1] - 162:5

**step** [5] - 37:18, 61:8, 63:11, 73:13, 135:14
**Steve** [1] - 90:1
**still** [8] - 7:7, 7:8, 11:11, 19:10, 62:18, 157:1, 157:3, 158:6
**stippling** [5] - 85:13, 85:15, 85:17, 86:6, 86:8
**stipulate** [7] - 87:19, 88:20, 89:8, 89:18, 90:6, 90:9, 94:22
**stipulated** [2] - 104:23, 105:14
**stipulation** [5] - 94:7, 94:17, 94:20, 101:1, 105:15
**stipulations** [3] - 87:14, 87:17, 89:17
**stock** [1] - 32:9
**stone** [1] - 7:6
**stop** [5] - 59:15, 60:24, 64:19, 64:21, 102:4
**stopped** [1] - 59:17
**Street** [4] - 1:16, 1:19, 8:5, 58:8
**street** [1] - 44:23
**streets** [4] - 44:21, 45:6, 45:8, 45:10
**stricken** [2] - 109:9, 109:13
**strict** [1] - 99:9
**structure** [2] - 101:21, 114:16
**subject** [1] - 154:10
**subjects** [1] - 114:15
**submit** [2] - 95:19, 96:4
**subsection** [1] - 124:22
**subsequent** [1] - 117:1
**substance** [8] - 136:6, 136:7, 136:9, 136:10, 136:12, 136:13, 136:15, 136:18
**substances** [1] - 131:15
**substantial** [1] - 135:14
**substantially** [1] - 127:20
**substantive** [2] - 98:23, 98:25
**substitute** [1] - 119:7
**succeed** [1] - 121:24
**success** [1] - 137:25
**successful** [1] - 138:1
**successfully** [1] - 127:11
**suffer** [1] - 159:18
**suffering** [1] - 100:9
**sufficient** [14] - 97:11, 97:22, 98:5, 115:13, 122:3, 122:19, 128:13, 131:24, 133:12, 134:6, 148:14, 149:1, 150:8
**sufficiently** [1] - 97:15
**suggested** [1] - 57:25
**suggestion** [1] - 117:4
**suit** [2] - 20:12
**Suite** [3] - 1:22, 2:3, 2:6
**sum** [2] - 99:21, 134:14
**summation** [2] - 95:25, 161:4
**summations** [1] - 98:19
**Superior** [1] - 105:7
**supervised** [5] - 35:17, 35:21, 39:19, 39:20, 71:8
**supervising** [2] - 35:20, 71:16
**support** [1] - 127:5
**supported** [1] - 111:7
**supporting** [1] - 115:14
**suppose** [1] - 95:24
**supposed** [2] - 16:19, 21:21
**surgery** [10] - 18:3, 18:5, 18:6, 18:7, 18:9, 36:16, 36:20, 64:14, 65:8, 72:16
**surprise** [1] - 100:9
**surrounding** [3] - 110:14, 117:2, 155:21
**Susan** [2] - 90:4
**suspicious** [1] - 75:3
**sustain** [2] - 143:10, 147:1
**sustained** [8] - 11:19, 12:3, 57:20, 60:9, 60:20, 68:8, 109:4, 109:12
**sweep** [1] - 137:17
**sworn** [2] - 4:6, 104:21
**system** [1] - 104:4

**T**

**T-Mobile** [2] - 90:10, 90:13
**Tab** [1] - 23:17
**tab** [1] - 23:23
**table** [1] - 4:13
**TABLE** [1] - 3:1
**tall** [1] - 71:7
**tampering** [10] - 96:22, 97:2, 98:4, 124:13, 131:18, 136:20, 138:18, 138:25, 142:2
**tape** [8] - 117:23, 118:6, 118:12, 118:14, 118:15, 118:17, 118:19, 118:22
**tapes** [4] - 118:23, 118:25, 119:8, 119:9
**taping** [1] - 118:16
**target** [2] - 85:20, 85:22
**tattoo** [8] - 83:21, 84:1, 85:20, 86:23, 86:24, 86:25, 87:1, 87:6
**tattoos** [5] - 84:4, 84:5, 84:9, 87:23, 88:2
**technical** [1] - 115:7
**technology** [1] - 115:5
**teenager** [3] - 39:7, 41:18, 41:19
**telephone** [9] - 29:23, 40:17, 90:10, 90:13, 90:15, 115:5, 118:18, 118:19, 119:16
**ten** [3] - 46:13, 47:1
**tendered** [1] - 77:6
**tends** [1] - 121:5
**teresa** [1] - 2:8
**term** [11] - 13:5, 35:20, 39:21, 117:25, 118:7, 125:8, 125:9, 131:2, 131:3, 131:21, 132:14
**terms** [1] - 96:9
**Territory** [1] - 128:4
**territory** [1] - 126:18
**testified** [30] - 12:20, 37:1, 38:11, 39:6, 39:12, 40:6, 42:4, 45:19, 45:22, 46:25, 47:23, 48:8, 51:25, 64:13, 76:16, 76:21, 77:1, 77:3, 107:23, 109:17, 109:22, 109:24, 110:9, 114:15, 114:20, 114:22, 114:25, 115:2, 115:3, 115:4
**testifies** [1] - 111:18
**testify** [16] - 73:1, 73:3, 111:25, 112:25, 114:4, 114:11, 114:12, 115:11, 157:19, 158:3, 158:4, 158:6, 158:8, 158:13, 158:14, 158:17
**testifying** [3] - 32:14, 110:5, 110:11
**testimony** [47] - 3:8, 35:19, 39:25, 42:1, 42:24, 44:24, 45:12, 48:1, 51:4, 51:20, 51:24, 68:7, 73:16, 73:21, 87:9, 97:9, 100:23, 100:24, 104:21, 107:18, 107:23, 108:2, 109:17, 110:19, 110:20, 110:23, 111:5, 111:12, 111:14, 111:16, 111:20, 111:21, 111:23, 112:12, 112:14, 113:1, 113:3, 113:5, 113:20, 113:24, 114:1, 114:14, 115:25, 116:5, 116:11, 119:13, 137:2
**testing** [1] - 37:24
**THE** [148] - 1:1, 1:1, 1:10, 1:14, 4:2, 4:17, 4:19, 4:25, 5:3, 5:10, 9:15, 9:17, 11:19, 12:3, 15:12, 15:14, 16:21, 21:14, 23:15, 23:19, 23:20, 23:23, 24:20, 24:21, 27:15, 28:9, 28:10, 29:2, 29:6, 29:13, 31:16, 32:3, 37:11, 37:14, 37:17, 37:19, 37:21, 37:24, 38:1, 38:5, 40:24, 56:19, 56:21, 57:20, 58:4, 59:25, 60:4, 60:9, 60:12, 60:20, 60:24, 61:2, 61:5, 61:6, 61:8, 61:11, 61:15, 61:18, 61:19, 61:21, 61:23, 61:25, 62:1, 62:4, 62:6, 62:10, 62:14, 62:17, 62:18, 62:19, 62:21, 62:22, 62:23, 62:25, 63:4, 63:5, 63:10, 63:11, 63:13, 63:14, 63:17, 63:19, 63:21, 63:23, 67:9, 68:8, 68:20, 68:21, 69:12, 70:10, 70:25, 71:1, 72:10, 73:13, 73:15, 73:20, 79:24, 80:1, 87:10, 87:15, 91:18, 91:21, 94:2, 94:4, 94:8, 94:10, 94:12, 94:15, 95:9, 95:12, 95:15, 96:2, 96:8, 98:7, 98:10, 98:15, 100:5, 101:4, 101:8, 101:11, 101:24, 102:1, 102:15, 102:18, 102:20, 156:11, 156:20, 157:10, 157:12, 157:18, 157:22, 157:24, 158:2, 158:11, 158:19, 158:25, 159:2, 159:20, 159:23, 159:25, 160:10, 160:13, 160:17, 160:19, 160:21, 160:24, 161:8, 161:11
**theft** [1] - 126:25
**theory** [2] - 99:21, 153:10
**therefore** [3] - 43:5, 119:23, 120:10
**thereof** [1] - 138:18
**thinking** [1] - 155:20
**third** [6] - 54:23, 125:17, 128:21, 141:3, 142:19, 147:5
**thirst** [1] - 57:17
**thoughtful** [1] - 107:7
**threat** [13] - 30:7, 31:9, 97:3, 97:17, 131:23, 132:4, 132:13, 135:20, 136:1, 136:2, 136:23, 138:7, 138:10
**threaten** [1] - 73:1
**threatens** [1] - 140:4
**threats** [6] - 97:5, 126:20, 127:4, 136:2, 136:24, 137:9
**three** [13] - 14:1, 37:7, 53:16, 54:13, 58:17, 59:11, 72:20, 73:6, 88:18, 117:7, 131:11, 145:9, 153:13
**Three** [1] - 127:15
**throughout** [3] - 106:7, 106:9, 127:23

**thwarted** [1] - 137:15
**Title** [7] - 123:14, 123:17, 124:9, 131:15, 131:17, 136:5, 139:20
**title** [1] - 71:17
**today** [16] - 4:22, 34:3, 37:1, 37:2, 62:7, 62:23, 70:17, 73:1, 73:4, 73:9, 101:18, 101:20, 115:2, 157:3, 159:22
**together** [12] - 48:9, 58:16, 95:5, 95:23, 108:19, 123:9, 126:3, 129:18, 130:2, 134:2, 154:6, 154:7
**TOKIRO** [1] - 1:7
**Tokiro** [31] - 4:4, 4:15, 88:1, 88:8, 89:2, 91:5, 94:21, 120:3, 120:5, 120:12, 123:8, 139:7, 139:19, 140:17, 145:1, 145:6, 145:18, 145:24, 146:8, 151:8, 152:13, 152:18, 152:22, 153:9, 153:13, 153:24, 154:14, 155:2, 155:7, 155:15
**tomorrow** [9] - 96:1, 101:21, 102:6, 102:23, 157:2, 157:5, 157:7, 157:8, 159:9
**tomorrow's** [1] - 101:22
**took** [8] - 22:2, 32:9, 48:21, 68:16, 72:17, 102:15, 104:23, 105:4
**toolmark** [1] - 114:23
**top** [1] - 92:18
**totally** [1] - 158:4
**touch** [2] - 54:15, 94:18
**toward** [1] - 135:15
**towards** [3] - 45:3, 45:4, 93:14
**track** [1] - 161:6
**trafficking** [3] - 126:25, 131:14, 142:2
**Trafficking** [1] - 1:15
**trained** [1] - 75:10
**training** [5] - 75:5, 75:12, 75:13, 75:16, 115:10
**trajectory** [1] - 82:8
**transcribed** [1] - 24:1
**transcript** [7] - 4:23, 23:14, 23:17, 23:18, 51:7, 162:4, 162:6
**TRANSCRIPT** [1] - 1:9
**transcriptions** [2] - 89:10, 89:14
**transcripts** [6] - 88:21, 89:16, 118:21, 118:25, 119:2, 119:6
**transfer** [2] - 136:9, 136:10
**transfers** [2] - 91:2, 91:10
**translated** [1] - 88:23
**translation** [12] - 88:4, 88:5, 88:7, 88:9, 88:11, 88:13, 88:21, 91:16, 93:10, 119:1, 119:21, 119:23
**translations** [3] - 89:10, 89:14, 119:6
**translator** [5] - 88:6, 88:10, 88:14, 88:23, 119:8
**translators** [2] - 88:23, 88:24
**transported** [1] - 149:3
**traveled** [5] - 82:3, 82:5, 82:20, 82:21, 82:22
**treat** [1] - 119:2
**treatment** [2] - 104:3, 112:10
**treats** [1] - 115:20
**trial** [33] - 4:13, 62:11, 90:17, 96:17, 97:25, 99:2, 99:6, 99:14, 99:20, 100:4, 102:7, 103:9, 103:18, 104:11, 104:20, 105:13, 106:7, 106:9, 109:4, 111:10, 113:11, 115:25, 116:7, 117:22, 118:5, 118:7, 119:3, 119:11, 119:17, 120:6, 137:23, 156:3, 158:8
**TRIAL** [1] - 1:9
**tried** [2] - 44:8, 161:5
**trigger** [1] - 97:22
**trouble** [1] - 38:3
**true** [13] - 51:1, 79:18, 90:9, 90:12, 90:15, 90:20, 91:16, 93:9, 106:21, 111:6, 116:8, 162:4, 162:5
**truth** [4] - 106:22, 110:7, 111:13, 112:17
**truthful** [1] - 68:3
**truthfully** [3] - 32:14, 109:22, 112:1
**try** [4] - 75:4, 98:12, 99:8, 102:16
**trying** [2] - 97:7, 160:11
**turn** [3] - 23:16, 78:7, 112:12
**tweaked** [1] - 96:17
**twice** [6] - 15:5, 25:5, 37:6, 53:18, 54:24, 60:21
**two** [37] - 10:22, 20:5, 54:7, 54:16, 54:18, 54:19, 54:22, 57:10, 60:14, 77:13, 80:15, 85:7, 86:13, 89:25, 99:24, 107:14, 117:1, 124:16, 129:17, 129:20, 130:8, 130:18, 131:8, 131:22, 131:25, 132:16, 136:16, 136:21, 138:17, 139:5, 142:15, 145:8, 153:12, 154:1, 154:4, 154:14, 158:20
**Two** [1] - 127:14
**type** [7] - 7:4, 7:7, 7:8, 77:16, 77:18, 138:15, 138:22
**types** [5] - 107:14, 112:23, 138:15, 138:22, 141:23

## U

**U.S** [2] - 1:14, 128:4
**U.S.C** [6] - 124:12, 124:14, 124:18, 136:15, 136:21, 137:8
**ultimately** [2] - 38:19, 43:23
**unanimous** [1] - 152:25
**unchanged** [1] - 127:20
**under** [20] - 31:9, 65:19, 97:2, 99:9, 99:10, 100:9, 110:16, 112:17, 112:20, 123:20, 124:10, 131:17, 134:9, 135:23, 142:9, 143:7, 145:14, 146:9, 150:8, 153:10
**undergo** [1] - 18:3
**understood** [1] - 41:4
**undertaking** [1] - 134:19
**undisputed** [2] - 105:3, 105:15
**unfair** [1] - 100:9
**Union** [4] - 26:2, 91:2, 91:9, 92:3
**unique** [2] - 80:12, 80:13
**unit** [2] - 126:7, 127:16
**UNITED** [3] - 1:1, 1:3, 1:11
**United** [33] - 1:18, 2:14, 4:3, 4:10, 6:6, 6:16, 14:15, 14:18, 26:11, 36:10, 39:6, 39:10, 39:13, 39:16, 41:12, 42:13, 43:19, 89:5, 89:7, 94:21, 123:14, 123:17, 124:9, 127:6, 128:5, 131:15, 131:17, 136:5, 137:4, 139:20, 140:5, 146:3, 147:10
**united** [1] - 13:8
**University** [2] - 75:10, 75:13
**unknowingly** [1] - 155:3
**unknown** [3] - 123:4, 123:10, 154:2
**unlawful** [13] - 124:21, 124:25, 125:5, 126:13, 129:18, 129:21, 130:9, 134:5, 134:13, 134:16, 134:18, 154:21, 154:23
**unlawfully** [4] - 123:13, 139:7, 140:18, 146:1
**unless** [3] - 97:20, 98:12, 106:7
**unlike** [1] - 142:12
**unnatural** [1] - 75:3
**unreasonableness** [1] - 111:4
**unspoken** [1] - 130:8
**up** [49] - 17:16, 19:15, 19:24, 19:25, 20:1, 20:10, 20:15, 24:12, 24:13, 25:7, 34:17, 39:5, 43:23, 44:17, 44:18, 44:19, 46:17, 48:19, 52:10, 60:19, 60:23, 62:12, 68:16, 82:9, 85:25, 92:5, 92:10, 92:12, 92:15, 92:18, 92:21, 92:24, 93:2, 93:6, 93:11, 93:19, 95:3, 99:21, 108:2, 121:12, 121:19, 123:5, 147:13, 154:3, 156:1, 156:16, 157:1, 158:6, 160:6
**upper** [3] - 83:20, 83:24, 85:10
**upward** [1] - 82:6
**upwards** [1] - 82:23
**Urrutia** [1] - 113:6
**Urrutia-Barrera** [1] - 113:6
**uses** [1] - 7:23

## V

**VA** [1] - 2:4
**vacant** [1] - 158:23
**value** [2] - 135:22, 140:14
**van** [2] - 95:5, 95:6
**variety** [1] - 137:13
**various** [4] - 111:16, 111:24, 116:23
**vehicle** [1] - 149:3
**vehicles** [1] - 126:25
**verdict** [13] - 103:8, 104:2, 104:13, 108:13, 108:17, 108:20, 108:21, 138:19, 146:20, 146:22, 146:23, 152:11, 152:25
**verified** [1] - 48:2
**versus** [1] - 4:3
**via** [1] - 26:2
**victim** [3] - 131:18, 135:2, 135:21
**victims** [3] - 127:2, 132:8
**Viejo** [32] - 11:9, 11:23, 11:24, 12:8, 12:11, 12:18, 13:10, 14:5, 14:10, 14:12, 14:17, 14:20, 16:19, 17:3, 17:5, 17:7, 17:17, 17:21, 18:12, 22:15, 22:19, 26:3, 26:4, 26:6, 36:4,

40:1, 40:17, 71:20, 120:24, 121:6, 123:8
**viewed** [1] - 96:25
**violate** [4] - 122:24, 123:14, 124:22, 132:22
**violated** [1] - 34:4
**violating** [1] - 124:18
**violation** [19] - 123:22, 123:23, 124:1, 124:2, 124:4, 131:4, 131:5, 131:8, 131:9, 131:11, 131:15, 136:20, 139:9, 139:16, 139:20, 140:5, 140:20, 140:21, 142:1
**violence** [23] - 14:16, 126:20, 127:4, 136:2, 140:4, 141:6, 141:8, 143:6, 143:20, 144:6, 145:1, 145:7, 145:21, 146:2, 147:6, 147:9, 147:12, 147:16, 148:5, 148:17, 148:24
**violent** [5] - 44:16, 45:13, 64:7, 139:21, 152:5
**Violent** [1] - 1:15
**Virginia** [5] - 8:18, 13:13, 24:24, 90:5, 97:10
**vision** [2] - 62:8, 62:9
**visitation** [2] - 91:4, 91:5
**voluntarily** [2] - 150:13, 154:22
**vouch** [2] - 11:16, 17:15
**vouched** [3] - 11:22, 11:24, 12:5
**vs** [1] - 1:5

## W

**wait** [2] - 159:8, 159:18
**waited** [2] - 12:18, 159:11
**waiting** [3] - 20:18, 57:11, 159:18
**walk** [1] - 152:10
**wants** [3] - 61:16, 61:19, 96:2
**Washington** [9] - 1:5, 1:17, 1:19, 1:23, 2:7, 2:15, 76:20, 95:3, 162:13
**Wayne** [1] - 114:19
**weak** [1] - 62:7
**weaker** [1] - 97:25
**weapon** [30] - 16:12, 19:15, 19:18, 19:20, 140:2, 140:20, 145:2, 145:3, 145:13, 145:14, 146:4, 146:12, 147:11, 147:25, 148:7, 148:8, 148:9, 148:15, 148:16, 148:25, 149:5, 150:14, 150:21, 151:1, 151:6, 151:10, 151:14, 152:16, 152:21, 152:24
**weapon's** [1] - 149:4
**weapons** [4] - 16:7, 16:10, 52:10, 65:6
**wear** [2] - 8:7, 8:9
**wearing** [3] - 20:9, 20:11, 20:13
**weather** [1] - 88:18
**weekend** [1] - 4:22
**weekly** [1] - 47:15
**weeks** [1] - 83:14
**weigh** [1] - 135:7
**weight** [13] - 77:15, 78:19, 78:20, 103:18, 105:19, 108:8, 108:10, 111:15, 111:21, 113:3, 113:25, 115:18, 119:4
**Western** [4] - 26:2, 91:2, 91:9, 92:3
**white** [1] - 8:1
**whole** [5] - 20:6, 45:9, 54:12, 103:5, 103:13
**whores** [1] - 25:11
**willful** [1] - 135:1
**willfully** [5] - 125:19, 129:15, 129:24, 139:14, 146:1
**willfulness** [1] - 134:24
**Williams** [1] - 114:19
**willing** [2] - 44:16, 62:11
**window** [2] - 107:22, 107:25
**wire** [4] - 117:24, 117:25, 118:2, 118:8
**wired** [1] - 118:8
**wiretap** [2] - 118:8, 118:9
**wiretaps** [2] - 117:24, 118:2
**wished** [1] - 121:23
**wit** [1] - 161:3
**withhold** [1] - 137:2
**witness** [68] - 5:4, 5:8, 31:14, 37:17, 38:2, 61:8, 61:15, 61:20, 61:22, 63:17, 64:2, 70:8, 73:15, 96:22, 97:1, 97:9, 98:4, 104:21, 107:16, 109:8, 109:19, 109:20, 109:22, 109:23, 109:24, 110:2, 110:4, 110:5, 110:7, 110:8, 110:9, 110:17, 110:21, 111:5, 111:6, 111:7, 111:8, 111:12, 111:13, 111:14, 111:18, 111:20, 112:13, 112:16, 112:18, 112:21, 112:24, 113:1, 113:9, 113:24, 114:1, 114:15, 115:9, 116:2, 116:7, 116:9, 116:20, 117:5, 117:7, 117:9, 124:12, 131:18, 136:20, 138:17, 138:25, 142:2
**Witness** [2] - 2:10, 73:14
**WITNESS** [12] - 5:9, 9:17, 21:14, 24:21, 28:10, 40:24, 56:21, 60:12, 62:6, 68:21, 69:12, 71:1
**witness's** [18] - 107:17, 109:21, 110:5, 110:13, 110:19, 110:20, 110:23, 112:4, 113:7, 113:10, 113:17, 115:12, 116:5, 116:10, 116:21, 116:24, 117:3, 117:13
**WITNESSES** [1] - 3:2
**witnesses** [22] - 87:10, 87:13, 94:5, 94:14, 96:18, 97:8, 100:16, 103:20, 104:21, 109:17, 109:18, 109:25, 111:17, 111:24, 111:25, 112:9, 112:23, 113:19, 114:13, 115:23, 117:15, 118:20
**woke** [1] - 108:2
**woman** [1] - 64:24
**women** [1] - 25:13
**word** [7] - 13:5, 14:3, 22:7, 25:19, 125:6, 138:3, 150:15
**words** [6] - 24:5, 119:1, 130:4, 133:2, 142:5, 144:12
**wore** [1] - 8:3
**wound** [38] - 80:18, 80:19, 80:23, 80:25, 81:11, 81:12, 81:14, 81:16, 82:1, 82:4, 82:16, 82:18, 82:20, 82:25, 83:3, 83:6, 83:8, 83:11, 83:13, 83:20, 83:21, 83:22, 83:25, 84:11, 84:13, 84:17, 84:18, 84:19, 84:23, 84:25, 85:7, 85:9, 85:14, 85:23, 86:3, 86:6
**wounds** [10] - 78:25, 80:15, 81:8, 81:9, 81:10, 81:17, 81:18, 82:11, 85:12, 89:21
**write** [1] - 69:16
**writing** [2] - 102:24, 130:4
**written** [2] - 102:9, 115:2
**wrote** [2] - 69:2, 95:1

## Y

**year** [18] - 10:9, 36:25, 37:6, 37:7, 46:14, 49:4, 53:18, 58:24, 59:1, 64:16, 64:22, 72:17, 72:19, 74:11, 74:12
**years** [23] - 7:16, 35:7, 35:9, 35:10, 37:5, 40:7, 43:7, 53:3, 53:15, 54:5, 54:7, 54:13, 54:18, 54:19, 54:22, 59:1, 68:17, 68:21, 72:21, 73:7, 74:16, 74:17, 76:12
**young** [1] - 42:21
**younger** [4] - 59:9, 59:22, 60:1
**yourself** [3] - 16:1, 49:25, 119:18

## Z

**Zabuillah** [2] - 73:25, 115:1
**ZABUILLAH** [4] - 3:8, 73:21, 73:25, 87:9
**Zelaya** [1] - 114:20
**Zombie** [33] - 14:25, 15:4, 15:24, 16:15, 17:5, 17:7, 17:9, 17:11, 17:18, 17:22, 18:12, 18:15, 18:20, 19:25, 20:1, 20:9, 20:15, 20:19, 20:24, 21:5, 21:25, 22:16, 22:18, 22:19, 24:19, 24:21, 34:16, 34:17, 47:21, 51:2, 51:21, 52:9, 139:15
**Zombie's** [1] - 50:21
**zoom** [1] - 93:14